IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 21-40039-SMY |
| | ) | |
| MINGQING XIAO | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

COMES NOW Defendant Mingqing Xiao, through his counsel, Ryan P. Poscablo, Patrick F. Linehan, and Michelle Nasser, and moves this Honorable Court to suppress the statements and evidence obtained by the government in violation of the Fourth and Fifth Amendments of the Constitution.  In support of his request, the Defendant states the following:

**FACTS**

In the early morning of December 3, 2020, during the height of the COVID-19 pandemic, law enforcement agents, consisting of members of the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI") and local law enforcement, prepared to execute a search warrant on 143 Coffee Tree Lane, Makanda, Illinois, the home of Professor Mingqing Xiao, a tenured theoretical mathematics professor at Southern Illinois University Carbondale.  Professor Xiao, a United States citizen, shares his home with his wife, Dr. Qi Liu, a physician at the Marion VA Medical Center in Marion, Illinois, his daughter Teresa Xiao, a medical student at the University of Chicago, his daughter Doreen Xiao, a sophomore at the University of Chicago, and his daughter Elenia Xiao, a junior in high school.  Through most of the pandemic, the Xiaos slept, ate, worked and attended school there.  Professor Xiao taught his classes from home using Zoom, and his three daughters attended their respective schools at home through Zoom.

1

While the search team stood ready to execute the warrant, the government sent two experienced agents, highly skilled and trained in the art of eliciting admissions, to interrogate Professor Xiao before the slew of agents arrived to conduct a search of his home. Their plan was to surreptitiously record the conversation.[1] At approximately 8 a.m., SA Christopher Bockelmann of the FBI and SA James Morris of HSI, rang the doorbell of Professor Xiao's home. Teresa Xiao, who was preparing for her first medical school class of the day, answered the door. The agents identified themselves as federal officers, one displayed his badge, and they told Ms. Xiao that they wanted to speak to her father about "an immigration question." They said it was "about travel to China." *See* Exh. A, Draft Transcript of Custodial Interrogation of Mingqing Xiao dated December 3, 2020 ("Tr."), at 1:9.

Teresa promptly told her father of the unannounced visit by the men at their door. Professor Xiao, who was in the shower, quickly finished, got dressed, and went to see the men. SA Morris said, "we should come in," and when Professor Xiao expressed hesitation, SA Bockelmann insisted that the agents "get COVID tested every day" in an effort to enter. *Id.* at 3:8; 3:13–14. When the agents entered, they sat back facing the entrance to the room, between the entrance (which led to the outside door) and Professor Xiao, during the duration of the interrogation. The agents started by telling Professor Xiao that they wanted to talk to him about "travel patterns," because his name purportedly matched someone else's name that traveled to Wuhan. *Id.* at 4:13–21. This was a lie to get Professor Xiao to retrieve and present to them his passport, which they

---

[1] *See* Exh. B, Approval of Consensual Monitoring or Other Electronic Devices: Request to Record Interview. The Request notes that Xiao is a "Subject" and not a "Witness" or "Victim" who "has applied for federal grant funds from NSF." The Request says that in "his application, Xiao did not disclose his affiliation with the Chinese University, or funding by the Peoples Republic of China." The Request states that "[o]n December 3, 2020, a Search Warrant will be executed at Xiao's residence" and that "SA Chris Bockelmann will attempt to interview Xiao before the Search Warrant." The Request notes that "the interview will be used as evidence" and that the request to surreptitiously record is because "Subjects change their behavior and answers when they know they are being recorded."

previously received authority to confiscate pursuant to the search warrant, and which they never expected to return to him. *See* Exh. E at 2, ¶ A.5. After Professor Xiao retrieved his passport, they asked to see it. They kept the passport and they did not return it.

Over the course of two hours and twenty minutes, the government agents displayed a well-planned, coordinated, and psychological approach in their custodial interrogation of Professor Xiao. As the Supreme Court noted in *Miranda v. Arizona*, 384 U.S. 436, 448 (1966), "the modern practice of in-custody interrogation is psychologically rather than physically oriented." The Court reviewed various manuals and texts that documented procedures employed by law enforcement officers and noted the importance of privacy as an interrogation technique, explaining that a private atmosphere "suggests the invincibility of the forces of the law." *Id.* at 449–50. *Miranda* guards against the police use of psychological tactics such as getting the subject alone in order to "deprive him of any outside support." *See id.* at 449–50, 455. The agents' use of this predatory strategy was especially effective in Professor Xiao's case where his daughters, all native English speakers, were in other rooms.

