IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,       )
                                         )
        Plaintiff,             )
                                         )
vs.                                    )     CRIMINAL NO. 21-40039-SMY
                                         )
MINGQING XIAO             )
                                         )
                                         )
        Defendant.       )

## <u>MOTION TO DISMISS THE INDICTMENT</u>

Comes now Defendant, Mingqing Xiao ("Dr. Xiao" or "Defendant") by his attorneys, Ryan P. Poscablo, Patrick F. Linehan, and Michelle Nasser (collectively, "Defense Counsel") for his Motion to Dismiss Counts I, II, and III of the Indictment and in support thereof states:

1. Each of the three counts in the Government's indictment are premised on the alleged false statements made by Defendant in response to three questions posed by the Government, as set forth in an NSF grant application and in an email from the NSF program director that followed months later.

2. The question on which these criminal counts are based contain vague terms and phrases lacking any definition, rendering them "fundamentally ambiguous," especially when considered their broader context.

3. Where the Government questions giving rise to alleged false statements are fundamentally ambiguous, as here, pretrial dismissal is warranted.

Accordingly, the Indictment should be dismissed in its entirety.

<u>**MEMORANDUM IN SUPPORT**</u>

For the reasons that follow, the defendant, Mingqing Xiao, through undersigned counsel, moves the Court to dismiss the Indictment in its entirety. Dismissal is warranted because the questions from the Government (here, the National Science Foundation) that gave rise to the three alleged false statements serving as the sole basis for the three counts in the Indictment were "fundamentally ambiguous" such that criminal prosecution of Dr. Xiao's responses to them would be improper, unfair and a violation of his due process rights.

**INTRODUCTION AND FACTUAL BACKGROUND**

**I.     The Defendant - Dr. Mingqing Xiao**

Dr. Mingqing Xiao is a tenured theoretical mathematics professor at Southern Illinois University ("SIU") at Carbondale (together "SIUC"). He was born and raised in Guangzhou, China, before emigrating to the United States with his wife, Qi Liu, a medical physician at the Marion VA Medical Center in Marion, Illinois. They are the proud parents of three daughters. Dr. Xiao obtained his Bachelor of Science from Guangdong University of Technology in 1983, two Masters of Science in Control Theory from Sun Yat-Sen University in 1989 and in Computational Science & Engineering from the University of Illinois at Urbana-Champaign in 1995, respectively. He then earned his Ph.D. at the University of Illinois at Urbana-Champaign in 1997, completed his post doctorate work in Nonlinear Control and Estimation at the University of California at Davis between 1997 and 1999, and taught at Zhongshan University, the Chinese University of Hong Kong, the University of California at Davis, and the US Air Force Research Laboratory before he received tenure at SIUC in 2002.

In 2015, Dr. Xiao agreed to visit China as a delegate of SIUC on a recruiting trip. His role, as sponsored and supported by SIUC, was to expand this American University's reach in

China, to recruit undergraduate, graduate and PhD students to SIU's Carbondale campus, and to develop and foster a joint mathematics degree program between SIUC and Shenzhen University. And as a research professor, it is not unexpected that he would collaborate on research projects with in-field professors in the United States and abroad. Indeed, it is a sign of accomplishment in academia if you are asked to serve as a guest lecturer, to give talks on research projects, and to otherwise promote your work and your school, things which Dr. Xiao proved successful.

## II.     The China Initiative

On November 1, 2018, then-United States Attorney General Jeff Sessions announced a new initiative by the Department of Justice to "combat Chinese economic espionage." AG Sessions "ordered the creation of a China Initiative led by Assistant Attorney General [of the National Security Division] John Demers" formed to "identify priority Chinese trade theft cases, ensure that we have enough resources dedicated to them, and make sure that we bring them to an appropriate conclusion quickly and effectively." AG Sessions noted that the China Initiative would "address two major responsibilities of our National Security Division: the Foreign Investment Review Staff's review of investments and licenses in U.S. infrastructure and telecommunications, and the Foreign Agent Registration Act Unit's work to counter covert efforts to influence our leaders and the general public."

AAG Demers then sent out a message to each of the country's 94 U.S. Attorney's offices. "You're not going to do 125 cases in a year as a U.S. Attorney's Office. You're going to do maybe one, which would be great. If you do two, that's very impressive. If you do none, that's understandable and you'll get there next year."[1]

---

[1] *Inside DOJ's nationwide effort to take on China*, POLITICO (Apr. 7, 2020), https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653.

And so it was, that in or about 2020, a crime found a defendant, when the Department of Justice launched an investigation into Dr. Mingqing Xiao based on his documented and SIUC-sponsored relationship with a university in China. A mentor to many, a friend to all, Dr. Xiao helped grow SIUC's relationship with Chinese-based universities, all the while unwittingly making himself a target of the administration's new policy. The government issued numerous subpoenas and search warrants, and interviewed Dr. Xiao in his home for several hours on multiple occasions. As a result of this investigation, the one case in 2020 brought by this U.S. Attorney's office, Mingqing Xiao was indicted on April 21, 2021.

