IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-cr-40039-SMY |
| | ) | |
| MINGQING XIAO, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>UNITED STATES' RESPONSE TO MOTION TO SUPPRESS</u>**

The interview of Mr. Xiao had none of the hallmarks of custodial interrogation.  It was conducted at Mr. Xiao's residence sitting around the dining room table after Mr. Xiao invited agents to "feel free to ask" questions.  There was no show of force, no raised voices, and no restraints of any kind.  And, of course, there was no arrest at the conclusion of the interview.  Thus, Defendant's motion to suppress should be denied.  Because Defendant's allegations on their face do not establish a custodial interrogation, the Court can deny the motion without a hearing.  *See United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982).  But if the Court disagrees, the government respectfully asks for a hearing to present evidence addressing contested facts.

## BACKGROUND

Whenever federal programs offer money, fraud follows, and this case is no exception.  In order to make a grant application more competitive, Defendant Mingqing Xiao made materially false statements and omissions to the National Science Foundation (NSF) in September 2018 in order to obtain a grant running from 2019 to 2022.  Among other things, Defendant Xiao told NSF he had no other time commitments, grants, or grant proposals.  In fact, Defendant Xiao (1) had received a grant from the Natural Science Foundation of Guangdong Province for about $180,000 that ran from 2018-2022, (2) had contractually promised to work two months a year for Shenzhen University in addition to his full-time employment at Southern Illinois University-Carbondale, and (3) applied for a grant from the National Science Foundation of China.  NSF followed up in April 2019 to specifically ask about "any position outside of the US or any source of funding from any non-US funding source," and any "commitments of time" to such projects.  Defendant Xiao doubled down, telling them he had nothing to report.  Had Mr. Xiao truthfully disclosed these other commitments the NSF very likely would not have funded his grant and would have instead awarded the funding to a deserving candidate and their valuable work.

1

In December 2020, two federal agents knocked on Mr. Xiao's door to ask him about this fraud. The agents agreed to wait several minutes until Mr. Xiao could come to the door. Then, Mr. Xiao invited them in ("Come, please come"), encouraged them to take a seat ("Now you guys have a seat. Yeah, have a seat."), and told them to "feel free to ask" any questions they had. Doc. 39-1 at 3.[1] Mr. Xiao and agents sat down at the table in the dining room. Mr. Xiao's adult daughter sat at the same table, moving in and out and occasionally contributing to the conversation.

The interview was congenial and polite. Defendant Xiao, who has lectured in English for over twenty years at both the undergraduate and graduate levels, often fell into professorial mode, giving long answers. *See, e.g.*, *Id*. at 13, 19, 46. Agents asked about Mr. Xiao's travel to China. *Id*. at 4. Contrary to defense's motion, agents had a legitimate purpose in asking about these travels, as Mr. Xiao had gone to China to work on the projects that he failed to disclose to NSF. In order to put Mr. Xiao at ease, agents suggested there may have been an identity mix up. *Id*. In response, Mr. Xiao conversationally discussed his travels and extended family. *Id*. at 5-8. He got up and retrieved his passport without any prompting from agents. *Id*. at 5. Contrary to defense's motion, the passport was left on the table throughout the interview.

The agents quickly asked Mr. Xiao specifically about his overseas grant. *Id*. at 9 ("Plus your grant in China . . . came up as well"). Mr. Xiao initially told the agents what he told NSF— that he did not have one. *Id*. ("I don't have any grants in China."). Realizing agents knew this was false, Mr. Xiao backpedaled, admitting that his name *was* on a grant in China, but, he claimed, he was just listed as "personnel or support[,] something like that" not as "[a] PI" or principal investigator. *Id.* This, too, was false. Mr. Xiao had disclosed to his department supervisor at

---

[1] The audio recording of the interview is the original copy, and the government attaches it hereto. Att. A. The government cites to the Defendant's transcript of the interview, Doc. 39-1, for the Court's convenience. But it contests the accuracy of the transcript at several key points and is preparing its own transcript for trial.

SIUC that he *was* in fact a co-PI on a grant with the Natural Science Foundation of Guangdong Province. *See* Att. B. Mr. Xiao hid this grant from NSF.

Mr. Xiao then quickly changed the topic. Shenzhen University, he said, had recently paid him to review the promotion file of a professor there. *Id*. at 10-11. He claimed that this request was "random[]," and probably was made because Mr. Xiao helped coordinate collaboration between SIUC and Shenzhen University, including a potential joint Ph.D. program. *Id*. at 12-15. Agents asked if this potential collaboration had any ties to the Chinese government's "talent plans." *Id*. at 14. Mr. Xiao stated that it "has nothing to do with the talent plan." *Id*. But Mr. Xiao would later admit that he applied for the Thousand Talent program "through the Shenzhen University" in 2016.[2] Doc. 39-1 at 46. And in January 2021, he would admit to SIUC that his contract with Shenzhen University required him to help Shenzhen University faculty apply for and receive national grants (in China). Att. C.

