IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:21-cr-40039-SMY |
| | ) |
| MINGQING XIAO, | ) |
| | ) |
| Defendant. | ) |

**<u>UNITED STATES' RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE</u>**

The United States largely opposes Defendant's motions in limine (Doc. 51) for the reasons described below, but believes there is some common ground between the parties' motions to keep the evidence and arguments focused on the charged offenses.

**1.      The China Initiative and uncharged offenses.**

So long as the Defendant has no objection to the government's corresponding motions in limine 1 and 2, the government has no objection to the first parts of Defendant's motion. Both parties agree that evidence and argument (a) about this case being part of DOJ's China Initiative, and (b) about offenses that have not been charged like espionage, spying, or theft of trade secrets, should be excluded. The government also does not intend to put on evidence about the investigation resulting in a "disruption" to the Chinese government.

**2.      China's talent programs.**

The government opposes, however, the portion of Defendant's motion seeking to exclude evidence and argument about China's talent programs. Talent programs are a Chinese government recruitment tool used to bring foreign "talent" back to China to work and to conduct technical and scientific research through lucrative and prestigious awards. A key task for the jury in this case

1

will be to determine if Mr. Xiao hid his contractual relationship with Shenzhen University from the National Science Foundation (NSF). Thus, evidence showing the terms of his contracts with Shenzhen University, and the benefits Mr. Xiao received, is central to the case. And one of the benefits written into Mr. Xiao's contracts with Shenzhen University was that the university agreed to help Mr. Xiao receive talent-program awards. In fact, Mr. Xiao applied for the Chinese government's Thousand Talent Program through Shenzhen University in 2016. In addition, Mr. Xiao agreed to help a younger faculty member at Shenzhen University enter "prestigious domestic programs" like China's talent programs. So Mr. Xiao's contractual relationship with Shenzhen University—which the indictment charges Mr. Xiao did not disclose to NSF—cannot rationally be separated from China's talent programs.

The indictment also charges that Mr. Xiao did not disclose a grant he received in Guangdong Province along with members of the Guangdong University of Technology (GUT) faculty. Mr. Xiao's relationship with GUT is also tied to China's talent programs. In August 2016, Mr. Xiao received an email from Chen Xuesong of GUT stating, "Our School Personnel Office has agreed to your application as a 100-person special professor."[1] These "100-person" positions are province-level talent plans. After this appointment, Mr. Xiao received a grant from the Natural Science Foundation of Guangdong Province with two members of GUT's faculty, including Shuting Cai (see below).

These connections to China's talent programs are also relevant to Mr. Xiao's intent to defraud. SIUC's export-control officer, Todd Wakeland, alerted SIUC faculty in January 2019 that China had "been aggressively recruiting leading international experts" for "work in and with the Chinese government." He noted that one mechanism for talent programs is "short-term

---

[1] This is from a machine translation.

appointments that typically target international experts who have full-time employment at a leading international university." Mr. Wakeland noted that these programs and others like it are not inherently illegal, but "may increase risks of export violations or conflict with US grants." Because of this, he asked faculty to let him know if they "have been contacted or are contacted in the future, by the Chinese government regarding your research or joining the Thousand Talent Program."

In response, Mr. Xiao did nothing. He did not tell Wakeland about his past applications to the Thousand Talent Program (or his future application), did not tell Wakeland about his existing grant and grant application with Chinese-government grant programs, and did not tell Wakeland about his short-term appointments with universities in China. Nor did Mr. Xiao update his conflict-of-interest form with SIUC to disclose these relationships. And when, three months later in April 2019, NSF followed up to ask Mr. Xiao about "any position outside of the US or any source of funding from any non-US funding source," Mr. Xiao again chose not to make the required disclosures—despite Wakeland's warning that such grants and positions increase the risk of conflicts with US grants.

3.  **Agent training**.

