**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,      )
                                    )
          Plaintiff,          )
                                      )
vs.                                        )       Case No: 21-CR-40039-SMY
                                      )
MINGQING XIAO                   )
                                      )
          Defendant.       )
                                      )

## DEFENDANT MINGQING XIAO'S MOTION IN LIMINE TO PRECLUDE THE GOVERNMENT'S EVIDENCE PROFFERED IN ITS RULE 404(B) NOTICE

Now comes, defendant Mingqing Xiao, by and through his attorneys, Ryan P. Poscablo and Patrick F. Linehan, who provide the Court with this *motion in limine* to preclude the United States' from offering the evidence cited in their Notice of Rule 404(b) Evidence (ECF No. 108) ("Gov't 404(b) Notice" or "Notice") [1]  The Notice seeks to admit the following as direct evidence of the charges under the indictment, but offers the evidence under Rule 404(b) "out of an abundance of caution" and "in the alternative": 1) an unrelated plagiarism investigation; 2) Dr. Xiao's relationships with two Chinese universities not at issue in this case; and 3) an account with the Industrial and Commercial Bank of China ("ICBC"). *See generally,* Gov't 404(b) Notice.

Despite the government's claim that its case is nothing more than a simple "grant fraud" case, the proffered evidence constitutes irrelevant, highly prejudicial, propensity evidence.   Dr. Xiao therefore respectfully requests that this Court exclude this proffered evidence as each

---

[1] The government represented to the Defense via email that this Notice is meant to supplant it's previously filed 404(b) motion, filed on October 4, 2021 before the trial in this matter was adjourned to April 25, 2022 (EFC No. 56); *See* March 22, 2022 Email from AUSA P. Reed, attached hereto as Ex. 1. Accordingly, this response only addresses those arguments that appear in the current Notice and consider any arguments not advanced in the current Notice abandoned.

constitutes impermissible propensity evidence under Rule 404(b) *and* because the proffered evidence is irrelevant and unduly prejudicial under Rules 401, 402 and 403.

First, as discussed more fully below, the government's offer of proof connecting the NSF's research misconduct investigation to the charged conduct was *manufactured* by the government's own agents during their two-hour interrogation of Dr. Xiao.  Importantly, the government offers scant arguments why such evidence should be permitted under Rule 404(b).  This "evidence" should be further precluded for its irrelevance, and for the distinct and clear possibility that it would confuse and mislead the jury while providing little probative value.

Second, despite the government's consistent proclamations that its case against Dr. Xiao is not about China, the China Initiative, espionage, spies or any trade security between the United States and China, the government seeks to offer irrelevant evidence related to *other* Chinese universities that have no connection to the charged conduct.  The government's convoluted and constructed assertions related to Foshan University ("Foshan") and the Guangdong University of Technology ("GUT") should be excluded as both direct evidence under Rules 401, 402 and 403 and as 404(b) other-act evidence as neither alleged relationship has any connection to the government's claim that Dr. Xiao committed grant fraud related to his 2018 United States National Science Foundation grant by failing to identify his relationship with *Shenzhen University*.

Lastly, as to the introduction of highly prejudicial evidence concerning an ICBC bank account, the government seeks to offer nothing more than highly prejudicial propensity evidence and a constructive amendment of the superseding indictment, as related to this account.  This too should be excluded pursuant to Rules 401, 402, 403 and 404(b).

## APPLICABLE LAW

### A.  Other-Act Evidence Under Rule 404(b)

Federal Rule of Evidence 404(b) prohibits the admission of evidence of crimes, wrongs, or other acts to prove a person's character or propensity to behave in a certain way.  *See* Fed. R. Evid. 404(b).  It is not enough for a proponent to simply link such "other-act" evidence to another purpose.  *See id.*; *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012).  Instead, the proponent of other-act evidence must demonstrate that the entire chain of reasoning is propensity-free because a permissible ultimate purpose does not cleanse an impermissible secondary purpose.  *See United States v. Gomez*, 763 F.3d 845, 855–56 (7th Cir. 2014).

To demonstrate a propensity-free chain of reasoning, a proponent must show *how* the evidence tends to make a fact in issue more or less probable.  *See id.* (holding that district court's admission of cocaine in defendant's bedroom was erroneous because the government failed to connect it to the cocaine distribution conspiracy at issue, leaving only a propensity inference).  If the proponent cannot persuasively and specifically demonstrate the link, then the evidence likely relies on an impermissible propensity inference.  *See United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012) (finding that relevance of defendant's prior conviction rested on propensity because the government failed to articulate a rationale beyond a bare recitation of "intent" that did not actually connect prior conduct to current charge).  This risk is especially dangerous when other-act evidence is purported to show intent. The Seventh Circuit requires special caution in this situation, as it has found the intent is "most likely to blend with improper propensity uses. *See Gomez*, 763 F.3d at 858.

