IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:21-cr-40039-SMY |
| | ) |
| MINGQING XIAO, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES' TRIAL MEMORANDUM**

At the heart of this case are Defendant Mingqing Xiao's false answers to two simple questions, showing his fraudulent intent. In 2019, the National Science Foundation (NSF) asked Mr. Xiao if he had "any position outside of the US or any source of funding from any non-US funding source" (including pending proposals), and any time commitment or salary attached to them. "The award size," NSF explained, "depends on what other support and commitments of time you have, particularly other projects whose work overlaps this one." In order to get the grant, Mr. Xiao told NSF he had nothing to report, when in fact he *did* have positions overseas and current and pending funding from non-US funding sources.

Defendant's false statements to NSF were echoed in his false statements to the IRS. Form 1040 asks, "[D]id you have a financial interest in or signature authority over a financial account . . . located in a foreign country?" In 2017, 2018, and 2019, Mr. Xiao answered "no" to this question, when in fact he *did* have a foreign bank account, which he used to store money obtained from the very projects he fraudulently concealed from NSF.

This memo outlines the government's evidence and the bases for its admission into evidence at trial.

1

**FACTS**

Defendant Mingqing Xiao ("Xiao") is charged in a seven-count superseding indictment with wire fraud (count 1 and 2), making a false statement (count 3), subscribing to materially false federal income tax returns (counts 4-6), and failure to file a Report of Foreign Bank and Financial Accounts in 2019 (count 7).  All of these charges stem from the Defendant's relationships with universities in China, primarily Shenzhen University and Guangdong University of Technology.  These relationships were not themselves unlawful.  The charged crimes instead arise from Defendant's false statements and material omissions—to the National Science Foundation (NSF) and to the Internal Revenue Service (IRS)—about his relationships with Shenzhen University and Guangdong University of Technology, and the Chinese-government grants Defendant applied for or received through those relationships.

Federal programs are often the target of fraud, and federal grant programs are no exception. In September 2018, Mr. Xiao applied for a grant with NSF through his primary employer, Southern Illinois University – Carbondale (SIUC).  Professors like Mr. Xiao work for the university and are paid by them during the nine-month school year, which leaves only a few months for them to take on additional work.  In the grant proposal to NSF, Mr. Xiao promised to spend a "significant amount of his time" on the project and requested one month of salary for each year of the project. To back up this promise, the proposal claimed Mr. Xiao had *no other projects* taking up his time or paying him salary support (count 1).  Before submitting the grant proposal to NSF, Xiao signed and submitted a corresponding "proposal checklist" to SIUC, certifying that the submission was true, complete, and accurate, and acknowledging that false or fraudulent statements could subject him to criminal penalties (count 3).

Contrary to what he told NSF, Xiao was overextended. He used three different universities—SIUC, Shenzhen University, and Guangdong University of Technology—to apply for grants in the US and in China. He (1) had used his base at Guangdong University of Technology to apply for and receive a grant from the Natural Science Foundation of Guangdong Province for about $180,000 that ran from 2018 to 2022, (2) had contractually promised at least two months a year to Shenzhen University from 2016-2022, and (3) would soon apply for a grant from the National Science Foundation of China, promising to devote several additional months to that proposed project. There was no way, given these commitments, for Xiao to devote a significant portion of his time to the new NSF project.

Before recommending that Xiao receive the grant, the NSF program officer followed up with Xiao in April 2019. She expected to "recommend an award for the proposal," but wanted to check with Xiao about other projects:

> Also, this year we are asking all PIs to make sure that the current and pending support statement includes worldwide sources. So, if you have any position outside of the US or any source of funding from any non-US funding source please include it in your updated current and pending support page.
>
> **The award size depends on what other support and commitments of time you have, particularly other projects whose work overlaps this one.**
>
> So please send me a statement about any other support, including any other pending proposals. If there are no other grants or pending proposals but this one, it's enough to say that.
>
> Otherwise the statement must include two things:
> + months of effort devoted each year to other projects
> + months of salary support provided or requested in other proposals
> …

April 29, 2019 email (emphasis original). The request was straightforward, leaving Defendant a simple choice: risk losing the grant by making the required disclosures, or ensure he received the grant by continuing his fraud. Defendant told NSF that he had no projects "but this one" (count

3

2). It worked. Believing Xiao had no other projects "but this one," NSF awarded a grant for $151,099 running from August 2019 to August 2022.

