IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-cr-40039-SMY |
| | ) | |
| MINGQING XIAO, | ) | |
| | ) | |
| Defendant. | ) | |


**MOTION FOR JUDGMENT OF ACQUITTAL**

## INTRODUCTION

The government has rested after five days of testimony during which it offered only *two* witnesses with firsthand factual knowledge—Kelly Alongi and Yvonne Ou—in its effort to prove Professor Xiao guilty beyond a reasonable doubt of the seven counts in the Superseding Indictment.[1]  In light of the dearth of factual witnesses, it is unsurprising that the government's evidence is far from sufficient "to convince a [rational] trier of fact *beyond a reasonable doubt* of the existence of *every* element of the offense."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis supplied); *accord United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).  Here, "reasonable jurors must necessarily have a reasonable doubt as to guilt," so this Court "must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Jackson*, 443 U.S. at 318 n.11.

Counts 1-3 (wire fraud and false statement) are premised on Professor Xiao not disclosing to NSF: (1) a grant he allegedly "received in or around 2017 from the Natural Science Foundation of Guangdong Province of China . . . that ran from 2018-2022;" and (2) his alleged "ongoing contractual obligations to Shenzhen University" specifically in the sections entitled "Current and Pending Support" and "organizational affiliations."[2]  As explained in more detail below, Rule 29 acquittal is required on each of these counts because:

---

[1] Beyond Ms. Alongi, the government presented the following nine witnesses: James Westfall (testimony regarding interstate wire); William O'Sullivan (same); Lisa Skelly (authentication of TurboTax software); Michael Welch (IRS agent expert not involved in investigation); Cameron McDowell (chain of custody for evidence seized in search warrant); Chris Bockelmann (authentication of interview recording and transcript); Yvonne Ou (NSF expert not involved in facts at issue); Zhirong Yang (interpreter); and Stephen Dalecheck (documents obtained through search warrants and subpoenas).

The Superseding Indictment in this case charges that the defendant committed the crimes of wire fraud (count 1), wire fraud (count 2), making a false statement (count 3), making a false statement on a tax return (count 4), making a false statement on a tax return (count 5), making a false statement on a tax return (count 6), and failure to file a report of a foreign bank account (count 7).

[2] For Counts 1-2 (wire fraud), the government must prove beyond a reasonable doubt that: (1) the defendant knowingly devised or participated in a scheme to defraud; and (2) the defendant did so with the intent to defraud; and (3) the

- There is *no evidence* that Professor Xiao ever received a grant from the NSF of Guangdong Province of China that ran from 2018-2022, much less a grant that he would have been required to disclose.  The government presented not a single witness to testify that Professor Xiao ever received such a grant.  And, in fact, Agent Dalechek testified that the purported grant from Guangdong Province of China was not the grant described in Professor Xiao's sabbatical application, which the government charged in the Superseding Indictment.

- The government never admitted into evidence any executed contract between Professor Xiao and Shenzhen University.  Likewise, the government presented not a single witness who had firsthand knowledge of Professor Xiao having an ongoing contractual obligation to Shenzhen University.

- The government's evidence established that Professor Xiao did, in fact, disclose on his NSF submission—specifically on his biographical sketch and elsewhere—that he was a guest professor at Shenzhen University.

- Professor Xiao received no proceeds from the NSF grant.  In fact, of the $151,099 awarded to SIUC pursuant to NSF Grant #1854638, only $5,314.54 was submitted by SIUC to the NSF for reimbursement, and those funds were expended to compensate two graduate students.

- The work for NSF Grant #1854638 was done until brought to a halt by the government's investigation.

- There is no evidence that Professor Xiao had any intent to defraud, much less that he acted willfully, with the intent to do something illegal.

Meanwhile, Counts 4-7 (tax fraud and FBAR) are premised on Professor Xiao not reporting

on his disclosing a Ping An bank account on his tax returns for tax years 2017-19, and for

---

scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and (4) for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place in the manner charged in the particular count.

Meanwhile, for Count 3 (false statement), the government must prove beyond a reasonable doubt that: (1) the defendant concealed a fact by trick, scheme or device; *and* (2) the fact was material; *and* (3) the defendant acted knowingly and willfully; *and* (4) the defendant concealed the material fact in a matter within the jurisdiction of the executive branch of the government of the United States

delinquently filing an FBAR for 2019.[3]  As explained in more detail below, Rule 29 acquittal is required on each of these counts because:

- There is no evidence the defendant *prepared* the income tax returns for tax years 2017-19.

- There is no evidence that the defendant *signed* the income tax returns for tax years 2017-19.

- There is no evidence that defendant *filed* the income tax returns for tax years 2017-19.

- There is no evidence that the defendant acted *willfully* in that he intentionally violated a known legal duty to report the Ping An bank account on his tax returns for tax years 2017-19.

- There is no evidence that the defendant acted *willfully* in that he intentionally violated a known legal duty to file a Report of Foreign Bank and Financial Accounts on or before the due date following the calendar year 2019.

In light of the government's case, no result other than acquittal is permissible.  For these reasons, defendant Minqping Xiao respectfully requests that the Court enter a judgment of acquittal of each of the seven counts in in the Superseding Indictment.  Fed. R. Crim. P. 29(a).  A pre-verdict judgment of acquittal under Rule 29(a) is final and unappealable.  *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977) ("[T]he Double Jeopardy Clause bars appeal from an acquittal entered under . . . Rule 29(a) . . . .").[4]  In contrast, a post-verdict judgment of

---

[3] For Counts 4-6 (filig a false tax return), the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant prepared an income tax return; *and* (2) the income tax return was false as to a material matter; *and* (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; *and* (4) the defendant acted willfully, that is, he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe that it was truthful as to a material matter; *and* (5) the defendant filed the income tax return with the Internal Revenue Service.

Meanwhile, for Count 7 (failure to file FBAR), the government must prove each of the following elements beyond a reasonable doubt: (1) defendant was a United States person during the calendar year specified in the count; *and* (2) defendant had a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country during the calendar year 2019; *and* (3) the aggregate value of the Defendant's foreign bank, securities, or other financial accounts exceeded $10,000 at any time during the calendar year 2019; *and*  (4) defendant willfully failed to file a Report of Foreign Bank and Financial Accounts on or before the due date following the calendar year 2019.

