```
 1                       UNITED STATES OF AMERICA
                        SOUTHERN DISTRICT OF ILLINOIS
 2

 3     UNITED STATES OF AMERICA,        )
                                        )
 4                     Plaintiff,       )
       V.                               ) No. 4:21-cr-40039-SMY-1
 5                                       )
       MINGQING XIAO,                   ) BENTON, IL
 6                                       )
                       Defendant.       )
 7

 8

 9


10               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                             DAY 7 OF 7
11
                 BEFORE THE HONORABLE STACI M. YANDLE
12                  UNITED STATES DISTRICT JUDGE

13                          May 4, 2022

14

15

16

17

18

19

20

21     REPORTED BY:       Christine Dohack LaBuwi, RDR, CRR
                          Official Court Reporter
22                        301 West Main Street
                          Benton, Illinois  62812
23                        (618) 439-7725
                          Christine_Dohack@ilsd.uscourts.gov
24
       Proceedings recorded by mechanical stenography, produced by
25     computer-aided transcription.
```

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:        Peter T. Reed, Esq.
                          Scott A. Verseman, Esq.
 3                         OFFICE OF THE U.S. ATTORNEY
                          9 Executive Drive, Suite 300
 4                         Fairview Heights, IL  62208
                          (618) 628-3700
 5                         Peter.Reed@usdoj.gov
                          Scott.Verseman@usdoj.gov
 6

 7   FOR DEFENDANT:        Ryan P. Poscablo, Esq.
                          Brittney L. Denley, Esq.
 8                         STEPTOE & JOHNSON LLP
                          1114 6th Avenue
 9                         New York, NY 10036
                          (212) 506-3900
10                         rposcablo@steptoe.com
                          bdenley@steptoe.com
11
                          Patrick F. Linehan, Esq.
12                         James M. Hobbs, Esq.
                          STEPTOE & JOHNSON LLP
13                         1330 Connecticut Avenue NW
                          Washington, DC 20036
14                         (202) 429-3000
                          plinehan@steptoe.com
15                         jhobbs@steptoe.com

16                         Michelle D. Nasser, Esq.
                          DOWD BENNETT LLP
17                         7733 Forsyth Blvd., Suite 1900
                          St. Louis, MO 63105
18                         (314) 889-7000
                          mnasser@dowdbennett.com
19

20

21

22

23

24

25
```

1          **I N D E X**

2
                                              PAGE:
3

4     Jury Instructions by the Court        1002:14
      Closing Argument by Mr. Reed          1015:20
5     Closing Argument by Mr. Poscablo      1038:5
      Closing Argument by Mr. Shugert       1072:17
6     Jury Instructions by the Court        1089:10
      Verdict                               1094:10
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings began in open court at 9:05 a.m.,

2     defendant and jury present.)

3          COURTROOM DEPUTY:  The Court calls Case No.

4     21-CR-40039, *United States of America versus MingQing Xiao*.

5     This matter is called for Day 7 of jury trial.

6          Would the parties please state your presence for

7     the record?

8          MR. REED:  Good morning, Judge.  Peter Reed, Scott

9     Verseman, and Derek Shugert for the Government.

10         THE COURT:  Good morning, counsel.

11         MR. POSCABLO:  Good morning, Your Honor.  Ryan

12    Poscablo, Patrick Linehan, Michelle Nasser, with our client

13    Professor MingQing Xiao.

14         THE COURT:  Good morning, counsel.

15         And good morning, Dr. Xiao.

16         Good morning, members of the jury.

17         I first need to advise you that Counts 1 and 2,

18    charging wire fraud, have been dismissed.  The case

19    proceeds with respect to the offenses charged in Counts 3,

20    4, 5, 6, and 7.

21         Now, I am about to instruct you on the law.  You

22    have a copy of the jury instructions you have been

23    provided.  Those are just for your convenience.  Some

24    people like to read along as I read them, but you don't

25    have to.  You don't have to memorize them.  You will have

1    those instructions with you in the jury room to refer to.

2         And with that:

3         Members of the jury, I will now instruct you on the

4    law that you must follow in deciding this case.  Each of

5    you has a copy of these instructions to use in the jury

6    room.  You must follow all of my instructions about the

7    law, even if you disagree with them.  This includes the

8    instructions I gave you before the trial, any instructions

9    I gave you during the trial, and the instructions I am

10   giving you now.

11        As jurors, you have two duties.  Your first duty is

12   to decide the facts from the evidence that you saw and

13   heard here in court.  This is your job, not my job or

14   anyone else's job.

15        Your second duty is to take the law as I give it to

16   you, apply it to the facts, and decide if the Government

17   has proved the defendant guilty beyond a reasonable doubt.

18        You must perform these duties fairly and

19   impartially.  Do not let sympathy, prejudice, fear, or

20   public opinion influence you.  In addition, do not let any

21   person's race, color, religion, national ancestry, or

22   gender influence you.  You must not take anything I said or

23   did during the trial as indicating that I have an opinion

24   about the evidence or about what I think your verdict

25   should be.

1           The charges against the defendant are in a document

2    called an Indictment.  The Indictment in this case charges

3    that the defendant committed the crimes of "False

4    Statement" in Count 3; "False Statement on Tax Return,"

5    Count 4; "Fraud or False Statement on Tax Return," Count 5;

6    "Fraud or False Statement on Tax Return," Count 6; and,

7    "Failure to File Report of Foreign Bank Account" in

8    Count 7.  The defendant has pled not guilty to the charges.

9    The Indictment is simply the formal way of telling the

10   defendant what crimes he is accused of committing.  It is

11   not evidence that the defendant is guilty.  It does not

12   even raise a suspicion of guilt.

13          The defendant is presumed innocent of the charges.

14   This presumption continues throughout the case, including

15   during your deliberations.  It is not overcome unless, from

16   all the evidence in the case, you are convinced beyond a

17   reasonable doubt that the defendant is guilty as charged.

18          The Government has the burden of proving the

19   defendant's guilt beyond a reasonable doubt.  This burden

20   of proof stays with the Government throughout the case.

21          The defendant is never required to prove his

22   innocence.

23          A defendant has an absolute right not to testify.

24   You may not consider in any way the fact that the defendant

25   did not testify.  You should not even discuss it in your

1  deliberations.

2      In deciding your verdict, you should not consider

3  the possible punishment for the defendant.  If you decide

4  that the Government has proved the defendant guilty beyond

5  a reasonable doubt, then it will be my job to decide on the

6  appropriate punishment.

7      You must make your decision based only on the

8  evidence that you saw and heard here in court.  Do not

9  consider anything you may have seen or heard outside of

10  court, including anything from the newspaper, television,

11  radio, the internet, or any other source.

12      The evidence includes only what the witnesses said

13  when they were testifying under oath, the exhibits that I

14  allowed into evidence, and the stipulations the lawyers

15  agreed to.  A stipulation is an agreement that certain

16  facts are true or that a witness would have given certain

17  testimony.

18      In addition, you may recall that I took judicial

19  notice of certain facts that may be considered as matters

20  of common knowledge.  You may accept those facts as proved,

21  but you are not required to do so.

22      Nothing else is evidence.  The lawyers' statements

23  and arguments are not evidence.  If what a lawyer said is

24  different from the evidence as you remember it, the

25  evidence is what counts.  The lawyers' questions and

1    objections likewise are not evidence.

2         A lawyer has a duty to object if he thinks a

3    question is improper.  If I sustained objections to

4    questions the lawyers asked, you must not speculate on what

5    the answers might have been.

6         If, during the trial, I struck testimony or

7    exhibits from the record, or told you to disregard

8    something, you must not consider it.

9         If you have taken notes during the trial, you may

10   use them during deliberations to help you remember what

11   happened during the trial.  You should use your notes only

12   as aids to your memory.  The notes are not evidence.  All

13   of you should rely on your independent recollection of the

14   evidence, and you should not be unduly influenced by the

15   notes of other jurors.  Notes are not entitled to any more

16   weight than the memory or impressions of each juror.  Give

17   the evidence whatever weight you decide it deserves.  Use

18   your common sense in weighing the evidence and consider the

19   evidence in light of your own everyday experience.

20        People sometimes look at one fact and conclude from

21   it that another fact exists.  This is called an inference.

22   You are allowed to make reasonable inferences, so long as

23   they are based on the evidence.

24        You may have heard the terms "direct evidence" and

25   "circumstantial evidence."  Direct evidence is evidence

1    that directly proves a fact.  Circumstantial evidence is

2    evidence that indirectly proves a fact.

3            You are to consider both direct and circumstantial

4    evidence.  The law does not say that one is better than the

5    other.  It is up to you to decide how much weight to give

6    to any evidence, whether direct or circumstantial.

7            You heard a recorded conversation.  This is proper

8    evidence that you should consider together with and in the

9    same way you consider the other evidence.

10           You were shown a transcript of the conversation to

11   help you follow the recording as you listened to it.  The

12   recording is the evidence of what was said and who said it.

13   The transcript is not evidence.  If you noticed any

14   differences between what you heard in the conversation and

15   what you read in the transcript, your understanding of the

16   recording is what matters.  In other words, you must rely

17   on what you heard, not what you read.  And if you could not

18   hear or understand certain parts of the recording, you must

19   ignore the transcript as far as those parts are concerned.

20           I am providing you with the recording and a device

21   with instructions on its use.  It is up to you to decide

22   whether to listen to the recording during your

23   deliberations.  You may, if you wish, rely on your

24   recollections of what you heard during the trial.

25           You have heard evidence obtained from the

1    Government's use of deceptive investigative techniques.

2    The Government is permitted to use these techniques.  You

3    should consider evidence obtained this way together with

4    and in the same way you consider the other evidence.

5         You have received evidence that the defendant made

6    a statement to the Federal Bureau of Investigation and

7    Homeland Security Investigations.  You must decide whether

8    the defendant actually made the statement and, if so, how

9    much weight to give the statement.  In making these

10   decisions, you should consider all of the evidence,

11   including the defendant's personal characteristics and

12   circumstances under which the statement may have been made.

13        During the trial, Chinese language e-mails and

14   documents were admitted in evidence.  You were also given

15   English translations of those e-mails and documents.  It is

16   up to you to decide whether a translation is accurate, in

17   whole or in part.  You may consider the translator's

18   knowledge, training, and experience, the nature of the

19   conversation, and the reasonableness of the translation in

20   light of all the evidence in the case.  You may not rely on

21   any knowledge you may have of the Chinese language.

22   Rather, your consideration of the translations should be

23   based on the evidence introduced at trial.

24        Part of your job as jurors is to decide how

25   believable each witness was, and how much weight to give

1    each witness's testimony.  You may accept all of what a
2    witness says, or part of it, or none of it.
3          Some factors you may consider include:
4          The intelligence of the witness;
5          The witness's ability and opportunity to see, hear,
6    or know the things the witness testified about;
7          The witness's memory;
8          The witness's demeanor;
9          Whether the witness had any bias, prejudice, or
10   other reason to lie or slant the testimony;
11         The truthfulness and accuracy of the witness's
12   testimony in light of the other evidence presented; and
13         Inconsistent statements or conduct of the witness.
14         You have heard witnesses, namely, Michael Welch and
15   Zhirong Yang, who gave opinions and testimony about certain
16   subjects.  You do not have to accept these witnesses'
17   testimony.  You should judge these witnesses' opinions and
18   testimony the same way you judge the testimony of any other
19   witness.  In deciding how much weight to give to these
20   opinions and testimony, you should consider the witness's
21   qualifications, how he reached his opinions, and the
22   factors I have described for determining the believability
23   of testimony.
24         It is proper for an attorney to interview any
25   witness in preparation for trial.

1          Do not make any decisions simply by counting the

2    number of witnesses who testified about a certain point.

3    You may find the testimony of one witness or a few

4    witnesses more persuasive than the testimony a larger

5    number.  You need not accept the testimony of the larger

6    number of witnesses.

7          What is important is how truthful and accurate the

8    witnesses were and how much weight you think their

9    testimony deserves.

10          The defendant has been accused of more than one

11    crime.  The number of charges is not evidence of guilt and

12    should not influence your decision.

13          You must consider each charge separately.  Your

14    decision on one charge, whether it is guilty or not guilty,

15    should not influence your decision on any other charge.

16          Count 3 of the Indictment charges the defendant

17    with concealing a material fact.  In order for you to find

18    the defendant guilty of this charge, the Government must

19    prove each of the following elements beyond a reasonable

20    doubt:

21          1.  The defendant concealed a fact by trick, scheme

22    or device; and

23          2.  The fact was material; and

24          3.  The defendant acted knowingly and willfully;

25    and

1          4.  The defendant concealed the material fact in a

2    matter within the jurisdiction of the executive branch of

3    the Government of the United States.

4          If you find from your consideration of all the

5    evidence that the Government has proved each of these

6    elements beyond a reasonable doubt as to the charge you are

7    considering, you should find the defendant guilty of that

8    charge.

9          If, on the other hand, you find from your

10   consideration of all the evidence that the Government has

11   failed to prove any of these elements beyond a reasonable

12   doubt as to the charge you are considering, then you should

13   find the defendant not guilty of that charge.

14         A "scheme" or "device" includes any plan or course

15   of action intended to deceive others.

16         In order to prove that the defendant concealed a

17   fact by trick, scheme, or device, the Government must prove

18   that the defendant engaged in an affirmative act to

19   conceal.  Simple omissions do not constitute affirmative

20   acts of concealment.

21         For the purposes of Count 3, a statement is

22   "material" if it is capable of influencing the actions of

23   the body or agency.  The Government is not required to

24   prove that the statement actually influenced the actions of

25   the body or agency.

1    A person acts knowingly if he realizes what he is

2    doing and is aware of the nature of his conduct, and does

3    not act through ignorance, mistake, or accident.  In

4    deciding whether the defendant acted knowingly, you may

5    consider all of the evidence, including what the defendant

6    did or said.

7    A person acts "willfully" if he acts voluntarily

8    and intentionally, and with the intent to do something

9    illegal.

10   The National Science Foundation is a part of the

11   executive branch of the Government of the United States.

12   Facts concerning an application for National Science

13   Foundation grants are within the jurisdiction of that

14   branch.