The *Miranda* Court described other police tactics that mirror the government's interrogation of Professor Xiao, including putting him "in a psychological state where his story is but an elaboration of what the police purport to know already – that he is guilty." *Miranda*, 384 U.S. at 450. "Explanations to the contrary are dismissed and discouraged." *Id.* And when Professor Xiao displayed indignance and lack of acquiescence, or when agents weren't receiving the answers they wanted from him, they relied "on an oppressive atmosphere of dogged persistence." *Id.* at 451. When Professor Xiao failed to agree with their interpretation of the events, the agents interrupted him, contradicted him, or re-characterized his words. They interrogated Mingqing Xiao "steadily and without relent, leaving [him] no prospect of surcease." *Id.* They overwhelmed him with their "inexorable will to obtain" what they believed to be "the

truth." *Id.* They took no pauses or breaks, and in moments when Mingqing Xiao defied their proclamations of his guilt, they changed their tone and began displaying "hostility." *See id.* at 452 (describing "friendly-unfriendly" manipulative interrogation tactic). As the *Miranda* Court recognized, even absent physical abuse or threats of violence, the strategies employed by these agents "exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.* at 456.

In deciding *Miranda* and the two other cases joined in the *Miranda* opinion, the Court found that "[t]he fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to ensure that the statements were truly the product of free choice." *Id.* at 457. Agents Bockelmann and Morris chose not to give Professor Xiao his *Miranda* warnings before they interrogated him for two hours and twenty minutes. Having then obtained what they believed was sufficient proof, they informed him that they had a search warrant to search his house, that a team of additional agents were on their way to conduct that search, and then they presented him with his *Miranda* rights and had him sign a *Miranda* form. They purposefully waited until the end of their interrogation to provide Professor Xiao with his Miranda warnings and the search warrant, because they knew that, if he knew his rights *before* they started interrogating him, he would resist their questioning. Moreover, unbeknownst to Professor Xiao during, he had been the target of their investigation for a long time before they rang his doorbell that morning. They knew that Mingqing Xiao would not ask them to stop without any warnings. They knew that he was born and was raised in Guangzhou, China. Professor Xiao grew up in an environment where citizens obey the orders of police and other authorities. You did not say no to a government request. The agents also knew that he had no criminal history and never before had an encounter with law enforcement. He is a mild-mannered and trusting man. They also knew that, even if he asked them to leave, they wouldn't, because their plan was to execute

4

the search warrant that day. Lastly, Professor Xiao didn't know that he could ask to call his lawyer or otherwise stop the interrogation because they did not begin their interrogation with any *Miranda* warnings. Their psychological dominance over Professor Xiao was so complete and their tactics so effective that, when they presented him with the *Miranda* form <u>at the end of the interrogation</u>, when they began searching his house, Professor Xiao signed their form and continued to answer their questions. Specifically, the SA Bockelmann asked Professor Xiao questions regarding his cellular telephones, a Huawei cellphone and an Apple iPhone, and directed Professor Xiao to provide the associated telephone numbers and passwords for each of the phones. Bockelmann then seized both of these phones.

We anticipate that the government may concede that on December 3, 2020, Professor Xiao was subject to an *interrogation*, but that it will argue that it was not a *custodial* interrogation. They will argue that Mingqing Xiao was free to leave and he was free to end the conversation. However, the psychological restraint anticipated and feared by the Supreme Court in *Miranda* pervaded their approach to and interaction with Professor Xiao. Their interrogation is replete with the hallmarks of a custodial interrogation. The request to enter the house. Placing themselves between Professor Xiao and the door. Taking away his U.S. passport. The unrelenting and persistent questioning. Recharacterizing and rephrasing his statements. Displays of hostility, distrust and frustration. They didn't need to yell at him or physically threaten Mingqing Xiao, they just psychologically dominated him. The cadence, repetition and unrelenting nature of their questions never gave Professor Xiao an opportunity to ask questions, to consider his rights. Moreover, during the time of COVID-19, when the pandemic is raging and when Professor Xiao's home at 143 Coffee Tree Lane was serving as his lecture hall and classroom, the school for his three daughters, and the place where they eat meals and rest their heads, where was Professor Xiao to go? And given their

intention to search his home, he would not be permitted to leave anyway, nor would the agents leave if they were asked as the search team stood ready to conduct their search.