## III. The Charges Against Dr. Xiao

Despite the grand intentions of the China Initiative to address the national security risk posed by China, none of the charges brought in this Indictment makes any allegations involving national security. The Indictment does not allege the misappropriation of government data, corporate espionage, the theft of trade secrets or any other criminal conduct that poses a national security threat. Rather, the Government has brought three felony charges – two wire fraud charges under 18 U.S.C. § 1343 (Counts 1 and 2) and one false statement charge under 18 U.S.C. § 1001(a)(1) (Count 3) - based substantially on the submission of a proposal for a $151,099 grant from NSF to fund research on "the low rank approximation of tensorial data via non-convex regularization." In layman's terms, a way in which to better manage large data sets. And the awarded grant proceeds, which to-date amount to a little more than $5,000, went to SIUC to fund two graduate students, not to Dr. Xiao.

Critically, the only allegations of fraudulent or dishonest conduct by Dr. Xiao in the Indictment are his three answers to three separate questions asked by NSF. There are no

allegations evidencing Dr. Xiao's criminal intent beyond the three statements at issue and the underlying facts that purport to demonstrate those statements' falsity.

## IV. Alleged False Statements

Of the three statements alleged in the Indictment to be false, two of the statements, which form the basis of Counts 1 and 3, were made in the research grant proposal form Dr. Xiao submitted to SIUC on or around September 17, 2018 ("NSF Proposal Form"). The third allegedly false statement on which Count 2 is based, was a response Dr. Xiao sent via email on or about May 1, 2019, before NSF's decision to award Dr. Xiao the grant, in response to a question from an NSF program director regarding any positions or "funding sources" outside the United States. Each of these questions and answers is discussed in further detail below.

### A. "Organizational Affiliations"

The Indictment alleges that "[d]uring the application process, the principal investigator (PI) with the institution applying for the award was required to disclose to NSF all 'organizational affiliations.'" Indictment ¶ 1(b); *see also id*. ¶ 7. Neither the Indictment nor the NSF Proposal Form itself (attached hereto as Exhibit 1), however, offers any definition of "organizational affiliation," leaving the applicant to speculate as to what constitutes an "affiliation" and what "organizations" the instruction is seeking disclosure of. The context in which the instruction is given only adds to its ambiguity and confusing nature. The only instruction in the NSF Proposal Form mentioning "organizational affiliation" is included among five separate tables the applicant was required to complete. The instruction for completing one of the tables, Table A, states as follows: "List your Last Name, Middle Initial, and ***organizational affiliation*** (including considered affiliation) in the last 12 months." Exhibit 1 at p. 10 (emphasis added). Moreover, in instructing the applicant as to how to complete these five

tables, the NSF Proposal Form provides that "each PI, co-PI, and other senior project personnel identified on a proposal must provide collaborator and other affiliation information to help NSF identify appropriate reviewers[,]" suggesting that, perhaps, the instruction's vague request for "organizational affiliations" is seeking disclosure of organizations with which the applicant is affiliated that NSF may otherwise consider for purposes of evaluating the applicant's grant proposal. *See* Exhibit 3.[2] Based on the NSF Proposal Form itself, the applicant is left to wonder whether he/she must list his/her current employer, professional organizations of which he/she is a member, institutions the applicant has visited to give lectures, or even any community of religious organizations with which the applicant might be "affiliated."

Moreover, although not mentioned anywhere in the Indictment, the NSF Proposal Form's instruction cross-references Chapter II.C.1.e of the NSF's 181-page Proposal & Award Policies and Procedures Guide ("2018 PAPPG," attached as Exhibit 2). Notwithstanding the absence of any allegation in the Indictment that Dr. Xiao actually referred to the PAPPG when completing the NSF Proposal Form, that section of the 2018 PAPPG offers the applicant no further guidance whatsoever, and merely restates almost verbatim the instruction for Table A in the NSF Proposal Form. *See* Exhibit 2 at p. II-6-7 ("COA Template 1: List the individual's last name, first name, middle initial, and organizational affiliation (including considered affiliation) in the last 12 months." This section of the PAPPG also notes, as does the instruction in the NSF Proposal Form, that "[t]his information is used to manage reviewer selection." *Id.* at II-7.[3]

---

[2] As seen in Exhibit 2, the version of this template that was produced in discovery included incomplete text: "each PI, co-PI, and other senior project personnel identified on a proposal must provide collaborator and other affiliation information to help NSF identi[…]. The complete version is attached at Exhibit 3.

[3] Adding to the confusion of what "organizational affiliations" needed to be disclosed per this Instruction is the cryptic statement in this section of the 2018 PAPPG, made without further explanation or specifics, that "some information requested in prior versions of the PAPPG is no longer requested. THIS IS PURPOSEFUL AND WE NO LONGER REQUIRE THIS INFORMATION TO BE REPORTED." Exhibit 2 at II-7

**B. "Current and Pending Support"**

The Indictment also alleges that "[d]uring the application process, the principal investigator (PI) with the institution applying for the award was required to disclose to NSF … all "Current and Pending Support."  Indictment ¶ 1(b); *see also id*. ¶ 7.  The Indictment further alleges that

> NSF defined Current and Pending Support: "[a]ll current project support from whatever source (e.g., Federal, State, local or foreign government agencies, public or private foundations, industrial or other commercial organizations, or internal funds allocated toward specific projects) must be listed.  The proposed project and all other projects or activities requiring a portion of time of the PI and any other senior personnel must be included, even if they receive no salary support from the project.