Shenzhen University was a safe topic for Mr. Xiao until agents asked him about the nature of his relationship with it. Asked if he has ever been a professor employed by a university in China, Mr. Xiao said no. *Id*. at 19 ("Not employee but give a program, yeah, I do often"). Mr. Xiao then said he just sometimes gets a speaking fee from universities in China. *Id*. at 21. When asked about anything *other* than a speaking fee, Mr. Xiao admitted "Shenzhen University[,] they say they pay me if I visit them," adding that "they say the money is for me to visit them." *Id*.

But it quickly became apparent that this was not true: in fact, Shenzhen University was paying Mr. Xiao about $2,000 a month, and doing so whether he traveled to China or not.[3] *Id*. at

---

[2] Chinese talent programs are Chinese-government sponsored awards used to recruit experts from western universities, research centers, and private companies to boost China national capabilities in the science and technology fields.

[3] Mr. Xiao admitted that this made his relationship with Shenzhen University different than his relationship with other universities, which, he said, did not give him any money. *Id*. at 23 ("Agent: … you don't get any money from any other universities…" Xiao: No.").

22 ("every month" and "[a]bout two thousand Unit- US dollars").  In fact, Shenzhen University had paid him $2,000 a month going back to 2016, resulting in a current account balance of over $100,000.  *Id*. 23-26.  Shenzhen University paid all this money into his account, Mr. Xiao admitted, even though he had not traveled to Shenzhen University in 2016, 2017, or 2018.  *Id*. at 26.

Agents asked him again, "Do you have a contract with them [Shenzhen University]?"  Mr. Xiao denied it: "not like a contract, they just say now this the money [we] give you for the … because I also supervise one of the . . . some of the students in China. . . I [make] what the supervisor makes when they write a paper."  *Id*. at 26.  Later, asked again if he has a contract with Shenzhen, Mr. Xiao responded: "Uh uh I don't know is that's called contract because it's kind of like[,] uh I knew I couldn't find right now[,] is that they say that there's the money for you to supposed to um come . . . twice a year."  *Id*. at 53-54.

Mr. Xiao hid the true nature of his relationship with Shenzhen University for a simple reason: Mr. Xiao, ostensibly working for SIUC, was pushing SIUC to set up a collaborative program with Shenzhen University.  But SIUC was unaware that Mr. Xiao had a contract with *Shenzhen University* obligating Mr. Xiao to lobby for that collaborative program.  Pointedly, Mr. Xiao had not disclosed to SIUC that Shenzhen University had been giving him money.  *Id*. at 28 (Agent: "[D]id you ever tell the university about the uh like this stipend or whatever, SIU?"  Xiao: Uh, no."); 44 (Agent: Did the university approve you to get the two thousand dollars a month from Shenzhen? Did they know about it?   Xiao: No, no they didn't they didn't know it.").  He had not told the IRS about it either.  *Id*. at 35.

That is one of the reasons Mr. Xiao did not disclose to NSF his contractual affiliation with Shenzhen University and the significant amount of time he had committed to that institution.  At the time in 2019, Mr. Xiao was under investigation by NSF and SIUC for plagiarism on an earlier

NSF grant application.   When asked why he did not disclose his affiliation with Shenzhen University even when NSF specifically followed up, Mr. Xiao explained that he was concerned it would make him look bad and potentially damage his relationship with SIU: "Agent: Why didn't you follow up and do that [make the disclosure]? … Xiao: Yeah, I think I should do that but I just didn't do it at the time."   *Id*. at 41.   He continued:

> **Xiao**: My thinking is that they will make more and more complicated, is that now its already about the plagiarism and then over the money [from Shenzhen University], and everything go together … it makes just…
> **Agent**: right, you were worried it was just going to stack on, so…
> **Xiao**: Right, right.  It just makes this thing seem more and more complicated and how to explain it …

*Id*. at 42.[4]  Mr. Xiao was also concerned disclosure would "damage" his "employment" with SIUC. *Id*. at 43.  Mr. Xiao had been hiding from SIUC the true nature of his relationship with Shenzhen University and the payments Shenzhen University was making to him.  Had he made the proper disclosures to NSF, it not only would have made it harder to get the grant, but SIUC may have found out, and Mr. Xiao did not want that.