The government also opposes the Defendant's motion to exclude agents from identifying themselves as "counterintelligence" agents or discussing training in conducting national security investigations or concerning China's talent programs. The training and experience of law enforcement is an essential part of their testimony. While this is not a national security case per se, the case's international aspects make that training relevant to show agents are equipped to handle some of the complexities of this case that are similar, like foreign-language documents and Chinese entities. And it is accurate to describe some of the agents on this case as

3

counterintelligence agents. As for agent training concerning China's talent programs, those programs are in fact part of this case, as explained above. So any specific training concerning China's talent programs is directly relevant to the case. The defense asks to put on three witnesses physically located in China, so surely it is relevant that agents are equipped to handle China-related cases. Any potential prejudice is eliminated by Defendant's separate request that the government not introduce evidence or argument of espionage, spying, or theft of trade secrets. There is no reason to go beyond that and exclude agents' training too.

4. **The government should be permitted to cross-examine Defendant's out-of-country witnesses about the reliability of their testimony**.

The government also opposes the defense's motion to limit the government's cross examination of the witnesses they seek to call by video from China.

These requests only reinforce the unreliability of such testimony. As explained in the government's opposition to Defendant's motion to call witnesses physically in China by video, such testimony suffers from substantial reliability problems. *See, e.g.*, *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993) ("[B]ecause of the absence of procedural protections afforded parties in the United States, foreign depositions are suspect and, consequently, not favored."); *United States v. Buck*, 271 F. Supp. 3d 619, 624 (S.D.N.Y. 2017) (denying defendant's motion to allow remote testimony, in part, because the witnesses resided in Switzerland and were "immune from perjury charges"); *United States v. Moalin*, No. 10-CR-4246-JM, 2012 WL 3637370, at *6 (S.D. Cal. Aug. 22, 2012) (concluding that defendant failed to show that "an oath in Somalia is subject to penalties of perjury and judicial process like those available in the United States" and that "this factor of reliability and trustworthiness of the proposed depositions strongly disfavors Rule 15 depositions in Somalia").

The defense should not be allowed to present testimony through an unreliable mechanism, then hamstring the government's ability to cross examine about the conditions under which such testimony is given. For example, the defense asks to exclude any evidence or arguments that the three witnesses—Cai, Tang, and Chen—work for China's government. But as the defense admits, all three witnesses work for public universities in China, which are in fact part of the Chinese government and are often controlled by China's Communist Party. *See, e.g.*, NPR, *Chinese Universities Are Enshrining Communist Party Control In Their Charters* (Jan. 20, 2020), *available at* https://www.npr.org/2020/01/20/796377204/chinese-universities-are-enshrining-communist-party-control-in-their-charters. Similarly, the defense seeks to exclude questions and evidence suggesting these witnesses are "participating or recruiting" for talent programs. But it was one of those witnesses, Xuesong Chen, who told Mr. Xiao that GUT had "agreed to [Mr. Xiao's] application as a 100-person special professor" in 2016, a position tied to a talent program. Since Mr. Chen in fact facilitated Mr. Xiao's connections to GUT, but is purportedly going to deny some of those connections on the stand, the government should be able to raise these topics on cross examination. Similarly, another one of those witnesses, Jianlang Tang, facilitated the submission of Mr. Xiao's Thousand Talent application through Shenzhen University in 2016 and later recommended and facilitated Mr. Xiao's application for a grant from the Natural Science Foundation of China. Again, Mr. Tang *did* in fact assist Mr. Xiao in applying for a talent program and an NSFC grant in China, so the government should be able to ask about this on cross examination.

Finally, the PRC disfavors arrangements that allow persons in China to give evidence for use in foreign courts. *See* Dep't of State, China Judiciary Assistance Information, available at https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-CountryInformation/

China.html. It is reasonable, then, if the Court allows those witnesses to testify, for the government to ask those witnesses whether their employers or the PRC has directed, restricted, or monitored their testimony.

5.      **Other grant applications and teaching opportunities**.

Next, the government opposes Defendant's motion to exclude evidence of other research grants and professorships not specifically mentioned in the indictment. Doc. 51 at ¶ 6. The evidence the defense seeks to exclude is direct evidence of the offenses charged in the indictment. Mr. Xiao is associated with three other universities in China in addition to Shenzhen University: Guangdong University of Technology (GUT), the University of Electronic Science and Technology of China (UESTC), and Foshan University. His relationships with two of these other universities, GUT and UESTC, are direct evidence of the charged offenses in the following ways.