For specific-intent crimes like those charged in the instant action, "other-act evidence offered to prove intent 'can still be completely irrelevant to that issue, or relevant only in an impermissible way.'" *Id.* at 859 (*quoting United States v. Miller*, 673 F.3d 688, 697-98) (7th

Cir.2012); *see also*, *e.g.*, *United States v. Lee*, 724 F.3d 968, 976 (7th Cir.2013) ("Simply because a subject like intent is formally at issue when the defendant has claimed innocence and the government is obliged to prove his intent as an element of his guilt does not automatically open the door to proof of the defendant's other wrongful acts for purposes of establishing his intent."); *United States v. Earls*, 704 F.3d 466, 471 (7th Cir.2012) ("Rule 404(b) does not provide a rule of automatic admission whenever bad acts evidence can be plausibly linked to another purpose.... The Rule 402 requirement of relevance and the unfair prejudice balancing inquiries of Rule 403 still apply with full force.").

Even if a proponent can overcome this special caution and show that the other-act evidence is relevant, this Court may still exclude the evidence under Rule 403 balancing test. *See* Fed. R. Evid. 403; *Gomez*, 763 F.3d at 859 (holding that, even though cocaine found in defendant's bedroom made it more probable that he was involved in the drug conspiracy at issue, the evidence was inadmissible because the government failed to show that this connection was propensity-free). Indeed, other-act evidence raises profound prejudice issues because it inherently contains an invidious risk that the jury will rely on the forbidden propensity inference. *See id.* at 857. For this reason, Rule 403 ultimately governs admissibility of Rule 404(b) evidence because, even where this other-act evidence is slightly probative under a non-propensity theory, it often has a high likelihood of prejudicing a jury. *See id.*

## B.  Direct Evidence Under Rules 401, 402 and 403

Federal Rules of Evidence 401 and 403 provide the primary constraints for the admission of direct evidence of a crime. *United States v. Hanjuan Jin*, 833 F. Supp. 2d 957, 962 (N.D. Ill. 2011) (citing *United States v. Gorman*, 613 F.3d 711, 718 (7th Cir. 2010) (noting that direct evidence is subject only to Rule 401's relevancy requirements and Rule 403's balancing test)). Under Rule 401 relevant evidence is "evidence having any tendency to make the existence of any

fact that is of consequence ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Rule 402 provides that relevant evidence is generally admissible unless there is a reason for its exclusion. Fed.R.Evid. 402. And Rule 403 provides a balancing test, under which the Court must weigh whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Fed.R.Evid. 403; *see also Gorman*, 613 F.3d at 718 (7th Cir. 2010). The Rule 403 balancing test in particular ensured that the risks of bias and prejudice, in the introduction of evidence are minimized and controlled. See Fed. R. Evid. 403. The Supreme Court has made clear that "unfair prejudice" should be understood as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

## ARGUMENT

The government offers that three categories of purported "other acts," 1) the NSF's unrelated research misconduct investigation; 2) Dr. Xiao's relationships with *other* Chinese universities; and 3) an account with ICBC, if not admitted as direct evidence, should be admitted under Rule 404(b).  The government's Notice lacks any propensity-free chain of reasoning to support the admission of this evidence, instead relaying on conclusory assertions and prejudicial narratives to create links between this evidence and the charges at issue.  Moreover, the government offers no reason why the limited probative value of each of these "acts" would overcome the substantial prejudice from allowing such evidence to be presented to the jury.  All of this evidence should be precluded.

### A. The Research Misconduct Investigation Has No Relevance Other Than to Prejudice Dr. Xiao.[2]

In a thinly-veiled attempt to further malign Dr. Xiao's character and academic reputation, the government seeks to introduce evidence of an irrelevant investigation of Dr. Xiao by the NSF's Office of Inspector General (NSF OIG), and a parallel SIUC investigation, neither of which have any relation to the charges in this case.[3] The government fails to identify a logical, non-propensity chain of reasoning to admit this evidence, other than what was supplied *to* Dr. Xiao *by* FBI agents. The admission of this evidence would serve only to impermissibly subject the jury to a lengthy and confusing trial within a trial on an issue that is not before this Court (i.e., alleged plagiarism by Dr. Xiao for failing to cite to a Wikipedia page).