Being overextended paid off not just for the status that comes from high performance, but also financially. Defendant told law enforcements agents that SIUC paid him about $90,000 for nine months of work. From 2016 to 2022, Shenzhen University paid him (or will pay him) at least an additional $24,000/year. From 2017 to 2020, he was also paid some $30,000 for his research projects at Guangdong University of Technology. For the payments from Shenzhen University and from his collaborator at Guangdong University of Technology, Defendant provided his bank account information at Ping An Bank in China (counts 4-7).

Evidence at trial will establish each of Defendant's other undisclosed projects.

**Guangdong Province grant**. In a series of 2016 emails, Xiao negotiated part-time employment terms with GUT in correspondence with GUT employees, Xuesong Chen and Shuting Cai. In October 2016, Xiao signed a contract with GUT and emailed it back to GUT. In November 2016, Xiao then submitted a grant application to the Natural Science Foundation of Guangdong Province through the same GUT employees. In September 2017, in a signed sabbatical application to SIUC, Xiao stated: "Recently, as a co-PI, I received an external grant from China (4 years) for a collaboration with Guangdong University of Technology." In a corresponding CV, he listed: "Natural Science Foundation of Guangdong Province of China, Co-PI, RMB 1, 200, 000 (approximately $180, 000), 2018-2022 (with Shuting Cai and Xiaoming Xiong)." Finally, in a series of emails in late 2017, Xiao and Cai discussed the best way to start sending payments to Xiao. Xiao sent Cai his bank information at Ping An Bank and Cai notified Xiao that there may be a delay before funds were released from the province, so payments would be routed through an entity called "Xinzhu" before GUT started making the payments to Xiao directly. Xiao later

replied, "Thank you and the company for your strong support for the research project." Xiao received approximately $30,000 from 2017-2020 as a result of his joint research work with Cai.

**Shenzhen University**. Across a series of emails in 2016, the Defendant negotiated a contract with Shenzhen University. Ultimately, the terms of the contract provided that Xiao would work at Shenzhen University for two months per year from 2016 to 2019. His responsibilities included publishing 5-6 papers jointly with others at Shenzhen University and listing Shenzhen University as the primary employer. He would also help train younger faculty and help them apply for talent program awards from the Chinese government. The contract also provided that Xiao's "annual compensation (including lodging and transportation subsidies) is RMB ¥156,000 yuan (pre-tax), paid monthly at RMB 13,000/month (pre-tax)"—about $24,000 annually. Xiao signed the contract on May 30, 2016. He also opened an account at Ping An Bank. Later, in December 2020, Xiao acknowledged to law enforcement agents that Shenzhen University had paid him about $2,000/month since 2016 by direct deposit into his Ping An Bank account.

On April 15, 2018, Xiao and Shenzhen University entered into a new, fully signed contract. The new contract ran from May 1, 2018 to April 30, 2023. The contract terms were similar, but Xiao took on increased research commitments (15 papers listing Shenzhen University as the primary employer for the work) and time commitment (full time) in return for increased funding and compensation, including an annual salary of RMB ¥660,000 (about $100,000).[1] In May 2018, Xiao submitted his "annual appraisal" to Shenzhen University reporting on his research and publishing work on behalf of Shenzhen University. In July 2018, Xiao applied for and received a "work permit" to work in person at Shenzhen University for 36 months. In the signed work permit

---

[1] Despite these new contract terms, Xiao has since insisted to SIUC that, in practice, the workload (2 months per year) and compensation (about $24,000 a year) remained the same from 2016 to 2022.

5

application, Xiao indicates that he intended to work in China for eight months a year from 2018 to 2023.  This new contract came less than six months before Xiao applied to the NSF in September.