[4] *Accord Evans v. Michigan*, 133 S. Ct. 1069, 1074 (2013); *Smith v. Massachusetts*, 543 U.S. 462, 467-68 (2005) (midtrial judgment of acquittal under equivalent state rule was final and unreviewable).

acquittal is appealable and may result in a new trial if the judgment is reversed on sufficiency grounds but remanded because of other errors.  *See, e.g.*, Fed. R. Crim. P. 29(d)(3).

## ARGUMENT

"After the government closes its evidence . . . , the court on the defendant's motion *must* enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a) (emphasis added); *see, e.g.*, *Burks v. United States*, 437 U.S. 1, 10 n.5 (1978) (reaffirming the mandatory nature of this rule); *accord* 2A Charles Alan Wright et al., *Federal Prac. & Proc. Crim.* §462 (4th ed. 2009) ("Wright & Henning") (same).  Although the court must "look at the evidence in the light most favorable to the government," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (citing *United States v. Seidling*, 737 F.3d 1155, 1159–60 (7th Cir. 2013)), acquittal is required if the evidence is not sufficient "to convince a [rational] trier of fact beyond a reasonable doubt of the existence of every element of the offense."  *Jackson*, 443 U.S. 316; *accord United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013); *United States v. Moore*, 572 F.3d 334, 337 (7th Cir.2009).  "If reasonable jurors must necessarily have a reasonable doubt as to guilt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Jackson*, 443 U.S. at 318 n.11 (quoting *Curley v. United States*,160 F.2d 229, 232-33 (D.C. Cir. 1947) (internal quotation marks and alteration marks omitted)); *accord* Wright & Henning § 467, at 366 (noting *Curley* formulation states the "proper test" and "is universally accepted by the courts").

A pre-verdict judgment of acquittal under Rule 29(a) is final and unappealable.  *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977) ("[T]he Double Jeopardy Clause bars

appeal from an acquittal entered under . . . Rule 29(a) . . . .").[5]  In contrast, a post-verdict judgment of acquittal is appealable and may result in a new trial if the judgment is reversed on sufficiency grounds but remanded because of other errors.  *See, e.g.*, Fed. R. Crim. P. 29(d)(3).

## I.  This Court Should Decide This Motion Now

This Court should decide the motion now, based on the present record (which includes the entirety of the government's case).  *See* Fed R. Crim. P. 29(a); *Burks*, 473 U.S. at 10 n.5 (noting mandatory nature of rule); *Jackson*, 443 U.S. at 324 (defendant is entitled to relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt").  Where the government has not proven a case sufficient to allow a rational factfinder to convict beyond a reasonable doubt, the Defendant should not be put to the burden of putting on a defense.  *See* Wright & Henning § 462 (Rule 29(a) "implements the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense.") (citation and internal quotation marks omitted).

The deficiencies of the government's case are deficiencies of fact, not law.  In order to meet its burden under Counts One, Two and Three, the government must prove that the alleged non-disclosures were materially false and made either with intent to defraud the NSF (Counts 1 and 2) or knowing and willfull (Count 3).  And to punish Professor Xiao for his tax-related offenses (Counts 4-7), the government must prove that Professor Xiao's inaccurate tax return responses and failure to file an FBAR were done willfully.  The government does not dispute these legal requirements.  *See* Gov. Prop. Jury Instructions No. 6, 12, 18.  The *factual sufficiency* of the government's case, however, is quintessentially a matter for resolution in the trial court.  *See* Fed.

---

[5] *Accord Evans v. Michigan*, 133 S. Ct. 1069, 1074 (2013); *Smith v. Massachusetts*, 543 U.S. 462, 467-68 (2005) (midtrial judgment of acquittal under equivalent state rule was final and unreviewable).

R. Crim. P. 29(a), Advisory Committee Notes, 1994 Amendments (noting Rule 29(b)'s reservation provision balances "the government's right to appeal from *an erroneous conclusion of law* with the defendant's interest in avoiding a second prosecution").

If the Court declines to rule on Professor Xiao's Rule 29 motion now, it could effectively give the government a chance for a "do-over," where it can hope to (a) persuade the jury to convict despite the lack of sufficient evidence to do so beyond a reasonable doubt,[6] and (b) should the Court grant the motion after verdict, find some appealable issue, even a fact-bound one, to seek appellate relief from this Court's eventual ruling.  This Court should decline to go forward and end this prosecution now.  Because the government has not adduced evidence from which a rational factfinder could convict beyond a reasonable doubt, the Court should grant judgment of acquittal on all counts.

\*      \*      \*

The Court should enter judgment of acquittal on all Counts because the government has failed to present evidence sufficient for a reasonable juror to convict, on the following elements of each Count:

- **Count 3 (18 U.S.C. § 1001(a)(1)).**  The government has failed to present sufficient evidence (1) that Professor Xiao made any falsification or concealment, (2) that he did so knowingly and willfully, or (3) that he did so in a matter within the jurisdiction of the NSF.

- **Counts 1 and 2 (18 U.S.C. § 1343).**  The government has failed to present sufficient evidence that Professor Xiao (1) made a materially false statement, or (2) did so with an intent to defraud NSF.

---

[6] *See Jackson*, 443 U.S. at 317 (noting that even "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt," and that in such circumstances reversal of the conviction is required).

- **Counts 4-7 (26 U.S.C. §§ 7206(1); 31 U.S.C. §§ 5314, 5322(a)).** The government has failed to present sufficient evidence that Professor Xiao acted willfully as to each of these Counts.

## II.   Professor Xiao Is Entitled to Judgment of Acquittal on Count 3

Professor Xiao is entitled to judgment of acquittal on Count 3 because the government has failed to present sufficient evidence for the jury to find that Professor Xiao committed any act that was (1) a "falsif[ication]," or "conceal[ment]," (2) knowing and willful, or (3) "in a matter within the jurisdiction" of NSF.  Accordingly, this Court should acquit Professor Xiao as to Count 3.

### A.  Governing Legal Principles

To convict Professor Xiao of making a false statement in violation of 18 U.S.C. § 1001(a)(1), the government needed to show beyond a reasonable doubt that:  (1) the defendant made a statement or had a duty to disclose the information; (2) the statement was false, or there were acts amounting to concealment; (3) the statement or concealed facts were material; (4) the person made the statement or concealed the facts knowingly and willfully; and (5) the statement or concealed information concerned a matter within the jurisdiction of a federal department or agency.  *See United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006); *United States v. Ross*, 77 F.3d 1525, 1543 - 44 (7th Cir. 1996).