15   Counts 4, 5, and 6 of the Indictment charge the

16   defendant with filing a false tax return.  In order for you

17   to find the defendant guilty of this charge, the Government

18   must prove each of the following elements beyond a

19   reasonable doubt:

20   1.  The defendant prepared an income tax return;

21   and

22   2.  The income tax return was false as to a

23   material matter, as charged in the Count; and

24   3.  The defendant signed the income tax return,

25   which contained a written declaration that it was made

1  under penalties of perjury; and

2      4.  The defendant acted willfully, that is, he knew

3  that he had a legal duty to file a truthful tax return, but

4  when he signed the return, he did not believe that it was

5  truthful as to a material matter; and

6      5.  The defendant filed the income tax return with

7  the Internal Revenue Service.

8      If you find from your consideration of all the

9  evidence that the Government has proved each of these

10  elements beyond a reasonable doubt as to the charge you are

11  considering, then you should find the defendant guilty of

12  that charge.

13      If, on the other hand, you find from your

14  consideration of all the evidence that the Government has

15  failed to prove any one of these elements beyond a

16  reasonable doubt as to the charge you are considering, then

17  you should find the defendant not guilty of that charge.

18      You may infer that a tax return was, in fact,

19  signed by the person whose name appears to be signed to it.

20  You are not required, however, to infer this.

21      If you find that the Government has proved beyond a

22  reasonable doubt that the defendant signed a tax return,

23  then you may infer that the defendant knew of the contents

24  of the return.  You are not required, however, to infer

25  this.

For the purposes of Counts 4, 5, and 6, a false matter is "material" if the matter was capable of influencing the Internal Revenue Service.

Count 7 of the Indictment charges defendant with failure to file a report of a foreign bank account. In order for you to find the defendant guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:

1. Defendant was a United States person during the calendar year 2019; and

2. Defendant had a financial interest in, or signature or other authority over a bank, securities, or other financial account in a foreign country during the calendar year 2019; and

3. The aggregate value of the defendant's foreign bank, securities, or other financial accounts exceeded 10,000 dollars at any time during the calendar year 2019; and

4. Defendant willfully failed to file a Report of Foreign Bank and Financial Accounts on or before the due date following the calendar year 2019.

If you find from your consideration of all the evidence that the Government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of

1    that charge.

2         If, on the other hand, you find from your

3    consideration of all the evidence that the Government has

4    failed to prove any one of these elements beyond a

5    reasonable doubt as to the charge you are considering, then

6    you should find the defendant not guilty of that charge.

7         A "United States person" means a citizen or

8    resident of the United States.

9         If the defendant acted in good faith, then he

10   lacked the willfulness required to prove the offenses

11   charged in Counts 3 through 7.  The defendant acted in good

12   faith if, at the time, he honestly believed the validity of

13   the statements that the Government has charged as being

14   false.

15        The defendant does not have a prove his good faith.

16   Rather, the Government must prove beyond a reasonable doubt

17   that the defendant acted willfully as charged in Counts 3

18   through 7.

19        And with that, we are ready to proceed.

20        MR. REED:  At bottom, this is a simple case about a

21   series of false statements by the defendant MingQing Xiao

22   in response to straightforward questions.

23        The first set of lies came with the grant proposal

24   in September of 2018.  Dr. Xiao certified to SIU-C that the

25   proposal was true and complete.  And it wasn't.

1      You have all seen this Current and Pending Support
2  page many times now.  The only grant Dr. Xiao lists is the
3  one he is applying for.  You heard from Dr. Ou what that
4  tells NSF.  *I've got nothing else going on.  No other time*
5  *commitments.*  That was a lie.
6      As we know, Dr. Xiao had a lot going on.  He had a
7  grant in Guangdong Province and he contractually agreed
8  with Shenzhen University to do research for them.  You
9  heard Dr. Xiao say he's been paid monthly by Shenzhen
10 University since 2016.  And he did not disclose his
11 organizational affiliations with Shenzhen University
12 either.
13     Why didn't he tell the truth?  Well, you heard
14 that, too, in his interview with agents.  It was too
15 complicated to explain to NSF; it would make things worse
16 and harder for Dr. Xiao.
17     The second set of lies was to the IRS.  Dr. Xiao
18 had a foreign bank account at Ping An Bank since 2016.  He
19 shared that account information both with Shenzhen
20 University and with Mr. Cai.  The same Mr. Cai he received
21 that grant with in Guangdong Province.
22     You have seen the TurboTax questions asking about
23 foreign bank accounts.  You have seen the tax returns.
24 Year after year after year, Dr. Xiao signed and certified
25 to the IRS that he did not have a foreign bank account; the

1   very account he was using to receive money for the overseas

2   projects that he hid from NSF.

3          Ladies of the jury, thank you for your time and

4   attention over the last couple weeks.  I'm going to walk

5   through each of the charges the judge just read for you,

6   and I'll explain how the evidence establishes beyond a

7   reasonable doubt that Dr. Xiao is guilty on all those

8   Counts.  But that's the case in a nutshell.

9          You heard it from the Court.  Use your common sense

10  in good judgment in considering the evidence.  Consider Dr.

11  Xiao's long list of false statements in light of your

12  everyday experience.  He hid the truth until he couldn't

13  hide it anymore.

14         Here are the charges you are considering.  We'll

15  start with the first one, making a "False Statement" which,

16  as you heard, has four elements.  And we'll start with that

17  first element that "the defendant concealed a fact by

18  trick, scheme, or device."

19         "A scheme or device includes any plan or course of

20  action intended to deceive others."  So, what was the plan

21  here?  Well, the plan was to get the grant.  What fact did

22  defendant conceal?  That his proposal was false and

23  incomplete.  And he did that by taking an affirmative step,

24  by telling SIU-C that the proposal was true and complete.

25         Count 3 relates to this document from Southern

1  Illinois University at Carbondale called a Proposal

2  Checklist.  And as you heard from SIU-C employee Miss

3  Alongi, SIU-C requires researchers to submit this cover

4  sheet along with the proposal.  That's why it's called a

5  transmittal form on the back.  It's certifying what's being

6  transmitted.

7       On the second page, the researcher certifies the

8  accuracy of the proposal.  That the information submitted

9  herein is true, complete, and accurate to the best of your

10 knowledge.  It's signed here by Dr. Xiao on September 13

11 for the proposal he submitted to NSF on September 17.

12      And you heard Miss Alongi explain why the

13 certification exists.  She has to certify to NSF that the

14 proposal is true and complete to the best of her knowledge.

15 But it's Dr. Xiao who is in the best position to know what

16 other commitments and activities he has going on.

17      So, Dr. Xiao first certifies to SIU-C that the

18 proposal is true and complete on the Checklist.  Then Miss

19 Alongi signs and certifies the proposal is true and

20 complete, relying on Dr. Xiao's prior certification in

21 doing so.  The two statements are nearly identical on

22 purpose.

23      So, let's start with the simple question:  What did

24 NSF want to know?

25      You have seen this Current and Pending Support page

1   a number times.  What did NSF want to know?  They wanted to

2   know about other projects and proposals; they wanted to

3   know about other sources of support; they wanted to know

4   about money; and, they wanted to know about time

5   commitments.

6         This is a straightforward request for information.

7   Nobody in the field is confused by this.  And if by some

8   chance Dr. Xiao were at all uncertain -- and there is no

9   evidence whatsoever that he was -- he could have contacted

10  NSF.  And we know exactly what the Program Officer, Dr. Ou,

11  would have said.  You heard it from her.  NSF wants to know

12  about other positions.  NSF wants to know about other

13  sources of funding, including non-US funding sources.

14        Or Dr. Xiao could have looked it up in the PAPPG,

15  where NSF explains what they want to know in very broad

16  terms.  "All current project support from whatever source

17  must be listed."

18        "The proposal project and all other projects or

19  activities requiring a portion of the time of the PI" must

20  be included.

21        All means all, as Dr. Keiser told you.

22        And what did NSF want to know about organizational

23  affiliations?  Well, you heard that, too, from the NSF

24  witnesses.  They want to know where you have been employed

25  in the last twelve months.  There are multiple blanks in

1    this table for a reason.  So, that's what NSF wanted to
2    know.
3         What did Dr. Xiao say to NSF?  He told NSF he had
4    nothing else going on; no other time commitments.  You
5    heard Dr. Ou explain to you, that's what this form means
6    when there is nothing else listed besides the project that
7    he is applying for.  It means he doesn't have any other
8    time commitments.
9         And what did Dr. Xiao tell NSF on this page?  Well,
10   he told NSF that SIU-C was the only organization he had
11   worked for in the last twelve months.
12        So, we talked about what NSF wanted to know, and we
13   talked about what Dr. Xiao told NSF.  Let's look about what
14   we know from the evidence we have seen this week.  Well, we
15   know he had funding from a non-US funding source in
16   Guangdong Province, and we know he had a position outside
17   of the United States at Shenzhen University.
18        Start with the Guangdong Province grant.  You saw
19   Dr. Xiao's grant application to the Natural Science
20   Foundation of Guangdong Province.  Here it is.  It's
21   Exhibit 29.  You can look at it.  The defense can't say it
22   doesn't exist.  Maybe they'll say Dr. Xiao applied for two
23   grants in Guangdong Province, maybe they'll say three.  I
24   don't know.  But you saw that, a few months later, Dr. Xiao
25   told his employer SIU-C that he had gotten a grant with the

1    Natural Science Foundation of Guangdong Province.  You saw

2    this sabbatical application that Dr. Xiao signed and

3    submitted to Southern Illinois University.

4         What justification did Dr. Xiao offer for seeking a

5    sabbatical?  He explains it on the second page.  "Recently,

6    as a co-PI, I received" -- past tense -- "an external grant

7    from China for collaboration with Guangdong University of

8    Technology."

9         And Dr. Xiao said the same thing on his CV.  It's

10   Government's Exhibit 19.  You can look at it.  "Natural

11   Science Foundation of Guangdong Province, co-PI, RMB 1.2

12   million, 2018 through 2022, with Shuting Cai and Xiaoming

13   Xiong."  At no point did Dr. Xiao ever modify these

14   statements.  Never said, *No, I don't need a sabbatical*

15   *after all.  I didn't get a grant.*  And that's precisely

16   what he promised SIU-C he would do.  He said, *I have an*

17   *obligation.*  If granted leave under the conditions

18   described -- it is the grant he had received -- and he

19   knew, *I am obligated to submit a statement of revision.*  No

20   statement of revision was ever filed.  It's because Dr.

21   Xiao received a grant in Guangdong Province for 2018

22   through 2022.

23        And he disclosed this grant in September of 2017,

24   and it starts in '18.  And leading up to January of 2018,

25   we saw he sent his bank account information to that other

researcher Shuting Cai.  And a week later, Dr. Xiao thanked

Mr. Cai for his support for the research project.

And when -- and what did he admit to SIU-C after

his law enforcement interview?  Well, remember this letter.

It's Government's Exhibit 11.  It's what Dr. Xiao sent to

SIU-C after that law enforcement interview.  And in the

letter he admits receiving 30,000 dollars from Mr. Cai from

late 2017 through 2020.  He said he received a grant, he

said he was working on the grant, and he is sending out

banking information and getting money back.

But what did he tell NSF?  I got nothing else going

on.  And he certified to SIU-C that this statement was

true, complete, and accurate.

Next on the list, Shenzhen University.  You have

seen a lot of information about Dr. Xiao and Shenzhen

University.  I'm just going to hit on five high points

here.  The first is 2016.  You will have that interview

recording with you when you deliberate, and you can go back

and listen to it again, if you want.  You'll hear that Dr.

Xiao has been getting 2,000 dollars a month, every month,

since 2016 from Shenzhen University.  Every single month.

January, *here's your 2,000 dollars*.  February,

*here's your 2,000 dollars*.  March, *here's your 2,000

dollars*.  The very month that Dr. Xiao applied to NSF, *here

is your 2,000 dollars*, for over four years.

1          2016 is also, by the way, when Dr. Xiao opened his

2    account at Ping An Bank.  You saw that account opening for

3    him.  It's Exhibit 82.

4          Let's move on to 2017 and 2018.  This is when Dr.

5    Xiao signed -- filed and signed that employee appraisal

6    form to Shenzhen University outlining his research

7    accomplishments.  This appraisal form, here it is, it's

8    Government Exhibit 62, was for a time period, September

9    2017 through August 2018.  That appraisal period is very

10   important.  It ends in August of 2018, the month before Dr.

11   Xiao applies to NSF.

12         The defense claims that he wasn't working here.

13   But I'd ask you guys to use your common sense.  What kind

14   of job -- or what does it mean when you submit employment

15   forms for your annual work and when you get payments every

16   month?  That's a job.  That's employment.

17         We know he was employed there the previous twelve

18   months.  But what does he tell NSF?  Well, what were his

19   organizational affiliations during those previous twelve

20   months?  We know he was employed at Shenzhen University

21   because his employment appraisal form says he was employed

22   at Shenzhen University.  But he doesn't tell NSF about it.

23         Back to the appraisal form.  Farther down on that

24   form, Dr. Xiao reports to Shenzhen University that he's

25   published three papers in collaboration with faculty

1    members at Shenzhen University, and listing Shenzhen

2    University as the primary employer.  That's research work

3    he's doing for Shenzhen University.  And on the last page,

4    he attests that the information is true and accurate and

5    signs the document.

6              So, back to the timeline.  The next thing that

7    occurs is that he signs a full time contract with Shenzhen

8    University for 2018 through 2023.  You have seen that

9    contract.  Dr. Xiao is the employee.  Shenzhen University

10   is the employer.  And it's signed by Dr. Xiao and it's

11   signed by Shenzhen University.  The contract is for five

12   years, 2018 through 2023.  That's important because Dr.

13   Xiao applied to NSF for a grant running from 2019 through

14   2021.  These are overlapping obligations that NSF asked to

15   know about.

16             When he signed this contract, Dr. Xiao agreed to

17   complete these research tasks:  Publish more than 15-SCI

18   indexed papers in the major field; and apply for the

19   state's major grants; and get at least one such project

20   approved.  That is precisely the kind of overlapping

21   research information that Dr. Xiao [sic] testified she

22   wanted to know about when she made her decision.  As she

23   said, the award size depends on what other support and

24   commitments of time you have, particularly other projects

25   whose work overlaps this one.

1          Back to the contract.  Dr. Xiao agreed to work full

2    time and, in return, Shenzhen University agreed to continue

3    making payments to Dr. Xiao.  Both Dr. Xiao and the

4    university signed that page, as well.