The agents' conversation with Professor Xiao on December 3, 2020 did not stop once their recording ended. While they were searching his home, Professor Xiao was told by the agents that he was "fine" and "okay." They advised Professor Xiao not to tell the other professors about the investigation because "he needed to protect his reputation." Professor Xiao, who has been a professor over the course of his entire career, understood their admonition to mean that he was not tell to anyone about his investigation as the majority of his friends are professors. Professor Xiao also expressed concern about the return of his work computer so that he could continue his work. This interaction and the words spoken by the agents set the foundation for their second visit and interrogation of Professor Xiao, on January 21, 2021. After they took his electronic materials, the agents promised Professor Xiao that they would be returned to him within two weeks. When his electronic items were not returned within that period, Professor Xiao, who still had not obtained counsel and had not spoken to anyone about the investigation because of the agents' words, emailed Special Agent Bockelmann about the return of his items. Bockelmann responded that some items were ready to return and set a date for the return on January 21, 2021.

When Bockelmann and Special Agent Stephen Dalechek entered Professor Xiao's home on January 21, 2021, they presented him with some, but not all that they seized. When he asked about the remainder, they told him that it would take a long time before they could be returned "probably July or August." They told him that he needed to sign another form, a form entitled "Consent to Assume Online Identity Authorization Form" and they told Professor Xiao that they needed to do this additional work before his items could be returned. See Exh. D, Consent to Assume Online Identity Authorization Form dated January 21, 2021. They also told him that they were not threatening him nor coercing him to sign the form, but wanted him to sign it. Wanting

his computers back as soon as possible, and not understanding the purpose of the form (the agents did not explain it to him), Professor Xiao signed the form.

Agents' visit to return equipment was a second interrogation which they did not record. Nor apparently, did the agents take any notes during this meeting.[2]  The agents took the same seats in the same dining room between Professor Xiao and the only direct egress from the room.  SA Bockelmann then commanded Professor Xiao to "write down your password, write down your bank accounts, and write down all of your email accounts."  They did not tell him that he could refuse.  They did not tell him he could say no.  They told him they wanted to check his bank accounts.  And they told him that they would ship his wife's improperly seized laptop back to her.

## **ARGUMENT**

I.      ***The government violated the Fifth Amendment when agents subjected Professor Xiao to a systematic, custodial interrogation without informing him of his Miranda rights.***

Under *Miranda v. Arizona*, to guard against "inherently compelling pressures" of custodial interrogation, a person who is subjected to such an interrogation must be informed, at the outset and in clear and unequivocal terms, that they have the right to remain silent, that anything they say can be used against them in a court of law, and they have a right to consult with an attorney and the right to have counsel present during questioning. *See* 384 U.S. 436 at 467–73, 479 (1966).  The Fifth Amendment protects individuals when their freedom of action is curtailed as a result of government tactics designed to psychologically wear them down, including in-custody interrogation.  U.S. Const. amend. V; *Miranda*, 384 U.S. at 467.  The government violated Professor Xiao's Fifth Amendment right against self-incrimination when agents pummeled him with questions for over two hours December 3, 2020, purposefully chose to Mirandize him at the

---

[2] The government informed the defense that no handwritten notes exist for this interrogation, and that the FD-302 was the only written record of the conversation as it was not recorded either.  Professor Xiao recollects that SA Dalechek was taking notes.

*end* of their interrogation, questioned him again on the same day after they Mirandized him, and then interrogated him again weeks later.  Statements made by Professor Xiao in the absence of these warnings should be suppressed.  *Miranda*, 384 U.S. at 444.