*Id*. ¶ 1(b).

This second alleged false statement in Dr. Xiao's NSF grant proposal occurs later in the form, on a page titled "Current and Pending Support."  Exhibit 1 at p. 44. An excerpt from that page is set forth below:

*Id.* Neither a definition of the phrase "Current and Pending Support" nor separate definitions of "current," "pending" or "support" can be found anywhere in the NSF Proposal Form, let alone on this page. The form offers no explanation of the difference between "current" and "pending," and does not explain whether "pending support" means (1) financial support that has been awarded awaits delivery of funds, (2) financial support that has been awarded and delivered but where the project at issue has not yet begun, or (3) a proposal that is awaiting an award decision. Moreover, there is no indication on the page of what types of things for which the applicant has "support" need to be listed. And although there is a suggestion in each reporting box that it seeks disclosure of "support" for "projects" – see entries for "Location of "***Project***" and "Person-Months Per Year Committed To the ***Project***" – there is no definition for that term anywhere in the NSF Proposal Form, leaving the applicant at a loss as to whether, for examples, one-off visiting lectures given at other universities unrelated to any broader project, various projects helping local community, and reimbursements for recruiting work done for the benefit of his own employer (SIUC), constitute the type of "support" contemplated by these disclosure instructions.

Although the Indictment correctly references that NSF defined "Current and Pending Support," NSF did so not in the grant proposal but in a separate section of the PAPPG (Section II.C.2.h), which the form cross-references but which the Indictment fails to allege Dr. Xiao ever consulted. Exhibit 2 at II-23. Moreover, that section of the PAPPG provides little further guidance as to the indecipherable ambiguities on the Current and Pending Support page, as it also offers no definition of "project," "current," or "pending." Moreover, this Section confusingly explains on the one hand that "[t]his section of the proposal calls for required information on all **current and pending support** for ongoing projects and proposals," but that

"[a]ll **current [but apparently not *pending*] project support** from whatever source (e.g., Federal, State, local or foreign government agencies, public or private foundations, industrial or other commercial organizations, or internal funds allocated toward specific projects)[4] must be listed." *Id.* Even if Dr. Xiao were alleged to have consulted this PAPPG section, it would have only added to the confusion created by the hopelessly vague terms used in this page of the NSF Proposal Form.

### C. April 29, 2019 Email from NSF Program Director

Finally, the Indictment alleges as follows in support for Count 2 (wire fraud):

> On or about April 29, 2019, a representative of NSF contacted XIAO by email before awarding the grant, stating that NSF was contacting him "to make sure that the current and pending support statement includes worldwide sources. So, if you have any position outside of the US or any source of funding from any non-US funding source please include it in your updated current and pending support page. The award size depends on what other support and commitments of time you have, particularly other projects whose work overlaps this one."

Indictment ¶ 9. It further alleges that "[o]n or about May 1, 2019, XIAO falsely stated in reply to NSF, 'I don't have other grants or pending proposals but this one.'" *Id*. ¶ 10. However, the emailed instruction does nothing to clarify the ambiguities of "current," "pending," "support" or the phrase "current and pending support" as a whole, but merely relays that whatever those terms or phrase mean, they include any such "support" from "worldwide sources."[5] Further creating confusion, the email also suggests that the Current and Pending Support page required disclosure

---

[4] Notably, this PAPPG section does not cite other educational institutions, where domestic or foreign, as an example of a source whose "support" must be disclosed.
[5] Indeed, the NSF program director's need to try to clarify for Dr. Xiao the ambiguity left by the Current and Pending Support page (and related PAPPG guidance) in this email only highlights further that these instructions were fundamentally ambiguous.

of "positions" (another ambiguous term), a term not found anywhere in the Current and Pending Support page of the related guidance given in Section II.C.2.h of the 2018 PAPPG.[6] *Id.*

<h2 style="text-align:center">ARGUMENT</h2>

The Indictment should be dismissed in its entirety. The three questions presented by the Government – in both the NSF grant application and in the email from the NSF program director that followed months later – that gave rise to the alleged false statements on which each of the three counts are based contain hopelessly vague terms and phrases lacking any definition that render the questions "fundamentally ambiguous," especially when considered in their broader context.[7]

## I. Applicable Law

It is well settled in this Circuit and others that charges brought under § 1001 and similar charges based on false statements warrant dismissal prior to trial where the Government questions giving rise to the alleged false statements are "fundamentally ambigu[ous]." *United States v. Martellano*, 675 F.2d 940, 942 (7th Cir. 1982).[8] In such cases, "[p]recise questioning

---

[6] This term is also absent from the February 25, 2019 revision of the PAPPG, which would arguably have been in effect as to the time of this email. It is worth noting that this version includes revisions that appear to correct the omission of U.S. and non-U.S. educational institutions in the prior version. Compare 2018 PAPPG, § II.C.2.h (citing as examples of funding sources requiring disclosure "Federal, State, local or foreign government agencies, public or private foundations, industrial or other commercial organizations, or internal funds allocated toward specific projects") with 2019 PAPPG § II.C.2.h (omitting reference to "government agencies" from list of examples).