After the interview, agents served a search warrant.  Before bringing in the search warrant team, however, the two agents worked with Mr. Xiao and his family so other agents could carry out the search warrant without disturbing their studies and be as "non invasive as possible."  *Id*. at 66; *see also id* at 72 ("[T]hey're doing school right now . . . So if you could not disrupt them as much as possible.").  Agents also notified SIUC so the university could provide Mr. Xiao with a new work laptop to minimize any professional disruption.  *Id*. at 67.

Although not necessary, agents explained the *Miranda* warnings to Mr. Xiao in conjunction with the search warrant.  Doc. 39-1 at 70.  Mr. Xiao signed the *Miranda* rights form. As part of

---

[4] The transcription here comes from the audio recording because of inaccuracies with the transcription in Doc. 39-1, but the relevant passage appears on page 42-43 of that document and at 1:19:40 to 1:21:25 of the audio.

the search, agents seized two cellphones used by Mr. Xiao, an Iphone used in the U.S. and a Huawei phone that Mr. Xiao said he primarily used while in China.  At some point during this process, agents took the time to tell Mr. Xiao that they did not want to harm his reputation and did not intend to tell other faculty about the interview or the search.  Agents did not instruct Mr. Xiao that he could not speak with other professors; if that had been their intent, they would have used a non-disclosure form.  The next day, Mr. Xiao's spouse contacted agents about a computer that she said belonged to her, not Mr. Xiao.  Although Defendant now claims agents did not return the spouse's laptop until January 21, 2021, *see* Doc. 39 at 7, agents returned it by overnight mail the same day it was requested.  *See* Att. D.

Mr. Xiao did not sit passive between December 3, 2020 and January 21, 2021.  He thought better of his prior secrecy and disclosed to SIUC the real nature of his relationship with Shenzhen University.  On January 16, 2021, he submitted revisions to his SIUC Financial Interest on Grants Disclosure Statement Form, previously submitted in September 2018.  *See* Att. C. Mr. Xiao explained that while he had answered "no" on the 2018 form to a question asking about "any remuneration, gift, or in-kind support . . . from a foreign institution of higher education," he in fact "*had some income from teaching engagement from Shenzhen University*."  *Id*. (emphasis added).  Later in the letter, he admitted that this "income" is provided in the form of a stipend of "around $24,000 per year."  *Id*. at 3.  Mr. Xiao explained that he chose to make the revised disclosure after talking with Dr. DiLilla, another professor at SIU and the then- Associate Provost for Academic Administration.  *Id*.  Mr. Xiao also admitted he had received about $30,000 from 2017 to 2020 from a collaborator, Professor Shuiting Cai of Guangdong University of Technology in China.  *Id*.  This was the same time period when Cai and Mr. Xiao received the grant from the Natural Science Foundation of Guangdong Province, which ran from 2018-2022.

6

Mr. Xiao also admitted he had been under contract with Shenzhen University since 2016 and disclosed the terms of that contract. *Id*. at 3. He admitted that the contract required him to work for Shenzhen University "2 months per year during the contract period." *Id*. Finally, he admits that as far back as 2016, Shenzhen University hired him to promote and establish a joint math Ph.D. program with SIUC and to help Shenzhen University students join that program. *Id*.

Later, on January 21, 2021, agents returned to Mr. Xiao's home at a prescheduled time to return his Iphone and two computers, and to ask for Mr. Xiao's consent to access his foreign bank accounts on his Huawei phone. The entire encounter lasted only about fifteen minutes. Agents began by reminding Mr. Xiao that they had discussed his *Miranda* rights in December 2020 and that he did not have to talk to them. They then read part of the consent form out loud, explained to Mr. Xiao what they wanted to access, and asked if he would sign the form. As that form shows, Mr. Xiao consented to allow agents to assume his online identity to look at his ICBC and Ping An Bank accounts. Mr. Xiao acknowledged he gave this consent "freely and voluntarily, without fear, threats, coercion, or promises of any kind." *See* Doc. 39-3.[5]

## ARGUMENT

"[O]fficers need not provide *Miranda* warnings unless the suspect is both 'interrogated' and 'in custody.' *United States v. Leal*, 1 F.4th 545, 549 (7th Cir. 2021) (citation omitted). An individual is "in custody" when the individual "has been taken into custody or otherwise been deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). That is, "[t]o establish that he was in custody at the time of the questioning, a defendant must show that he was either 'formally arrested' or 'subjected to restraints of freedom such that

---

[5] Defendant's motion creates some confusion about handwritten notes. Doc. 39 at 7 fn.2. The undersigned explained to defense counsel on August 20, 2021, in writing, that "There are handwritten notes from when the agent accessed the Huawei phone. Those notes are classified as a 1A in connection with the FD-302 interview report with Xiao from January 21, 2021."

the conditions of a formal arrest were closely approximated or actually attained." *Leal*, 1 F.4th at 549 (quoting *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016)). Importantly, a person who is "'free to end the interrogation and leave is not in custody.'" *Id*. (quoting *United States v. Higgins-Vogt*, 911 F.3d 814, 820 (7th Cir. 2018)).