First, Mr. Xiao told NSF on the biographical sketch portion of the grant application in this case that he was a "guest professor" at Shenzhen University, GUT, and UESTC. But he did not tell NSF that his relationship with Shenzhen University was much more than that: Mr. Xiao worked for both SIUC and Shenzhen University, so both should have been separately disclosed as "organizational affiliation(s)," not just SIUC. And according to Mr. Xiao's translation of the 2016 Shenzhen University contract, it included a research commitment to publish papers on behalf of Shenzhen University with other faculty there, and had a "total workload [that] should be 2 months per year." This research commitment should have been disclosed to NSF as well.

By contrast, Mr. Xiao explained in a May 1, 2016 email to Shenzhen University that his positions with GUT and UESTC were "empty names (honorary nature)" with "[n]o part-time jobs."[2] This shows Mr. Xiao's intent to defraud. He told NSF that his relationships with these

---
[2] This language comes from a draft translation.

three universities were the *same*, but he told Shenzhen University that they were *different*. The defense has argued in its motions that Mr. Xiao was "transparent about his relationships with other U.S. and non-U.S. universities" on the NSF grant application based on Mr. Xiao stating he was a "guest professor" at Shenzhen University, GUT, and UESTC, Doc. 42 at 14 n.2, and will likely make the same argument at trial. Thus, the evidence about Mr. Xiao's ties with GUT and UESTC are directly relevant to showing that Mr. Xiao misled NSF with intent to defraud.

Second, Mr. Xiao's relationship with GUT is direct evidence of his grant in Guangdong Province. Mr. Xiao first mentions the existence of this grant when he applied to go on sabbatical for the spring of 2019. In the sabbatical application, Mr. Xiao stated, "as a co-PI, I received an external grant from China (4 years) for a collaboration with Guangdong University of Technology" (GUT). His department chair emailed back, "I don't find this in your list of grants" and asked Mr. Xiao to update his CV. Mr. Xiao responded with an updated CV disclosing that he received a grant as a "co-PI" from the Natural Science Foundation of Guangdong Province, stated it ran from 2018-2022, and noted the grant was received "with Shuting Cai," who works at GUT.[3]

The fact that Mr. Xiao had a "guest professorship" at GUT is itself corroborating evidence of the fact that he received a grant from the Natural Science Foundation of Guangdong Province to conduct research with GUT. The grant and the position are mutually reinforcing evidence. In addition, Mr. Xiao's contract with GUT says Mr. Xiao could receive incentives for research accomplishments completed on GUT's behalf.[4] This further ties the grant and contract together. What is more, Mr. Xiao later admitted that he had "collaboration with Prof. Shuiting Cai of

---

[3] The defense appears to be taking the position that Mr. Xiao did *not* receive this grant despite his prior statement that he *did* receive the grant. *See* Doc. 51 at 3. If Defendant is actually taking that position, then corroborating evidence of his relationship with GUT becomes all the more probative.

[4] This is taken from a draft translation.

7

Guangdong University of Technology," and that Mr. Cai paid Mr. Xiao about $30,000 from 2017 to 2020 based on "generous productivity rewards from his university [GUT] for his publications, including some of our joint works." As these three interlocking pieces of evidence show—the grant, the faculty appointment, the money—Mr. Xiao's relationship with GUT directly corroborates the fact that Mr. Xiao had an ongoing grant in Guangdong Province that he hid from NSF.

**6.     ICBC account**.

The government opposes Defendant's motion to exclude evidence about Mr. Xiao's bank account at the Industrial and Commercial Bank of China (ICBC). That Mr. Xiao in fact had bank accounts in China during the relevant time period, but told IRS he did have foreign bank accounts, is evidence of Mr. Xiao's intent under counts 4-7 of the superseding indictment.

**7.     Todd Wakeland**.

The government opposes Defendant's motion to exclude testimony from SIUC's export-control officer, Todd Wakeland. As explained above, in January 2019, Todd Wakeland (a) alerted SIUC faculty about Chinese recruitment; (b) warned SIUC faculty that such positions increased the risk of conflicts with US grants; and thus (c) requested that SIUC faculty tell him about any applications to China's talent programs and alert him if the Chinese government contacted SIUC faculty about their research.