In an effort to survive preclusion, the government offers its agents' own manufactured link between the investigation of potential plagiarism on two of Dr. Xiao's previous NSF grant applications and Dr. Xiao's 2018 NSF application. In its Notice, the government blatantly and invidiously distorts Dr. Xiao's statements made during the FBI's December 3, 2020 interrogation of him to fit its narrative and create a causal link where one does not exist. The government claims that Dr. Xiao said that he did not disclose his relationship with Shenzhen University to the NSF because Dr. Xiao believed that, when compounded with the then-ongoing NSF-OIG investigation, it would be harder to acquire the NSF grant. However, a plain review of the interrogation recording and accompanying transcript demonstrates that Dr. Xiao expressly denied the line of reasoning that the investigation impacted his other application disclosures.

---

[2] While the Court has ruled that the FBI's questioning of Dr. Xiao was not custodial in nature, it is undisputed that during an unwarned interrogation of Dr. Xiao, Agents Bockelmann and Morris, elicited the statements upon which the government now relies to show the relevance of the plagiarism investigation.

[3] The defense's Consolidated Motions in Limine sought to preclude the government from offering evidence of the outcome of the NSF OIG and SIUC investigations. *See* Defendant Mingqing Xiao's Consolidated Motion in Limine (ECF No.110). In the government's Response to the Defendant's Motions in Limine (ECF No. 113) and the Gov't 404(b) Notice, the government states its intent to introduce statements made by Dr. Xiao concerning the investigations. Here, Dr. Xiao addresses why these statements should also be precluded.

The government also claims that Dr. Xiao should have disclosed his guest professorship with Shenzhen University in response to the NSF's April 2019 follow-up email. *See* Gov't 404(b) Notice at 7. The government insists that "[w]hen asked why he did not disclose his affiliation with Shenzhen University even when NSF specifically followed up, Mr. Xiao explained that he was concerned it would make him look bad and potentially damage his relationship with SIUC." Gov't 404(b) Notice at 7.[4] As the interview transcript shows, however, Dr. Xiao said nothing about the connection between the research misconduct investigation and 2018 NSF application *that was not supplied to him by the government*. The government manufactured a nexus between the investigation and the NSF email by presenting to the Court cherry-picked excerpts from his statements and strategically omitting those to the contrary.[5] After the Agents asked Dr. Xiao why he did not disclose his relationship with Shenzhen University to the NSF during the April 2019 email exchange, Dr. Xiao stutters in trying to answer them, when the Agents speak over him— "I mean, if the answer is 'I was worried I wasn't going to get the grant,' that's fine, just be honest." *See* Interrogation Transcript (ECF No. 39-1) ("Tr.") at 41:11–15.

---

[4] While the government couches its argument for the admissibility of the plagiarism in an intent analysis, a closer examination of its argument reveals that its analysis hinges on motive. *See Young v. City of Harvey*, 2016 U.S. Dist. LEXIS 102932, at * 6–8 (N.D. Ill. Aug. 4, 2016) (explaining motive as "why someone performed an act" and intent as "an intent to perform some act" or doing an act with a specific "intent to defraud").

[5] Here FBI agents deployed the exact interrogation playbook that the Supreme Court decided *Miranda* to remedy:

> The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it . . . These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already -- that he is guilty. Explanations to the contrary are dismissed and discouraged.

*Miranda v. Arizona*, 384 U.S. 436, 450 (1966). Here, agents posited Dr. Xiao's guilt as a fact, and repeatedly hammered him on his motivations, while ignoring Dr. Xiao's repeated assertions that any money from Shenzhen University was a travel reimbursement and did not belong to him. Instead, Dr. Xiao's story was steamrolled, and agents zeroed in on their pre-conceived elaboration of Dr. Xiao's guilt—that he deliberately withheld information about his relationship with Shenzhen University because he thought it would make him look bad and more difficult to get the NSF grant. In reality, Dr. Xiao never brought up that he feared that his relationship with Shenzhen University would prevent him from getting the grant – after all, how could he? NSF already knew about Dr. Xiao's relationship with Shenzhen University because he explicitly disclosed it on his application, under the Biographical Sketch section, which he understood to be the appropriate location for such a disclosure. *See* 2018 NSF Application ("Ex. 2").