**Natural Science Foundation of China**.  In November 2018, Xiao's contact at Shenzhen University suggested he apply for a grant from the Natural Science Foundation of China (NSFC).  On March 11, 2019, Xiao emailed the same person a link to a document titled "Xiao-NSFC-Final-2019(4).pdf" and confirmed "submission completed."  The NSFC application stated Xiao was a professor at SIUC from August 2007 to June 2018, then became a professor at Shenzhen University from July 2018 to present.  The grant application requested RMB ¥605,000 (about $90,000) from January 1, 2020 to December 31, 2023 and promised Xiao would work on the project for several months a year.  Only a few weeks later, the National Science Foundation (US) followed up to ask Mr. Xiao about other grants and pending proposals.  Xiao falsely assured NSF he had no positions outside the United States with time commitments or salary, and no pending proposals.

**Foreign bank accounts and tax counts**.  As explained above, Defendant received payments for these projects at Shenzhen University and in Guangdong Province by direct deposit into his account at Ping An Bank, which he opened when he signed his first contract with Shenzhen University in 2016.  Evidence will include Mr. Xiao's bank card and account opening documents in addition to the emails discussed above where Xiao represented that the account was his.  During his interview in December 2020, Xiao admitted to agents that the account was his, that no other person or entity was on the account, and that the account was located in a foreign country.  Xiao also confirmed that the Ping An Bank application on his cell phone could be used to access information about this account and later gave agents consent to access it.  A series of snapshots from that application—while by no means capturing every deposit and withdrawal into and out of the account—will show payments into the account for salary corresponding to his Shenzhen

University contracts as well as payments from a company in China. Relevant to count 7, the snapshots also show about $70,000 was moved out of the primary Ping An Bank account in April 2019 (possibly into another account), showing Xiao had that amount in the account (far in excess of the $10,000 reporting threshold for FBAR) at that point in the 2019 tax year.[2] These facts underlying these tax charges was discussed with Mr. Xiao in December 2020.

These numbers are confirmed by Defendant's own statements. Mr. Xiao did not file a timely FBAR for calendar year 2019. Nor did he correct this error after his interview with law enforcement. He was indicted April 21, 2021. Only after indictment did Defendant file delinquent foreign-account reports in April and July 2021. Those delinquent reports confirm that Xiao had accounts at Ping An Bank during tax years 2017, 2018, and 2019 and that the aggregate balance by 2019 was well in excess of $10,000.

## LEGAL ISSUES

The government's exhibits come from five main sources: Defendant's emails; Defendant's records and statements submitted to Southern Illinois University – Carbondale; Defendant's records and statements submitted to the National Science Foundation; foreign account documents; and Defendant's false statements to the IRS and his past-due, post-indictment disclosures to the Financial Crimes Enforcement Network (FinCen)—the part of the Treasury Department that handles reports of foreign accounts.

**A. Admissibility of emails between Defendant and third parties and related files.**

The government intends to use emails from Defendant Mingqing Xiao's work email (mxiao@siu.edu and mxiao@math.siu.edu) and personal email (mingqingxiao30@gmail.com), as

---

[2] The government will prove the conversion rate of yuan to dollars during the appropriate tax years through the testimony of the IRS Revenue Agent. The IRS Revenue Agent's testimony regarding the conversion rates will be based upon the publicly available conversion table used for FBAR filings. The Revenue Agent's reliance on this table is permitted under Fed. R. Evid. 703.

well as email attachments and linked documents, to show Xiao's undisclosed commitments. The United States will introduce the emails and attachments during the testimony of the case agent. These records are (1) authentic and (2) admissible under the hearsay rules.

      **1.     Authenticity of emails and related files**.

The Seventh Circuit has held that the government can authenticate email files without putting on one of the individuals personally involved in the email exchange. *See United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012) (holding that emails were properly authenticated using "circumstantial evidence" and noting "[a]uthentication can be established in a variety of ways" other than personal knowledge). As *Fluker* explains, "[o]nly a prima facie showing of genuineness is required," *id*., and there are many ways for email evidence to meet that threshold.