### 1.   Falsity

The government has the burden to provide sufficient evidence that the statements were false; if it does not, then a conviction under § 1001 cannot be sustained.  *See United States v. Khellil*, 678 F. Supp. 2d 713, 743 (N.D. Ill. 2009) (reviewing the evidence presented by the government under § 1001 and concluding "that the government failed to offer evidence from which a reasonable jury could find beyond a reasonable doubt that [the defendant] made false statements about his date and place of last entry into the U.S.")  If a defendant provides a literally true, but nonresponsive and/or misleading statement, that does not mean that the statement is a "false

statement" under § 1001.  "When reviewing sufficiency of the evidence" under § 1001, a literally true answer does not sustain a conviction for making a false statement. *United States v. Gorman*, 613 F.3d 711, 716 (7th Cir. 2010) (citing *Bronston v. United States*, 409 U.S. 352, 356–58, 61-62) (1973) (reversing the defendant's perjury conviction where the statement was both misleading and nonresponsive, but not literally untrue).  As the Supreme Court has noted, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston*, 409 U.S. at 360; *see also, e.g.*, *United States v. Parker*, 364 F.3d 934, 945 (8th Cir. 2004) (ruling that the government bears the burden of negating literally truthful interpretations of statements when the statements are ambiguous and are subject to reasonable interpretations).

Moreover, it is "incumbent" on the government to pose questions "in a way that elicits accurate, responsive, and comprehensive answers."  *United States v. Nash*, No. 21-CR-105-JPS, 2022 WL 1004205, at *3 (E.D. Wis. Apr. 1, 2022).  Where the government fails to do so — that is, where the question is "fundamentally ambiguous" — "then it cannot sustain an indictment for false statements."  *Id.* (citing *Manapat*, 928 F.2d at 1101).  If the ambiguity of the question at issue is debatable, the question of whether the defendant's response was false must go to the jury; but where the question's meaning is not something "about which men of ordinary intellect could agree," the question is fundamentally ambiguous and the count must be dismissed.  *United States v. Lattimore*, 127 F. Supp. 405 (D.D.C.), *aff'd*, 232 F.2d 334 (D.C. Cir. 1955); *see also United States v. Caputo*, 288 F. Supp. 2d 912, 922 (N.D. Ill. 2003) (a question is fundamentally ambiguous "if it is not capable of being reasonably understood" or is "incapable of reasonable comprehension").

### 2.       "Knowingly and Willfully"

Section 1001 requires that the defendant acted "knowingly and willfully" in making a false statement.  18 U.S.C. § 1001.  In essence, this *mens rea* requirement "prohibits making a false statement to a government agency with the intent to deceive or mislead."  *United States v. Freed*, 921 F.3d 716, 724 (7th Cir. 2019); *see also United States v. Clark*, 787 F.3d 451, 457 n.1 (7th Cir. 2015) ("'[I]ntent to deceive' is an element of [section 1001]." (citation omitted)).  This standard "is satisfied when the defendant knows that misrepresentations to and concealment from a government agency are essential in order for a scheme to succeed."  *United States v. Beck*, 615 F.2d 441, 453 (7th Cir. 1980).  "Personal knowledge of the false information also satisfies the intent requirement."  *Id.*

### B.  The Evidence Is Insufficient to Find Professor Xiao Guilty As To Count 3

The government's entire case as to Count 3 rests on Professor Xiao's alleged concealment from his grant application of two facts: (1) a purported grant awarded to him from Natural Science Foundation of Guangdong Province of China (the "Alleged Guangdong Grant"), and (2) a purported employment contract between Professor Xiao and Shenzhen University with a term beginning on May 1, 2018 (the "Alleged Shenzhen Contract") (GX 44).  Specifically, the Superseding Indictment alleges that Professor Xiao "falsely certified to SIUC that the grant proposal to NSF was "'true, accurate, and complete,'" because he failed to disclose the Alleged Shenzhen Contract in the "Organizational Affiliations" section of the grant proposal, and both the Alleged Shenzhen Contract and the Alleged Guangdong Grant in the "Current and Pending Support" section[7] of the grant proposal.  Superseding Indictment ¶¶ 6, 7.

---

[7] The Superseding Indictment alleges that "NSF defined Current and Pending Support: '[a]ll current project support from whatever source (*e.g.,* Federal, State local or foreign government agencies, public or private foundations, industrial or other commercial organizations, or internal funds allocated toward specific projects) must be listed.  The proposed project and all other projects or activities requiring a portion of time of the PI and any other senior personnel

The evidence presented during the government's case in chief falls woefully short of the minimum required for a reasonable juror to find the existence of either the Alleged Guangdong Grant or the Alleged Shenzhen Contract beyond a reasonable doubt.  And in failing to present sufficient evidence on these two facts, it has failed to present sufficient evidence that Professor Xiao's certification of the grant application as "truthful, accurate and complete" was in fact false.  Moreover, the government's evidence is also insufficient to permit a jury finding that his alleged false certification was done "willing and knowingly," or that the certification was "in a matter within the jurisdiction" of the NSF.  Accordingly, the Court should acquit Professor Xiao of Count 3.

1. **There Is Insufficient Evidence The Grant Application Was False or Misleading**

a. **There Is No Evidence That the Guangdong Grant Was Ever Awarded**

Regarding the Alleged Guangdong Grant, the Superseding Indictment alleges that "XIAO did not disclose to NSF a grant that XIAO had received in or around 2017 from the Natural Science Foundation of Guangdong Province of China for about 1,200,000 yuan (about $180,000) that ran from 2018-2022." Superseding Indictment ¶ 6.

The only presented evidence the government could possibly claim establishes that the Alleged Guangdong Grant was awarded to Professor Xiao is (1) three documents mentioning the Alleged Guangdong Grant as part of Professor Xiao's September 2017 sabbatical application (GX 16, 18, 19), (2) a grant application to GUT prepared in November 2016 (GX 29), and (3) two

---

must be included, even if they receive no salary support from the project(s)."  Superseding Indictment ¶ 1(b).  That definition, however,  is pulled not from the grant proposal itself, but from a separate guidance document, the Proposal and Award Policies and Procedures Guide (Government Exhibit ("GX") 3), which Government has not presented evidence of Professor Xiao ever reading.

emails between Professor Xiao and Guangdong University of Technology professor Shuting Cai (GX 21, 25).