5          So, what do we know?  Well, we know that Dr. Xiao

6    had a position outside the United States and that there was

7    time and money attached to that position.  But we know the

8    time and money devoted to research at Shenzhen University

9    was not in the Current and Pending Support page, and we

10   know his employment was not disclosed on the affiliation

11   sheet.  He hid all of that from NSF, then certified to

12   SIU-C that he was telling NSF the complete truth.  And he

13   wasn't.

14         Now, did Dr. Xiao's work at Shenzhen University

15   magically end right before he submitted that NSF proposal?

16   No, of course not.  We just saw the contract.  It goes

17   through 2023.  In a few months after he sent that contract,

18   he applied for a grant for the Natural Science Foundation

19   of China.  Here it is.  Dr. Xiao lists his employer as

20   Shenzhen University.  And he says the same thing on the

21   resume page of that document.  You can look at it.

22         He says he's a professor, not a visiting professor,

23   not a guest professor.  And this resume looks very

24   different from the one he submitted NSF a month earlier.

25   Let's look at them side by side.

1       Government's Exhibit 76 is the grant application to

2   China.  Government's Exhibit 1 is the grant application to

3   NSF in the United States.  He tells the grant agency in

4   China that he is a professor at Shenzhen University and not

5   at SIU-C.  But he tells NSF that he only works at SIU-C and

6   has no time commitments at Shenzhen University.

7       You heard Dr. Ou explain what that term "guest

8   professor" means.  It means he has no time commitments

9   attached.  He is lying to both grant agencies.  Why?

10  Because he's overcommitted.

11      But that did not stop Dr. Xiao from claiming that

12  both grant applications were true and complete.  Here is

13  the attestation from the grant agency in China, and here is

14  the attestation underlying Count 3.  In reality, both were

15  false.

16      And by the way, Dr. Xiao continued to get paid

17  until at least December of 2020, every month from 2016

18  through at least 2020, 2,000 dollars a month, every month.

19      So, the next element of this Count is that the fact

20  was material.  And "a statement is 'material' if it is

21  capable of influencing the actions of the body or agency.

22  The Government is not required to prove that the statement

23  actually influenced the actions of the body or agency,"

24  simply that it was capable of doing so.

25      And there were three witnesses who testified about

1  materiality for you in the last week and a half.  Dr.

2  Keiser told you why it matters from a big picture

3  perspective.  First, NSF asks for these disclosures for a

4  reason.  What else a researcher has going on is important

5  for NSF to know.  They get many, many grant applications

6  and they can only award a small number of them.  And they

7  use this kind of information about other time commitments

8  to make that decision, to determine the lucky few who will

9  actually get a grant.

10       Second, Dr. Keiser explained to you that when a

11  researcher hides information, it undermines the fairness of

12  the selection process.  There are standards, there's a

13  process that's followed, and there are other applicants who

14  are honest and truthful.

15       Third, Dr. Keiser explained to you that dishonesty

16  on the grant application poisons the entire enterprise.  If

17  you are not honest on the grant application, then you

18  cannot trust the research either.

19       SIU-C employee Miss Alongi also testified about

20  materiality.  She explained, as I said earlier, that Dr.

21  Xiao makes an attestation to SIU-C.  He says, *This is true*

22  *and complete*.  She relies on that statement to then turn

23  around and tell NSF that the proposal is true and complete.

24  And you heard her say, *If I had known, if I had any reason*

25  *to believe that that proposal was not true and complete, it*

*could have affected my decision to submit the grant.*

And third, you heard from Dr. Ou, who also testified about materiality. She explained to you that each of Dr. Xiao's omissions would have been an important piece of information for her to know. And she explained that each of those lies and omissions was separately capable of influencing her decision to make the grant recommendation.

As she told Dr. Xiao, the award size depends on what other support and commitments of time you have, particularly other projects whose work overlaps with this one. Dr. Xiao's false statements were material.

So, the third element is the defendant acted knowingly and willfully.

"A person acts 'willfully' if he acts voluntarily and intentionally, and with the intent to do something illegal." Look, we all know Dr. Xiao acted knowingly. All activities means all activities. You heard the length the defense took to try to claim that all somehow doesn't mean all. That words like organization and current are hard to understand. Use your common sense and good judgment. Dr. Xiao is by all accounts a highly educated and intelligent person and this is what he does professionally. He knew what he was doing.

He also knew that making false statements on the

1    proposal was illegal and could subject him to criminal

2    penalties.  It says so right here:  Any false, fictitious,

3    or fraudulent statements or claims may subject you to

4    criminal penalties.

5         And he acted willfully.  NSF made a straightforward

6    request for information.  If Dr. Xiao chooses to answer

7    honestly and fairly, he may not get the grant, or he may

8    get less money.  But if he chooses to lie, then he may get

9    the grant and the prestige that comes with it.

10        You heard Dr. Keiser talk about what getting an NSF

11   grant means to an academic like Dr. Xiao, the prestige that

12   comes with it.  It's a simple choice.  Lie and get the

13   grant; tell the truth and risk losing the grant.  That's

14   willfulness.  And he did that repeatedly.

15        He left his Guangdong grant off his Current and

16   Pending Support sheet.  He left his research obligations at

17   Shenzhen University off of this sheet.  And he hid his

18   employment at Shenzhen University on the organizational

19   affiliations page.  And then he told SIU-C that it was all

20   true and complete.

21        His intent is also shown by his interview with law

22   enforcement in December of 2020.  Again, you'll have that

23   interview.  You can go back and listen to it.  You will

24   hear agents ask Dr. Xiao, *Have you ever been a professor*

25   *employed by a university in China before?*  And you will

hear Dr. Xiao's answer. *Not employee.* We all know that isn't true. We have seen his employee ID card. We have seen his Employee Appraisal Forms that he submitted to Shenzhen University.

Once it became clear that Dr. Xiao is not being honest with agents, they asked him a more specific question: *Do you have a contract with them?* Dr. Xiao again did not tell the truth. *Not like a contract,* he said. But we all know that isn't true, either. We have seen the contract.

And when asked, *Hey, why didn't you just reach out to NSF, lay it all out on the table?*

Dr. Xiao, you will hear, responded: *Yeah, I think should I do that, but I just didn't do it at the time.*

*Why not?*

*Well, because it would make things complicated and be hard to explain because it would make things worse.*

But telling the truth isn't complicated. It isn't hard. It doesn't make things worse. It's only hard to explain if he wanted to get the grant. It's a simple choice. Lie and get the grant, or tell the truth and risk losing the grant. Dr. Xiao chose to lie and that's acting willfully. So, that's element three.

Move down to element four: "The defendant concealed the material fact in a manner within the

1    jurisdiction of the executive branch of the government of

2    the United States."

3         The material fact concealed by Dr. Xiao was in a

4    matter within the jurisdiction of the executive branch.

5    Facts concerning an application for the Natural Science

6    Foundation grants are within the jurisdiction of that

7    branch.

8         In this particular Proposal Checklist involved

9    federal funds from NSF, as Dr. Xiao says at the top of the

10   Checklist.  In his statement that the proposal was true and

11   complete was a fact concerning an application for a Natural

12   Science Foundation grant.  Thus, it was within the

13   jurisdiction of the executive branch.

14        Because each of these elements has been proven

15   beyond a reasonable doubt.  The Government asks that you

16   find Dr. Xiao guilty on Count 3.

17        That brings us to the tax Counts, making a false

18   statement on tax returns.  This offense is five parts.

19        The first part is easy.  The defendant prepared an

20   income tax return.  You have seen the income tax returns

21   prepared by Dr. Xiao in 2017 and 2018 and 2019.  You heard

22   Revenue Agent Welch explain that in his experience the

23   return is typically prepared by the first individual listed

24   on the return, and that's Dr. Xiao.  And you heard Dr. Xiao

25   tell agents that he does his own taxes on TurboTax.

1          COURTROOM DEPUTY:  Five.

2          MR. REED:  Second.  Dr. Xiao's return each year was

3     false as to a material matter.

4          Let's look at what we know.  Government's Exhibit

5     82 is the translation of this bank form.  The form shows

6     that Dr. Xiao is the account holder of an individual

7     account at Ping An Bank.  It shows Dr. Xiao had the account

8     in May of 2016.  And it shows the location of the bank,

9     Shenzhen branch, Shenzhen University sub branch, in China.

10    It's a foreign bank account.  And we saw that Dr. Xiao

11    attested to the truthfulness of this information.

12         We looked at this second blue form as well, same

13    exhibit.  This form shows that Dr. Xiao still had an

14    account at Ping An Bank in 2019.  We saw the bank card from

15    Ping An Bank.  And we saw transactional data from that

16    account pulled up from Dr. Xiao's cell phone.  And we saw

17    Dr. Xiao's post Indictment admissions that he had this

18    account in 2017, in 2018, and in 2019.  That's what we

19    know.

20         Here's what Dr. Xiao told the IRS.  *At any time*

21    *during 2017 did you have a foreign bank account?*

22         Dr. Xiao told the IRS, *No.*  He made that answer in

23    2017.  He made that answer in 2018.  He said it again in

24    2019.  And once again, that false statement was material.

25    That is, it was capable of influencing the IRS.

1     As Revenue Agent Michael Welch explained, U.S.

2 Banks report information directly on Form 1099, but foreign

3 banks do not.  So, the IRS asks taxpayers directly, "Do you

4 have a foreign bank account?"  And that information is

5 capable of influencing the IRS.  The IRS might, for

6 example, ask for more information about the account or they

7 may determine whether additional tax is owed.

8     The next part of the offense is that the defendant

9 signed a tax return under penalties of perjury.  You saw

10 those attestations.  They're in evidence.  It's

11 Government's Exhibit 93, 94, and 95.

12     Here is one of them.  It says, "Under penalties of

13 perjury, I declare that I have examined this return and

14 accompanying schedules and statements, and to the best of

15 my knowledge and belief, they are true, correct, and

16 accurate."

17     The fourth element is that "The defendant acted

18 willfully, that is, he knew that he had a legal duty to

19 file a truthful tax return, but when he signed the return,

20 he did not believe that it was truthful as to a material

21 matter."

22     So, this is two subparts, right?  The first is the

23 defendant knew he had a legal duty to file a truthful tax

24 return.  That part is straightforward.  The return has to

25 be truthful.  You saw the statement -- the attestation.

He also knew when he signed the return that it was not truthful as to a material matter.  And you saw the TurboTax slides.  It says in big writing "foreign bank accounts or trusts."  Dr. Xiao likely saw one these slides in 2017 and affirmatively clicked that he did not have a foreign bank account, and he did the same thing in 2018, and he did the same thing in 2019.

And it's not like he forgot that the account existed.  We saw him sending the bank account information to Mr. Cai.  And we saw him sending the bank account information to Shenzhen University.  And we heard and we saw that he was receiving regular deposits into that account.  He had well over 100,000 dollars in that account by 2019.  You can look at his post Indictment admissions and his delinquent FBARS and you can look at those cell phone screenshots.

Instead, Dr. Xiao told agents he wasn't sure if the money in the account was his.  But is that really an honest explanation for the false statement on Dr. Xiao's tax returns?  This money that he had been receiving from multiple sources?  Not at all.  Go back and listen carefully to that interview, while thinking about the actual question on the tax return.  And I think you'll hear Dr. Xiao acknowledge, no other person or entity was on that account.  It's a bank account.  It's Dr. Xiao's bank

account.  And it's in a foreign country.  Full stop.  Dr.
Xiao knew that he had a foreign bank account but he told
the IRS he did not.

This second set of lies echoes what we talked about
earlier.  It's a straightforward question and it only is
complicated if you are trying to hide what's going on.  Dr.
Xiao answered it falsely year after year after year.

So the final element is, "The defendant filed the
income tax return with the IRS."  You saw that the returns
were electronically filed with IRS through TurboTax, and
you have seen the actual returns received from the IRS.

Because the Government has proven each of these
elements and each of these offenses beyond a reasonable
doubt, the Government asks you to find Dr. Xiao guilty of
all three of these charges.

And that takes us to the last one, "Failure to File
Foreign Bank Account Report."  This has four elements.

First. " Defendant was a U.S. person."  As you
heard, Dr. Xiao is a U.S. person.  You saw his passport and
you know he resides here in Illinois.

Second. " Defendant had a financial interest in, or
signature authority over, a bank, securities, or other
financial account in a foreign country during the calendar
year 2019."

We just went over that.  I won't tell it to you

again.  We know he had a foreign bank account and we know he had it in 2019.

Third.  "The aggregate value of the defendant's foreign bank account...exceeded 10,000 dollars during calendar year 2019."  Well, you heard Agent Welch explain, it had over 100,000 dollars by this time.

And, fourth.  The defendant willfully failed to file a report on or before the due date following the calendar year 2019."

Well, you heard Agent Welch explain, the due date is going to be the tax year day April 2020.  There's an automatic extension to October 20.  But you know, as you heard, that he did not file a timely FBAR during that time period.

So, the last part of this is the defendant acted willfully.  And again, it has two parts, right?

The first, Dr. Xiao knew he had a legal duty to report the account.  Well, you heard him tell agents that.  You can go back and listen.  It's the very end of the recording.  He knew and he understood that he had to report a foreign bank account over 10,000 dollars.  He said he looked it up.  He said he got the information.  And he said he knew that information when he filed his taxes in 2019.  You can listen to it.

The other subpart of this element is that he acted

1    intentionally.  Dr. Xiao's failure to file that report was

2    intentional.  It was a continuation of the same conduct we

3    have seen time and time again.  He lied to SIU-C and NSF.

4    He lied to IRS.  And he didn't report the foreign bank

5    account, which he knew he had to report.

6         Because the evidence proves each of these elements

7    beyond a reasonable doubt, the Government asks that you

8    find Dr. Xiao guilty on Count 7.

9         The evidence in this case shows a long string of

10   lies in response to straightforward questions from NSF,

11   from SIU-C, and from the IRS.  In response, Dr. Xiao made a

12   simple choice.  He chose to hide the truth over and over

13   again, until he couldn't hide it anymore.  He chose to lie

14   and to cheat to advance his career.  The evidence you have

15   seen and heard proves that beyond a reasonable doubt.

16        Based on that evidence, the judge's instructions,

17   and your own common sense and good judgment, we ask you to

18   hold defendant accountable and find him guilty on all five

19   of these Counts.

20        Thank you.

21        THE COURT:  Okay.  Before we proceed with the

22   closing argument on behalf of the defendant, we're going to

23   go ahead and take a break.  We'll take a 15-minute break

24   and we will reconvene at 10:15.