A.      **Professor Xiao was Interrogated**

There should be no doubt that agents interrogated Professor Xiao on December 3, 2020 and again on January 21, 2021.  The Supreme Court has held that an "interrogation" for purposes of *Miranda* refers not only to express questioning but also to any words or actions on the part of law enforcement that they "should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 308 (1980).  Agents' questions about Professor Xiao's activities in China, his bank accounts and his passwords, among other things, were calculated to elicit what they believed would be an incriminating response.  The audio recording and attached transcript shows that agents incorporated systematic questioning covering what they believed to be incriminating information regarding economic espionage on behalf of China.  Agents already formed the belief that Professor Xiao was a Chinese spy and their pointed questions, statements, and tactics were intended to elicit an incriminating response.  *See* Exh. C, ¶¶ 11–17.

B.      **Professor Xiao was Interrogated While In Custody**

Even when not placed under arrest, a subject may be considered "in custody" for *Miranda* purposes whenever the they are "deprived of [their] freedom of action in any significant way." 384 U.S. at 444.  To determine whether the subject is "in custody," courts review the circumstances surrounding the interrogation and decide whether a reasonable person in the subject's position would have felt "at liberty to terminate the interrogation and leave."  *See Thompson v. Keohane*, 516 U.S. 99, 112–14 (1995).  When adjudicating whether the circumstances invoke a person's Fifth Amendment right against self-incrimination, their "home occupies a special place in the

pantheon of constitutional rights." *United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008). Even though "interrogation conducted within the suspect's home is not per se custodial," in certain circumstances, the Supreme Court has found that in-home interrogations are custodial. *Id.* at 1078; *see also Orozco v. Texas*, 394 U.S. 324, 326 (1969) (holding that unrestrained defendant was in custody when police officers interrogated him in his bedroom because, despite familiarity, his freedom of action was curtailed). Even "more important than the familiarity of the surroundings where the suspect was being held is the degree to which the police dominated the scene." *United States v. Borostowski*, 775 F.3d 851, 863 (7th Cir. 2014) (citing *Sprosty v. Buchler*, 79 F.3d 635, 641–42 (7th Cir. 1996)). Agents dominate a scene when they instruct a subject where to sit in his own home, physically separate him from his family, and sit between the subject and the door. *Id.* at 861, 863 (citing *U.S. v. Mittel-Carey*, 493 F.3d 36, 38–40 (1st Cir. 2007)).

Custody analysis is fact-intensive and numerous factors play a role in evaluating the circumstances of the interrogation. In *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996), the Seventh Circuit, citing to courts in other circuits, articulated some of these factors: whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation take place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene. *Id.* This is an objective inquiry that depends on the "totality of the circumstances" not the subjective views harbored by the agents or the defendant. *United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988).

A review of these circumstances supports a finding that Professor Xiao was subjected to a custodial interrogation.  The government agents never told Professor Xiao that he could stop the interrogation.  They never told him that he was free to refrain from answering their questions, and they never told him that he could leave or ask them to leave.  They did not tell him that his statements were voluntary and they did not indicate one way, or the other, that he would be arrested.  Moreover, they withheld from Professor Xiao until the end of the interrogation, the fact that they were going to search his home and that they had obtained a judicially authorized search warrant.  These undisputed facts support a finding that Professor Xiao reasonably believed he was in custody.  *Cf. Craighead*, 539 F.3d 1073 (citing *U.S. v. Griffin*, 922 F.2d 1343 (8th Cir. 1990)) ("If a law enforcement officer informs the suspect that he is not under arrest, that his statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the change that a suspect will reasonably believe he is in custody").

In addition, at the onset of the encounter, SA Morris could be heard on the recording telling Professor Xiao "we should come in."  Once entering the home, Morris then states that he is going to take his jacket off, a sign to Professor Xiao that Morris intends to stay.  Exh. A, Tr. 3:8.  Once inside the home, the agents strategically placed themselves in a position in the dining room that blocked Professor Xiao's access to the front door.  Further, although there were only two government agents conducting the interrogation, their control over the physical space in which they conducted their interrogation supports a finding that the interrogation was custodial.  *See United States v. Tang Juan*, 2021 WL 2212235, 20-cr-00134, (E.D. Cal. 2021) (in a China Initiative case, finding that the number of agents (two) was not dispositive, but rather whether there were any "police-free rooms or spaces to which the suspect could have retreated if she wanted to end the interrogation").  Moreover, because Professor Xiao was working from home and his three daughters were attending school from home during the height of the COVID-19 pandemic,

Professor Xiao had *nowhere* to go if he wanted to escape the questioning.  "The usual inquiry into whether the suspect reasonably believed he could "leave" the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home."  *U.S. v. Craighead*, 539 F.3d at 1082.