[7] Indeed, the pattern of vagueness and ambiguity in grant proposal forms like the NSF Proposal Form led Eric Lander, the new Director of the White House Office of Science and Technology, to remark regarding federal agency grant proposal forms generally: "It's very hard to figure out what you're supposed to be disclosing…Agencies have different rules, and their definitions vary." *Biden's New Science Adviser Shares Views on Foreign Influence, Research Budgets, and More* (June 3, 2021) SCIENCE, (https://www.science.org/news/2021/06/biden-s-new-science-adviser-shares-views-foreign-influence-research-budgets-and-more). Lander commented that he does not "want to see [research security] used as a tool to foster anti-Asian sentiment. One of this country's great assets is that we are a magnet for the world's talent. And I don't want to lose that asset." *Id.* Although the China Initiative was created under the previous administration, the new Administration's efforts concerning the China Initiative remains to be seen.

[8] *See also United States v. Richardson*, 421 F.3d 17, 32-34 (1st Cir. 2005); *Lighte*, 782 F.2d at 375 (2d. Cir. 1986); *United States v. Ryan*, 828 F.2d 1010, (3d Cir. 1987); *United States v. Stover*, 499 F. App'x 267, 274 (4th Cir. 2012); *United States v. Brooks*, 681 F.3d 678, 706 (5th Cir. 2012); *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005); *United States v. Robbins*, 997 F.2d 390, 395 (8th Cir. 1993) (stating "absent fundamental ambiguity or

is imperative as a predicate for the offense…." *Bronston v. United States*, 409 U.S. 352, 362 (1973). Although the Seventh Circuit has not squarely defined the contours of fundamental ambiguity, at least one Court has held, consistent with other Circuits, that a question is fundamentally ambiguous "if it is not capable of being reasonably understood" or "incapable of reasonable comprehension." *United States v. Caputo*, 288 F. Supp. 2d 912, 922 (N.D. Ill., 2003); *accord United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) ("A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which [persons] of ordinary intellect could agree…'") (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C.), *aff'd*, 232 F.2d 334 (D.C. Cir. 1955)).

This principle resonates particularly where rules or instructions by a government agency that govern disclosure requirements meet the fundamental ambiguity standard. *See, e.g., United States v. Harra*, 985 F.3d 196, 213 (3d Cir. 2021) ("[A] conviction for concealing material facts in violation of 18 U.S.C. § 1001(a)(1) … cannot stand absent fair notice of the legal duty to make the particular disclosure."); *United States v. Safavian*, 528 F.3d 957, 964-65 (D.C. Cir. 2008) (reversing § 1001(a)(1) conviction because "vague" government guidance documents were insufficient to create a duty to disclose); *United States v. White Eagle*, 721 F.3d 1108, 1118 (9th Cir. 2013) (reversing § 1001(a)(1) conviction when the regulation purportedly creating a duty to disclose did not "provide specifics on what kind of information should be reported or to whom").

In such cases, where there is a "fundamental ambiguity" in the questions forming the basis of the charge, "the issue must be taken from the jury." *United States v. Cohen*, 209 F. App'x. 576, 578 (7th Cir. 2006); *United States v. Manapat*, 928 F.2d 1097, 1101-02 (11th Cir. 1991) (affirming pre-trial dismissal of § 1001 charge where questions on FAA airman

---

impreci[sion] in the questioning, the meaning and truthfulness of a declarant's answer is for the jury"); *United States v. Boone*, 951 F.2d 1526,1534 (9th Cir. 1991); *States v. Hale*, 762 F.3d 1214, 1219 (10th Cir. 2014); *Manapat*, 928 F.2d 1097, 1099-1100 (11th Cir. 1991); *see also United States v. Safavian*, 528 F.3d 957, 966 n.9 (D.C. Cir. 2008).

certification were fundamentally ambiguous); *United States v. Serafini*, 7 F. Supp. 2d 529, 540-541; 555 (M.D. Pa. 1998), *aff'd*, 167 F.3d 812 (3d Cir. 1999) (ordering pre-trial dismissal of some perjury charges based on fundamental ambiguity of questions asked by prosecutor during grand jury testimony); *United States v. Danner*, Crim. No. 10-345 PJS/FLN, 2011 WL 2262495, at *4 (D. Minn. May 26, 2011), *report and recommendation adopted*, No. 10-CR-0345 PJS/FLN, 2011 WL 2292151 (D. Minn. June 9, 2011).[9]   And although it is beyond dispute that when considering a motion to dismiss an indictment, a court must assume all facts in the indictment are true and must "view all facts in the light most favorable to the government," *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999), the question of whether a question giving rise to the alleged false statement is so "fundamentally ambiguous" so as to be legally insufficient requires consideration of the context surrounding the question, prior to trial if need be.  *See, e.g.*, *Manapat*, 928 F.2d at 1101 (noting in dismissal of § 1001 charge that questions were fundamentally ambiguous where questions about prior convictions in an FAA airman application were "buried in a list" of questions dealing with health conditions); *Danner*, 2011 WL 2262495, at *3-4 (noting that dismissal warranted where certified statement on state transportation agency form at issue was fundamentally ambiguous "in the context of the … form at issue").[10]