Determining whether conditions closely approximated a formal arrest "is an objective inquiry." *Id*. "Courts must ascertain whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id*. (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). The relevant "*Howes* factors" are: "the location of the questioning; its duration; statements made during the interview; the presence or absence of physical restraints during the questioning; and the release of the interviewee at the end of the questioning." *Id*.

Finally, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). The ultimate inquiry is whether questioning presented the same "coercive pressures" as the type of station house questioning at issue in *Miranda*. *Id*. at 113.

"It is a well-established rule that 'the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed.'" *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (citation omitted). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the statement was given voluntarily. *Id.*

**A.   Defendant Xiao's December 2020 interview was not a custodial interrogation.**

Defendant's interview evinces none of the hallmarks of custodial interrogation.

8

**Location.**  The first *Howes* factor is the location where the questioning occurred.  *Leal*, 1 F.4th at 549.  Agents spoke with Mr. Xiao at his residence, a large home located on a suburban street and backing up to the Keller's Crossing golf course in Makanda, Illinois.  "[C]ourts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *United States v. Faux*, 828 F.3d 130, 135–36 (2d Cir. 2016); LaFave, et al., 2 Crim. Proc. § 6.6(e) (4th ed.) (noting that "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings").

After agents waited a few minutes at the front door, Mr. Xiao invited them in ("Come, please come"), encouraged them to take a seat in the dining room ("Now you guys have a seat. Yeah, have a seat."), and told them to "feel free to ask" any questions they had.  Doc. 39-1 at 3. Mr. Xiao's invitation to come in reflects his knowledge that the encounter is collegial and voluntary.  Mr. Xiao then chose the location of the interview, the dining room, and invited the agents to sit down—just as he would with any other guest, showing that Mr. Xiao is in his own home and understands he is in control.  He then invited the agents to "feel free to ask" questions, objectively indicating to the agents that Mr. Xiao was entering the conversation voluntarily.  There was no show of force or intimidation.

Defendant's motion suggests that one agent said, "we should come in" when Mr. Xiao came to the door.  Doc. 39 at 10.  Although the words "come in" can be heard on the audio recording, it sounds questioning, and the phrase "we should come in" cannot be heard.  At any rate, that factual dispute does not matter.  The whole exchange at the door lasts only a few seconds. Mr. Xiao never expresses any hesitancy in allowing agents to come in, and in fact invites them to come in out of the December weather.  Doc. 39-1 at 3 ("Come, please come").  After they came in, Mr. Xiao invited them to ask any questions they had.  *Id.*  It was not at all coercive.  *See United*

*States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) (finding no custodial interrogation where defendant "invited the agents into his home and agreed to be questioned").

Moreover, agents went out of their way to make sure that the interview was not coercive. Certainly the entire team of agents could have shown up in mass and agents could have conducted the interview while carrying out the search warrant. That would have certainly looked and felt more coercive to the objective reasonable person in Mr. Xiao's shoes. But agents took the less coercive route, sending only two agents to the door, and conducting a voluntary interview. Only after the interview was complete did agents mention that they had a search warrant, shielding Mr. Xiao from any coercive pressure that the warrant brought with it.

Defendant's motion makes much of the fact that agents sat in the seats nearest the door. Doc. 39 at 10. But the interview recording and transcript show it was Mr. Xiao who directed the agents to sit down. Doc. 39-1 at 3 ("Now you guys have a seat."). Nor does the Defendant suggest the room was so small that the seating arrangement prevented Mr. Xiao from leaving the room. The opening from the dining room to the front foyer is wide (there is no door), leaving plenty of room to go around the agents. In fact, at least one other member of Mr. Xiao's family was coming in and out (behind the agents) during the interview. Further, the motion to suppress does not mention that the dining room has a second entry leading from the dining room to the back of the house —and that Mr. Xiao was seated in front of that second entry. He also got up several times to retrieve items. There was nothing coercive or restraining about the dining room or the seating.