This email in January 2019, and Mr. Wakeland's other work at SIUC, is directly relevant to the charged offenses in two ways. First, Mr. Wakeland's email put Mr. Xiao on notice that full disclosure of positions in China was important to uncover potential conflicts with US grants. Contrary to defense's pretrial motions, Mr. Xiao was not confused or unsure in April 2019 about whether his positions and projects in China had to be disclosed to NSF. He had been told

8

repeatedly that such positions and projects presented potential concerns (by both SIUC and NSF), and then chose not to disclose them. Second, Mr. Wakeland's email and Mr. Xiao's failure to respond show his state of mind. At the same time when Mr. Xiao was concealing his positions and projects from NSF, he was also failing to respond to a similar disclosure request from Mr. Wakeland, and (as alleged in counts 4-6) making false statements to the IRS about his foreign accounts.

8. **Plagiarism investigation**.

Finally, the defense asks the Court to exclude evidence regarding a plagiarism investigation concerning Mr. Xiao's 2017 NSF grant application and the subsequent finding by SIUC. *See* Doc. 51 at ¶ 9. The United States does not intend to introduce evidence about the outcome of the plagiarism investigation unless it is elicited by the defense, or to rebut evidence from the defense about Mr. Xiao's character for truthfulness. But the existence of the investigation is direct evidence of Mr. Xiao's intent to defraud with respect to the specific 2018 grant application referenced in the indictment. When interviewed by the FBI and asked about the 2018 grant application, Mr. Xiao himself brought up the plagiarism investigation and explained that it played a crucial role in his decision to defraud NSF.

By way of background, Mr. Xiao's prior 2017 NSF application (not the 2018 application underlying the indictment) was referred by NSF to SIUC for alleged plagiarism, and that referral led to a research misconduct investigation at SIUC during 2019. Importantly, this investigation was still going on when the NSF program director, Ms. Ou, emailed Mr. Xiao in April 2019 asking him to disclose any positions outside of the United States and any source of funding from any non-US funding source, as well as his corresponding time commitments.

9

When FBI interviewed him in connection with the grant fraud, Mr. Xiao brought up the plagiarism investigation. When asked why he did not disclose his affiliation with Shenzhen University even when NSF specifically followed up, Mr. Xiao explained that he was concerned it would make him look bad and potentially damage his relationship with SIUC. The agent asked "Why didn't you follow up and do that?" that is, make the disclosure? Xiao responded a few lines later "Yeah, I think I should do that but I just didn't do it at the time." He explained:

> **Xiao**: My thinking is that they will make more and more complicated, is that now its already about the plagiarism and then over the money [from Shenzhen University], and everything go together … it makes just…
>
> **Agent**: right, you were worried it was just going to stack on, so…
>
> **Xiao**: Right, right. It just makes this thing seem more and more complicated and how to explain it …

*See* Doc. 46-1 (audio recording) at 1:19:40.

According to Mr. Xiao, then, the existence of the plagiarism investigation played a central role in Mr. Xiao's intent to defraud, according to his own statements. One of the reasons he decided not to make a required disclosure to NSF was his concern that the full disclosure—on top of the existing plagiarism investigation—would make it "harder" for him to get the grant and might hurt his relationship with SIUC. There is no propensity inference here, just Mr. Xiao's own explanation of his intent to defraud.

Thus, by his own admission, Mr. Xiao knew he should have added Shenzhen University to his "organizational affiliations" list but did not do so in part because he feared it would hurt his chances of getting the grant and potentially damage his relationship with SIUC. This directly rebuts any defense that he did not disclose because he (1) did not understand the question, or (2) did not believe he should disclose his "organizational affiliation" with Shenzhen University.

10

## CONCLUSION

For the foregoing reasons, the Court should grant in part and deny in part Defendant's motions in limine as outlined above.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

*s/ Peter T. Reed*

PETER T. REED
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL 62208
Peter.Reed@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-cr-40039-SMY |
| | ) | |
| MINGQING XIAO, | ) | |
| | ) | |
| Defendant. | ) | |

**Certificate of Service**

I hereby certify that on October 7, 2021, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Peter T. Reed*

PETER T. REED
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL 62208
Peter.Reed@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720