Dr. Xiao then explains that he *did not* think that his relationship with Shenzhen University would prevent him from getting the grant because, after all, his relationship with Shenzhen University is clearly disclosed on his application. *See id.* at 41:23–25. (Agent Bockelmann: "You thought you wouldn't get it because of your current and pending support from Shenzhen University;" Dr. Xiao: "No, no, no;"). Instead, Dr. Xiao responds that he never expected to receive the 2018 NSF grant in the first place because of the research misconduct investigation (*See id.* at 41:26--27 (Agent Morris: "You were worried you weren't going to get it because of the plagiarism issue?;" Dr. Xiao: "Yeah, yeah, yeah, yeah, yeah.")) and that he was concentrating on that separate issue. *See id.* at 41:18; 41:32–42:11. Dr. Xiao was trying to convey that the *research misconduct investigation* would complicate NSF's review of his grant application, and so he did not think that he would be awarded the grant for that reason alone. *See id.* at 41:23–27.

However, agents distort Dr. Xiao's explanation by repeatedly injecting their own idea of his intent, interrupting him to say, "You were worried [the Shenzhen disclosure] was just going to stack on." *See* Tr. at 42:16. Instead, Dr. Xiao clarifies to say "I would prefer [NSF to determine that] the plagiarism things clear out" and reiterated that he, "didn't view this money" as his money and did not use it for his personal benefit—a point that he made clearly just minutes before. *See id.* at 42:21–22; 37:14-21 (Agent Morris: "So if you weren't sure about if you should say anything about that money or not why didn't you just ask that person?"; Dr. Xiao: "Oh money, yes I don't say it's basically this because this I didn't view this money as mine so actually um so I just leave them sit there. And but for the CV I did list my uh I did list my uh guest professor association with the Shenzhen University and other university"). Despite this clarification, the government is now attempting to misrepresent Dr. Xiao's own words on the recording as an admission of intent, when

in fact the recording demonstrates that any purported connection between Dr. Xiao's Shenzhen University disclosure and the plagiarism investigation was manufactured by the agents.

Under the guise of "distilling this down," the agents assert their own view of the relationship between Dr. Xiao's plagiarism investigation and the Shenzhen University disclosure:

> If this wouldn't have been at the same time that you had the plagiarism issue, you definitely would've made sure that you had all those forms filled out but because you were worried about that being stacked onto your issue of plagiarism. . . So you were just really worried that if you told [NSF] about this right now, even though you didn't view it as that big of a deal, if you told them about this, coupled with the plagiarism, you weren't going to get the grant and you were worried about that.

*See id.* at 42:26–34.

Rather than accepting Dr. Xiao's own account of his own subjective mental state, agents deliberately distort and dismiss Dr. Xiao's explanation to the contrary. *See id.* at 42:26–28. Indeed, in obvious deference to the Agents, Dr. Xiao ultimately regurgitated the lines they repeatedly fed him that the plagiarism investigation and Shenzhen University disclosure were compound concerns. *See id.* at 42:13-17. This back-and-forth is clearly reflective of a well poisoned by the government agents rather than an independent statement of intent to defraud, as the government suggests. In each other instance in which Dr. Xiao had the opportunity to clarify his mindset, he explained that he was concerned about *the plagiarism investigation,* not the disclosure of "his affiliation with Shenzhen University," as the government claims. He was concerned that the *plagiarism investigation* would make it harder for him to get the grant (a concern he always has, due to the competitive nature of acquiring research grants), and that the *plagiarism investigation* might jeopardize his employment with SIUC.[6] *See id. at* 43:1–9.

---

[6] Dr. Xiao's disclosure of his relationship with Shenzhen University to the NSF could not possibly damage his relationship with SIUC or make it more difficult for him to get the NSF grant. Not only did SIUC already know about Dr. Xiao's affiliation with Shenzhen University, SIUC encouraged this connection to boost its lagging enrollment numbers. See "Success stories…" Email from B. Bhattacharya to SIUC Math Department (Nov. 19, 2018) ("Ex. 4") ("Professor Xiao helped to establish relation with Shenzhen University in China. This helped us to get several UG students who likely will continue in MS/PhD."); "Exchange students enrollment" Email from B. Bhattacharya to Dr.