First, these emails and files are self-authenticating, akin to business records. *See* Fed. R. Evid. 902(11); 902(13); 902(14).[3] Records of sent and received emails and files are made contemporaneously by SIUC and Google as part of maintaining their information systems; the records are kept by SIUC IT and by Google in the course of a regularly conducted activity of the business (maintaining electronic records); and the records were in fact made and kept in the regular practice of that activity. Both SIUC IT and Google have certified this. Much like a business record affidavit, Federal Rule of Evidence 902(14) provides for the self-authentication of certified data copied from an electronic device, storage medium, or file so long as it is authenticated by a process of digital identification that ensures the produced data is a true and accurate copy. When Google and SIUC produced the files, they included certifications stating that the produced records were true and accurate copies of the electronically stored originals. Thus, the records are self-

---

[3] Rule 902 is designed for precisely this kind of situation, and is meant to provide "a procedure in which the parties can determine in advance of trial whether a real challenge to authenticity will be made, and can then plan accordingly." Fed. R. Evid. 902(14) Comm. Notes (2017). The government made its Rule 902 disclosure March 22, 2022 and Defendant has not objected.

authenticating. *See United States v. Brown*, 822 F.3d 966, 972–73 (7th Cir. 2016) (recognizing the self-authentication of MoneyGram and Western Union records even though they contained information entered by third parties); *see also United States v. Dunnican*, 961 F.3d 859, 872 (6th Cir. 2020) (upholding self-authentication of text messages under Rule 902(14)); *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019), *as revised* (Mar. 4, 2019) (holding Google and Yahoo! emails were self-authenticating through 902(11) certifications in proving scheme involving international romance scam).

  The parties expect to stipulate to the authenticity of these emails and files. But, alternatively, the Seventh Circuit has said that emails and files can be authenticated under Rule 901 through "distinctive characteristics" like "appearance, contents, substance, [or] internal patterns" taken "together with all the circumstances." Fed. R. Evid. 901(b)(4). These distinctive characteristics are often evident from the face of an email or file. *See Fluker*, 698 F.3d at 999-1000 (establishing authenticity from the email address itself; the author identified in the email body, the use of the email address by the author for other purposes, and the context of the message showing knowledge). Here, Defendant cannot seriously dispute that the two email addresses are his. Defendant lists his work email addresses on the NSF grant proposal and in communication with NSF, and his personal email address on his TurboTax and IRS records (mingqingxiao30@gmail.com). And the context of the emails demonstrate the author's knowledge of Defendant's work and willingness to sign Defendant's name. *See Fluker*, 698 F.3d at 999-1000 (finding "these types of factors" are "sufficient to satisfy Rule 901(a)'s authentication requirements for email evidence"); *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) (authentication of university email address).

## 2. Admissibility of the content of emails and related files.

The *content* of the emails and related files is also admissible. Where (as here) self-authenticating records contain information from third parties, the Court may have to refer to "'additional sources of corroboration'" to "'cure the hearsay problem'" before fully admitting the records. *Brown*, 822 F.3d at 973 (quoting *United States v. Emenogha*, 1 F.3d 473 (7th Cir. 1993)). But this is a hearsay problem, not an authenticity problem. And curing the hearsay problem here is easy because the emails and files at issue contain the Defendant's own statements. *See Emenogha*, 1 F.3d 473 (explaining that third-party hearsay provided to the business-record maker "may fall under another hearsay exception, such as when the information constitutes an admission of a party-opponent"); *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990) ("'[I]f the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception. . . .'") (citation omitted); *Bondie v. Bic Corp.*, 947 F.2d 1531, 1534 (6th Cir. 1991) (admitting third-party statement contained in social worker's report, where recording such statements was part of social worker's regular activity).[4]

As noted above, emails and files written and sent by Defendant Mingqing Xiao are statements of a party opponent, not hearsay. Thus, the government can admit such emails and files under Fed. R. Evid. 801(d)(2). The emails Mr. Xiao "*sent* are his own statements and as such are

---

[4] The committee notes for Rule 902(14) support this too. "A certification under this Rule can only establish that the proffered item is authentic. The opponent remains free to object to admissibility of the proffered item on other grounds . . . For example, in a criminal case in which data copied from a hard drive is proffered, the defendant can still challenge hearsay found in the hard drive, and can still challenge whether the information on the hard drive was placed there by the defendant." *See* Fed. R. Evid. 902 comm. notes paragraph (14). Similarly, a record may be self-authenticating under Rule 902(11) and still be subject to hearsay objections. *See Brown*, 822 F.3d at 973-74 ("[A] Rule 902(11) certification cannot overcome Rule 803(6)(E)'s requirement that the records must be trustworthy.").

excluded from the definition of hearsay by Rule 801(d)(2)(A)." *See United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (discussing text messages).