This razor-thin evidence does not come close to evidence sufficient to go to the jury on this issue. Notwithstanding Professor Xiao's references to the Alleged Guangdong Grant in his sabbatical application and related correspondence to Professor Bhattacharya, there is not a single piece of documentation in evidence reflecting the submission of that grant or the award of that grant to Professor Xiao (or anyone else). The government did not offer a single document from the supposed grantor, or any evidence showing that Professor Xiao performed any research related to the research topic identified in the sabbatical application and CV, or any money paid to Professor Xiao in connection with the grant.

Moreover, the documents presented by the government relating to the Alleged Guangdong Grant are themselves of almost no probative value. Although the sabbatical application can be read that the grant was awarded, the sabbatical report describing Professor Xiao's actual activities, also presented during the government's case in chief, makes no mention of any work done relating to the Alleged Guangdong Grant during his sabbatical.[8] And even Professor Xiao's email correspondence with Professor Bhattacharya, which notes that the Alleged Guangdong Grant had not yet received an official grant number as of three months after the application's submission, suggests the more likely scenario that Professor Xiao may have gotten ahead of himself when he noted the award in the application. Regarding the GUT grant application offered by the government, as Agent Dalechek acknowledged on cross-examination, that application proposes an

---

[8] Although the Government has suggested that any major modification to Professor Xiao's sabbatical application would have required pre-approval per Professor Xiao's certification in the sabbatical application, that certification speaks only broadly about "major modifications" to the sabbatical plan, without further clarity as to the types of changes requiring pre-approval. The actual approval letter sent to Professor Xiao, also offered in the Government's case in chief provided him with that clarity: only "dates, length, and pay status" are identified as requiring pre-approval. (DX 88).

entirely different topic than that mentioned by Professor Xiao in his sabbatical application. Compare GX 16 and 19, with GX 29; *see also* April 28, 2022 Tr. 137:4-13.  And as for the two email exchanges between Professor Xiao and Professor Cai (GX 21, 25), the emails presented to the jury evidence nothing more than a discussion about a bank account and vague references to the writing of papers, without any reference to a grant or even a research topic.

Moreover, other than Special Agent Dalecheck, no witness testified about the Alleged Guangdong Grant.  And S.A. Dalecheck's testimony actually disproved the existence of the Alleged Guangdong Grant.  S.A. Dalecheck testified that of the "hundreds of thousands of documents that he found" he was not able to "locate a grant number for the "Alleged Guangdong Grant."  S.A. Dalecheck further testified that, it would not surprise him that the reference to the National Science Foundation of Guangdong Province of China grant appeared in only one curriculum vitae within the discovery produced to the defense by the government.  (April 28, 2022, Tr. 131:16 – Tr. 132:4).  Moreover, S.A. Dalecheck agreed, under cross examination that the Guangdong Province grant application (GX 29), which the government offered as the Alleged Guangdong Grant, *is not* the grant "that the government alleged was in violation of any NSF rules or regulations."  (April 28, 2022, Tr. 135:10 – 137:13).

At best, the evidence shows that Professor Xiao at one point asserted that he was awarded the Alleged Guangdong Grant, but that statement was inaccurate.  The evidence offered by the government fall far short of the minimum required to allow the jury to determine this factual issue.

### b.  There Was No Operative Contract With Shenzhen At the Time The Grant Application Was Submitted

In support of Count 3, the Superseding Indictment also alleges that "[o]n or about April 15, 2018, XIAO signed a contract with Shenzhen University running from 2018 to 2023, replacing an earlier contract," and that Professor Xiao did not disclose on the grant proposal – specifically, in

13

the Organizational Affiliations and Current and Pending Support sections – his ***ongoing contractual obligations*** to Shenzhen University."  Superseding Indictment ¶ 7 (emphasis added). The evidence presented by the government as to the existence of the Alleged Shenzhen Contract does not merely fall short of the minimum required to allow a jury to assess the alleged falsity of its non-disclosure in the grant application; it affirmatively proves that no disclosure of that contract was required.

The testimony of both Dr. Rebecca Keiser and Dr. Yvonne Ou was unequivocal: disclosure of Professor Xiao's relationship with Shenzhen was required - in both the Organizational Affiliations and Current and Pending Support sections – ***if*** Professor Xiao had an employment contract with Shenzhen University at the time the grant application was submitted.  *See* April 26, 2022 Tr. at 70-72 (Keiser); April 28, 2022 Tr. at 188 (Ou).  In other words, to prove the falsity of the non-disclosure of Professor Xiao's relationship with Shenzhen, the government must have presented evidence of a contract between Professor Xiao and Shenzhen that was operative at the time of the grant proposal's submission.

However the evidence presented during the government's case in chief affirmatively established that the contract identified in the Superseding Indictment and the only contract with Shenzhen offered into evidence – GX 44 – ***was terminated before the date of the grant proposal's submission***.  Although GX 44 on its face appears to be a signed contract between Shenzhen and Professor Xiao setting a term of employment from 2018 through 2023, it also contains a provision (Section 6.6) setting forth in unequivocal terms conditions on which the contract is terminated:

> Party B [Xiao] must ensure that he/she works full-time for Party A during the term of employment ***and that he/she does not enter into a full-time contract with a third party***.  Party B must request approval from Party A for paid part-time work with a third party during the employment employment period.  When that happens, all three parties shall sign a joint agreement to define the rights and

> obligations of all three parties so as not to impede the performance of the contract. ***If Party B violates this item, Party A shall terminate the contract and hold Party B liable for breach of contract***.

GX 44 (emphases added).  The evidence presented during the government's case in chief also indisputably established that Professor Xiao remained a full-time professor at SIUC from 2000 to the present, and it presented no evidence that Professor Xiao ever attempted to or actually did tender his resignation from SIUC.  Moreover, the government's evidence also indisputably established that Professor Xiao's contemplated employment was conditioned upon Professor Xiao applying for and receiving a Chinese employment visa, and the government presented no evidence that Professor Xiao ever received a Chinese employment visa.  Indeed, when Agent Dalechek reviewed Professor Xiao's passport during cross-examination, he found only a Chinese "Q2," or "Chinese Family Visit" visa.  (April 28, 2022 Tr. 121:14-22.)  And although GX 44 provided for a base salary of RMB 46,000 Yuan/month, there is no evidence Professor Xiao ever received a payment in that amount.  Given the undisputed fact of Professor Xiao's continued full-time employment with SIUC during the relevant time period, and the absence of any evidence in the government's case-in-chief that Professor Xiao received a Chinese employment visa, or was ever paid in accordance with the terms of the Alleged Shenzhen Contract, GX 44 not only offers zero proof of an "ongoing contractual obligations to Shenzhen" (Superseding Indictment ¶ 6) at the time of the grant proposal's submission, it proves the lie.