25        COURTROOM DEPUTY:  All rise.

1          (Court recessed from 10:02 a.m. to 10:15 a.m.)

2          (Proceedings continued in open court, defendant and

3     jury present.)

4          THE COURT:  You may proceed, Mr. Poscablo.

5          MR. POSCABLO:  Thank you, Your Honor.

6          Good faith.  Members of the jury, for the last two

7     weeks, you probably never really had to think about what it

8     means to act in good faith.  But once you heard that term

9     in this courtroom, each of you knew exactly what it meant.

10    Your gut, your heart, your mind, your common sense tells

11    you when people are acting in good faith.

12         And you also know when people aren't being honest

13    with you.  Like when someone comes to your door in the

14    middle of the winter of COVID, and they tell you that they

15    are there for an immigration issue.  And they tell you that

16    your Chinese name is similar to someone who traveled to

17    Wuhan, where COVID began.

18         And even when you welcome them in, and you offer

19    them a seat, they begin berating with you, working with a

20    team member, to ask you the same questions over and over

21    and over again.  Constantly rephrasing your answers and

22    constantly putting words in your mouth.  No one -- and I

23    mean no one -- has the mental energy or dexterity to

24    withstand that type of verbal attack from two federal

25    trained agents.  No one.

1        But you heard testimony and you saw evidence of

2   Professor Xiao's good faith and his clear conviction.  You

3   heard him tell Agent Bockelmann and Agent Morris many times

4   that he did not believe that the money in China -- in the

5   Chinese bank account was his, and he didn't earn it.  And

6   you don't have to just trust Ming's words because his

7   actions, his actions speak loudly.

8        Agent Welch told that you Professor Xiao didn't

9   touch the money.  And you saw this exhibit.  Government

10  Exhibit 91, which shows you that in 2017, 2018, zero

11  expense.  The only expense you see is in 2019 when

12  Professor Xiao returned to China.

13       Ming didn't touch the money.  Indeed, Agent

14  Dalechek told you, consistent with Ming's passport, that

15  after Ming's initial visit in 2016, Ming didn't go to China

16  again for several years.  He didn't go in 2017.  He didn't

17  go in 2018.

18       And in 2019, he took two trips, one a personal one

19  to bring his mother's ashes to Malaysia and to attend a

20  family wedding, and a second trip where he visited

21  Shenzhen.  And again, the evidence shows that he didn't

22  touch that account.  He didn't touch that money.

23       How else can you trust that Professor Xiao put --

24  what Professor Xiao says was true?  Because both Agent

25  Dalechek and Agent Bockelmann told you that they secretly

1    recorded him because they expected he will be more likely

2    to tell the truth and answer questions truthfully if he

3    didn't know that he was being recorded.  They told you that

4    if they show up with a recording device or told Professor

5    Xiao about it, he would be less likely to tell them the

6    truth and be less forthcoming.

7            Your belief that Professor Xiao acted in good faith

8    is vitally important -- it is vitally important, members of

9    the jury.  Because if you find that Professor Xiao acted in

10   good faith, if you find that at the time he honestly

11   believed the validity of the statements that the Government

12   charge with being false, then you must -- you must acquit

13   him.  You must acquit him of the remaining Counts in this

14   Indictment.

15           Judge Yandle instructed you that, quote, a

16   defendant does not have to prove his good faith.  It was

17   the same point that Miss Nasser made two weeks ago, when we

18   selected you to be a part of this jury.  The burden of

19   proof is always, always on the Government.  They charged

20   this man.  And the responsibility of proving the crimes

21   they have charged is on them, always.

22           Now, I think this is a good point to go over the

23   remaining charges, to explain to you the Government's

24   burden, and to tell you the story of Ming, to piece

25   together the various pieces of evidence and testimony that

1   you heard and you read and you reviewed.  And I submit to

2   you that at the end, you will find Professor MingQing Xiao

3   not guilty of all the remaining crimes that the Federal

4   Government has charged him with.

5          Count 3 of the Indictment charges Professor Xiao

6   with concealing a material fact by trick, scheme, or

7   device, and that he did so willfully, and that he did this

8   by falsely certifying to SIU-C -- not NSF -- to SIU-C that

9   the grant proposal to NSF was true, complete, and accurate.

10  That's what they charged him with.

11         Yesterday, you heard the testimony of Dr. Scott

12  Ishman, the former Interim Dean of the College of Science

13  at SIU-C.  Dr. Ishman is a geology researcher and he,

14  himself, has served as a Principal Investigator on many NSF

15  grants through SIU-C.

16         Now, we showed Dr. Ishman Government Exhibit 4.

17  And Mr. Reed went over this.  It's the Proposal Checklist.

18  This is the form that the Government claims is the basis

19  for Count 3.  And it is this form that the Government

20  claims Professor Xiao made a false statement.  That he knew

21  was false.

22         Now, remember what the Government said.  They said

23  that the material fact that Professor Xiao concealed was,

24  one, his guest professorship at Shenzhen and, two, his

25  Guangdong Province grant.

1          Now, I showed Dr. Ishman this form.  You remember,

2    we went over it.  And this is a form that he signed many

3    times, both as PI and also as the Dean of the College.

4          Dr. Ishman pointed out to you that this language,

5    which is right above Dr. Xiao's signature, exists.  And it

6    says, "By signing below, you agree that you have read and

7    approved the contents of this Proposal Checklist."  There

8    is no reference here to the actual proposal.  There is no

9    reference here to any attachment or exhibit.

10         Now, Dr. Ishman then read to you the language in

11   the box directly where Professor Xiao signed.  It reads:

12   "By signing this transmittal form, you are certifying that,

13   one, the information submitted herein is true, complete,

14   and accurate to the best of your knowledge."

15         Dr. Ishman told you that he understood that PIs who

16   signed this were certifying to this document, which

17   involves questions that are important to the University.

18   Questions concerning human subjects or vertebrae animals;

19   human stem cell research; issues concerning export control;

20   and the most important page -- at least according to Kelly

21   Alongi -- cost sharing.

22         You remember I asked her some questions about that.

23   And she said this was really important to her because if

24   someone signed this and checked the box, SIU-C would be on

25   the hook for some of the research costs.  This document was

1    important to SIU-C.  This is what Professor Xiao was

2    certifying.

3          A plain and simple reading of this document,

4    members of the jury, supports Dr. Ishman's position.  Now,

5    let me point one other thing to you as further support.  He

6    pointed you to the language in the "other required

7    signatures" part, where it specifically says that the

8    "fiscal officer has thoroughly reviewed this checklist and

9    accompanying documents and approve the proposed scope of

10   work."  So, when they wanted someone to certify that they

11   were going to look at the attachments?  They wrote that in.

12   When they didn't, they didn't.  And Dr. Ishman told you,

13   what was important to him was the budget.  He wanted to

14   make sure that it made sense.

15         So, here's the point.  Before we even start talking

16   about the underlying documents, the references to Current

17   and Pending and the Biosketch -- which I'm sure you all

18   know much better than some people who are actually applying

19   for grants -- you can find Professor Xiao not guilty of

20   this Count if you believe that this form is only asking him

21   to attest to the truth and accuracy of this form.  And

22   there's no evidence that he lied on this form.

23         There is no evidence that Professor Xiao concealed

24   a material fact knowingly and willfully by trick, scheme,

25   or device.  There is no evidence that any material fact on

1     this form has been concealed.

2          Now, the Government wants you to believe that the

3     certification that Dr. Xiao signed attests or swears to the

4     accuracy of the NSF grant proposal.  It does not.  And

5     here's another reason why.  The certification on this page

6     is a certification that the Principal Investigator --

7     that's Professor Xiao -- is making to the University.

8          The items on this page that the PI is attesting to,

9     that's what matters to SIU-C.  It matters to them because

10    it brings up a whole host of compliance issues for them.

11    If stem cell research is involved, if vertebrate is

12    involved, if animals are involved.

13         And here's one more reason.  Notice the date on

14    this Proposal Checklist.  Mr. Reed pointed it out.

15    Professor Xiao signed it on September 13 of 2018.  That is,

16    he certifies this document on September 13th, 2018.

17         Now look at this e-mail between Professor Xiao and

18    Kelly Alongi.  The Government offered this entire e-mail

19    chain.  This is Government Exhibit 6.  Kelly Alongi

20    testified that this e-mail was between her and Ming and it

21    related to the NSF grant proposal at issue.

22         Now, we put on the screen for you the e-mail

23    starting on September 13, 2018.  And that's -- remember,

24    that's the date that he signed the Proposal Checklist.

25    Read the e-mail:

1        "Hello MingQing.  I have reviewed the proposal in

2   Fastlane, and I have the following comments and questions."

3        She then proposes a bunch of edits, a bunch of

4   things.  Now, if you take that down and go to -- if you

5   look at the whole e-mail, it continues.  They have a back

6   and forth from September 13th all the way to September 17.

7   And that was the day that the NSF proposal was submitted by

8   Kelly Alongi, which she did on September 18, if you recall.

9        Now, here's the point.  Professor Xiao signed the

10  Proposal Checklist before the NSF proposal itself was

11  finalized.  Why would he certify a document that had not

12  been finalized?  That's because he doesn't sign it.  Kelly

13  Alongi signs it.  That's why she's having this back and

14  forth with him.  He can't and is not certifying in this

15  document a proposal that has not yet been finalized.

16       But I submit to you that even if the Government

17  were correct, even if you believe that Professor Xiao was

18  certifying the attachments, which he's not, or the

19  exhibits, which he's not, in this form -- in this form

20  alone -- there is no proof that MingQing Xiao concealed a

21  material fact by trick, scheme or device.

22       Now, I understand that the Government is claiming

23  that the two material facts were concealed -- right? -- the

24  Shenzhen University guest professorship and this

25  make-believe and nonexistent grant from Guangdong Province.

1   　　　　The Government has argued that Professor Xiao
2   falsely certified this Proposal Checklist.  This is
3   confusing.  You have to say it out loud a couple times.
4   　　　　The Government has argued that Professor Xiao
5   falsely certified this Proposal Checklist because his NSF
6   grant proposal concealed two material facts.  And again,
7   those two material facts are Shenzhen and Guangdong so,
8   let's go over each of those.
9   　　　　As to the Shenzhen University guest professorship,
10  the Government wants you to believe that he concealed it
11  from the NSF because he put it on one section of the grant
12  proposal and not the other.  Now, your common sense should
13  tell you that that's ludicrous.  This is just silly.
14  Because you heard Dr. Keiser and you heard Dr. Ou and you
15  heard all the testimony, that they review the entire
16  proposal.  They don't split it up.  They don't say, *Hey,*
17  *you review this part, I'll review this part, and then we'll*
18  *come together.*
19  　　　　The Program Director reviews the entire document.
20  It is just silly to say that he didn't tell them about his
21  guest professorship.  But let's go on.
22  　　　　Their first claim is that he didn't put Shenzhen
23  University in this Organizational Affiliations section.
24  But remember the testimony that was given about this
25  section.  Dr. Keiser and Dr. Ou gave a little bit of

1    resistance to this.  But what they ended up saying to you

2    is that this section is intended to protect NSF from

3    putting somebody from SIU-C in your panel.  They don't want

4    your buddy from SIU-C or your buddy from your nonprofit to

5    serve as a panelist to decide whether you do or do not get

6    the NSF grant.  No one claims that someone from Shenzhen

7    was placed on Professor Xiao's panel.  And you know why?

8    Because Shenzhen was listed on the document.  And we showed

9    this to Dr. Ou and we showed this to Dr. Keiser.

10           Now, because Shenzhen was already listed on this

11   document, they were already excluded from the list.  This

12   argument is just silly.  And it's silly to argue that

13   Professor Xiao was concealing -- that's the operative term

14   for Count 3, concealing -- his relationship with Shenzhen

15   by not placing it in this section.

16           Now let's talk about Current and Pending.  The

17   Government's second argument is that Professor Xiao is

18   guilty of Count 3 because he concealed his guest

19   professorship by failing to place it on this page, the

20   Current and Pending page.

21           Now, first, common sense should tell you that this

22   form is not about guest professorships.  Just look at the

23   structure of the form.  The questions themselves tell you

24   that.  If they wanted to know about guest professorships,

25   they would have had questions that focused on guest

1   professorships.  But it doesn't.  It focuses questions on

2   grants and proposals, and your common sense to tell you

3   that this argument by the Federal Government is a stretch

4   at best.

5           Testimony showed you that this is about research.

6   It's about research proposals.  It's about research grants.

7   That's what the questions asked.  Dr. Keiser, whose job it

8   is to enforce the rules?  Now, she wants you to believe

9   that guest professorships that have a research component

10  should be listed in here somehow.  Her point was about

11  research, about duplicative work, about the Pilot example I

12  told you about.  There is no evidence of that in this case.

13          Now, let's look at the Biographical Sketch.  And

14  now this is why the Government's argument about this is

15  just silly, because Professor Xiao clearly and

16  unambiguously listed his guest professorship with Shenzhen

17  in his Biographical Sketch.  It's silly because for years

18  Ming listed his Shenzhen guest professorship in every NSF

19  application he had.  He wasn't hiding it.  Everyone knew

20  about it.  He told NSF about it.  He told SIU-C about it.

21  He told OSPA about it.

22          And SIU-C was promoting this relationship because

23  -- guess what? -- SIU was bleeding its students.  Its

24  enrollment was down.  It was trying to promote these

25  international collaborations.  And there is no question

1   that he was doing the work.  That the work was done.

2   Because when his first NSF grant was coming to an end, he

3   was extended by one year without pay.  That was his offer

4   to NSF.  And as you heard during trial, that was during the

5   same period that he had this guest professorship at

6   Shenzhen.

7          No one, no one complained that he had a commitment.

8   No one complained that the work was not done.  And you

9   didn't hear anyone at OSPA asking him about it because no

10  one cared.  He had been listing it in the Biographical

11  Sketch for years.  No one told him to put in a different

12  part of a grant application.

13          And in fact, you heard Dr. Pericak-Spector, who

14  just kept spelling yesterday.  She kept spelling and

15  spelling.  There was a lot of letters coming out of her

16  mouth when she introduced herself.  And she told you that

17  she lists her guest professorships in the Biographical

18  Sketch.  Now, I anticipate that the Government's going to

19  say, *well, the difference is, he got paid*.  But that fact,

20  that fact that he had a reimbursement agreement, it doesn't

21  take away from the ridiculousness of the argument that it

22  should have been here and not here.  Because each of those

23  individuals look at the whole document.  And if they had a

24  question, they could have just asked him.