> If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go?  The library?  The police station?  He is already in the most constitutionally protected place on earth.  To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home.

*Id.* at 1083.  Further, through the use of a ruse, they obtained and kept his passport at the beginning of the interrogation.  *See U.S. v. Tang Juan*, No. 2:20-cr-00134, 2021 WL 2212235, at *4 (finding that the agents planned seizure of the suspect's passport and her inability to leave the apartment because her mother and child were in the apartment with her "indicate there were no places for Defendant to retreat had she wanted to terminate the interrogation").  Professor Xiao's inability to leave is further strengthened by the fact that the agents never intended to leave, as they planned to execute their search warrant of his home as soon as the interrogation ended.  Lastly, although his three daughters were home, they were attending their classes by Zoom, and for large parts of the interrogation, Professor Xiao was alone with the government agents.  The presence of his children, who were attending remote-school and largely unavailable to him does not chip away at the police domination of the Xiao home.  Indeed, the enormous pressure of being subjected to a government interrogation is heightened when one's child is knowingly in an adjacent room.

Lastly, the prolonged, coercive and accusatory questioning employed by the government agents, as well as their use of lies and subterfuge to induce Professor Xiao's statements support a finding that he being subjected to a custodial interrogation.  The agents obtained entrance into the Xiao home by falsely asserting that they wanted to talk about "travel to China" and specifically to confirm that Professor Xiao had not recently traveled to Wuhan, China.  Exh. A, Tr. 4:9, 13–16.

This lie is particularly egregious during the pandemic and through subterfuge, they were able to obtain his passport.   The recorded interrogation further evinces Professor Xiao's lack of proficiency in understanding and speaking English, which is not his first language.  *See e.g., id.* at 15:1–10 (discussion of "Angel" versus "Andrew" Carter).  There are numerous instances during the interrogation where the agents use subtle techniques to question Professor Xiao's truthfulness and suggest his guilt.  *See, e.g.*, *id.* at 28:8–11 (in discussing a Chinese account, agent asks "do you go on a shopping spree when you uh get to China too?  Because I mean if I had that money sitting over there, I'd probably be buying a Rolex").  There are other instances when the agents attempt to elicit admissions by posing hypotheticals, and when they don't receive compliance from Professor Xiao, they increase the pressure on him.  *See, e.g., id.* at 38:17–39:21.  When Professor Xiao refuses to agree with the agents, they raise that pressure, take advantage of the fact that Professor Xiao's first language isn't English, and begin to make long-winded statements containing multiple questions intended to elicit agreement and not debate.  *See e.g., id.* 40:10–16, 26–34.  When that didn't work, they resorted to trying to rephrase Professor Xiao's statements. *See e.g., id.* at 42:26–28, 32–34.  When that technique doesn't work, the agents heightened the psychological pressure and begin an unrelenting cacophony of questions and comments intended to make Professor Xiao comply.  *See e.g., id.* pg. 57-59 and specifically, statements that "I don't mean to berate you," pg. 58, line 22 and "I'm not trying to put words in your mouth" pg. 59, line 20.   These psychological tactics during their more-than-two-hour interrogation were used to break down Professor Xiao's will.  They hammered him with constant, unrelenting questions.  They changed their tone when they weren't getting the responses they wanted.  *See Griffin*, 922 F.2d at 1351 (1990) (citing to the *Miranda* Court's discussion concerning police high-pressure tactics and noting that "Police deployment of strong arm tactics or deceptive strategems during interrogation ... is a practice widely condemned in American law").  When law enforcement subjects an

12

individual to a systematic, exhaustive interrogation managed with psychological skill, that subject is in custody under Miranda. *See Siebert*, 542 U.S. at 602 (2004). Their approach was even more effective on Mingqing Xiao because, having been born and raised in China, he is used to providing significant and unquestioning deference to government authority and he had never before had any encounter with law enforcement.