---

[9] Courts in this Circuit have not hesitated to address the question of fundamental ambiguity at the motion to dismiss stage.  *See, e.g.*, *Caputo*, 288 F. Supp. 2d at 922-23 (N.D. Ill. 2003); *United States v. Skiljevic*, No. 11-CR-72, 2012 WL 2050911, at *14 (E.D. Wis. Mar. 26, 2012), *report and recommendation adopted*, No. 11-CR-72, 2012 WL 2050861 (E.D. Wis. June 7, 2012); *United States v. Ilic*, No. 07CR522, 2008 WL 192319, at *1 (N.D. Ill. Jan. 23, 2008).

[10] The permissibility of examining the context of the Government's questions when assessing fundamental ambiguity is consistent with the principle that courts, in ruling on a motion to dismiss under Rule 12(b), have considered extrinsic evidence under certain circumstances.  *See United States v. Levin*, 973 F.2d 463, 469–70 (6th Cir.1992) (affirming the District Court's dismissal of the indictment where "the undisputed extrinsic evidence" showed that "the government was, as a matter of law, incapable of proving beyond a reasonable doubt the intent required to convict"); *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976) ("The District Court was not limited to the face of the indictment in ruling on the motion to dismiss…Rule 12 vests the Court with authority "to determine issues of fact in such manner as the court deems appropriate.") (citing Notes of the Advisory Committee to Fed. R. Crim. P. 12); *see also Serfass v. United States*, 420 U.S. 377, 392-93, 95 S. Ct. 1055, 1065, 43 L. Ed. 2d 265 (1975) (affirming the Circuit Court had jurisdiction of an appeal where the District Court considered evidentiary facts outside indictment on motion to dismiss);  *Cf. United States v. Grasso*, 173 F. Supp. 2d 353, 360 (E.D. Pa.

The legal rationale underlying the fundamental ambiguity doctrine is straightforward: to protect defendants from the risk of arbitrary and selective prosecutions based on the imprecision of government questioners. As the Third Circuit in *Ryan* has explained:

> The purpose behind the rule of fundamental ambiguity is two-fold 1) to preclude convictions that are grounded in little more than surmise or conjecture, and 2) to prevent witnesses … from unfairly bearing the risks associated with the inadequacies of their examiners…

*United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987); *see also United States v. Richardson*, 421 F.3d 17, 32-34 (1st Cir. 2005) (holding that in case of "fundamentally ambiguous" question, "'we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made'") (quoting *Manapat*, 928 F.2d at 1101). Indeed, vagueness, whether in criminal statutes or in Government questions on which false statement charges are based, "is Constitutionally problematic when [it] fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibited[, or] may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

## II. The Indictment Must be Dismissed Because the Statements on Which it is Based are "Fundamentally Ambiguous" and Therefore Not Proper Questions for a Jury to Resolve

Against this legal backdrop, the questions in the NSF Proposal Form and the question asked by the NSF program director months later easily fit the definition of "fundamental ambiguity."

---

2001) (rejecting the admission of extrinsic documents, where they were offered to challenge the *sufficiency* of evidence at the motion to dismiss stage).

The term "organizational affiliations" (Count 1) in the instruction for Table A is so vague as to render the disclosure instruction containing this term almost meaningless. The application form does not provide any definition or guidance as to what constitutes an "affiliation" or what "organizations" fall within this disclosure requirement, and the "guidance" in Section II.C.1.e of the PAPPG – which the Indictment does not allege Dr. Xiao even read – offers no further aid. Indeed, the context in which this request for disclosure was made – i.e., that the purpose of such disclosures was to assist in identifying potential reviewers of the grant proposal that may have conflicts of interest – certainly suggests that such disclosures need not include connections with universities that the NSF would presumably never task with reviewing a grant proposal it receives. And, in any event, all such information was disclosed in the other Tables in the NSF Proposal Form, as well as in the "Biographical Sketch Section" section in the NSF Proposal Form.

The term "current and pending support" instruction is equally vague and confusing, as its constituent terms – "current," "pending," and "support" - create fundamental ambiguity both standing alone and when read as a single phrase. None of these terms is separately defined in the NSF Proposal Form, nor is the phrase "current and pending support." Indeed, the terms "current" and "pending" have strikingly similar definitions,[11] leaving the applicant to speculate as to what one term requires that the other one does not. Moreover, the Current and Pending Support Page ("CPS Page") does not make clear what objects of "support" require disclosure, except for the undefined references to "projects" contained therein. Exhibit 1 at p. 44. And although Section II.C.2.h of the PAPPG – which, again, the Indictment does not (and cannot)

---

[11] Black's Law Dictionary defines "current" as "running; now in transit; whatever is at present in course of passage," whereas it defines "pending" as "Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process." *Current*, BLACK'S LAW DICTIONARY (4th ed. 1968); *Pending*, BLACK'S LAW DICTIONARY (4th ed. 1968).

allege Dr. Xiao consulted in completing his proposal - provides some guide as to what should be disclosed on the CPS Page, even the applicant who consults the PAPPG is left confused as to what constitutes "current" or "pending" support, and what constitutes a "project" receiving such support. Exhibit 2 at p. II-23.