Finally, Defendant's motion suggests Mr. Xiao was not in fact free to leave because the agents had a search warrant to be there, and so "never intended to leave." Doc. 39 at 11. This flips the *Howes* analysis on its head. If anything, waiting to serve the search warrant made the interview *less* coercive. But a reasonable person in Mr. Xiao's shoes would not *know* about the

warrant, so it could not affect his belief about whether he felt free to leave.  *Stansbury*, 511 U.S. 318, 323 (1994) (explaining that officer's subjective knowledge is not part of the objective test for determining custodial interrogation).  Moreover, even if the interview had occurred while the search warrant was being carried out (and it did not), it still would not make the interview custodial.  *See, e.g.*, *United States v. Salyers,* 160 F.3d 1152, 1159–60 (7th Cir. 1998) (holding a defendant was not in custody during execution of search warrant at home when he was not restrained and was not told he could not leave).  In sum, the residential location of the interview strongly weighs against the motion to suppress.

**Length.**  The second *Howes* factor is whether the interview was unduly long.  *Leal*, 1 F.4th at 549.  Mr. Xiao's interview with agents lasted about two hours and twenty minutes.  For a fraud interview covering a number of topics—*e.g.*, the nature of Xiao's relationship with several different universities in China; his grants and grant applications; his applications for "talent program" awards in China; his travel; the money he was receiving from those universities, programs, and grants; and his disclosures to NSF, SIUC, and the IRS—this is a relatively short interview.  *See, e.g.*, *Beckwith v. United States,* 425 U.S. 341, 347–48 (1976) (finding a three-hour interview in suspect's home during tax investigation did not implicate *Miranda*).  Defendant asserts that there were no breaks during this time, but points to no evidence that Mr. Xiao asked for a break or wanted one.  Again, Mr. Xiao felt free to move about.

This factor also weighs against suppression.  *See Beckwith*, 425 U.S. at 347-48; *Patterson*, 826 F.3d at 453 (holding two-hour interview was not custodial even though it occurred in FBI conference room accessed through two locked doors).

**Statements.**  Another relevant factor is the statements made during the interview.  *Howes*, 565 U.S. at 509.  In *Patterson* and *Leal*, the Seventh Circuit "reasoned that the statements at issue

weighed against suppression because the defendant 'never said anything that indicated he did not want to speak with the agents' and 'was never told he *was* under arrest." *Leal*, 1 F.4th at 551 (quoting *Patterson*, 826 F.3d at 458)*.*  The same is true here.  At the outset, Mr. Xiao invites the agents to "feel free to ask" any questions they had.  Doc. 39-1 at 3.  At no point did he indicate to agents that he was no longer willing to answer questions, and at no point was he told he was under arrest (and in fact he was not).  Following *Leal* and *Patterson*, this factor too weighs against suppression.

The rest of the interview was calm and collegial, agents did not raise their voices or make any threats.  *See generally* Att. A (recording).  Defendant suggests the questioning was "coercive and accusatory" because agents began by asking Mr. Xiao about "travel to China."  Doc. 39 at 11-12.  In fact, agents were interested in Mr. Xiao's travel to China to work on his grants and affiliations there.  It is true that agents added a line about a potential identity mix up.  Doc. 39-1 at 4.  But agents are not required to ask only honest questions.  *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.").  And the motion fails to explain why these questions were threatening or coercive.  To the contrary, the motion seems to argue that they were designed to put Mr. Xiao at ease, making the questioning *less* coercive not more coercive.  At any rate, agents quickly told Mr. Xiao they had questions about his grants and university affiliations in China, which formed the bulk of the interview.  *Id*. at 9.

The motion also suggests the interview was custodial because English is not Mr. Xiao's first language.  Doc. 39 at 12.  Legally, the motion offers no citation in support of the idea that an interrogation becomes more custodial when English is a second language.  The relevant inquiry is

12

whether Mr. Xiao felt free to terminate the interview.  Factually, the motion omits some obvious facts.  Mr. Xiao is a university professor who has been lecturing in English and interacting with students in English for decades.  He has written dozens of academic articles in English and helps non-English speakers with their English.  *See* Att. C (noting that he helped a collaborator with his English for an article).  Yes, Mr. Xiao has an accent, but both his professional work and the interview itself shows he has no difficulty understanding and communicating in English.  Mr. Xiao did not weakly acquiesce to agents' suggestions.  To the contrary, he sometimes responded to questions at length.  *See, e.g.*, Doc. 39-1 at 13, 19, and 46.  And when agents made mistakes, Mr. Xiao was quick to correct them.  *E.g.*, Doc. 39-1 at 39 (Agent: "[Y]ou said you remembered about the conflict of interest and you tried logging in."  Xiao: "Not remember they remind us.").