The government's strained effort to convince Dr. Xiao during his interrogation, and now this Court, to accept its narrative that the existence of this unrelated investigation is indicative of his intent to make disclosures on the 2018 NSF application at issue is simply unpersuasive and does not justify admission under Rule 404(b). *See Miller*, 673 F.3d at 699. Similar to the government's attempt in *Miller*, the government's unpersuasive argument revealed a "forbidden inference that [Dr. Xiao] has a certain character and acted in accordance with that character" when submitting the NSF application. *See* Gov't 404(b) Notice at 2–3 (alteration added); *Miller*, 673 F.3d at 698. Despite the government's conclusory assertion that "[t]he risk of unfair prejudice [from admitting this evidence] is low," Gov't 404(b) Notice at 9, this ignores the reality: plagiarism is a serious allegation in academia and carries a high risk of unfair prejudice due to its implications for honesty and truthfulness. A jury that hears evidence of the plagiarism investigation will be unable to separate out a propensity inference, leading to prejudice against Dr. Xiao.

Contrary to the Government's assertions, this research misconduct investigation is unrelated to the charged conduct. It has no bearing on Dr. Xiao's intent and it certainly has no bearing on Dr. Xiao's character for truthfulness. At the investigation's conclusion on November 15, 2021, NSF OIG found that Dr. Xiao acted "knowingly" which in this context means that "he had an awareness of his actions" as opposed to acting "willfully." NSF OIG Assessing Intent in Research Misconduct Investigations Memo. Dr. Xiao was found to have *inappropriately* cited multiple lines of text; many of these references did in fact have a citation. The NSF *did not* find that Dr. Xiao acted "willfully" and explicitly stated that Dr. Xiao "took full responsibility for the

Xiao (Dec. 10, 2018) (noting that exchange students from Shenzhen will continue to return to SIUC) ("Ex. 5"). Second, there was no reason for Dr. Xiao to believe that disclosing his relationship with Shenzhen University to NSF would have made it "harder" for him to get the grant because Dr. Xiao did in fact disclose his relationship with Shenzhen University to NSF. See Ex. 2 (listing "Biographical Sketches of MingQing Xiao . . . Guest Professor, Shenzhen University, China (since 2016).").

copying."  At no point did SIUC or the NSF indicate that they believed this was anything other than what the investigation found, "an isolated incident" where the "violation of the policy was not a willful or malicious one."  December 4, 2020 Letter to Mingqing Xiao.

This investigation spanned nearly two years; during which time hundreds of pages of records were reviewed, two different panels of professors at SIUC deliberated for hours, there was an additional review by SIUC administrators, and a final layer of review by the NSF OIG.  The introduction of this essential context would necessitate a trial within a trial on what is, ultimately, an unrelated issue.

This Court should not permit the admission of this evidence against Dr. Xiao, which would lead to unfair prejudice against Dr. Xiao as well as a burdensome and confusing mini-trial on an irrelevant issue, further prolonging and over-complicating an already-lengthy and contentious criminal trial.

### B. Any Relationships That Dr. Xiao Had with Chinese Universities Not Charged in the Superseding Indictment are Patently Irrelevant and Designed to Incite Juror Prejudices and Should Not be Admitted.

Evidence of Dr. Xiao's alleged relationships with two other Chinese universities – GUT and Foshan – should also be excluded under Rules 401, 402, 403 and 404(b).

### 1. The Government's Proffered Nexus between Dr. Xiao's Relationship with Guangdong University of Technology and the Guangdong Province Grant is Conclusory and Unfounded.

The government argues that Dr. Xiao had a 2016 guest professorship agreement with GUT and that, as a result, he "used his base at Guangdong University of Technology [ ] to apply for and receive the Guangdong Province grant described in the indictment."  The sole argument offered by the government is that "Defendant's contract with GUT is direct evidence of facts charged in the indictment because it tends to show he had a grant in Guangdong Province based at GUT."  ECF No. 108 at p. 5.  The government offers no other rationale, no other offer of proof, and no

other reasoning to establish the probative nature of this connection.  Instead, it appears to be arguing that the probative connection between the University and the Provincial grant can be drawn solely from their sharing the name "Guangdong."  This is insufficient.  If this evidence is permitted, it would confuse the jury, incur substantial prejudice to Dr. Xiao, and create a trial within a trial, requiring the defense to defend against a relationship that is not at issue in this case. This "direct" evidence should therefore be excluded pursuant to Rules 401, 402 and 403.