The "messages he *received*" from others are "admitted not for the truth of the matter asserted but instead to provide context for" his own messages." *Id*. Some emails he received are also variously admissible to show statements of Defendant's agents and Defendant's adoptive admissions, Fed. R. Evid. 801(d)(2)(D) (statements of Defendant's agents); *Equal Emp. Opportunity Comm'n v. Staffmark Inv. LLC*, 67 F. Supp. 3d 885, 891 (N.D. Ill. 2014) ("a statement by an agent is admissible as long as the agent had authority to make statements in a given area"); Fed. R. Evid. 801(d)(2)(B) (statements Defendant "adopted" and "believed to be true"); *United States v. Ward*, 377 F.3d 671, 675 (7th Cir. 2004), as amended on denial of reh'g (Mar. 4, 2005); to show Defendant's verbal acts, such as contracts and contract negotiations, *Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (holding that testimony about an informant's "offer to buy" was testimony of a "verbal act"); *United States v. Moreno*, 233 F.3d 937, 940 (7th Cir. 2000) (describing "offer and acceptance" as "classic examples of verbal acts"); FED. R. EVID. 801(c) Advisory Committee Notes (noting that the definition of hearsay excludes "'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights"); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 567 n.50 (D. Md. 2007) ("the hearsay rule does not exclude relevant evidence as to what the contracting parties said or wrote with respect to the making or the terms of an agreement"); and to show Defendant was on notice.

    3.    **Chinese-language emails and related files**.

A final note about emails and related files. Many of these documents are in Chinese, so three things have to happen: (a) admit the emails; (b) admit the translations; and (c) present the

translated content. In an effort to streamline testimony, the government will ask the Court to provisionally admit these exhibits and the corresponding translations while the agent is on the stand. The United States will then present the content of the emails by asking the agent to read the translation of each email and document. The translator will then take the stand after the agent to testify to the accuracy of his translations and final admission into evidence, after which the government will move for final admission of the translations into evidence.[5]

**B. Authenticity and admissibility of SIUC records.**

A similar line of admissibility analysis applies to Defendant's submissions to SIUC pursuant to SIUC's record-keeping policies. These records each contain information submitted by the Defendant: (1) Defendant's grant-related submissions to SIUC; (2) Defendant's sabbatical-related submissions to SIUC; and (3) Defendant's 2021 disclosures and admissions to SIUC after his interview with law enforcement.

These records are self-authenticating under Fed. R. Evid. 902(11). That is, it was the policy and practice of SIUC to require forms containing certain information and affirmations for grant proposals, sabbaticals, and other disclosure requirements. SIUC did in fact regularly make and keep such records. And SIUC has offered certifications affirming this. So these records are self-authenticating pursuant to Rule 902(11).[6]

The content of these records are admissible for the same reason as the emails. These business records are submitted and signed by the employee: here, the Defendant. Any imbedded hearsay are Defendant's own statements. *Emenogha*, 1 F.3d 473 (explaining that imbedded third-

---

[5] The government is willing to do this differently if the Court prefers.
[6] Here, too, the relevant business records can be independently authenticated under Rule 901 through "distinctive characteristics" like "appearance, contents, substance, [or] internal patterns" taken "together with all the circumstances." Fed. R. Evid. 901(b)(4). These records are typically on SIU letterhead or SIU-marked forms, or sent with such documents. All these records contain Defendant's signature or his name. Defendant cannot seriously contest that they are his own submissions to SIUC.

party hearsay provided to the business record maker "may fall under another hearsay exception, such as when the information constitutes an admission of a party-opponent"). And the Defendant's own statements and omissions are relevant to show intent to defraud and an absence of mistake.

Because these documents are self-authenticating and admissible, they can be admitted without putting a SIUC witness on the stand for each document. The content of some of these records will be presented by SIUC witnesses and some presented by the case agent.

**C. Authenticity and admissibility of NSF records.**

The NSF proposal documents (two proposal documents; the follow up email and Mr. Xiao's response; and the NSF policy guide) are also self-authenticating business records as disclosed in the government's Rule 902 notice. These documents are business records of the NSF, and the statements made and adopted by Mr. Xiao in the documents are admissions of a party opponent. For the purposes of streamlining trial, the government will ask the Court to admit these documents in advance of the witnesses who will present them.