###   c.   The Questions Asked in the Organizational Affiliations and Current and Pending Support Sections Are Fundamentally Ambiguous.

As discussed *supra,* a question is fundamentally ambiguous when its meaning "is not capable of being reasonably understood," *Caputo*, 288 F. Supp. 2d at 922, or is not something "about which men of ordinary intellect could agree," *Lattimore*, 127 F. Supp at 405.  The

Government's case-in-chief demonstrated that the terms "Organizational Affiliations" and "Current and Pending Support" fall squarely within the fundamental ambiguity doctrine, as it shows not "men of ordinary intellect" but two government witnesses with expertise in NSF disclosure rules disagreeing on their meaning. Regarding "Organizational Affiliations," Dr. Keiser testified that that term required disclosure of all current affiliations with organizations must be disclosed in this section (April 26, 2022, Tr. 22: 21-25), while Dr. Ou testified that it required only disclosure of one's "primary" employer (April 28, 2022, Tr. 202:22 – 204:17). Thus, under Dr. Keiser's reading, Dr. Xiao would have had to disclose his guest professorship at Shenzhen in this section, but would not have been required to do so under Dr. Ou's reading. Similarly, regarding "Current and Pending Support," Dr. Keiser testified that any money or in-kind support for research-related activities would need to be disclosed there (April 26, 2022, Tr. 36:4-12; 36:22-37), while Dr. Ou testified that only support that is the result of a grant submission, approval and award process (April 28, 2022, Tr. 168:20-25, 169:11-17)). These interpretive differences matter here as well – Dr. Xiao's Alleged Shenzhen contract, if it had been operative, would have required disclosure under Dr. Keiser's view, but not Dr. Ou's. Given the fundamental ambiguity of these terms, the question of whether Dr. Xiao's responses to them were false should not be given to the jury.

### 2.  There Is Insufficient Evidence That Professor Xiao Certified To SIUC That The *Grant Proposal* Was "True, Complete and Accurate"

The Court should also enter judgment of acquittal as to Count 3 for the additional reason that it has not presented any evidence that Professor Xiao, as alleged in Count 3, "falsely certif[ied] to SIUC that *the grant proposal* was 'true, complete, and accurate' when XIAO knew that it was not." Superseding Indictment, Count 3.

The Superseding Indictment undisputed evidence presented by the government establishes only that Professor Xiao certified the Proposal Checklist (GX 4) that accompanied Professor Xiao's submission of the grant proposal to SIUC's Office of Sponsored Program Administration ("OSPA").  That Proposal Checklist makes clear what precisely Professor Xiao certified in signing it:

> NOTE TO PI/PD(s): ***By signing this transmittal form***, you are certifying that 1) the information ***herein*** is ***true, complete, and accurate*** to the best of your knowledge; 2) any false, fictitious or fraudulent statements or claims may subject you to criminal, civil or administrative penalties; 3) you agree to accept responsibility for the scientific conduct of the project and to provide progress reports as required by the funding agency; and 4) you are in conformance with SIUC's Conflict of Interest and Financial Conflict of Interest on Federal Grants Policy.

GX 4.  The "true, complete, and accurate" language tracks the language in Count 3 of the Superseding Indictment, and appears nowhere else in GX 4.  "Herein," however, unequivocally refers to the transmittal form itself.  See *Herein*, Black's Law Dictionary (11th ed. 2019) (defining herein as "In this thing (such as a document, section, or paragraph)."  Moreover, the instruction preceding this certification confirms this interpretation: "By signing the below, you agree that you have read and approved the contents of this proposal checklist."  And although Kelli Alongi testified that the proposal "accompanied" the checklist, the government did not present any evidence that it was part of the "transmittal form."  Moreover, when GX 4 intends to refer to the grant proposal or other documents, it does so explicitly.  For example, GX 4 contains the following other certification excerpts that reference the proposal and other documents beyond the Checklist itself:

- "I understand and acknowledge the follows: a) if ***this proposal*** for external funding includes a request for 100% salary, regardless of the period or duration, from Federal, State and/or other sponsored project(s), I certify that if this project is awarded, I will work exclusively

on this project during that 100%-funded period…." ("PI/PD SIGNATURES").

- As a Unit Officer for Southern Illinois University, I agree to the following: … 3) I have thoroughly reviewed this checklist *and accompanying documents* and approve the proposed scope of work, level of faculty effort and budget. ("OTHER REQUIRED SIGNATURES").

GX 4 (emphases added).  GX 4, therefore, makes clear that Professor Xiao, by signing it, certified that "this transmittal form" (*i.e.*, GX 4 itself), ***and not the accompanying grant proposal***, was "true, complete and accurate."  Because the government has presented no evidence beyond GX 4 that Professor Xiao "falsely certif[ied] to SIUC that the grant proposal was 'true, complete, and accurate,'" judgment of acquittal as to Count 3 is warranted.

### 3. There Is Insufficient Evidence That Professor Xiao Certified the Grant Application To SIUC "Willfully and Knowingly"

Even if the evidence were sufficient to sustain a jury finding that Professor Xiao certified to SIUC that the grant proposal (as opposed to the Proposal Checklist) was "true, complete, and accurate" (which it is not), and even if it were sufficient to sustain a jury finding that the grant proposal falsified or concealed anything (which it did not), the government has not produced any evidence that Professor Xiao did so "willfully and knowingly."  There is not a single piece of evidence – including in the recording of FBI's interview of Professor Xiao – that Professor Xiao understood the grant proposal to require the disclosure of Alleged Guangdong Grant (of which there is no evidence of award) or the Alleged Shenzhen Contract (which was without effect, given Professor Xiao's continued full-time employment at SIUC and lack of a Chinese employment visa).  There is therefore no evidence (let alone sufficient evidence) presented by the government that Professor Xiao knowingly falsified, concealed or cover up anything that was supposed to be disclosed in the grant application, either knowingly or willfully.

18

For all of these reasons, judgment of acquittal as to Count 3 is warranted.

### III.   Professor Xiao Is Entitled to Judgment of Acquittal On Counts 1 and 2

#### A.  Governing Legal Principles

For a conviction of wire fraud, the government was required to prove that Professor Xiao was "(1) involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (holding that defendant did not commit wire fraud by misleading potential purchaser of asset) (internal citation omitted)).