25          They are telling you that this charge -- they

1  charged this man.  They charged him with a federal crime

2  because he didn't list his guest professorship on page two

3  or three instead of on page seven.

4      Please, see the ludicricy of that argument and find

5  him not guilty of this Count.

6      Now, the Government keeps talking about a contract.

7  I'm going to shift gears.  But for a variety of reasons,

8  you can just discard their arguments.  Sometime in 2018,

9  you saw in some of the emails that the Government showed

10 you, Professor Xiao was contemplating taking a longer

11 sabbatical leave to teach in China.  And that's what those

12 e-mails with Professor Tang show.  Look at them.

13     Remember that Professor Tang was at Shenzhen, was a

14 visiting scholar at SIU-C.  So, he was just trying to

15 reciprocate the collaboration.  Now, in order to work in

16 China, you need a work visa.  Not the Q2 visa that Agent

17 Dalechek said he didn't know about.  You need a work visa.

18 And you heard the stipulation between the parties

19 concerning the work visa and the Q2 visa.

20     Remember that the Government didn't put this

21 exhibit into evidence.  We did.  I did.  Special Agent

22 Dalechek testified this was a document that they

23 translated; that was translated by their interpreter, Mr.

24 Yang.  But they didn't offer it.  I did.  And that's

25 because this document says, *In order for you to work in*

1    *China, you gotta quit your job.  You gotta separate.*  And

2    Ming didn't want to do that, so he didn't get a work visa

3    and he didn't quit his job and he didn't go to Shenzhen.

4         Let's move forward in the interest of time to

5    Government Exhibit 46.

6         The Government showed you this document.  This is

7    the NSFC grant.  There's no testimony about this grant.  If

8    you recall, the Government didn't offer the denial letter.

9    Ming didn't get this grant.  They didn't offer that.  We

10   did.  And it had a Government Exhibit sticker on it.  They

11   only showed you the grant application itself.  And they

12   showed it to you to say that Professor Xiao listed himself

13   as a professor at Shenzhen.  But you know from the evidence

14   and your common sense that he was not an employee at

15   Shenzhen and he never left the United States.

16        Let's go to the Defense Exhibits 504, 505.

17        Now, you haven't see this document, but it was a

18   document that was offered into evidence as part of a

19   stipulation between the parties.  It is -- it shows the

20   U.S. Department of State per diem at Shenzhen.

21        And you heard Kathy Pericak tell you about per

22   diems.  I submit to you that if you look at the rate of the

23   hotel, look at the per diem rate, and you calculate the

24   cost of a trip to China, the 24,000 dollars is roughly the

25   equivalent of two trips to China, for two weeks at a time.

1          Now, I submit to you that there is no evidence that

2     Dr. Xiao was conducting research activities for Shenzhen

3     University, which is really the critical issue underpinning

4     the Government's argument.  You heard testimony from

5     Special Agent Dalechek, where he admitted that he found no

6     research papers where Dr. Xiao listed any school other than

7     SIU-C.  Always listed SIU-C as his school.  At best, the

8     Government offered evidence that Professor Xiao was

9     mentoring some students who came to SIU-C from China.

10         So, here's the bottom line.  This section is not

11    the place where one places information regarding their

12    guest professorships.  Common sense tells you that.

13         Let's talk about the Guangdong Province grant.

14    Now, there is one more claim.  And in their closing -- I

15    can't even believe that they're still pursuing this -- they

16    claim that Professor Xiao lied on his NSF grant proposal

17    and falsely certified the form -- again, the Proposal

18    Checklist -- because he didn't list this nonexistent

19    Guangdong Province grant on his NSF grant proposal.

20         I don't want to spend too much time on this because

21    Special Agent Dalechek testified that the grant offered by

22    the Government in this Exhibit 29 is not the grant that

23    they are claiming was on the NSF grant.  And you remember

24    that; right?  I asked him to memorize spectral matrix sets.

25    Neither of us knew what that meant, but he memorized it.

1    And what it showed was that this application was a

2    continuation of his 2014 work for NSF.  This had nothing to

3    do with the -- what he thought was going to come as a grant

4    from his sabbatical application.  You can look at those

5    documents yourself.

6          The only point I want to make is, is that you

7    didn't hear any evidence, didn't hear any testimony that

8    showed you there was a formal proposal, that there was a

9    research, that there was a proposal number.  You didn't see

10   any evidence about a grant amount or the transfer grant

11   awards.  It just doesn't exist here.

12         And in fact, Special Agent Dalechek testified that

13   he didn't see any other curriculum vitaes other than this

14   one where Professor Xiao listed it.

15         Now we also -- we also offered into evidence

16   Government Exhibit 17, which is the leave report from that.

17   And, you know, Professor Xiao put it in his sabbatical

18   leave -- put it in his sabbatical leave after it was

19   completed.  You're going to see that.  You'll see that

20   Ming didn't talk about a Guangdong Province grant because

21   he didn't work on a Guangdong Province grant while he was

22   in China during his sabbatical.  And remember that.

23         We showed you a document that showed that, and it

24   was Defendant's Exhibit 88.  It was a Memorandum from David

25   DiLalla that talked about when you needed to report to

SIU-C.  *You need to talk about dates, length, or pay status.*  That's all they wanted to know about.  They weren't concerned with what you were working on.  They wanted to make sure that you weren't going to extend your time or get -- or they would have to pay you more.

Ladies and gentlemen, I submit that the Guangdong Province grant exists in the same way that my rainbow unicorn outside exists.  It doesn't.  There's no Guangdong Province grant, just like there is no rainbow unicorn.

Now, in his closing argument, the Government also referenced this e-mail from Dr. Ou.  Now, I submit to you that these are completely irrelevant.  And here's why.  The Dr. Ou e-mail?  And the NSFC China grant?  Occurred after, after the Proposal Checklist.  He couldn't certify something that he had not done yet.  So, I think you can just discount that.

Now, there's a part of the call that I wanted to touch base upon again, and I'll talk about the call again later.

Can I have a time check, Miss Hurst?

COURTROOM DEPUTY:  34 minutes.

MR. POSCABLO:  Spent or left?

COURTROOM DEPUTY:  Left.  I'm sorry.

MR. POSCABLO:  Remember during the call when Professor Xiao was talking about trying to figure out where

1    he should list his guest professorships?  He said he tried

2    to get on research.org, but he couldn't figure out where to

3    put it.  And that makes sense to you now, right?

4         Because if you look at his response to Professor Ou

5    -- to Dr. Ou, he doesn't talk about his -- what was the

6    word that they used? -- position.  It was not a term that

7    was in the P-A-P-P-G -- the PAPPG.  It was new to him and

8    he didn't understand what it meant.  It wasn't -- you look

9    at the Current and Pending, it doesn't ask for your

10   position.

11        So, when she sent him that e-mail, he looked on the

12   website to see, *well, what does that mean and how do I put

13   it in there?  I already have it in there.*  And then what he

14   told the agent was, he couldn't figure it out.  And he

15   figured that he already had it in there and they knew about

16   it, and so he didn't do anything more with it.

17        Members of the jury, before I move away from

18   Count 3, which we ask you to find Professor Xiao not guilty

19   of, I want to talk about a word that Judge Yandle mentioned

20   in her instruction to you.  She discussed the word

21   "willfully."  And she told you that a person acts willfully

22   if he acts voluntarily and intentionally and with the

23   intent to do something illegal.  Do something illegal.  You

24   have to have that intent in order for you to find that his

25   actions were willful.

1    Voluntarily, intentionally, again, with the intent

2    to do something illegal.  And I offer to you that this is

3    the most important thing for you to consider with regards

4    to Count 3, and even more so with regards to the tax

5    charges and the FBAR charge.

6    For each of those Counts requires Professor Xiao to

7    have acted willfully, as well.  So, you need to say and you

8    need to determine that he did those things with the intent

9    to do something illegal.  And I submit to you that they

10   don't have that.  The mere existence of the bank account in

11   China?  The mere fact that he didn't do an FBAR?  That's

12   not the intent to do something illegal.

13   Now, when you go back and you talk about Counts 4

14   and 5, and 6, and 7 -- you're going to talk about 3 -- I

15   ask you to hold the Government to its burden.  It's their

16   burden.  Hold them to the burden of ensuring that they have

17   met every element of every crime.  Every element.  And I

18   submit to you that when you go through it that way, you

19   will find that the Government has failed to meet its

20   burden.

21   I'm going to review those elements with you

22   shortly, but let me give you a recap of what you heard this

23   week regard to these Counts.  It felt like a long two

24   weeks.  But at the end of the day, the Government really

25   just called two witnesses related to the tax charges.  They

1    called Miss Skelly, who was from TurboTax, Intuit, and she

2    led us through the five slides that the Government offered.

3    Now, Miss Nasser had like a million slides.  But,

4    fortunately, we didn't have to look at all those.  Right?

5    We looked at about 15.  And we'll go over a couple of those

6    slides today.

7           And you also heard from the second witness, and

8    that's Mr. Welch.  And what did Mr. Welch tell you?  He

9    told you that he did no independent investigation about

10   this case.  I asked him about four questions about it.  And

11   his answer was the same.  *I did no independent*

12   *investigation of this case.*  Because his purpose was to

13   talk to you about why it's important that, for the IRS, the

14   taxpayers inform the Government about their foreign

15   holdings.

16          In 2016, a bank account, at Ping An Bank was open.

17   You remember this document.  Agent Welch and I went back

18   and forth about it.  He called it a signature card.  And I

19   showed him the Government's translation.  And he admitted,

20   *well, it looks more like an application form.*  It's not a

21   signature card.

22          And -- but I do submit to you that this document

23   shows that an account was opened at the Shenzhen Branch in

24   Shenzhen University.  But there is no evidence to show who

25   opened the account.  All you have is the evidence that it's

1    in Ming's name.  I'm only saying that because you gotta

2    hold the Government its burden; what they did prove and

3    what they did not prove.

4         Now, after the account is opened, a very small sum

5    was used in 2016.  I went through this exhibit with you

6    already.  But you will see that the activity in 2019

7    coincides with Ming's travel to China.  And you know this

8    to be true because you can review his passport, which is

9    Government Exhibit 180.  But we prepared this demonstrative

10   to show you Ming's work.  And if you look at it, it shows

11   that he went there in 2016.  He then went there in 2019.

12   And so, you know, it's the entry and exit.  That's why you

13   have two.  And he only went there three times.  And Special

14   Agent Dalechek confirmed that.

15        My point is this:  You can believe Professor Xiao's

16   statement to the agents that he didn't think this money was

17   his because he didn't touch it, he didn't spend it on

18   personal items, and this is reflected in the evidence that

19   you saw.

20        But I offer to you that there is a nuance for you

21   here.  There is something else I want you to think about.

22   It isn't just about, *he didn't think that the money was*

23   *his*.  It's that he didn't think it was income.  You have

24   heard him describe during the call -- during the recorded

25   interview with him that he thought he was just getting

reimbursed.  That's what he said.  It was a travel

reimbursement and it was intended to cover his travel, his

hotel, his airline, and a per diem.  And you know from

common sense, and I explained it earlier, that that was

about 24,000 dollars.  You saw the per diem rates with the

Department of State.

Now, the issue in the back of your minds may be,

*well, if he didn't go there, why were they still depositing*

*money?*  Well, listen to Ming's explanation to the agents.

Listen to it.  And you can tell that he doesn't really know

either.  What he should have said to them is, "Go ask

Shenzhen.  I haven't been back there."  Because there is no

question that he didn't go back there.  And there is no

question that, other than mentoring some students who came

from China to SIU-C, and occasionally helping them with

their papers, he didn't travel to China.  And he struggles

with his answer to the agents because he doesn't know the

answer himself.  Listen to it.  The best that he can say

is, *well, I figure, when I go back to China, I'll talk to*

*them about it and I'll either give it back to them or I'll*

*give it to charity.*  And that's an honest answer from a man

who is answering honest questions.

But please remember, it is irrelevant to the

question before you with regards to the tax charges.  The

amount that's in there, the purpose of the payments, why

1    Shenzhen is continuing to deposit that money.  It's

2    irrelevant.  And here is why:  The tax counts, Counts 4

3    through 7, it's about Ming's mindset.  It's about whether

4    he believed that that money was his, and whether he

5    believed that that money was his income.

6            And I submit to you that his actions and his words

7    support what he told those agents, that he did not think

8    that this was his money; he did not treat it like his

9    personal funds.

10           And there's one more thing I want you to consider.

11   Because everyday Americans like you, like me, we make

12   mistakes on our taxes.  Oftentimes, things like having to

13   pay a tax on your jury per diem is missed by people who

14   aren't used to serving on a jury and then having to pay a

15   particular tax.

16           And more often than not, people who make these

17   mistakes?  They're allowed to correct them.  They don't get

18   indicted for tax fraud.  And that's because of the word I

19   mentioned a few moments ago.  That's the word willfully.

20   I'm going to say it again.  Judge Yandle told you that a

21   person acts willfully if he acts voluntarily and

22   intentionally, and with the intent to do something illegal.

23   I submit to you that there is no proof that he had the

24   intent to do something illegal.

25           And you know from your time listening and reading

1    and reviewing that there is no evidence that Professor Xiao

2    acted with the intent to do something illegal.

3            If you recall, I asked Mr. Welch some of these

4    questions:

5            "Were there any LLCs or other companies?"

6            *I don't do any independent investigation.*

7            "Did you find any homes in China?"

8            *Sir, I didn't do any independent investigation.*

9            "So, were there fancy cars or expensive items?"

10           *I didn't do any internal -- any additional*

11           *investigation.*

12           Well, clearly he didn't do any internal independent

13   investigation.  But it's clear to you that the money in

14   Shenzhen just stayed there.

15           And I submit to you, members of the jury, that Mr.

16   Welch is not the only person who didn't do any independent

17   investigation.  Because you have seen no evidence, none,

18   other than what Ming filed and what he voluntarily shared

19   with the agent and what he said during the interview.

20           And that, members of the jury, the information that

21   you do have, is simply insufficient for you to find that

22   Ming acted willfully or with the intent to do something

23   illegal.  And this is really important.