### C.     Question-First Strategy

These government agents' "Question-first" practice as described above is a predatory police tactic disavowed by the Supreme Court. *See Missouri v. Seibert*, 542 U.S. 600, 614–16 (2004). The object of this practice "is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *See Seibert*, 542 U.S. at 614–16 (2004). In *Seibert*, the police conducted a systematic, exhaustive interrogation and, when they "were finished, there was little, if anything, of incriminating potential left unsaid." In *Renken*, a suspect's pre- and post-warning statements made while seated at his kitchen table were inadmissible because the suspect was questioned until he confessed, and only then was presented with an "Advice on Rights" form. *U.S. v. Renken*, 2004 U.S. Dist. LEXIS 17107 at *2–4 (holding that pre- and post-warning statements were inadmissible where defendant was seated at his kitchen table, surrounded by government agents, and questioned for 30 minutes because suspect was not warned prior to custodial interrogation). This "question-first tactic threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted," and so both pre- and post-warning statements are inadmissible. *See Seibert*, 542 U.S. 617(2004).

Agents from two different law enforcement agencies conducted a systematic, exhaustive, two-hour plus interrogation of Professor Xiao. Once they had extracted every detail out of Professor Xiao and taken advantage of his forthcoming and trusting nature, they read him his rights. This is a clear attempt to circumvent *Miranda* and render Professor Xiao's awareness of

his rights completely useless.  Just like in *Siebert*, where police conducted a "systematic, exhaustive interrogation," in violation of the defendant's constitutional rights, agents questioned Professor Xiao with exacting precision, designed to get him to let down his guard and tell them every detail about his connections with China, deliberately choosing to Mirandize him at the end. Professor Xiao's ordeal is similar to *Renken*, in which a suspect's kitchen table confession to agents was inadmissible because the suspect was not informed of his rights until after the incriminating statements had already been made.  This calculated tactic is designed to circumvent *Miranda*, and coerces trusting individuals like Professor Xiao into making statements to law enforcement in violation of their constitutional rights.

Courts have found that midstream *Miranda* warnings do not comply with constitutional requirements when (1) the completeness and detail of the questions and answers in the first round of interrogation is high, (2) there is overlapping content between the two statements, (3) the similarity of the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.  *Seibert* 542 U.S. at 615 (2004).  A review of these factors supports a finding that Professor Xiao's statements post-Miranda on December 3, 2021, including his provision of certain passwords to two cellular telephones, should be suppressed.  First, like in *Siebert*, 542 U.S. at 616 (2004), there was "little, if anything . . . left unsaid" after the agents' two hours of methodical questioning.  Although there was little overlapping content between the first and the second rounds of interrogation, there is a similarity of timing, a continuity of police personnel, and the government agent, as evidenced by the transcript of the interrogation, clearly treated the second round as continuous with the first.

**D.**     **Professor Xiao's Statements to the Agents on January 21, 2021 Should Also Be Suppressed**

Professor Xiao's statements and passwords from the January 21, 2021 interrogation should be suppressed because: (1) Professor Xiao cooperated in reliance on the false promises and threats made during the first interrogation; (2) agents ensured Professor Xiao was psychologically isolated in between the first and second interrogations, and; (3) agents dominated the scene on January 21, 2021.  Government agents' threats or promises render a confession inadmissible. *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (finding that defendant's statements to unarmed, unaccompanied civil investigator regarding criminal tax fraud were admissible because there were no false promises).  "Simple failure to inform [a] defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless the perpetrator inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983).

Here, Professor Xiao's statements made during agents' January 21, 2021 interrogation are inadmissible based on the agents' false statement that Professor Xiao was "fine" and "ok."  In contrast to *Kontny*, 238 F.3d at 817, where no false promises were made, agents knew that Professor Xiao was the target of their investigation and Professor Xiao naïvely trusted their lies about his status in the investigation.  Agents surveilled Professor Xiao for months, parking outside his home, drafted lengthy search warrant affidavits, and meticulously combed through his emails to support their claims that he was a Chinese spy.  Even though their exhaustive investigation revealed no evidence of *any* espionage, agents knew they wanted to find something, anything, to charge Professor Xiao.  Agents' promise that Professor Xiao's was "fine" and "okay" was a deliberate lie as to the nature of their investigation.  Their admonishment that he not speak to other professors "to protect his reputation" influenced Professor Xiao to not discuss his case with anyone, including counsel during the investigation period, cooperating with agents' on January 21, 2021 and complying with their demands for passwords.  All the while, agents were affirmatively

15

misleading Professor Xiao regarding the nature of their investigation.  Therefore, Professor Xiao's January 21, 2021 statements relied on these false promises and should be suppressed.