Finally, the NSF program director's email to Dr. Xiao months after the submission of the grant proposal falls equally short. It contains the same fundamental ambiguities that the CPS Page did – both through its use of those same terms used therein and its reference back to the CPS Page – and only clarified that the disclosure requirements in the CPS page must include "worldwide" (*i.e.*, outside the U.S.) sources and imposed a new and equally vague disclosure requirement (found nowhere on the CPS Page or the corresponding PAPPG guidance) of "any *position* outside the U.S."[12]

The Government-posed questions at issue here are far more ambiguous than those found by other courts to be so "fundamentally ambiguous" as to warrant dismissal or acquittal of charges based on false statements to the Government.

In *United States v. Manapat*, for example, the Eleventh Circuit upheld the district court's pre-trial dismissal of an indictment charging the defendant with a § 1001 violation based on the defendant's answer two questions about prior convictions - "Record of traffic convictions" and "Record of other convictions" - embedded in a 24-question FAA airman certification form that otherwise asked about medical conditions. The court held that those two questions were

---

[12] As Exhibit 1 demonstrates, Dr. Xiao was transparent about his relationships with other U.S. and non-U.S. universities, including Shenzhen University, elsewhere in his grant proposal, including in the tables immediately following Table A. *See* Exhibit 1 at p. 10-11 (listing on Table C all research co-authors and collaborators and their "organizational affiliation" including individuals affiliated with Shenzhen University, Guangdong University of Technology and other non-U.S. institutions); *see also id*. at 37 (attaching Dr. Xiao's "Biographical Sketch" listing his then-current "guest professor" positions at Shenzhen University, University of Electronic Science and Technology of China, and Guangdong University of Technology of China).

fundamentally ambiguous as a matter of law, and therefore could not form a basis for a criminal prosecution. Its reasoning was as follows:

> We cannot accept the government's argument that a reasonable applicant would not be confused by this configuration of questions. It is conceivable that an applicant might believe that the form was asking for convictions somehow related to medical conditions. Or, an applicant could fail to understand the importance of such questions on a form concerning medical conditions and simply not give proper thought before answering. Or, more likely, an applicant in generally good health could routinely check off the many items on the standardized form without reading them carefully, resulting in an inaccurate response.

*Manapat*, 928 F.2d at 1101. The Third Circuit reached a similar conclusion in *United States v. Ryan*, when it reversed the defendant's conviction under § 1014 based on a false statement made in response to a question on a credit application asking the defendant to supply his "PREVIOUS ADDRESS (Last 5 years)." *Ryan*, 828 F.2d at 1015 (3d Cir. 1987). It found that the term "address" was "imprecise and vague," and that the request for the applicant's "previous address" was vulnerable to at least three different interpretations. *Id.*; *see also, e.g.*, *Danner*, 2011 WL 2262495, at *3-4 (granting motion to dismiss § 1001 charge based on fundamental ambiguity of statement on state Department of Transportation form to which defendant certified that "[t]he checks were issued without rebate from my companies…" where phrase "without rebate" could have been referencing rebates from either the defendant's companies or rebates from anyone with respect to checks issued "from [defendant's] companies"); *United States v. Watts*, 72 F. Supp. 2d 106, 110-11 (E.D.N.Y. 1999) (granting motion for acquittal of § 1014 charge upon finding that defendant's representation, by checking a box stating both "made" and "to be made," that he intended to make $200,000 in renovations and improvements in the future, was fundamentally ambiguous because checking both boxes at the same time left unclear the

certainty of defendant's future plans for the proceeds); *United States v. Naegele*, 341 B.R. 349, 356 (D.D.C. 2006) (granting pretrial dismissal of charges under 18 U.S.C. § 152 (false statement in connection with bankruptcy proceeding) because a question on Statement of Financial Affairs form asking for "state[ment] of gross income the debtor has received from debtor's business" was fundamentally ambiguous due to lack of clarity over whether it sought his or his company's gross income).[13]

## III.    The Risks of Selective Prosecution and Race-Based Conviction of Dr. Xiao Are Heightened by Pervasive Anti-Chinese Animus Created by China Initiative

The charging of Dr. Xiao for statements made in response to the fundamentally ambiguous questions posed by NSF is an apt illustration of the risks of arbitrary and selective prosecution that the fundamental ambiguity doctrine – and the broader Constitutional requirement of fair notice to defendants – are intended to prevent.