Relatedly, the motion makes the factual assertion that individuals "born and raised in China" are "used to providing significant and unquestioning deference."  *Id.* at 13.  Not only does the motion offer no factual basis whatsoever for this claim, it is not born out by the transcript. Again, Mr. Xiao pushed backed and minimized his fraud throughout the interview, there was no "unquestioning deference."  This argument also lacks a legal basis.  "Rather than focus on the idiosyncrasies of individuals that can impact how questioning is perceived, the Court has opted for an objective test."  *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012).

Finally, the motion accuses the agents of "psychological tactics" like "posing hypotheticals," making "long-winded statements," and rephrasing statements.  Doc. 39 at 12 (quoting Doc. 39-1 at 59, Agent: "I'm not trying to put words in your mouth").  But, again, the motion offers no explanation for why these so-called tactics made the interview more custodial. *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole").  Law enforcement can

and should ask questions designed to elicit truthful answers and test the interviewee's truthfulness. *Id*. For example, agents asked Mr. Xiao at different points whether he had a contract with Shenzhen University to carry out specific tasks. Doc. 39-1 at 19, 26, 53-54. Mr. Xiao revised his answer each time, stating early on that he just sometimes gives talks there, stating the next time that he supervises their students and reviews their work, and later admitting that he receives monthly payments from them. *Id*. For all these reasons, this factor supports denial of the motion.

**No restraints.** *Howes* also directed courts to look at "the presence or absence of physical restraints during the questioning." *Howes*, 565 U.S. at 509. This factor, too, shows that the interview was not custodial. There were no drawn weapons, no vehicle stop, no temporary detention, no pat-down, no show of force. The Seventh Circuit has held that this factor weighs against custody simply when agents do not draw or actively use their weapons or handcuff the suspect. *Patterson*, 826 F.3d at 457 ("That the agents did not draw or actively use their weapons to assert authority over Patterson weighs against custody."). There was nothing even close to that here. *See Thompson*, 496 F.3d at 811 (finding suspect was not in custody and noting that "agents did not raise their voices or display their weapons in an intimidating manner, nor did they physically restrain Thompson in any way").

Despite all this, Defendant's motion asserts that Mr. Xiao was not free to leave because he had nowhere to go. Doc. 39 at 10-11. The first argument is that Mr. Xiao was somehow not free to leave because of the COVID pandemic. This is factually incorrect, as lockdown restrictions in Illinois ended long before December 2020. And it gets the legal analysis wrong. The question is whether "'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Leal*, 1 F.4th at 549 (citation omitted). The "leaving" part of that analysis assumes the location is somewhere more intimidating that the individual's own home,

14

because one's own home will typically be the *least* coercive setting for an interview with law enforcement. *See Faux*, 828 F.3d at 135–36. The way to end an interview in one's own home is to ask agents to leave. Mr. Xiao never asked the agents to leave, to the contrary, he invited them to ask questions. At any rate, Mr. Xiao *was* free to leave, as shown by the fact that members of the Xiao family were coming and going during the interview (going behind the agents) and there were many other areas of the house. The motion conspicuously fails to mention that Mr. Xiao seated himself in front of a second entry into the dining room. Again, the interview was conducted in a comfortable suburban home, not a cramped interrogation room or apartment.

**No arrest.** The last *Howes* factor is whether the defendant was released at the end of questioning. *Leal*, 1 F.4th at 549. The officers left the house after carrying out the search warrant and did not detain Mr. Xiao in any way at any time. Nor did the agent ever suggest Mr. Xiao might be detained at any point. *Patterson*, 826 F.3d at 458 ("suspect never told he was under arrest one factor in finding no custody for purposes of *Miranda*") (citing *United States v. Wyatt*, 179 F.3d 532, 536 (7th Cir. 1999)); *Thompson*, 496 F.3d at 811 ("Thompson was not arrested at the conclusion of the interview, and his own actions the following morning . . . suggest that Thompson himself did not believe that he was in custody."). In fact, the government did not seek detention even *after* the indictment was filed.

Defendant's remaining arguments lack merit too. Defendant's suppression argument relies heavily on a single Ninth Circuit case, *United States v. Craigshead*, 539 F.3d 1073 (9th Cir. 2008) and a district court opinion purportedly applying it, *United States v. Juan*, No. 2:20-cr-134, 2021 WL 2212235 (E.D. Ca.). *See* Def. Mot. at 8, 9, 10, 11. But Defendant omits the fact that the suspect in *Craigshead* "was interrogated by eight officers in the storage room of his house with the door shut." *United States v. Burk*, 737 F. App'x 963, 971 (11th Cir. 2018) (rejecting a similar