Seemingly acknowledging the weakness of its direct evidence, the government next offers its flawed reasoning for permitting this evidence under Rule 404(b) -- that this evidence should be permitted, in the alternative, to show that Dr. Xiao at least "had a plan and opportunity to apply for Chinese government grants through GUT." (ECF No. 108 at p. 5)  This conclusory explanation is both unpersuasive and non-specific and should not survive review under Rule 404(b). The government has offered no evidence that a relationship with GUT created an opportunity for him to apply for a grant with Guangdong Province, or made it more likely that he would be awarded such a grant, which he was not. Nor do they offer any evidence that Dr. Xiao *believed* that a relationship with GUT afforded him such an opportunity. The government's proffered reasoning suggests that this GUT relationship was required for grant acquisition, and thus makes the grant more probable. However, the government's conclusory statements about the relevance of this evidence do not make it so.  It offers no support for this suggestion, as none exists. The fact that the alleged Guangdong Province Grant was referenced in conjunction with Professor Shuting Cai, a professor at GUT, has no bearing on the relevance of *Dr. Xiao's* relationship with GUT.  The government grasps at straws in an attempt to admit this evidence—claiming that an unsigned contract providing research "incentives" "ties the [alleged Guangdong Province] grant and [the guest professorship] together," Gov't 404(b) Notice at 6. In fact, over the course of his career, Dr.

Xiao, like most academics in his field, applied for a number of grants from public and entities, none of which required that he have a specific or preferred university affiliation.

Even were this Court to hold that the GUT guest professorship is relevant to the Guangdong Province Grant, the government still fails to show that this evidence is relevant in a non-propensity way under Rule 404(b). "On that pivotal question, the government has little to offer." *See Gomez*, 763 F.3d at 863. In *United States v. Gomez*, the government failed to connect cocaine found in the defendant's bedroom to the cocaine distribution conspiracy at issue, leaving a bare propensity inference. 763 F.3d at 855–56. The *Gomez* Court found that even if the small amount of cocaine found in the defendant's did make it more probable that defendant was involved in a drug conspiracy, the evidence was ultimately inadmissible because any relevance was tenuous and continued through a chain of propensity reasoning that the defendant does drugs and so must have been involved in the conspiracy. *Id.* at 863. As in *Gomez,* the government here has failed to connect the unsigned offer of a GUT guest professorship to the alleged Guangdong Province Grant listed in Dr. Xiao's sabbatical application. However, even if this Court finds that Dr. Xiao's guest professorship at GUT is relevant to the Guangdong Province Grant, any relevance provided by the "incentives" in the contract and the fact that the co-PI was a GUT professor is tenuous and continues along a chain of propensity reasoning. Because the government cannot persuasively and specifically demonstrate that the "other-acts" make a fact in issue more or less probable, the reasoning rests on a faulty propensity inference the Court should bar the admission any evidence of Dr. Xiao's relationship with GUT. *See Miller*, 673 F.3d at 699.

### 2. The Government Fails to Identify a Nexus Between Dr. Xiao's Relationships with Guangdong University of Technology and Foshan University, and the Charges at Issue.

Next, the government argues that Dr. Xiao's relationships with GUT and Foshan University ("Foshan") serve as direct evidence of willfulness in support of the false statement, tax

fraud, and failure to file charges Counts 4-7 of the Superseding Indictment. The government argues that if the Court does not accept this reasoning, then it should admit this evidence under Rule 404(b) to show lack of mistake as to the alleged false statements on unspecified Form 1040s.

The logic of the government's arguments regarding Foshan University is difficult to follow. First, the government seeks to admit evidence of Dr. Xiao's relationships with GUT and Foshan University, and payments from these entities, as direct evidence of the "willfulness" for the charges of tax fraud, false statement and, failure to file an FBAR. The government then asks the Court, if it does not accept this circuitous reasoning, to instead admit this as evidence of intent and lack of mistake as to Dr. Xiao's alleged false statements related to foreign bank accounts on his Form 1040s (and does not specify the tax years to which this reasoning would be applicable). This argument represents another attempt by the government to advance its request by offering a conclusory assertion.

The government fails to meet its burden to show a non-propensity chain of reasoning between the mere fact of Dr. Xiao's relationships with these universities and his representations to the IRS about his *financial interest* and *signature authority* over any foreign bank account. The government simply cannot make the significant leap to connect these points. It has, for example, proffered no evidence Dr. Xiao was presented with Form1040 question asking taxpayers whether they have *financial interest* and *signature authority* over a foreign bank account during the relevant tax years, and understood those terms to apply to any accounts that he held in China, and that the nature of and activity on those accounts was somehow connected to his relationships with GUT and Foshan. The government has made no such showing. Even if these alleged relationships with GUT and Foshan were somehow relevant to the conduct charged in the Superseding Indictment, any probative value is substantially outweighed by a danger of confusing the issues, misleading

14

the jury, and, most invidiously, unfair prejudice. Irrelevant evidence of Dr. Xiao's other guest professorships creates an unacceptable risk that any jury verdict would be based in anti-China bias.