**D. Authenticity and admissibility of foreign bank account records**.

The foreign bank account records will be offered during the testimony of the agents. During execution of the search warrant in December 2020, agents seized bank opening statements and bank cards. In addition, the government will offer screenshots of the Ping An Bank application on Mr. Xiao's cell phone. During his interview, Mr. Xiao used the Ping An Bank application on his cellphone to check his current account balance, demonstrating to agents that he relied on the data reported by the application to track that balance. Later in January 2021, Mr. Xiao consented to agents accessing the application on the cellphone using Mr. Xiao's login, at which time agents captured transaction and balance data for his Ping An Bank account. Because Mr. Xiao demonstrated to agents that he relied on the data reported by the application to track his account

13

balance, the captured transaction and balance data is admissible as Defendant's adoptive admissions. *See* Fed. R. Evid. 801(d)(2)(B) (a statement is not hearsay if it "is one the [opposing] party manifested that it adopted or believed to be true"); *In re Dougherty*, 84 B.R. 653 (B.A.P. 9th Cir. 1988) (CitiBank statements admissible as adoptive admissions because Defendant had indicated he believed them to be true), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279, 111 (1991). Defendant's manifestation that he believed the Ping An Bank application provided true records can be determined from "the entire context" of the conversation. *United States v. Allen*, 10 F.3d 405, 413 (7th Cir. 1993); *see also Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1268 (10th Cir. 1998) (noting that "[a] document is sufficiently 'tied' to the possessor to the extent the adoptive party accepted and acted upon the evidence."); *United States v. Paulino*, 13 F.3d 20, 25 (1st Cir. 1994) (adoptive admission determined by whether the "surrounding circumstances tie the possessor and the document together in some meaningful way"); (internal quotation and citation omitted) *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 856 (Tex. 2011) ("'Where a party has used a document made by a third party in such way as amounts to an approval of its contents, such statement may be received against him as an admission by adoption.'"); *In re Mirena IUD Prods. Liability Litig.*, 202 F. Supp. 3d 304, 321 (S.D.N.Y. 2016) ("A person . . . can adopt another's statement by an appropriate means such as language, conduct or silence, and a party may adopt a written statement by using it") (citations and quotation marks omitted).

**E. Authenticity and admissibility of IRS and post-indictment FinCen records**.

Finally, the government will offer into evidence certified and sealed copies of Defendant's tax returns for 2017-2019, a certified and sealed FinCen certification that Mr. Xiao failed to file a timely report of foreign bank and financial accounts (FBAR), and certified and sealed copies of

the untimely delinquent FBARs filed by the Defendant after he was indicted. Because these documents are domestic public records with the seal of the United States and signed and attested by an appropriate witness, these exhibits are self-authenticating as public records. *See* Fed. R. Evid. 902(1). The Defendant's statements on the tax returns and the post-indictment delinquent FBARs constitute statements of a party opponent. Fed. R. Evid. 801(d)(2).[7] Once admitted, these exhibits will be presented and reviewed with a summary witness—an IRS Revenue Agent.[8]

                                            Respectfully submitted,

                                            STEVEN D. WEINHOEFT
                                            United States Attorney

                                             /s/ *Peter T. Reed*_____
                                            Peter. T. Reed
                                            Scott A. Verseman
                                            Assistant United States Attorneys
                                            Nine Executive Drive
                                            Fairview Heights, IL 62208
                                            Peter.Reed@usdoj.gov
                                            Scott.Verseman@usdoj.gov
                                            (618) 628-3700
                                            Fax: (618) 628-3720

                                            S. Derek Shugert
                                            Trial Attorney
                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue, NW
                                            Washington, DC 20530
                                            (202) 305-1629
                                            shawn.shugert@usdoj.gov

---

[7] During the course of trial, the government will ask the Court to take judicial notice that the initial indictment was returned April 21, 2021. *See* Doc. 1. The delinquent FBAR filings were made post-indictment.

[8] Alternatively, the government is prepared to call court witnesses from both IRS and FinCen.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:21-cr-40039-SMY |
| MINGQING XIAO, | ) |
| Defendant. | ) |

**Certificate of Service**

I hereby certify that on April 8, 2022, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Peter T. Reed*

PETER T. REED
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Peter.Reed@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720