#### 1.    Falsity

To meet its burden under § 1343, the government must prove "the making of a false statement or material misrepresentation, or the concealment of [a] material fact." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (quoting *Williams v. Aztar Indiana Gaming Corp*., 351 F.3d 294, 299 (7th Cir. 2003)). The government meets this burden by presenting evidence that such false representation unmistakably occurred. *See United States v. Heon Seok Lee*, 937 F.3d 797, 810 (7th Cir. 2019) (finding that "[w]here the fraud alleged deals with a half-truth or material omission, [the Seventh Circuit] generally require[s] proof of an act of concealment on the part of the defendant" where "[t]he record . . . unmistakably reflects such concealment" through repeated misrepresentations).

#### 2.    Intent To Defraud

As the United States Supreme Court has aptly noted, not all deceit or deception about something that would be relevant to another party constitutes fraud. *See Kelly*, 140 S. Ct. 1565, 1568 (2020) ("The evidence the jury heard no doubt shows wrongdoing—deception, corruption, abuse of power. But the federal fraud statutes at issue do not criminalize all such conduct.").

Case 4:21-cr-40039-SMY   Document 155   Filed 05/03/22   Page 20 of 32   Page ID #2085


Consistent with this notion, the Seventh Circuit has consistently required something more than a mere intent to deceive: "[I]ntent to defraud requires a wilful [sic] act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Faruki*, 803 F.3d 847, 853 (7th Cir. 2015) (quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) (internal citation and quotation marks omitted)).

In *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), for example, the Seventh Circuit held that deception in the context of a commercial transaction does not violate the wire fraud statute *per se*, *i.e*., just because the conduct was deceptive. The Seventh Circuit explained that although a "party may not misrepresent material facts about an asset during a negotiation to sell it" or make "misrepresentations [that] materially alter one party's understanding of the subject of the deal," the "mail and wire fraud statutes [cannot] be stretched to criminalize" all forms of deception that enable one party to obtain a better deal from the other party. *Id*.

The principle recognized in *Weimert* - that § 1343 requires an intent to harm through deception - is consistent with other Circuits. In *United States v. Takhalov*, for example, the Eleventh Circuit reversed defendants' wire fraud and related convictions after the district court declined to instruct the jury "that they must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay." 827 F.3d 1307, 1323-24 (11th Cir. 2016), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). The Eleventh Circuit concluded that "to defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all" and thus "deceiving is a necessary condition

of defrauding but not a sufficient one" or "[p]ut another way, one who defrauds always deceives, but one can deceive without defrauding." *Id*. at 1312.

Similarly, the Second Circuit has held that a scheme does not implicate the wire fraud statute if, while employing deception to induce a third party to enter into an economic transaction that it might otherwise have avoided, the scheme does not involve a false representation regarding the "essential elements of the bargain." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). In reversing the defendant's conviction on appeal, the Court in *Shellef* held:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid--which do not violate the mail or wire fraud statutes--and schemes that depend for their completion on a misrepresentation of an essential element of the bargain--which do violate the mail and wire fraud statutes.

*Id*. It thus reversed the conviction on the ground that the jury "might have erroneously convicted [defendants] even though it concluded that the defendants did not misrepresent an 'essential element' of the bargain, but rather made 'simpl[e] fraudulent inducements to gain access to' the purported victim's products." *Id*. at 109.

### 3.    Materiality

To prove a scheme to defraud, the government must also show that the defendant made a material false statement, misrepresentation, or promise, or concealed a material fact. *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009); *see also Neder v. United States*, 527 U.S. 1, 25 (1999) (holding "materiality of falsehood" is an element of federal mail and wire fraud statutes). "[A] false statement is material if it has a natural tendency to influence or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013) (quoting *Neder*, 527 U.S. at 16).

21

**B. The Evidence Is Insufficient For Any Rational Factfinder To Find Professor Xiao Guilty of Counts 1 and 2**

In Counts 1 and 2, the Superseding Indictment alleges two separate uses of interstate wires to a single alleged scheme to defraud NSF running from August 1, 2018 (the date NSF's solicitation of grant proposals was issued) and continuing to on or about July 16, 2019 (the date before NSF transmitted to SIUC the award notice). Superseding Indictment ¶ 2. Within that scheme, the Superseding Indictment alleges two "materially false and fraudulent pretenses, representations and promises to NSF": (1) the grant proposal submitted to SIUC on September 13, 2018 (which SIUC submitted to NSF on September 17, 2018), and (2) Professor Xiao's May 1, 2019 response to Dr. Ou's April 29, 2019 email. *Id.* ¶¶ 3-5, 9.

Because the government, for the reasons set forth in Sections II.B.1 and II.B.2 *supra*, has failed to present sufficient evidence that the grant proposal was false, or that Professor Xiao submitted the grant proposal to SIUC (and caused SIUC to submit it to NSF) with an intent to deceive, the only alleged fraudulent pretense, representation or promise left in the alleged scheme to defraud is Professor Xiao's May 1, 2019 email. However, the government's case-in-chief presented insufficient evidence that Professor Xiao's email, which stated "I don't have other grants or pending proposals but this one," was neither material nor made with an intent defraud. And even such evidence of materiality and fraudulent intent were sufficient to sustain a conviction, the government's evidence

**1. There Is Insufficient Evidence That the Alleged Non-Disclosures In the Grant Application Were Misstatements or Concealments, or That Professor Xiao Had an Intent to Defraud**

The allegations of falsity under Counts 2 and 3 are the same as under Count 1.  As discussed in Section II.B.1 *supra*, the government's evidence of falsity falls far short of sufficient to sustain a conviction.[9]

Moreover, as discussed in Section II.B.2 *supra*, the government presented no evidence of any intent to deceive, let alone an intent to defraud NSF, on Professor Xiao's part in submitting the grant proposal.  Indeed, there is no evidence in the government's case that suggests that Professor Xiao even knew or understood that the Alleged Shenzhen Contract needed to be disclosed in the Organizational Affiliation section, or that either the Alleged Shenzhen Contract or Alleged Guangdong Grant needed to be disclosed in the Current and Pending Support section.