24           Because simply having a bank account in China does

25   not satisfy the willfulness requirement.  Let me say it

1   again:  Simply having the bank account in China does not

2   satisfy the willfulness requirement.  Let me say something

3   very similar:  Simply not filing an FBAR does not satisfy

4   the willfulness requirement.

5          And as you know, Professor Xiao was originally

6   indicted in this case in April of 2021, and the tax charges

7   were added more than five months later.  Now, in that time,

8   as you learned, Professor Xiao tried to fix his mistake.

9   You saw that in the delinquent FBARs that he filed for

10  calendar years 2017, 2018, and 2019.  And you saw that he

11  did it in April of 2021, more than five years before the

12  Government then charged him with anything.

13         He tried to fix his mistake and they used these

14  late FBAR filings against him.  Now, you saw -- because I

15  showed it to Mr. Welch -- that the FBAR language itself

16  concerns -- discusses the Streamline Domestic Offshore

17  Procedure.  And that was a program to permit tax filers to

18  fix their mistakes.

19         Members of the jury, I ask you to imagine what Ming

20  was thinking because there's simply no evidence that he

21  willfully filed a false tax return.  Indeed, the evidence

22  shows that this is a man who recognizes his mistakes and

23  then tries to fix them.

24         Now, as I noted earlier, the Government offered

25  only two witnesses related to this, Miss Skelly and Mr.

Welch.  Interestingly, neither of them told you that Ming himself prepared the joint tax return.  It was muddled. Neither of them told you that he prepared it.  Miss Skelly merely says that someone filed this joint tax return for MingQing Xiao.

Now, listen, I understand.  This is a hypertechnical argument.  I know that.  But if you hold them to their burden, I offer to you, I submit to you, that they haven't met this hypertechnical argument in this hypertechnical case.  And I submit that they can't even prove the first element of Counts 4 to 6, that Professor Xiao prepared this joint income tax return.

Now, they're going to argue in rebuttal that Ming talked about TurboTax during his interview.  He did.  I'm just asking you to hold them to their burden because I want to you look at what he said -- listen to what he said.

Now, as to the second element.  The Government's going to argue that the income tax return falsely answered this question:  "At any time during" -- insert year, 2017, 2018, 2019 -- "did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?"  And this appeared in 2017 and it appeared in 2019.  And the Government told you it says no.

1          But I want to raise two issues related to this

2     statement.  The first is that this language, "the language

3     that says financial interest in or signature authority over

4     a financial account," it exists nowhere in TurboTax.  Look

5     at the slides.  It exists nowhere.

6          Now, Miss Skelly told you that it doesn't exist in

7     all of TurboTax.  It only exists if you print out the form

8     and you read it.  And we know from Miss Skelly that there

9     is no evidence -- you saw no metadata -- no other

10    information that Professor Xiao looked at the paper copy

11    online or that he printed it out.

12          So, here's my point:  If TurboTax doesn't ask you

13    this question directly, how could he have lied willfully on

14    Paragraph 7a in Schedule B?  The answer is, he didn't.

15    Indeed, remember her testimony, Miss Skelly.  She says

16    nothing about whether Professor Xiao signed the income tax

17    return or whether he or someone else filed it.  I know it's

18    hypertechnical, but I need you to look at it.

19          And that's when Miss Nasser had a whole

20    conversation with her about wet signatures.  First time I

21    had heard that phrase.  And she showed you all the

22    asterisks.  Right?  There were all these asterisks.

23    There's no wet signature there.

24          Now, I challenge these things.  Again, I raise

25    them.  Because the burden is on these guys.  The burden is

1    on the Government to prove these elements to you beyond a

2    reasonable doubt.  And I submit to you that on these

3    elements, it has failed to do so.

4         Now, let me spend a few minutes talking about the

5    TurboTax slides -- actually, I'll do that at the end.  I

6    don't want to belabor the point, but I will talk about a

7    couple of the slides.  Let's turn to Count 7.

8         Count 7 charges Professor Xiao with failing to file

9    a report of a foreign bank account -- a report of a foreign

10   bank account.  It's called an FBAR.  F-B-A-R.

11        Here, as with the previous accounts we discussed,

12   I'm going to ask you to focus on the issue of willfulness.

13   Because there's no evidence that Ming willfully failed to

14   file this report.  There's no evidence that he failed to

15   file this report with the intent to do something illegal.

16   And how else do you know this?  Because Miss Skelly, the

17   TurboTax lady, she told you that you if you click "no" on

18   the question of whether you had an account?  You don't get

19   led anywhere else.  It doesn't lead you to a page that

20   says, *Hey, now you gotta file an FBAR*.  You don't get to

21   the screen that the Government showed you.

22        Members of the jury, I'm on my last topic.  And I

23   saved it for last because, man, it was an important point

24   during this trial.  You heard Ming's voice and you heard

25   him talk to the agents honestly.  And when the Government

1    played that secret recording -- I mean, I'm not going to go

2    play it for you today, and I don't intend to revisit what

3    Agent Bockelmann did and what Mr. Morris did and what they

4    said to get themselves there.  But I do think it's

5    important to talk to each of you about all of the questions

6    that they asked.

7          And when I talk to but their demeanor and their

8    tone, and I want to talk to you about Ming's demeanor and

9    his tone, and I want to talk to you about Professor Xiao's

10   good faith when he talked to them and he gave them truthful

11   answers.

12         Now, as you heard, Ming invited them in.  They

13   didn't tell him about the search warrant when they walked

14   in; they didn't tell him about the recording device; and,

15   they didn't tell him they were going to interview him for

16   hours.  They didn't tell him that they had been

17   investigating him for grant fraud.  Not tax fraud.  Grant

18   fraud.  Because they didn't even know he had a bank account

19   in China.  He told them that.  They didn't do any

20   investigation about that.  They sent no subpoenas to

21   Chinese banks and they sent no request to China.

22         Now, when they started questioning Ming about his

23   travels, he willingly produced his passport and he answered

24   truthfully about his travels.  He told them that he didn't

25   travel to China last year, and he certainly didn't go to

Wuhan.  And at no point during the interview did Ming

challenge the agents.  At no point during the interview did

he ask them to stop.  At no point during the interview did

he ask them for a lawyer.  And that's because, members of

the jury, MingQing Xiao was acting in good faith.  When he

spoke about his family in China and his parents' history in

Malaysia and the burial site where he was bringing his

mom's ashes?  You heard the agents' answers.  "Yes."

"Gotcha."  "Cool."  "Right."

      Because they weren't listening.  They were waiting

for the time to get their questions to him.  They were

doing that to establish rapport with Professor Xiao, to

make him comfortable.

      Now, their first question to him doesn't come up

until about 20 or 25 minutes later.  And they say to him,

Mr. Morris does, *Plus, your grant to China came up as well.*

Now they tried to sneak that in.  And you know what Ming

said?  *I don't have any grants in China.*  That was as true

then as it is now.  Ming did not have any grants in China.

      Ming then explains his work with Shenzhen.  He

tells them about it.  He's excited about it.  And he tells

them that he understands his agreement to be a

reimbursement agreement.  It's meant to cover the cost of

his travel.  He tells them about Professor Tang, who he

talked about, was a visiting professor at SIU-C, and Ming's

1  friend and contact at Shenzhen, who is trying to help Ming

2  build a collaboration between the two schools.

3          They then move to the next topic on their

4  Checklist.  The Government's Checklist.  And they sneak in

5  there, *well, have you done any work or gotten paid from the*

6  *Natural National Science Foundation of China?*  Again, Ming

7  answers truthfully.  He says no.  They already knew this.

8  They knew this because you saw we offered the document that

9  -- where that, that -- that foundation denied his

10 application.  But they asked him anyway.  And they asked

11 him again about the Shenzhen relationship, and he says

12 again, *That wasn't my money.*

13          Now, at this point, about halfway through the

14 interview, the topic of the bank account in China comes up.

15 Ming takes out his phone and he asked them, *Do you want me*

16 *to show you?*  And he does it.  And they take photos of it.

17 Right?  There's a whole conversation when he goes, you mean

18 like this?  Snap.  And you heard it.

19          Again, Ming is acting in good faith.  Man, he had

20 no reason to distrust these agents or their intentions.

21 And once they see that he had a bank account in China, the

22 tenor of the conversation changes because that's what they

23 wanted to, that's when they needed to, and that's when they

24 had to get Ming to say that he knew that that money was his

25 and that he failed to report it.

1    You see, members of the jury, these trained federal

2    agents?  They were trying to get Professor Xiao to admit

3    each of the elements of that crime.  And what was Ming's

4    response?  Did he stop talking?  Did he ask them to leave?

5    Did he ask for a lawyer?  No, no, and no.  He continued to

6    dutifully answer their questions, even as they asked the

7    same ones over and over.

8    He gave them their space to make their longwinded

9    soliloquies, which are not evidence here.  But he corrected

10   them where it matters; he told them the money wasn't his;

11   he did not believe it was his; and, that he didn't touch

12   it.

13   Now, I want to talk about two other things to

14   clarify what happened here.  You heard talk about a

15   plagiarism investigation that was weighing heavy on

16   Professor Xiao's mind and there's some confusion there

17   about what Ming was talking about.  Now remember, at this

18   point, he thinks they're here to talk about immigration.

19   He thinks they're here to talk about travel.  He thinks

20   they're here to talk about his travel and Wuhan.

21   He did not know -- and they never told him -- that

22   they were here to talk about the NSF grant from 2018.  So,

23   when they start asking him questions about it, Professor

24   Xiao was in the middle of preparing a rebuttal to the

25   issues related to the first grant.  So, he was confused.

1    Listen to it.  You heard it in his answers.  He tells them

2    that he never expected to actually get the 2018 grant,

3    because he was in the middle of defending himself related

4    to the 2014 grant.  And then the agents kept restating what

5    he was saying and they kept putting words in his mouth.

6           Now, this is important because the agents then ask

7    him a question about this Chinese bank account, and they

8    ask him this question:  "Do you have any foreign

9    investments or foreign bank accounts?

10          And he responds, "I didn't see it.  I didn't see

11   it."

12          And if I have time, I'm going to show you how he

13   didn't see it.

14          Can I have time check, Miss Hurst?

15          COURTROOM DEPUTY:  Ten minutes, 33 seconds left.

16          MR. POSCABLO:  Thank you.

17          I want to quickly go over the rest of that call,

18   because they ask about the Guangdong Province grant as

19   well, about 75 percent of the way in.  And he tells them, *I*

20   *don't have -- I don't know what you are talking about.  I*

21   *don't know what that grant is.*  And it is at this point, at

22   the end, where the agents turn to a different technique

23   which is the berating.  Right?  They have worn you down.

24   They did the rapport thing.  *Hey, we're here to investigate*

25   *something easy.*  Then they ask you some questions to get

1    you there.  And then they start really digging in on you.

2    And if you listen to it, they just kept answering and --

3    asking him questions and they would restate what he said.

4    And I tell you again, no one has the mental energy and

5    dexterity to compete with two federally trained officers.

6          But Professor Xiao did his best.  And if you listen

7    to the words, he wouldn't say things that were just not

8    true.  And he said to them, *I always think I won't get this*

9    *grant*.  Meaning the 2018.  And he tells them again and

10   again that that money was not his.

11         Members of the jury, from everything you have heard

12   from the Government's witnesses, from the defense's

13   witnesses, and everything you have seen both in the

14   documents that the Government showed you and the documents

15   that they didn't show you, but we have showed you,

16   Professor MingQing Xiao, a nerdy mathematics professor, a

17   father of three, a resident of Makanda, a beloved

18   colleague, he acted in good faith and he did the best that

19   he could.

20         This case is only simple when you don't do any

21   additional investigation.  This case is only simple if you

22   jump to conclusions.  This case is only simple if you don't

23   want to uncover the truth.

24         MingQing Xiao owned up to his mistakes and he took

25   steps to fix them.  If anything, members of the jury, I

1    think MingQing Xiao is guilty of one thing.  He's guilty of

2    being human, as we all are.  But that doesn't make him

3    guilty of these crimes.

4           His lack of willfulness makes him not guilty of

5    these crimes.  His good faith makes him not guilty of these

6    crimes.  When you go back to that jury room and you talk

7    about these Counts, we ask you to look at the evidence, to

8    read the instructions from Judge Yandle, and we ask you to

9    return a verdict of not guilty on all Counts.

10          Thank you for your time.

11          THE COURT:  You have about a half an hour left.

12   I'm going to leave it to you guys.  Do you want to take a

13   short break or do you want to just move right through?

14   Anybody need a break?

15          JURORS (in unison):  (Nonverbal response.)

16          THE COURT:  Okay.

17          MR. SHUGERT:  Members of the jury, for you to

18   believe the defense's version of the truth, for you to

19   accept their version of reality for this relevant time

20   period, you have to accept three things:

21          One.  You have to accept the defendant lied.  The

22   Guangdong Province, their defense, never existed.  Right?

23   You can see on the screen in front of you, the defendant

24   tells his employer in an application to justify paid leave

25   from the University, "I received" -- I got it.  It's mine,

1    past tense -- "I received a grant from the Guangdong

2    Province."  In their version of events, this is a lie;

3    right?

4         Also, this is reflected in the accompanying CV.

5    His employer says, *You are mentioning a new thing here,*

6    *this grant.  Please update your CV.*  He got caught.  So, he

7    had to put it on there.

8         Also, you will have to accept that the defendant

9    lied about Shenzhen University to the extent that he is

10   telling Shenzhen University he will be a full-time

11   employee.  So, in their version of events, he lies to

12   Shenzhen.  He has no intention of being a full-time

13   employee with all the perks and the benefits and the annual

14   salary.

15        And their version of events, he lies to the

16   National Natural Science Foundation of China.  It's right

17   there.  He puts, "My employer is Shenzhen University."

18        So, the first thing you will have to accept, if you

19   want to believe their version of events, is that he lies.

20   Just conveniently, not to the NSF, not for the conduct that

21   the Government is charged.

22        The second thing that you will have to accept, if

23   you are going to buy what they're selling, you will have to

24   accept that this individual who has multiple Master's, a

25   Ph.D, post Ph.D education, is confused by the words like

"all" and "current" and "pending" and "bank account."

The same person who can write in English those ten publications that are listed, and that's just the first ten.  It has 77.  That defies common sense.  The Government asked you, I asked you, the very beginning of this trial, I will only ask three things of you:  Please follow the evidence; follow the judge's instructions; and, follow your own good judgment and common sense.