In addition to agents' explicit coercion through false promises, their use of coercive psychological tactics also warrants suppression of the January 21, 2021 interrogation.  When agents showed up at 143 Coffee Tree Lane again a month later, Professor Xiao still had not retained a lawyer and had not told any trusted colleagues and advisors about the investigation.  Agents' command that Professor Xiao not tell the other professors about the investigation because "he needed to protect his reputation" accomplished agents' goal of coercion in two ways feared by the *Miranda* court: it was a threat, and it was designed to isolate him.  Government agents' threats render confessions inadmissible.  *See Id*.  Here, agents threated Professor Xiao about his most prized professional accomplishment—his reputation in the academic community.  Second, the *Miranda* court feared police abuse of psychological coercion in interrogation settings, most notably, getting the subject alone to "deprive him of any outside support" and coerce a confession. *See* 384 U.S. at 449–50, 55.

Finally, in addition to false promises, threats, and psychological manipulation carried over from the first interrogation, the January 21, 2021 interrogation had all the hallmarks of a custodial interrogation because agents dominated the scene.  Two agents sat between Professor Xiao and the front door, *Borostowski*, 775 F.3d at 863, and commanded him to "write down [his] password, write down [his] bank accounts, and write down all of [his] email accounts," *Miranda*, 384 U.S. at 452.  Professor Xiao complied with the requests as a result of the government's coercive influence over him through false promises, threats, and isolation still lingering from the first interrogation.  Therefore, statements made and passwords gathered during agents' January 21, 2021 interrogation should also be suppressed and Professor Xiao's consent, as purportedly given in the Consent to Assume Online Identity should be revoked.

**E.** **Any Evidence Obtained Pursuant to Professor Xiao's Coerced Provision of Passwords Should Be Suppressed.**

Any evidence procured from data on either of Professor Xiao's cell phones should be suppressed as his provision of the passwords to these devices, under the compulsion of the FBI agents, was testimonial in nature and are subject to Fifth Amendment protections against self-incrimination. *See Matter of Search Warrant Application* for cellular telephone in *United States v. Barrera*, 415 F. Supp. 3d 832, 835 (N.D. Ill. 2019). In *Barrera*, the Court considered whether a search warrant compelling the act of unlocking a phone warranted Fifth Amendment protections and reasoned that "communications or communicative acts are privileged under the Fifth Amendment when they are testimonial, incriminating, and compelled.'" *Id.* It further provided that to be testimonial, a communication or communicative act must "['']explicitly or implicitly, relate a factual assertion or disclose information.'" *Id.* (quoting *Doe v. United States*, 487 U.S. 201, 212(1988)). That is, it must force an individual to "'disclose the contents of the [subject's] own mind.'" *Doe*, 487 U.S. at 211. Where the government is explicitly expressing authority to force a communication or communicative act, it is compelled. *Barrera*, 415 F. Supp. 3d at 836 (N.D. Ill. 2019). Finally, the unlocking of a cellphone may be incriminating, given the nature of modern cellphone providing access to a "nearly unlimited" universe of evidence beyond the scope of just a phone. *Id.* (quoting *Riley v. California*, 573 U.S. 373, 393–98(2014). The Barrera Court held that a combination passcode requires a verbal statement from the possessor of the code noting that "compelling someone to reveal a passcode also requires an individual to communicate something against her will that resides in her mind." *Id.* at 839, *citing Doe*, 487 U.S. at 211.

Both direct and indirect fruits of an unlawful search (the "fruit of the poisonous tree") should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). The Supreme Court has only rejected fruit of the poisonous tree for non-coercive Miranda violations. *See United*

*States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002) (citing *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)).  Statements are voluntary when they are simple, brief, and without pressure. *See Abdulla*, 295 F.3d at 835.