The Indictment against Dr. Xiao is one of the latest in a pattern of arbitrary prosecutions of Chinese-origin academics under the China Initiative that have nothing to do with espionage, trade secret theft or any other risk to national security.  While the Government continues to seek prosecution of Chinese-born academics - many of whom are, like Dr. Xiao, longtime U.S. citizens - under the guise of protecting the U.S. from the China's efforts to secret intellectual property and other information to China, these prosecutions are clearly driven by suspicions based on race and national origin.  Indeed, of the approximately 23 criminal cases brought against Chinese academics under the China Initiative to date, all but one was brought against an

---

[13] The applicability of the fundamental ambiguity doctrine is not limited to charges under § 1001; it has been applied to an array of charges involving false statements made in response to vague and imprecise questions from the Government.  *See, e.g.*, *Ryan*, 828 F.2d at 1014 (18 U.S.C. § 1014 – false statement on loan/credit application); *United States v. Reynolds*, 919 F.2d 435 (7th Cir. 1990) (26 U.S.C. § 7206(1) – filing false income tax returns); *United States v. Gupta*, No. 98-6118-CR, 2002 WL 34216139, *7 (S.D. Fla. Oct. 18, 2002) (discussing fundamental ambiguity doctrine in context of motion to dismiss wire fraud count).  Thus, because the two wire fraud counts brought against Dr. Xiao are based solely on the alleged false statements at issue, the Court should dismiss all three counts.

academic of Chinese origin.[14] And of the cases involving Chinese-born academics, only one of those cases involves an academic allegedly acting as foreign agent to engage in the theft of intellectual property.[15]  None has charged an academic with espionage.[16]

This case is no exception. Here, the Government, in its dogged pursuit of Chinese spies, found no evidence on which to charge Dr. Xiao with any charges related to national security. This is so even after multiple hours-long interviews by FBI agents at Dr. Xiao's home and its broad seizure of computers, cellphones and other documents.  Yet the Government nonetheless persisted in charging Dr. Xiao, basing those charges on answers he gave to hopelessly ambiguous questions posed by NSF in connection with a grant proposal he submitted, for a hopelessly small sum that went to his employer, SIUC, and not Dr. Xiao himself.

While it is true that the Government is afforded broad discretion in its charging decisions, it must adhere to the constraints of the Constitution in exercising that discretion. "[T]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or

---

[14] *Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018*, UNITED STATES DEPARTMENT OF JUSTICE (June 14, 2021), https://www.justice.gov/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related.

[15] *Id.*; *See also Harvard University Professor and Two Chinese Nationals Charged in Three Separate China Related Cases,* UNITED STATES DEPARTMENT OF JUSTICE (January 28, 2020),   https://www.justice.gov/opa/pr/harvard-university-professor-and-two-chinese-nationals-charged-three-separate-china-related (Yanqing Ye, a Lieutenant of the People's Liberation Army (PLA) is indicted for "completing numerous assignments from PLA officers such as conducting research, assessing U.S. military websites and sending U.S. documents and information to China.").

[16] By November 2020, the DOJ reported that it prosecuted three cases involving academics under the China Initiative-- none of them was charged with espionage. *The China Initiative: Year-in-Review (2019-20),* UNITED STATES DEPARTMENT OF JUSTICE (November 16, 2020), https://www.justice.gov/opa/pr/china-initiative-year-review-2019-20. To date, while the number of academics facing federal criminal charges has increased, the number of whom have been charged with economic espionage remains at zero. *Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018, supra note 12.* Chinese scientists and researchers have been charged with infractions that are minor and unrelated to the China Initiative's purported mission of protecting against intellectual property theft and economic espionage. *Id.* Where, for example, addressing non-disclosures on a college or university conflicts of interest form would otherwise, and more appropriately, be addressed by the institutions themselves with corrective, deterrent, and instructive processes, the Government has instead employed an aggressive and discriminatory strategy of criminalizing these issues. *See The U.S. Is Purging Chinese Cancer Researchers from Top Institutions*, BLOOMBERG (June 13, 2019) https://www.bloomberg.com/news/features/2019-06-13/the-u-s-is-purging-chinese-americans-from-top-cancer-research ("Baylor College of Medicine …received NIH inquiries about four faculty members. It didn't punish anyone, but used the opportunity to correct past disclosure lapses and educate faculty members about more rigorous enforcement going forward, says Kuspa, the school's research dean.").

other arbitrary classification.'" *United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2019 WL 570730, at *2–3 (C.D. Ill. Feb. 12, 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 463–64 (1996) (internal citations omitted)). Such conduct, as has occurred in this case, is considered "selective prosecution" in violation of the Equal Protection provision of the Fifth Amendment the Due Process Clause. *See Armstrong*, 517 U.S. at 464, 116 S. Ct. 1480.

To evaluate a claim of selective prosecution, the defendant "must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Christensen*, 2019 WL 570730, at *2–3 (quoting *Armstrong*, 517 U.S. at 465). The Court must consider whether the defense has established a prima facie case that: (1) while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against Dr. Xiao, he has been singled out for prosecution, and (2) that the government's discriminatory selection of Dr. Xiao for prosecution has been invidious or in bad faith, *i.e.*, based on impermissible considerations based upon such impermissible considerations as race, religion or the desire to prevent his exercise of constitutional rights. *See also United States v. Finley*, 705 F. Supp. 1297, 1302 (N.D. Ill. 1988).