attempt to rely on *Craigshead*).  And the interview in *Juan* occurred in a small apartment rather than a suburban home.  *Juan*, 2021 WL 2212235 at *4.  Legally, Defendant quotes *Craigshead* for the principle that "interrogation conducted within the suspect's home is not per se custodial."  Doc. 39 at 9.  But he omits the next sentence, "*On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial* in nature."  *Craigshead*, 539 F.3d at 1078 (emphasis added).  Finally, there are important legal distinctions between Seventh Circuit law and *Juan*'s reading of Ninth Circuit law.  For example, law enforcement does not have to affirmatively tell the suspect he is free to leave and is not under arrest, particularly where the suspect invites questions.  *Leal*, 1 F.4th at 551; *Patterson*, 826 F.3d at 458.  And *Ambrose* requires an objective analysis, rather than a "focus on the idiosyncrasies of individuals that can impact how questioning is perceived."  668 F.3d at 954.

Next, Defendant's motion suggests the agents gave belated *Miranda* warnings after engaging in a "question-first" approach in violation of *Missouri v. Siebert*, 542 U.S. 600 (2004).  Doc. 39 at 13-14.  But as the Seventh Circuit has explained, *Siebert* has no application in cases like this one, where the defendant was not in custody in the first place.  *Thompson*, 496 F.3d at 811.  *Siebert* stands for the principle that belated *Miranda* warnings do not remedy an earlier custodial interrogation.  *Id*.  It does not say that *Miranda* warnings at the end of an interview somehow transform an earlier interview *into* a custodial interrogation.  At any rate, agents reminded Mr. Xiao in January of their earlier discussion of his *Miranda* rights.  And the passing of six weeks created a "sufficient break in the stream of events" to separate the two encounters from each other.  *See Ambrose*, 668 F.3d at 955.  There is no argument that the January 2021 exchange was anything but voluntary, as the next section explains.

**B.    Defendant Xiao voluntarily consented to law enforcement accessing his foreign bank account information in January 2021.**

16

Next, the defense suggests that Mr. Xiao's signed consent to allow agents to assume his online identity and access his ICBC and Ping An Bank phone applications should be suppressed. Doc. 39 at 14-16.  The Court should reject this argument too.  If the first interview was not custodial, this second interview was certainly not custodial under the *Howes* factors: (1) it too took place in Mr. Xiao's residence at his dining room table, (2) it lasted only about fifteen minutes, (3) Mr. Xiao signed a consent form, (4) there were no restraints of any kind, and (5) Mr. Xiao already knew there was no arrest after his last encounter with law enforcement and there was suggestion whatsoever that this encounter would end differently.  There's no "domination of the scene": just a brief exchange to return property and ask Mr. Xiao for his consent to access accounts.

Agents arranged to meet with Mr. Xiao to return property: two computers and an Iphone. Agents began this encounter by reminding Mr. Xiao that they had discussed his *Miranda* rights in December.  They then read part of the consent form aloud and asked Mr. Xiao if he would sign it. As the consent form shows, Mr. Xiao gave the consent "freely and voluntarily, without fear, threats, coercion, or promises of any kind."  Doc. 39-3.  Mr. Xiao, a university professor, now says he did not understand the form and that agents had not explained it to him.  Doc. 39 at 14-15.  But Mr. Xiao acknowledged that agents had advised him of his "right to refuse" this request and acknowledged that he was "voluntarily waiv[ing] this right."  Doc. 39-3.

The Court should also reject Defendant's claim that the consent was obtained by "false promises and threats."  Doc. 39 at 15.  "To prevail on this point defendant must produce clear and convincing evidence that the agents affirmatively misle[d] him as to the true nature of their investigation" and that the "misinformation was material in his decision to speak with the agents." *United States v. Serlin*, 707 F.3d 953, 956 (7th Cir. 1983).  Defendant falls far short of meeting this "heavy burden" to show "affirmative deceit" on this point.  *United States v. Peters*, 153 F.3d

17

445, 451 (7th Cir. 1998) ("'Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.'") (citation omitted).

Defendant's argument is again contradicted by his own words on the consent form, which acknowledged that consent was made voluntarily "without fear, threats, coercion or promises of any kind." Doc. 39-3. Defendant suggests agents had told him back in December not to speak with other professors about the investigation "to protect his reputation." Doc. 39 at 16. First, this is factually incorrect, agents explained to Mr. Xiao that *they* were not trying to hurt his reputation or tell anyone about the search warrant. Agents never told Mr. Xiao he could not to talk to others. Second, agents are *of course* free to ask a suspect not to talk to other witnesses. It is not a threat. Moreover, there was no attempt to isolate Mr. Xiao. Mr. Xiao's adult daughter was even in the room for parts of the interview. Third, while Defendant's motion claims that Mr. Xiao did "not discuss his case with anyone" between these two interviews, that factual claim is contradicted by Mr. Xiao's own submissions to SIUC. Mr. Xiao talked to Professor DiLilla about his relationship with Shenzhen University after his December 3 interview. On January 16, Mr. Xiao explained in his revised financial disclosure forms to SIUC that he submitted the revisions based on his discussions with Mr. DiLilla. *See* Att. C. Finally, Defendant does not at all suggest that agents told him not to talk to a lawyer. To the contrary, Mr. Xiao was told he had a right to an attorney. Again, agents did not isolate Mr. Xiao.