### 3. Irrelevant evidence of Dr. Xiao's other guest professorships creates an unacceptable risk that any jury verdict would be based in anti-China bias.

Not only will the introduction of Dr. Xiao's guest professorships with GUT and Foshan confuse and mislead the jury, it will create a danger of unfair prejudice against Dr. Xiao. The government's failure to identify the relevance of Dr. Xiao's extraneous guest professorships reveals its improper motive—emphasizing Dr. Xiao's ties to China in hopes of encouraging prejudice amongst the jurors. *See McKiver v. Murphy-Brown*, 980 F.3d 937, 998 (4th Cir. 2020) (Agee, J., dissenting in relevant part) (rejecting majority's holding that plaintiff simply may not "emphasize" defendant's irrelevant Chinese parent company because the escalating political tensions created an unacceptable risk that the jury's verdict would be based on anti-China bias); *Miller*, 673 F.3d at 699. At bottom, the government claims that Dr. Xiao has relationships with Chinese Universities, has Chinese collaborators, is Chinese-born, and so must have applied for a Chinese grant.

The government should be prohibited from making arguments that inflame bias based on race or national origin because "it draws the jury's attention to a characteristic that the Constitution generally demands the jury ignore." *See United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1044 (7th Cir. 2013). Not only do courts prohibit arguments based on race, but they routinely exclude irrelevant or prejudicial evidence of defendants' Chinese national origin. *See Indem. Ins. Co. v. Electrolux Home Prods.*, 520 Fed. App'x 107, 111 (3d Cir. 2013) (affirming denial of evidence of refrigerator's manufacture in China); *Fabric Selection, Inc. v. NNW Imp. Inc.*, 2018 U.S. Dist. LEXIS 62334, at *24 (C.D. Cal. Apr. 11, 2018) (excluding references to China and Chinese business practices to show intent because, even though the Office of U.S. Trade Representatives

put China on a watch list for IP theft, the risk of unfair prejudice outweighs the probative value).

Here, the government fails to persuasively identify the relevance of Dr. Xiao's relationships with GUT and Foshan. These universities have nothing to do with the offenses charged in the Superseding Indictment and evidence of Dr. Xiao's relationships with them would result in a burdensome and time-consuming mini-trial surrounding these uncharged university relationships. Such evidence will most assuredly will confuse the jury in what the government claims is a simple grant fraud case. Additionally, due to the international climate in the tailwind of the now-defunct China Initiative, the admission of this evidence creates a genuine likelihood that any verdict would be influenced by anti-China bias, rather than the offenses charged in the indictment. *See McKiver*, 980 F.3d at 999 (4th Cir. 2020) (Agee, J., dissenting in relevant part). We respectfully ask that this Court exclude evidence of Dr. Xiao's relationships with these universities because that evidence "draws the jury's attention to a characteristic that the Constitution generally demands the jury ignore" and creates the risk that the jury will reach a verdict based in unfair prejudices about Chinese professionals. *Ramirez-Fuentes*, 703 F.3d at 1044 (7th Cir. 2013).

The government's argument for the admission of this evidence is based on a crabbed reading of the facts and yet another manufactured chain of reasoning. The introduction of this purported evidence will confuse the jury and will create a substantial risk that the verdict will be based, in part, on an impermissible connection to Dr. Xiao's national origin and a manufactured narrative that Dr. Xiao is disloyal to the United States, where he has been a devoted citizen and contributor to this nation's intellectual fabric for nearly three decades.

**C. Evidence of an Unindicted Bank Account with ICBC Should Not be Admitted As it is Irrelevant, Prejudicial and Constitutes a Constructive Amendment to the Superseding Indictment.**

Evidence of any account with Industrial Commercial Bank of China should not be

admitted, either as direct or other-act evidence under Rules 401 and 404(b). The admission of this evidence would amount to a constructive amendment of the Superseding Indictment which would open the door for a minitrial on an issue not before the jury and constitute a violation of Dr. Xiao's rights under the Sixth Amendment.  Moreover, the government fails to offer a non-propensity chain of reasoning to support the admission of evidence concerning any ICBC Bank Account under Rule 404(b).