### 2. Professor Xiao's Non-Disclosure of the Alleged Shenzhen Contract and the Alleged Guangdong Grant In His May 1 Email Did Not Render His Email False Or Misleading

While it is true that Dr. Ou's April 29 email requested Professor Xiao to disclose "any position outside of the US or any source of funding from any non-US funding source" in an updated Current and Pending Support page, as discussed in Sections II.B.1.a and II.B.1.b *supra*, there is insufficient evidence both as to the existence the Alleged Guangdong Grant and any continuing contractual obligation under the Alleged Shenzhen Contract, and therefore insufficient evidence that their non-disclosure in Professor Xiao's May 1 email was false or misleading.  Moreover, Dr. Ou's request for disclosure of "any position outside of the US," when read in the context of the entire email, clearly requests disclosure of "positions" that would otherwise be required disclosures in the Current and Pending Support section.[10]  There is thus insufficient evidence that any non-disclosures in Professor Xiao's email rendered it false or misleading.

---

[9] As noted above, the fundamental ambiguity doctrine applies to wire fraud charges.

[10] To the extent Dr. Ou's email seeks information about "positions" beyond what the NSF required researchers to disclose as set forth in the PAPPG, Dr. Ou herself admitted that it would be improper to consider information not required for disclosure by the PAPPG.  *See* April 28, 2022 Tr. 222:20-223:25.

**3.   There Is Insufficient Evidence That Professor Xiao's May 1 Email Was Material To Dr. Ou's Recommendation of the Grant Proposal For Award**

Regarding Professor Xiao's affirmative representation in the May 1 email – "I don't have other grants or pending proposals but this one" – the evidence presented by the government is insufficient to sustain a jury finding that Professor Xiao's May 1, 2019 email was material to Dr. Ou's recommendation for award.

Although Dr. Ou testified on direct examination that information regarding Professor Xiao's pending NSFC application "[w]ould…have been capable of influencing your decision to approve [Professor Xiao's] application," April 28, 2022 Tr. 182:7-9, she acknowledged on cross-examination that a report of a pending proposal would have only prompted "further discussion" with the researcher, and had she subsequently learned during those discussions that the pending proposal was denied, she would still have recommended the award.  Thus, given the undisputed evidence that Professor Xiao's NSFC proposal was ultimately denied (*see* GX 78), the government's evidence is uncontroverted Professor Xiao's statement that he had no other "pending proposals" would not have been material to Dr. Ou's recommendation.

**4.   There Is Insufficient Evidence That Professor Xiao Sent the May 1 Email With An Intent To Defraud**

The evidence presented in the government's case-in-chief is likewise insufficient to allow a jury to find that Professor Xiao sent the May 1 email with an intent to defraud.  The only evidence the government presented regarding Professor Xiao's state of mind at the time he sent the email was the recording of Professor Xiao's responses to the FBI agents' questions regarding the May 1 email.  However, those responses, even viewing them in a light most favorable to the government, suggest at best that Professor Xiao was at the time of the email "depressed" and focused on writing the rebuttal in the pending plagiarism investigation, and that the disclosure of the complicated

24

issue of his relationship with Shenzhen would make his entire situation more complicated.  He also said that he was planning on telling NSF about the relationship and how he did not view the money he received from Shenzhen as his money after the "plagiarism things clear[ed] out."  If these responses are suggestive of any intent, it is only an intent to deceive, which falls short of an intent to defraud, as § 1343 requires.  Indeed, Professor Xiao unequivocally disavowed any intent to defraud NSF through his response to Dr. Ou's email:

> JM: So you were just really worried that, that if you told them about [the Shenzhen relationship] right now even though you didn't view it that big of a deal if you told em about this couple with the plagiarism you just weren't going to get the grant you were worried about that.
>
> MX: Not not get the grant just make things harder.
>
> JM: Just make, make the things harder to get the grant.
>
> MX: Uh, I always think I won't get [the grant], but just make the whole thing
>
> JM: Even worse.
>
> MX: Even worse.
>
> JM: Okay.
>
> MX: Or even damage the, the employment and, an, an those things, it would make it…
>
> JM: Damage employment with who?  With the university?
>
> MX: Yeah, yeah.
>
> JM: Ok.
>
> MX: Because you're coupling so many things, uh, uh, an, an, an, then just, just this one my things is coupling together.
>
> JM: Gotcha.
>
> MX: Yeah.  This is what I concern at the time.

25

Gov't Interview Tr. 47.   Whether Professor Xiao was depressed and unable to focus on the email response, wanted to wait until "the plagiarism things cleared out" before telling NSF about his Shenzhen relationship, or was worried about creating more complications, his responses to this questioning are insufficient to sustain a jury finding that he acted with intent to defraud NSF.

Moreover, there is no evidence presented in the government's case-in-chief that Professor Xiao intended to obtain the NSF grant, and his one month of salary covered by the grant's 3-year term, without performing the research work he proposed to do.  On the contrary, the evidence in the government's case-in-chief demonstrates that Professor Xiao did the work he proposed in the grant, and that his work report was submitted to and approved by NSF.  (DX 169).

## IV.   Professor Xiao Is Entitled to Judgment of Acquittal On The Tax Counts (Counts 4 through 7)

### A.   Governing Legal Principles

#### 1.   Willfulness

In the criminal tax context, the government bears the heavy burden of proving beyond a reasonable doubt that the defendant *willfully* violated the tax law.  To prove willfulness in a criminal tax case, the government must show that "the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991).  In other words, in the context of a complex statute, the government must establish that "defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).  Willfulness "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required."  *United States v. Murphy*, 469 F.3d 1130, 1137 (7th Cir. 2006) (quoting *United States v. Hooks*, 848 F.2d 785, 790 (7th Cir. 1988)).

This stringent standard reflects the good judgement of Congress and the federal courts to make clear that the purpose of tax law was not "to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." *Cheek*, 498 U.S. at 205 (quoting *United States v. Bishop*, 412 U.S. 346, 360-361 (1973)). Making this showing requires the government to negate "a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *Id.* at 202.