The idea that the words "all" or "current" or "pending" or "bank account" would be confusing does not mesh with common sense.

The other thing along these lines, this second thing you'll have to accept?  This box -- how much time did the defense spend on this box, line by line, word by word, letter by letter?  But he fills it out just fine when it's something he's okay with NSF knowing.  It's all there.  There's a title.  There's money.  There's time.  We went through all this.  But when it's okay for NSF to know about it, no problem filling it out.

The third thing you will have to accept if you are going to take their version of events as true, you will have to believe it is everyone else's fault except for his, for his choices, his omissions, his lies.  Everyone else is to blame.  TurboTax is to blame because they ask questions at an eighth grade reading level to make it easier for the

taxpayer.  The IRS is to blame.  Because they ask about the
foreign bank account to all taxpayers at the time they ask
about interest and dividends.

The university is to blame -- and the defense would
love if the university was to blame.  The university is to
blame because they did not train the defendant in how to
fill out a form.  A form that he filled out just fine when
he wasn't trying to hide something.  That is what the
defense version of reality will require of you.

The Government is asking of you the same three
things I asked at the very beginning:  Follow the evidence;
follow the judge's instructions; use your own good judgment
and common sense.

Now, in the remaining time, I wrote down some of
the points that the defense raised during their closing
argument, things that they believe create a reasonable
doubt.  Now, I'd like to go through these one by one.

The defense said the defendant was cooperative and
truthful with the FBI.  He cooperated.  He was there.  He
answered their questions.

I would ask you to listen to that recording again.
It is obvious he got caught in his lies to NSF; he got
caught having a foreign bank account that he never reported
that had money in it; and, he tried to find excuses to get
out of it.  We can list the excuses when you read the

recording -- or you listen to the recording.  He denies there's a contract with Shenzhen.  You saw it.  It's in evidence.  There is a contract.

He says disclosing would be complicated.  You saw the form.  You saw the application.  You saw the e-mail. Those are not complicated questions.

Didn't expect it to go through.  It's another excuse.  Tried to log in.  Internet's confusing, too. That's another excuse.  He was frustrated.  He was in a bad mood.  Another excuse.

The defense said during closing, he never challenged the agents.  Right?  He never challenged them. We just went through the excuses.  I submit to you that that is challenging them.  It might not be argumentative, it might not be raising your voice or threatening to run, but he is listing excuses that slowly get chipped away.

Shows his phone to the agents because he got caught.  It's the same reason -- and we'll get to this -- that he files that delinquent FBAR.  Files delinquent FBARs after he is indicted for the false statement, for the fraud related to NSF.  Then he submits those delinquent FBARs. It's the same reason.  He got caught.

FBI didn't tell the defendant why they were there to interview him.  Right?  The -- the reason why they knock on the door is a different reason why they are there.

First of all, that is perfectly appropriate.  There's no evidence -- there is none -- that that is not an allowed practice.

And no one can withstand that sort of pressure or those sorts of questions.  The agents were professional. They were courteous.  Yes, it can be intimidating if federal agents are asking you questions, especially when you have false statements to hide, foreign bank accounts to hide, money in those bank accounts that you have never reported.  Sure that can be pretty scary, I bet.  Nothing about the setting of that interview changes the defendant's lies to the University, to NSF, and to the IRS.  Nothing.

No investigation in China.  No legal process or anything like that for China.  We know why.  We heard Agent Dalechek say why.  Government in China doesn't cooperate. That's why.  Pretty straightforward.  They wouldn't have gotten him.

All right.  These are in no particular order, so we'll jump around.

TurboTax is confusing.  Okay.  Second thing that I mentioned that you will have to believe to accept their version of reality?  The defendant is confused despite his advanced education and everything else we know about him at this point, confused by these common everyday words.  So, TurboTax asking questions at an eighth grade reading

1    comprehension level, employing people whose only job is to

2    write these questions grammatically correct, with proper

3    syntax, so they're easy to understand.  That's confusing?

4         The question in the Schedule B, "Do you have

5    financial interest in, or signature authority over, a

6    foreign account" -- parens, all those examples -- "located

7    outside the United States?"

8         I will submit to you, what is easier to understand?

9    Do you have a foreign bank account or do you have all of

10   those things listed on the Schedule B?  TurboTax is

11   designed to be easier.  Which also gets to point three.

12   The third thing.  You will have to accept, for their

13   version of reality, everyone else is to blame.  So, it's

14   TurboTax's fault; right?  That's what they would like for

15   you to believe.  But we saw year after year after year, he

16   answers no.  He sees the question.  He knows he has a bank

17   account.  It's got money on it.  He's got an app on his

18   phone.  And he answers no.

19        Didn't sign his tax return.  I believe Mr. Poscablo

20   called this a technical argument, or maybe that was with

21   the filing or the preparing.  Again, his own words from the

22   recording.  "I use TurboTax." "I do my own taxes." TurboTax

23   software, Government's Exhibit 102.  It is signed with a

24   PIN.  That is what happens when you electronically sign

25   your tax returns.

1      Every taxpayer in America who electronically files,
2  electronically signs.  You have an individual PIN.  You
3  heard Agent Welch say that.  He is the primary filer.  It
4  is his name as the primary filer.  His Social Security
5  number as the primary.  His e-mail as the primary.  His
6  PIN, primary.  There is sufficient evidence beyond a
7  reasonable doubt that he signed his tax returns.
8      He didn't file.  These are going to be very similar
9  things.  I won't belabor the point.  You saw Government's
10 Exhibits 96, 97, and 98.  Primary.  Primary.  Primary.
11 Primary.  It's him.  It's his information.  It's his name.
12 It's his Social Security number.  Again, his own
13 statements.  Again, the testimony of Agent Welch.
14     Didn't prepare his returns.  Maybe someone else
15 prepared.  Again, same argument.  Please remember what the
16 Government asked of you at the very beginning, for your
17 common sense.  It is a theme.  Right?  It is something that
18 we have said a few times.  Because hypertechnical
19 arguments, things that defy logic, you can usually avoid
20 those, defeat those with just common sense.
21     FBARs filed after the initial Indictment for his
22 lies to NSF.  It is not improper for the Government to
23 charge someone when it discovers misconduct.  That is the
24 Government's role, the FBI, the Department of Justice, it's
25 what we do.  Filed late FBARs, after he is indicted.  He

1    did not tell the truth until he just could not get away

2    with it anymore.  That's what that is.  That's why he

3    filed.

4          Filed the FBAR to correct a mistake.  No.  He filed

5    the FBAR because he got caught.  He had agents at his

6    house.  Then he gets indicted.  It's just other charges at

7    that point.  There's no tax charges on there.  So, he goes

8    and he submits that FBAR.  He got caught.

9          Only two witnesses.  The Government only presented

10   two witnesses and spent a brief amount of time on these tax

11   charges.  Well, that is because, as my co-counsel told you

12   during his closing argument, this is at bottom a simple

13   case.  You have lies to the university on that Checklist;

14   you have lies to NSF about what you are doing; and, you

15   have lies to the IRS about your foreign bank account and

16   all the money in there.

17         You remove all of this other stuff about university

18   policies and university documents and people are to blame

19   who aren't the defendant.  The case is pretty simple.  So,

20   yes, the Government called two witnesses and they showed

21   you -- the documents showed you, the testimony showed you,

22   the defendant opened an account in China in 2016.  It's his

23   name.  He's the only name on there.  He then has an app on

24   his phone to track that money, his money.

25         You'll see on that 2019 delinquent FBAR, 2019, he

1   has two CD's now.  He doesn't just have the Ping An bank

2   account.  He has, with Ping An Bank, two CD's.  He's moving

3   stuff around.  That's his money.  Why do we put things into

4   cd's?  To earn interest on our money.

5        No additional investigation.  The Government would

6   offer, *what additional investigation was needed?*  Pretty

7   clear, he's got a foreign bank account in China.  Pretty

8   clear, there's money in it.  Pretty clear, he never listed

9   it on his taxes and he never listed it to the Department of

10  Treasury.  Pretty clear, he's doing things in China and not

11  telling NSF.

12       The defense says certain things are not, in and of

13  themselves, crimes.  Having a foreign bank account is not a

14  crime.  True.  Not reporting it to the IRS?  That's a

15  crime.  Not telling the Department of Treasury -- FinCEN --

16  when that account has over 10,000 dollars?  That's the

17  crime.

18       All right.  No fancy cars, no big houses, no big

19  money.  Right?  The Government has never once alleged that

20  this is about money.  Never once.  This is about the

21  prestige.  His career depends on these types of grants.

22  Look at his CVs.  His CVs are dozens of pages.  And they

23  list grants.  They list publications.  The first page, five

24  lines for employer.  Five lines for other things.  It's all

25  about the grants.  That's what happens in academia.  You

1    need these grants to advance your career.  Never once have
2    we said this is about the money.
3        What I just told you, Dr. Keiser said, here on the
4    stand.  *It is important in academia to get these grants.*
5    The defense's own witnesses that they called, highly
6    accomplished in academia.  One of the first things they
7    talk about, NSF grants.  And they're so accomplished,
8    right?  *How many NSF grants did you get?  How much money*
9    *did you give 'em?*  That's because that's what's important,
10   that's why.  Not the money.
11       Every day, people make tax mistakes.  The
12   Government would ask you, when you listen to the recording,
13   does an everyday person know about the 10,000-dollar
14   reporting requirement for FBARs?  Because the defendant
15   did.  That's on the recording.
16       Tax returns.  No willfulness.  So, how do we prove
17   -- how do we prove he acted willfully; right?  Well, let's
18   start with the fact, he's got these bank accounts.  They've
19   got over 10,000 dollars in them -- sorry, one bank account,
20   over 10,000 dollars in it, for these years.  Never files an
21   FBAR.  Doesn't want the IRS to know.  It's pretty easy to
22   just check the "no."  But once you click the "yes" and then
23   you gotta submit this form and you might have to pay and
24   then -- hmm -- it's a little bit trickier.  Right?  That's
25   evidence of willfulness.

1    You heard him on the recorded interview.  He knows

2  about that 10k reporting requirement.  That's evidence of

3  willfulness.

4    Does his own taxes.  He saw the question year after

5  year.  The question designed for eighth graders.  He saw it

6  every year.  "DO you have a foreign bank account?"  That's

7  evidence of willfulness.

8    Same argument about the FBAR.  Willfulness.  The

9  Government would offer to you the same reasons.  How do we

10  prove willfulness?  The same evidence that we prove

11  willfulness for the foreign tax -- for the foreign bank

12  account, the false tax returns.  It's the same for the FBAR

13  charge.

14    If you look at the money in there in 2019, moving

15  it into two CD's, you can also use that as evidence of

16  willfulness.  He's moving the money around.

17    We already addressed that one.  Okay.  Save time.

18    The money wasn't his.  Right?  The money wasn't

19  his.  He says that on the interview.  Mr. Poscablo mentions

20  it a few times.  Again, go back and listen to the

21  recording.  Because eventually his excuses start to wear

22  away and he does say, *Yeah, theoretically that's my money.*

23  At first, like a kid caught -- right?  -- with their hand

24  in the cookie jar?  No, no, not this.  Not that.  But

25  eventually, *Yeah, theoretically, that's my money.*

1        He admits to withdrawing it when he's in China.

2   He's the only name on the account.  You look at the FBAR

3   from 2019, Exhibit 106, he's moving it into CD's to earn

4   interest on the money.  And he has an app on his phone.  He

5   knew the money was his.

6        Again, willfulness, in relation to Count 3.

7   Defense talked a bit about that.  How many documents did we

8   see with the defendant's signature, certifications, other

9   folks' signatures and certifications, relying on

10  information that could only be provided by the defendant,

11  where they say under penalty of law that they're signing

12  it, it's true, it's complete, it's accurate, either from

13  him or based on the information provided by him.  Look at

14  Government's Exhibit 4 as an example.

15       The e-mail to Dr. Ou from NSF is, is not important.

16  Look at how the defendant answers that question.  The award

17  size depends on what you are about to tell me.  And he

18  says, *I don't have anything.*  As my co-counsel said, *I*

19  *ain't got nothing else going on.*  Right?

20       The question is pretty clear.  "Do you have you a

21  foreign position?"  "Do you have foreign funding?"  If so,

22  time commitments, money, just let me know these things

23  because the award size depends on your answer to this

24  e-mail.

25       Perhaps NSF was a little too trusting about this.

1    That e-mail is important.  It is proper for you to

2    consider.  It is his own statement.  It is his own lie.

3         Nonexisting grant proposal.  Air quotes,

4    nonexistent.  Okay.  So, it's nonexistent in their version

5    of reality.  This gets back to what I said at the very

6    beginning.  You are going to have to accept some things, if

7    you are buying what they are selling.  Nonexistent.  Well,

8    we showed you the application for the defendant that he

9    submits to get a grant from the Guangdong Province of

10   China.  We then show you, months later, where he tells his

11   employer, *I got it.  I received it.*

12        We show you e-mails where he is e-mailing his

13   counterpart in China and saying, *Here's my bank account*

14   *information*, so he can get paid from this grant.

15        The Government would offer to you that it does

16   exist because we showed you it existed.  Because the

17   evidence shows the application, his own words, his own

18   statement to his employer saying that he got it.

19        COURTROOM DEPUTY:  Five minutes.

20        MR. SHUGERT:  Thank you.

21        Okay.  Guangdong Province grant.  No award number.

22   No documents, things of that nature.  Okay.  Again, we

23   showed you all that evidence I just listed.  I won't go

24   through that again.

25        The defense's own witness, Miss Pericak, said of

1    course she sees award letters.  Of course.  Award letters,

2    award numbers, one of those terms.  But minutes later,

3    she's never seen one from China.  She has no idea what that

4    would look like.  She couldn't possibly know a Chinese

5    grant from the Guangdong Province of China, what that award

6    letter, what that award number, what it even -- does it

7    even exist?  She doesn't know.  She has no idea.

8            Talked about that one.  Guangdong, again.

9            Shenzhen.  Shenzhen University.  Defendant doesn't

10   live and work in China.  He only travels to China a few

11   times.  Right?  That's part of their argument.  The defense

12   wants you to believe he is just getting paid for travel.

13   Like a per diem.  They put up the State Department per

14   diem.  Who gets reimbursed for travel they don't take?

15   That makes no sense.  You get paid monthly, every month for

16   years, because you have a relationship -- in this case, a

17   contract -- with the other partner.  You don't get

18   reimbursed for travel when you are not travelling.