    **F.**    **The Government's Seizure and Search of Cellphones Taken From Professor Xiao's Home Was Not Supported by Probable Cause.**

As discussed above, at the end of their interrogation of Professor Xiao on December 3, 2020, the agents seized two cellphones, a Huawei cellphone and an Apple iPhone (collectively, the "phones"), and directed him to provide the passwords to the phones.  Ostensibly because they were unable to access the phones, they returned to Professor Xiao on January 21, 2021and sought his consent to assume his online identity.  *See* Exh. D.  The government then searched those phones and further searched a mobile application on the Huawei phone related to Ping An Bank.

The government's search and seizure of the Huawei phone and the Apple iPhone should be suppressed as their actions were not supported by the search warrant they executed at Professor Xiao's home.  The Affidavit of Stephen M. Dalechek makes no request to seize or search any cellphones found at 143 Coffee Tree Lane.  The Affidavit has no discussion of any phones with particularity, and provides no specific evidence to support a finding of probable cause to permit their search and seizure.  Indeed, the only references to cellular telephones appears to be stray commentary in paragraph 131(d) and 133(f).  *See* Exh. C, pages 47, 49.  The Search Warrant provided to Professor Xiao, however, permitted the law enforcement agents to seize "computers," which included the term "mobile phones."  Exh. E, Search Warrant for 143 Coffee Tree Lane, at pg. 5.  This definition of "computer," however, is different than the definition of a "computer" provided to the Magistrate Judge who assessed the probable cause for the Warrant.  Put another way, the government's Search Warrant exceeded the scope of the permissible items allowed by the Magistrate Judge when she/he reviewed the Search Warrant Affidavit.  This is clearly not

18

permissible.  *See Riley* 573 U.S. at 386 (2014) (holding that "officers must generally secure a warrant before conducting such search.").  There could be no good faith argument that a well-trained agent with sufficient knowledge of the facts of this case and the law intended to search and seize any cellphones when none were identified or discussed in the search warrant affidavit.

Professor Xiao, who was not arrested at the time of the search and provided no consent to the seizure of the phones (*see* Exh. A, pg. 71-72), respectfully submits that the search and seizure of the Phones from his home was an unconstitutional warrantless search and seizure of the phone and the data contained therein.  As such, the government should be precluded from using any evidence gathered from the phone and they should be directed to return any unreturned phones to Professor Xiao.[3]

Further, the *Riley* Court recognized that cell phones, and in particular the mobile application software on a cell phone, "offer a range of tools for managing detailed information about all aspects of a person's life" and in distinguishing between a cell phone and its applications, it is "a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything that may incriminate him."  *Id.* 573 U.S. at 396.  As related to the government's search of the Huawei phone and its specific search of the Ping An Bank application, even if the Court were to hold that the government's original search was not improper, the government would still need to obtain a search warrant for the mobile application, which is has failed to do.

---

[3] Should the Court determine that the search and seizure was appropriate, Professor Xiao respectfully submits that the search of the phone should be limited to what is requested in their supporting Affidavit and that any search of applications or other items on the cellphone requires additional probable cause.  Such probable cause, of course, should not contain any evidence or proof obtained through the government's custodial interrogation of Professor Xiao, should the Court grant defendant's motion to suppress his statements.

WHEREFORE, Mingqing Xiao requests that this Honorable Court grant the defendant's motion to suppress statements and evidence in its entirely and grant such further relief as the Court may deem just and appropriate.

BY:   /s/ Ryan P. Poscablo
       Ryan P. Poscablo, *pro hac vice*
       Steptoe & Johnson LLP
       1114 Avenue of the Americas
       New York, NY 10036
       rposcablo@steptoe.com
       212.506.3900

       Patrick F. Linehan, *pro hac vice*
       Steptoe & Johnson LLP
       1330 Connecticut Avenue, NW
       Washington, DC  20036
       plinehan@steptoe.com
       202.429.3000

       Michelle D. Nasser
       Dowd Bennett LLP-St. Louis
       7733 Forsyth Boulevard
       Suite 1900
       St. Louis, MO 63105
       mnasser@dowdbennett.com
       314-889-7300

       *Attorneys for Defendant*