The Government's discriminatory purpose and effect of prosecuting Dr. Xiao (and other Chinese-born academics in the U.S.) fits squarely within the Government's larger effort to cast the "whole" of Chinese "society," including U.S. citizens of Chinese origin, as a threat to the U.S.[17] The DOJ launched the *China Initiative* in November 2018. In his announcement of the initiative, former Attorney General Jeff Sessions remarked that it served to combat the "grave" national security threat posed by "geopolitical rival states[']" and their efforts to "try to steal

---

[17] Open Hearing on Worldwide Threats: Before the S. Select Comm. on Intelligence, 115th Cong. 50 (2018) (statement of Christopher A. Wray, Director, Fed. Bureau of Investigation) (noting that the FBI "view[s] the China threat as not just a whole of government threat, but [also] a whole of society threat").

[American] inventions and defraud [America]."[18]  Amidst an onslaught of harmful anti-Chinese rhetoric, particularly in the wake of the global Covid-19 pandemic, the federal government redoubled its efforts to single out persons of Chinese national origin or entities with Chinese affiliation for the purpose of enforcement. As evidence of this, in February 2020, FBI Director Christopher Wray, in his opening remarks at the *China Initiative Conference*, alleged that Chinese students were trying to entice scientists at U.S. universities "to bring their knowledge back to China," by means including stealing proprietary information and violating export controls or conflict-of-interest policies.[19] And in 2018, John Demers, the U.S. Assistant Attorney General for the National Security Division, directed each of the country's 94 U.S. Attorneys to bring cases under the China Initiative.[20]

As the nomenclature of the China Initiative suggests, it was designed to and has resulted in the discriminatory and targeted prosecution of scientists and researchers of Chinese descent or national origin, for alleged infractions wholly unrelated to national security concerns. Just as Dr. Xiao has been targeted for claims arising from his reporting of grant funding sources, additional Chinese individuals and entities have been similarly subjected to U.S. enforcement action and inquiry because of their known or perceived race or national origin.[21]  Moreover, there is no evidence that the Government is seeking similar prosecutions of disclosure violations relating to grant proposals against other non-Chinese academics.

---

[18] *Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage*, UNITED STATES DEPARTMENT OF JUSTICE (Nov. 7, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.
[19] *FBI Director Christopher Wray's Opening Remarks: China Initiative Conference*, CENTER FOR STRATEGIC & INTERNATIONAL STUDIES (Feb. 6, 2020), https://www.csis.org/analysis/fbi-director-christopher-wrays-opening-remarks-china-initiative-conference.
[20] *Inside DOJ's nationwide effort to take on China*, *supra* n.1.
[21] *See United States v. Feng Tao*, No. 19-20052-JAR (D. Kan.); *United States v. Anming Hu*, No. 3:20-CR-021-TAV-DCP (E.D. Tenn.); *United States v. Gang Chen*, No. 1:21-cr-10018-PBS (D. Mass.); *FBI Is 'Harassing' Some Chinese Citizens Says Academic Group*, 91.7 WVXU, https://www.wvxu.org/local-news/2019-08-26/fbi-is-harassing-some-chinese-citizens-says-academic-group#stream/0.

<p style="text-align:center">*  *  *</p>

The well-settled principle of barring criminal prosecution of individuals for alleged false responses to "fundamentally ambiguous" government questions serves a critical purpose: to bar the arbitrary and selective charging of individuals based on honest mistakes, and "to preclude convictions that are grounded in little more than surmise or conjecture." *Ryan*, 828 F.2d at 1015. Where, as here, the Government questions giving rise to the false statement charges are utterly imprecise, confusing and subject to multiple different interpretations, permitting criminal charges to go to a jury runs the grave risk of "allow[ing] [it] to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made." *Richardson*, 421 F.3d at 32-34. And more critically, where, as here, the defendant is a member of a group that has been targeted specifically and transparently by federal law enforcement, the importance of safeguarding defendants from these risks is at its highest.

For these reasons, the Government should dismiss the Indictment against Dr. Xiao in its entirety.

## CONCLUSION

WHEREFORE, Defendant requests that this Honorable Court grant this Motion to Dismiss the Indictment in its entirely and grant such further relief as the Court may deem just and appropriate.

<div style="margin-left:45%">

BY:  /s/ Ryan P. Poscablo
   Ryan P. Poscablo, pro hac vice
   Steptoe & Johnson LLP
   1114 Avenue of the Americas
   New York, NY 10036
   rposcablo@steptoe.com
   212.506.3900

</div>

Patrick F. Linehan, pro hac vice
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
plinehan@steptoe.com
202.429.3000

Michelle D. Nasser
Dowd Bennett LLP-St. Louis
7733 Forsyth Boulevard Suite 1900
St. Louis, MO 63105
mnasser@dowdbennett.com
314.889.7300

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2021 I electronically filed Defendant's Motion to Dismiss the Indictment (originally filed on September 2, 2021, *See* ECF. No 38) with the Clerk of Court using the CM/ECF system which will send notification of such filing the following:

Peter T. Reed
Assistant U.S. Attorney
9 Executive Drive
Fairview Heights, Illinois 62208

/s/ Ryan P. Poscablo
Ryan P. Poscablo, pro hac vice
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.3900
*Attorney for Defendant*