Defendant next makes vague factual allegations that agents told him he was "fine" and "okay." Doc. 39 at 15-16. These factual allegations do not come close to satisfying Defendant's "heavy burden" to show that he signed the consent form based on "affirmative deceit" from agents.

18

*Peters*, 153 F.3d at 451.  Notably, Defendant does not argue that he asked agents about the nature of the investigation, or whether he was going to be indicted.  *Id*.  So it is safe to assume no such questions were asked.  Without any explanation about *what* Defendant asked that elicited the response "fine" and "okay," the statements say little to nothing.

At any rate, Defendant asserts that these alleged statements by agents were made in December *after* the interview recording ended, and thus *after* agents had Mirandized Mr. Xiao and presented the search warrant.  Mr. Xiao knew what was going on.  Moreover, agents affirmatively explained precisely what the consent form was for: they wanted to access the phone applications for his foreign bank accounts.  It was not obtained by false promises or threats.

**C.      Defendant voluntarily provided his cellphone passwords to law enforcement.**

Defendant next argues that any evidence procured from Mr. Xiao's cell phones should be suppressed, as the provision of the passwords for those devices was testimonial.  Doc. 39 at 17-18.  There is no reason for the Court to reach that question at all because Mr. Xiao provided the information voluntarily, and without coercion, at agents' request.    *See* Doc. 39-1 at 71-72.  He provided the passwords after agents had read him his *Miranda* rights.  *Id*. at 70.  In addition, Defendant separately consented to agents accessing specific applications on his Huawei phone, providing a second layer of consent as to any evidence obtained from those applications.  *See* Doc. 39-3.  Accordingly, it does not matter whether passwords are testimonial or nontestimonial.  Like all his statements, Mr. Xiao's statements providing his passwords were voluntary.  At any rate, the passwords are nontestimonial under the foregone-conclusion doctrine.  The government already knew that Mr. Xiao knew the passwords to the devices, so their production does not compel testimony.  *See Fisher v. United States*, 425 U.S. 391, 411 (1976).

**D.      The search warrant was supported by probable cause.**

19

Finally, Defendant briefly attacks the seizure of his Huawei cellphone.  Doc. 39 at 18-19.

There is no doubt that the Court's search warrant authorized the seizure of Mr. Xiao's devices, including his cellphones.  The seizure was expressly authorized in the warrant's Attachment B, ¶ A (authorizing seizure of electronic files located on any computer or storage medium with relevant documents) and ¶ D (defining "computer" to include mobile phones).  *See* Doc. 39-4.  Thus, Defendant is simply wrong when he states that the seizure "was not supported by the search warrant."  Doc. 39 at 18.

Defendant next suggests that the warrant was improper because the search warrant affidavit did not identify or discuss cellphones.  *Id.*  This, too, is mistaken.  Pages 48-51 of the affidavit specifically set forth probable cause to seize electronic files on the computers and storage mediums "described above and in Attachment B."  Doc. 40-1, Aff. ¶ 132.  Both the affidavit and the attachment define "computers" to include cellphones.  And subparagraph 133(f) of the affidavit expressly addressed cellular telephones as a particular type of computer or storage device and explained why there was probable cause to believe evidence may be found on thefxm, including geographic location and communications relating to the crime.  *Id.*  Much of the evidence summarized in the affidavit was obtained from electronic files, so there was probable cause to search Mr. Xiao's electronic devices, including his cellphones, for similar evidence, including communications relating to the grant fraud under investigation.

Finally, Defendant argues that the government needed to obtain a *new* search warrant to access particular mobile banking applications on the cell phone. But Defendant expressly provided consent for agents to access the mobile banking applications.  Thus, no additional search warrant was required.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney


_s/ Peter T. Reed_
_____

PETER T. REED
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Peter.Reed@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
       vs.                     )      Case No. 4:21-cr-40039-SMY
                               )
MINGQING XIAO,                 )
                               )
              Defendant.       )

**Certificate of Service**

I hereby certify that on September 16, 2021, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Peter T. Reed*

PETER T. REED
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Peter.Reed@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720