In Counts 4-6 of the Superseding Indictment, the government alleges that Dr. Xiao made false statements on his tax returns during tax years 2017-2019 when he failed to appropriately disclose that he had financial interest in and signature authority over "a financial account at Ping An Bank…". ECF No. 57 at pp. 5-6. Likewise, it offers as the basis for Count 7 that Dr. Xiao, failed to file an FBAR to disclose an "interest in and signature authority" over that same Ping An Bank account, which it alleges had a value of over $10,000 for tax year 2019. *Id.* at pp. 6-7. In order to advance its charges in Counts 4-7, the government presented before the Grand Jury testimony from Special Agent Justin Fletcher of the IRS Criminal Investigations Unit. SA Fletcher was questioned and testified at length, *exclusively*, about his evaluation of the Ping An account referenced in Counts 4-7. There is no mention of any account at ICBC throughout his testimony.

While the government at no time sought to introduce allegations concerning any accounts allegedly held by Dr. Xiao other than this Ping An account, now, on the eve of trial, they seek to introduce evidence that would effectively amount to an additional charge against Dr. Xiao, without providing him with proper notice and an opportunity to defend against it. *See United States v. Rosin*, 892 F.2d 649, 651 (7th Cir. 1990) ("It is true that an indictment is sufficient only if it 'fairly informs the defendant of the charges against him so that he may prepare a defense....'")(*quoting United States v. McCarty*, 862 F.2d 143, 145 (7th Cir.1988)).  Permitting the admission of evidence

concerning an ICBC Bank Account would significantly prejudice Dr. Xiao and would amount to a constructive amendment of the Superseding Indictment, broadening the scope of its allegations. This would unfairly place Dr. Xiao in the position of defending claims concerning an ICBC Bank Account, a charge of which he was not adequately apprised, and for which the government has offered no support. *See United States v. Rosin*, 892 F.2d 649, 651, n.1 (7th Cir. 1990) ("The problems with an amendment are that it denies the defendant the opportunity to be charged by a grand jury of his peers for every offense, and may mean he was not adequately apprised of the charges against him."); *see also United States v. DeCicco*, 439 F.3d 36, 43 (1st Cir. 2006)("A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them…A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction."). This would lead to a burdensome and confusing mini-trial on an issue that has *not* been offered to prove guilt of the *charged* offenses, as may be proper under Rule 404(b). *Compare United States v. Rosario-Diaz*, 202 F.3d 54, 71, 53 Fed. R. Evid. Serv. 1448 (1st Cir. 2000). Evidence concerning an ICBC Bank account is not direct evidence of any charge in the Superseding Indictment. It does not tend to make any fact at issue concerning the Ping An Bank accounts referenced therein more or less probable. *See Fed.R.Evid. 401.*

Realizing that it cannot offer evidence of an ICBC Bank Account as direct evidence, the government now asks this Court to permit this evidence as Rule 404(b) evidence, under the premise that such evidence would show intent or lack of mistake. But the government offers scant reasoning as to why evidence of an ICBC Bank Account would show intent or lack of mistake concerning the Ping An Bank Account. All the government says is that this evidence should "be admitted as Rule 404(b) evidence for non-propensity reasons, i.e., because it shows Mr. Xiao's

intent and lack of mistake as to the false statements on his Form 1040s."  There is no further explanation or elucidation of its argument.  The government has offered nothing more than the argument that it is true simply because they say it is.  They offer no explanation to explain how Dr. Xiao's intent as to the Ping An Bank Account would be proven if evidence of ICBC Bank Account were permitted.  Similarly, they offer no argument or explanation as to how this displays a lack of mistake.  This scant reasoning and explanation falls woefully short of the requirements under Rule 404(b).  The government has simply failed to demonstrate – as it is required to do – that its entire chain of reasoning is propensity-free.

Moreover, the probative value of evidence concerning any ICBC Bank Account – which, given the Government's scant arguments is being offered as nothing more than propensity evidence – is outweighed by the significant prejudice that Dr. Xiao would suffer.

## CONCLUSION

WHEREFORE, Dr. Xiao respectfully requests that the evidence set forth in United States' Notice of Rule 404(b) Evidence be precluded from admission.

Dated: April 5, 2022

Respectfully submitted,

Ryan P. Poscablo, *pro hac vice*
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.3900

Patrick F. Linehan, *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW

19

Washington, DC  20036
plinehan@steptoe.com
202.429.3000

*Attorneys for Defendant Mingqing Xiao*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2022 I electronically filed Defendant's Response to the

Government's Notice of 404(b) Evidence with the Clerk of Court using the CM/ECF system which

will send notification of such filing the following:

Peter T. Reed
Assistant U.S. Attorney
9 Executive Drive
Fairview Heights, Illinois 62208

/s/ Ryan P. Poscablo
Ryan P. Poscablo, *pro hac vice*
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.3900

*Attorney for Defendant Mingqing
Xiao*