The Supreme Court has repeatedly and emphatically emphasized the complexity of the Tax Code and IRS regulations, as well as the burdens of that complexity on average citizens. *Cheek*, 498 U.S. at 205; *Bishop*, 412 U.S. at 360-361; *Spies v. United States*, 317 U.S. 492, 496 (1943). Other courts have reached the same conclusion, and gone so far as to conclude that expert tax professionals, including judges and tax attorneys who are not average taxpayers, do not always fully understand this area of the law. *See, e.g., Manor Care, Inc. v. United States*, 630 F.3d 1377, 1386 (Fed. Cir. 2011) (stating the "[T]ax [C]ode is complex" and the Tax Court must be careful in interpreting its meaning); *Voss v. Comm'r*, 796 F.3d 1051, 1053 (9th Cir. 2015) (stating the Tax Code is complex); *Loving v. IRS*, 742 F.3d 1013, 1014 (D.C. Cir. 2014) (stating that the "federal income [T]ax [C]ode is massive and complicated" and that "is it not surprising that many taxpayers hire someone else to help prepare their tax returns"). The high bar of the willfulness standard is a necessary and proper response to this complexity that ensures innocent taxpayers are not swept into criminal liability despite their good faith efforts to comply with the Tax Code.

## B. The Government Has Not Offered Sufficient Proof of Willfulness as to Counts 4 through 7

### 1.    Counts 4 through 6

To prove that Professor Xiao violated 26 U.S.C. § 7206(1), the statute governing Counts 4 through 6, the Government must establish beyond a reasonable doubt that Professor Xiao "[w]illfully [made] and subscribe[d] any return . . . , which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter."  Crucially, the Government must prove that Professor Xiao acted willfully, which "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *Murphy*, 469 F.3d at 1137 (quoting *Hooks*, 848 F.2d at 790).  Here, no rational factfinder could determine beyond a reasonable doubt that Professor Xiao was aware of the requirement to mark on Schedule B of Form 1040 his 2017, 2018, and 2019 tax returns that he had signatory authority over a foreign bank account, but nevertheless intentionally lied on his returns.  The only evidence presented by the Government on this issue is the TurboTax software purportedly relied on by Professor Xiao (GX 99-102), the face of Schedule B on Professor Xiao's initial tax returns (GX 93-95), the delinquent FBAR filings that Professor Xiao subsequently hired a tax preparer to make in an effort to fix any issues with his taxes (GX 103-06), and the Government's surreptitious recording of Professor Xiao (GX 13).  None of this evidence is sufficient to prove that he made a false statement on his tax returns.

First, the TurboTax software was not sufficient to establish that Professor Xiao understood the requirements of Schedule B and willfully made a false statement on his tax returns.  Although the Government presented a limited sample of the screens presented to a user of TurboTax (GX 102), a rational factfinder could not find that the full, often-confusing software was sufficient to put Professor Xiao on notice of this requirement.  Among other fatal issues with the TurboTax software, as acknowledged by Lisa Skelly, the TurboTax employee who testified for the

28

Government, the specific question asked on Schedule B appears nowhere in the TurboTax software (CITE).  Moreover, the initial question that might cause the software to fill in the key question on Schedule B appears in the "Interests and Dividends" section, and is essentially hidden by unrelated content and guidance.  Nor does TurboTax require the user to actually review their full returns before e-filing with the IRS.

Second, the Government provided evidence regarding the text of question 7(a) on Schedule B.  But there is zero evidence proving that Professor Xiao actually saw this question.  As noted above, Professor Xiao's tax returns in the relevant years were filed electronically (GX 96-98), and the TurboTax software does not require a user to review the actual forms being filed.  The Government took no steps to prove that Professor Xiao did so, and no rational factfinder could conclude that the text of Schedule B put Professor Xiao on notice of the filing requirement.

Third, although the delinquent FBAR filings (GX 103-06) state that the Ping An account was a foreign account under Professor Xiao's control, those after-the-fact statements have no bearing on Professor Xiao's understanding and willfulness at the time he made the 2017, 2018, and 2019 tax filings.  No rational juror could infer that a statement made years later, following advice by a professional tax preparer, could provide any insight into Professor Xiao's knowledge and intent at the moment he submitted the returns.

Finally, the recording of Professor Xiao's interview by the FBI and DHS (GX 13) makes clear that Professor Xiao, who had no reason to think he was being taped, stated repeatedly that he did not believe the money in the Ping An account was his because it was encumbered by the obligation to use the money only to reimburse his travels and other expenses associated with travel to Shenzhen University.  Professor Xiao's confidence that the Ping An account did not belong to

him (or at worst, his confusion about the tax treatment of the account) is surely not sufficient to prove that he willfully lied about the account.

For these reasons, no rational factfinder could reach the conclusion beyond a reasonable doubt that Professor Xiao willfully made a false statement on any of the charged tax returns, and the Court should enter a judgement of acquittal as to Counts 4 through 6.

### 2.      Acquittal is Warranted as to Count 7.

The Government's proof of willfulness with regard to Count 7 is equally insufficient.  Once again, to prove that Professor Xiao violated 31 U.S.C. §§ 5314 and 5322(a) by failing to file an FBAR, the government must establish that Professor Xiao acted willfully.  *See* 31 U.S.C. § 5322(a).  The government's proof is clearly insufficient to convince a rational factfinder of this element beyond a reasonable doubt.  Once again, the recorded interview offered by the government makes clear that Professor Xiao did not view the money in the Ping An account as his to use.  The selections of the TurboTax software offered by the government make no mention of FinCEN or the FBAR requirement.  And there is no evidence that Professor Xiao actually reviewed the underlying forms that were submitted to the IRS in connection with his initial tax returns.  Moreover, the evidence presented during the government's case made clear that Professor Xiao has no background or training in tax issues.  In light of all of this evidence, no rational factfinder could conclude beyond a reasonable doubt that Professor Xiao was aware of the requirement to make an FBAR filing for the 2019 tax year, but that he willfully decided not to do so.  For this reason, the Court should enter a judgment of acquittal as to Count 7.

## **CONCLUSION**

For the foregoing reasons, the Defendant respectfully moves this Court pursuant to Federal

Rule of Criminal Procedure 29(a) for a Judgment of Acquittal as to all counts.

Respectfully submitted,

By: /s/ Patrick F. Linehan
Patrick F. Linehan, *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
plinehan@steptoe.com
202.429.3000

Ryan P. Poscablo, *pro hac vice*
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.3900

Michelle D. Nasser
Dowd Bennett LLP-St. Louis
7733 Forsyth Boulevard, Suite 1900
St. Louis, MO 63105
mnasser@downbennett.com
314.889.7300

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2022 I electronically filed Defendant's Motion for Judgment of Acquittal with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                 /s/ Patrick F. Linehan
                 Patrick F. Linehan
                 Steptoe & Johnson LLP
                 1330 Connecticut Avenue, NW
                 Washington, DC  20036
                 plinehan@steptoe.com

                 *Attorney for Defendant*