19           No work permit.  Nothing in that contract said that

20   he had to work in China.  Nothing.  Nothing in that

21   contract was conditioned on receiving a work permit.  The

22   face of that document.  Nothing.

23           The better proof is the bank account.  Gets paid.

24   And in his own words in the recording, he admits to getting

25   paid 2,000 dollars a month from Shenzhen.  That is evidence

1    of a contractual relationship.  Some sort of relationship

2    with Shenzhen University.  And we saw the contract with all

3    of the benefits and the perks and the research obligations

4    that are contained in there.

5           And you also saw his employee ID card, before I

6    forget that one.

7           "Guest Professor" on the Biosketch.  This is a big

8    piece of their argument.  Right?  Yeah, guest professor's

9    on the Biosketch.  That's not even true.  He's not a guest

10   professor at Shenzhen University.  The contract says

11   specially-appointed professor.  Full-time.  He's not a

12   guest professor.  So that, in and of itself, is not true.

13          The contract also references a previous contract.

14   To the extent it may have existed, it annulled what you can

15   reasonably infer may have been a guest professorship.

16          You heard from two witnesses at NSF.  Guest

17   professorship means nothing.  We have no idea how much

18   money is involved, how much time commitment is involved.

19   Tells them nothing.  That's why they have another part of

20   the application.  The application is not difficult.  He was

21   able to fill it out when he was willing to tell NSF about

22   the specific thing in there.  That is not hard.  That's why

23   that part of the application is there.

24          Okay.  I talked about that one.  Only got a few

25   left.  I'm going to make it.

1    The defense admits, they concede, Current and
2    Pending, that part of the application is about research.
3    Exactly.  Look at the Shenzhen contract.  It is loaded with
4    research obligations that he was required by law to
5    disclose to NSF.
6        Defense tells you what NSF cares about in the
7    application process.  They're telling you what's important,
8    what matters.  Just remember the testimony from Dr. Keiser
9    and Dr. Ou.  They are the ones who can tell you, with
10   authority, what matters and why to NSF.
11       The Proposal Checklist.  Again, the defense is
12   asking you to abandon common sense.  The Proposal
13   Checklist, on its face, says this is a transmittal form.
14   Transmittal form.  It is the cover page to the stuff it is
15   transmitting.  The proposal.  That is the purpose of the
16   document.
17       When the proposal is submitted, the Checklist is on
18   top.  Right there.  We have dissected enough everyday words
19   like "all" and "current," "transmittal."  I'll leave it
20   there.
21       And we have one.  SIU-C is understaffed and
22   underbudgeted.  Okay.  That's the third -- that's the third
23   point.  Right?  It is literally everyone else's fault but
24   his.  SIU-C is understaffed, therefore, that somehow
25   absolves him from lying on this document.  Maybe it also

 1   absolves him from lying to the IRS.  I don't know.

 2        SIU's internal policies, their budget, all of those

 3   things do not matter.  He made the choice.  He chose to lie

 4   on that document.  He knew that he had positions outside

 5   the United States.  He knew that he had research

 6   obligations and time commitments and funding.

 7        COURTROOM DEPUTY:  Time.

 8        MR. SHUGERT:  The Government asks you to find him

 9   guilty on all Counts.  Thank you.

10        THE COURT:  Okay.  Members of the jury, once you

11   are all in the jury room, the first thing you should do is

12   choose a presiding juror.  The presiding juror should see

13   to it that your discussions are carried on in an organized

14   way and that everyone has a fair chance to be heard.  You

15   may discuss the case only when all jurors are present.

16        Once you start deliberating, do not communicate

17   about the case or your deliberations with anyone except

18   other members of your jury.  You may not communicate with

19   others about the case or your deliberations by any means.

20   This includes oral or written communication, as well as any

21   electronic method of communication, such as a telephone,

22   cell phone, smart phone, iPhone, Blackberry, computer, text

23   messaging, instant messaging, the internet, chat rooms,

24   blogs, websites or services like Facebook, LinkedIn,

25   YouTube, Instagram, Snapchat, Twitter, or any other method

1  of communication.

2      If you need to communicate with me while you are

3  deliberating, send a note through the court security

4  officer.  The note should be signed by the presiding juror,

5  or by one or more members of the jury.  To have a complete

6  record of this trial, it is important that you do not

7  communicate with me except by written note.  I may have to

8  talk to the lawyers about your message, so it may take some

9  time to get back to you.  You may continue your

10  deliberations while you wait for my answer.  Please be

11  advised that transcripts of trial testimony are not

12  available to you.  You must rely on your collective memory

13  of the testimony.

14      If you send me a message, do not include the

15  breakdown of any votes you may have conducted.  In other

16  words, do not tell me that you are split 6-6, or 8-4, or

17  whatever your vote happens to be.

18      Verdict forms have been prepared for you.  You will

19  take these forms with you to the jury room.

20      When you have reached unanimous agreement, your

21  presiding jury juror will fill in, date, and sign the

22  verdict forms.  Each of you will sign them.  Advise the

23  court security officer once you have reached a verdict.

24  And when you come back to the courtroom, I will read the

25  verdict aloud.

1        The verdict must represent the considered judgment
2   of each juror.  Your verdict, whether it is guilty or not
3   guilty, must be unanimous.
4        You should make every reasonable effort to reach a
5   verdict.  In doing so, you should consult with each other,
6   express your own views, and listen to your fellow jurors'
7   opinions.  Discuss your differences with an open mind.  Do
8   not hesitate to re-examine your own view and change your
9   opinion if you come to believe it is wrong.  But you should
10  not surrender your honest beliefs about the weight or
11  effect of the evidence just because of the opinions of your
12  fellow jurors or just so that there can be a unanimous
13  verdict.
14       The twelve of you should give fair and equal
15  consideration to all the evidence.  You should deliberate
16  with the goal of reaching an agreement that is consistent
17  with the individual judgment of each juror.  You are
18  impartial judges of the facts.  Your sole interest is to
19  determine whether the Government has proved its case beyond
20  a reasonable doubt.
21       So, members of the jury, this is how we're going to
22  proceed.  We're going to go ahead and actually break or
23  recess, let you go to lunch.  When you come back, then you
24  will retire to the jury room to begin your deliberations.
25  Because we'll have to swear in the court security officer;

1    once I swear him in, you can't go anywhere.

2         So, we'll wait -- and they won't let you.  So, we

3    will wait -- we'll go ahead and do lunch.  I'll have you

4    come back in at 12:30.  We will come back into the

5    courtroom at 12:30, swear in the court security officer,

6    and then the jurors will be led to the jury room to begin

7    deliberations.

8         Miss Hurst will then instruct them on the

9    electronic exhibit issues and then they will start.

10        So, we'll be in recess until 12:30.  We'll come

11   back out at 12:30.

12        (Proceedings continued in open court, defendant

13   present; jury not present.)

14        THE COURT:  I know we had a discussion yesterday

15   about whether the stipulations went back.  We instructed

16   them on stipulations but I'm going to let them go back.

17        MR. VERSEMAN:  Your Honor, may I ask a question?

18   At what point -- does the Court dismiss the alternates?  Do

19   they do that when we come back?

20        THE COURT:  I'll do that when we have a verdict,

21   Mr. Verseman.  I do that when we have a verdict.  I'm not

22   going to discharge them until we have a verdict.

23        MR. VERSEMAN:  Okay.

24        MR. LINEHAN:  We'd like to renew our Rule 29 Motion

25   as to the remaining Counts.

```
 1          THE COURT:  You have seven days to do that, don't
 2   you?
 3          MR. LINEHAN:  That's correct, Your Honor.  Just
 4   wanted to renew it prior to the jury coming back.
 5          THE COURT:  Okay.  It's renewed.  It's denied.
 6          MR. LINEHAN:  Thank you, Your Honor.
 7          THE COURT:  Okay.
 8          (Court is recessed from 11:44 a.m. to 12:30 p.m.)
 9          (Proceedings continued in open court, defendant and
10   jury present.)
11          THE COURT:  Okay.  Miss Hurst, could you swear in
12   the court security officer?
13          COURTROOM DEPUTY:  Yes.
14          Please raise your right hand to be sworn.
15          (Court security officer sworn by courtroom deputy.)
16          THE COURT:  Okay.  So, members of the jury, through
17   Juror No. 12, you are going to be led into the jury room
18   now.  In a few minutes, Miss Hurst will be back to give you
19   instructions on how to use the electronic exhibit
20   equipment, and then you will begin your deliberations.
21          The alternates, Jurors No. 13 and 14, you have not
22   been discharged at this point but, of course, you do not
23   deliberate with the jurors unless you need to replace one.
24   We're going to have you remain in the courtroom, the two of
25   you.  You will -- the courtroom will be clear while the
```

1    rest of the jury is deliberating.  You will be the only two

2    in here, and you will be free to move around unmasked.

3    Make yourself comfortable.

4         Miss Hurst will make sure, whatever you need, if

5    you need to use the restroom.  So, this will be where you

6    hang out.  So, when the jurors go into the jury room now,

7    I'll ask that you just stay where you are.

8         COURTROOM DEPUTY:  All rise.

9         (Jury out at 12:33 p.m. to commence deliberations.)

10        (Notification of verdict at 4:20 p.m.)

11        (Proceedings continued in open court, defendant and

12   jury present.)

13        COURTROOM DEPUTY:  Please be seated.

14        THE COURT:  I have been advised that the jury has

15   reached a verdict.

16        Who speaks as the foreperson?  Juror No. 1?

17        FOREPERSON:  Yes.

18        THE COURT:  Has the jury reached a unanimous

19   verdict, ma'am?

20        FOREPERSON:  They have, Your Honor.

21        THE COURT:  Could you hand the forms to the court

22   security officer?

23        FOREPERSON:  (Complies.)

24        (Pause.)

25        THE COURT:  The forms are properly completed and I

1    will now publish the jury's verdict.

2         Mr. Xiao, could you please stand?

3         In the case of the United States of America versus

4    MingQing Xiao:

5         As to Count 3:  We, the jury, find the defendant

6    MingQing Xiao not guilty of False Statement, as charged in

7    Count 3 of the Indictment.

8         As to Count 4:  We, the jury, find the defendant

9    MingQing Xiao guilty of False Statement on Tax Return, as

10   charged in Count 4 of the Indictment.

11        As to Count 5:  We, the jury, find the defendant

12   MingQing Xiao guilty of Fraud or False Statement on Tax

13   Return, as charged in Count 5 of the Indictment.

14        As to Count 6:  We, the jury, find the defendant

15   MingQing Xiao guilty of Fraud or False Statement on Tax

16   Return, as charged in Count 6 of the Indictment.

17        As to Count 7:  We, the jury, find the defendant

18   MingQing Xiao guilty of Failure to File Report of Foreign

19   Bank Account, as charged in Count 7 of the Indictment.

20        I will now poll the jurors.

21        (Whereupon, the jury was polled and the verdict

22   rendered unanimous.)

23        THE COURT:  Based on the polling of the jurors, I

24   will direct the Clerk to file and record the verdict.

25        You may be seated.

1          Members of the jury, including the alternates, you

2    are now discharged from your service.  On behalf of the

3    United States District Court for the Southern District of

4    Illinois, I want to thank you for your service.  You have

5    been engaged and listened to a lot of evidence over the

6    last week and a half, but I know that you were committed to

7    performing your duties and you did that.

8          I'm going to ask you to return to the jury room for

9    just a short time so that Miss Hurst can give you your

10   paperwork and process you out, and then we'll get you on

11   your way.  Again, thank you.

12         And I know I speak, also, for counsel for both

13   parties in this case that they appreciate your service.

14         Thank you.

15         (Proceedings continued in open court, defendant

16   present.)

17         THE COURT:  Be seated.

18         Sentencing will be set in this case for August 11,

19   2022, at 9:30 a.m.

20         Dr. Xiao, Probation will prepare and file a

21   Presentence Investigation Report to assist me in sentencing

22   you in this case.  You will receive a copy of that report

23   and have an opportunity to review it with counsel.

24         Included in that report will be Proposed Conditions

25   of Supervised Release.  You will also have an opportunity

1   to provide information through Probation to be included in

2   that report for my consideration and to have counsel

3   present with you at that time.

4          As it relates to custody status pending sentencing.

5   I believe Dr. Xiao was on his own recognizance.  I have not

6   had any issues or notification of any issues with his

7   compliance.

8          Mr. Reed, what is the Government's position?

9          MR. REED:  No objection to continued -- continuing

10  release, Judge.

11         THE COURT:  And so I am going to allow Dr. Xiao to

12  remain on release pending sentencing.

13         Dr. Xiao, you, of course, are obligated to continue

14  to comply with whatever Conditions that have been imposed.

15  And, obviously, if you fail to do so, your release status

16  could be revoked and you could be detained pending

17  sentencing.

18         Anything else we need to take up at this time from

19  the Government's standpoint?

20         MR. REED:  No, Judge.  Thank you.

21         THE COURT:  Mr. Poscablo?

22         MR. POSCABLO:  Yes, Your Honor.  We're wondering if

23  the Court would indulge us with an extended briefing

24  period.  I think we have 14 days, under the statute.  We

25  would ask for a month?

1          THE COURT:  For?

2          MR. POSCABLO:  One moment, Your Honor.  (Pause.)

3    For our Motion for Judgment Notwithstanding the Verdict,

4    Your Honor.

5          THE COURT:  Yes.

6          MR. POSCABLO:  Thank you, Your Honor.

7          THE COURT:  Anything else?

8          MR. POSCABLO:  Not from the defense.

9          THE COURT:  I just -- I do want to -- before we

10   recess and end here, I do want to thank counsel on both

11   sides for your professionalism and your civility.  It was a

12   difficult case and all of you are very vigorous advocates,

13   but I believe you did so respectfully and professionally

14   and the Court appreciates that.

15          All right.  We are in recess.

16          (Court adjourned at 4:36 p.m.)

17

18

19

20

21

22

23

24

25

1        <u>REPORTER'S CERTIFICATE</u>

2        I, Christine Dohack LaBuwi, RDR, CRR, Official

3    Court Reporter for the U.S. District Court, Southern

4    District of Illinois, do hereby certify that I reported

5    with mechanical stenography the proceedings contained in

6    pages 999-1099; and that the same is a full, true, correct

7    and complete transcript from the record of proceedings in

8    the above-entitled matter.

9

10        DATED this 12th day of May, 2022,

11

12            *s/Christine Dohack LaBuwi, RDR, CRR*
             _____
13            Christine Dohack LaBuwi, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25