IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-cr-40039-SMY |
| | ) | |
| MINGQING XIAO, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

    I.   Governing Legal Principles ...................................................................... 4

        A.  Federal Rule of Criminal Procedure 29 ............................................ 4

        B.  Federal Rule of Criminal Procedure 33 ............................................ 6

    II.  The Court Should Acquit Dr. Xiao of the False Tax Return Counts (Counts 4-6)............. 6

        A.  The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao Prepared, Signed, or Filed the Tax Returns at Issue ...................................................... 7

        B.  The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao's Conduct Was Willful .................................................................... 11

            1.  The Government Must Meet the High Bar of Proving Willfulness..................... 12

            2.  The Evidence Did Not Support a Finding of Willfulness...................................... 13

    III. The Court Should Acquit Dr. Xiao of the FBAR Count (Count 7) .................................. 21

        A.  The Evidence Was Not Sufficient For a Reasonable Jury to Find that Dr. Xiao's Failure To Failure An FBAR Was Willful ................................... 22

        B.  The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao Engaged in a Reportable "Transaction"...................................................... 25

            1.  The Treasury Regulation, As Written, Exceeds the Power Granted By Congress in the Bank Secrecy Act............................................................ 26

            2.  The Evidence Was Not Sufficient For a Reasonable Jury to Find That Dr. Xiao Made a Transaction During the Relevant Period .................................... 28

    IV. Alternatively, the Court Should Grant a New Trial Pursuant to Rule 33 ........................ 29

        A.  Sufficiency of the Evidence ...................................................................... 29

        B.  No Limiting Instruction Following Judgment of Acquittal on Counts 1 and 2 .......... 29

CONCLUSION............................................................................................................ 30

## INTRODUCTION

The conviction of Defendant Dr. Mingqing Xiao on four tax-related counts was not sufficiently supported by the evidence presented at trial, and Dr. Xiao now respectfully requests that the Court enter a judgment of acquittal on those counts.

As part of the now-abandoned China Initiative, the government initially charged Dr. Xiao with two counts of wire fraud under 18 U.S.C. § 1343 and one count of making a false statement under 18 U.S.C. § 1001(a)(1).  Indictment, ECF No. 1.  On October 5, 2021, twenty days before trial was to commence on October 25, 2021, and after Dr. Xiao declined to accede to the government's threat of tax-related charges if he did not agree to plead guilty to the initial indictment (of which he has now been fully acquitted), the government, as promised, brought a Superseding Indictment charging three additional counts of filing a false tax return under 26 U.S.C. § 7206(1) and one count of failure to file a Report of Foreign Bank and Financial Accounts ("FBAR") under 31 U.S.C. §§ 5313 and 5322.  *See* Superseding Indictment, ECF No. 57.  The government brought these counts after Dr. Xiao hired a tax professional to file delinquent FBARs (GX 103-06) and to help him amend his prior tax returns to address any issues with his prior filings.

To be sure, the government's grant fraud case was flawed from the start, and the government failed to persuade the jury (or this Court, with regard to the wire fraud charges) that Dr. Xiao had violated those laws.  Specifically, after the government closed its case-in-chief, this Court granted Dr. Xiao's motion for a judgment of acquittal and dismissed the two wire fraud counts (Counts 1 and 2) because the government had not provided sufficient evidence to establish that Dr. Xiao engaged in a scheme to defraud.[1]  May 3, 2022 Tr. at 8:7-16, ECF No. 169.  Later,

---

[1] As a pre-verdict judgment of acquittal under Rule 29(a), the Court's order is final and unappealable.  *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977) ("[T]he Double Jeopardy Clause bars appeal from an acquittal entered under . . . Rule 29(a) . . . .");  *Evans*

the jury acquitted Dr. Xiao of the only remaining count related to the purported grant fraud—the false statement charge alleged in Count 3.  May 4, 2022 Tr. at 1095:5-7, ECF No. 179.  At the same time, however, the jury, after only 227 minutes of deliberation, convicted Dr. Xiao of the four remaining tax-related charges.  May 4, 2022 Tr. at 1095:8-19.  The Court should now acquit Dr. Xiao of those counts because the evidence was insufficient to sustain the convictions.

As the Court is aware, the government rested its case-in-chief after five days of testimony.  During that time, the government offered only *two* witnesses with firsthand factual knowledge—Kelly Alongi and Yvonne Ou—in its effort to prove Dr. Xiao guilty beyond a reasonable doubt of the seven counts in the Superseding Indictment.  It presented *zero* witnesses with firsthand factual knowledge related to the tax counts.  In fact, the only witnesses who testified regarding the tax issues were Lisa Skelly—an Intuit employee who testified regarding the TurboTax software purportedly used by Dr. Xiao—and Michael Welch—an Internal Revenue Service ("IRS") agent who was assigned to testify in the case but was not involved in the government's investigation of Dr. Xiao.  And the government did not bolster its tax case with a detailed documentary presentation.  In fact, the government did not provide any emails, contemporaneous notes, forensic evidence, or direct witness testimony related to Dr. Xiao's allegedly willful violation of the tax laws.  Instead, the tax case was entirely circumstantial, and was based on the TurboTax software and tax filings associated with Dr. Xiao, as well as a garbled and often incoherent recording of the FBI's interview of Dr. Xiao, whose limited command of the English language led to a number of obvious misunderstandings of the agents' questions.[2]  Although a conviction can rest on

---

*v. Michigan*, 133 S. Ct. 1069, 1074 (2013); *see also Smith v. Massachusetts*, 543 U.S. 462, 467-68 (2005) (midtrial judgment of acquittal under equivalent state rule was final and unreviewable).

[2] Although Dr. Xiao is highly educated and writes academic papers in English, he speaks with an accent and oral communication in English can sometimes result in miscommunication.  In certain instances during the interview, it was clear that Dr. Xiao was struggling to express himself.

circumstantial evidence, "each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001)).  Here, the links in the chain of inferences were little more than "conjecture camouflaged as evidence," and were entirely insufficient to support a conviction.  *Piaskowski*, 256 F.3d at 693.

In light of the government's sparse case and the lack of direct evidence, the government's evidence was not sufficient "to convince a [rational] trier of fact ***beyond a reasonable doubt*** of the existence of *every* element of the offense."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added); *accord United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).  Here, a reasonable factfinder "must necessarily have a reasonable doubt as to guilt," and this Court must now acquit Dr. Xiao of the tax counts "because no other result is permissible within the fixed bounds of jury consideration."  *Jackson*, 443 U.S. at 318 n.11.

## ARGUMENT

As set forth in greater detail below, Counts 4 through 6 are premised on Dr. Xiao's allegedly willful failure to report a bank account with Ping An, a bank located in China, on his tax returns for tax years 2017-19, and Count 7 is premised on his allegedly willful failure to file a timely FBAR in connection with that same account for tax year 2019.  Rule 29 acquittal is required on each of these counts because:

- There was insufficient evidence that Dr. Xiao acted *willfully*, meaning that he intentionally violated a known legal duty to report the Ping An bank account on his tax returns for tax years 2017-19.  *See* Section II.B, *infra*.

---

*See, e.g.,* GX 14 at 24:20-21 ("But this money I only use it as I, for the, when I, let's see, when I, this money I only use when I travel to them.").  At other times, the transcript shows that the agents and Dr. Xiao were speaking past each other.  *See, e.g.* GX 14 at 20:24-42 (repeatedly confusing the name "Andrew Carver" for "Angel Carter").

- There was insufficient evidence that Dr. Xiao prepared, signed, or filed, the income tax returns for tax years 2017-19.  *See* Section II.A, *infra*.

- There was insufficient evidence that Dr. Xiao acted *willfully*, meaning that he intentionally violated a known legal duty to file a FBAR on or before the due date following the calendar year 2019.  *See* Section III.A, *infra*.

- There was insufficient evidence that Dr. Xiao engaged in a reportable transaction that would trigger the requirement to file a report with the government, as required by the Bank Secrecy Act provision that ultimately underlies the FBAR charge.  *See* Section III.B, *infra*.

In light of the government's case and all of the evidence presented at trial, no result other than acquittal on the remaining counts is permissible.  For these reasons, Dr. Xiao respectfully requests that the Court enter a judgment of acquittal of each of the four counts of conviction.  Fed. R. Crim. P. 29(c).  In the alternative, Dr. Xiao respectfully requests that this Court exercise its authority under Rule 33 to vacate the judgment regarding these tax counts and order a new trial, which would vindicate the interests of justice.  Fed. R. Crim. P. 33(a).

## I.      Governing Legal Principles

### A.      Federal Rule of Criminal Procedure 29

"After the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Because "[t]he rule provides that the court 'must enter a judgment of acquittal" if the evidence is insufficient, *see* 2A Charles Alan Wright & Peter Henning, FEDERAL PRAC. & PROC. (CRIM.) § 462 (4th ed. 2009) ("Wright & Henning"), and because it is required by Due Process, *see Jackson v. Virginia*, 443 U.S. 307, 314-19 (1979), "its requirements are mandatory."  Wright & Henning § 462; *accord Jackson*, 443 U.S. at 317 (holding that a conviction based on insufficient evidence "cannot constitutionally stand").

A defendant may also move for judgment of acquittal, or renew such a motion, after a guilty verdict or after the court discharges the jury.  Fed. R. Crim. P. 29(c)(1).  A court may enter

a judgment of acquittal on any count for which the evidence is insufficient.  Fed. R. Crim. P. 29(c)(2).  "The standard . . . is the same regardless of whether the motion is at the close of the government's evidence, at the close of all the evidence, or after discharge of the jury.  The judge is to direct acquittal if 'the evidence is insufficient to sustain a conviction.'"  2A Wright & Henning § 467 & n.1 (noting single standard under Rule 29(a)).  Although the court must "look at the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319; *see also United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019), "[t]his standard does not mean that" the verdict must be sustained "if there is any evidence that arguably could support a verdict."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  The standard instead is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  If "no rational trier of fact could find guilt beyond a reasonable doubt," the conviction cannot stand.  *Id.* at 317.  Moreover, "[i]f 'reasonable' jurors 'must necessarily have a reasonable doubt' as to guilt, the judge 'must require acquittal.'"  *Id.* at 318 n.11 (quoting *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) (internal quotation marks and alteration marks omitted)); *accord* Wright & Henning § 467, at 366 (noting *Curley* formulation states the "proper test" and "is universally accepted by the courts").

The Seventh Circuit has made clear that "[a] verdict may be rational even if it relies solely on circumstantial evidence."  *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009).  In such a case, however, the court "must carefully consider each inference necessary to prove all elements of the offense."  *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).  This inquiry is intended to avoid the injustice of the government proving its case with "conjecture camouflaged as evidence."  *Piaskowski*, 256 F.3d at 693.  In the context of a Rule 29 motion, a court must therefore scrutinize each link in the government's "inferential chain" to be sure it is "supported by evidence

5

that allows the jury to 'draw reasonable inferences from basic facts to ultimate facts.'" *Jones*, 713 F.3d at 340 (quoting *Coleman v. Johnson*, 566 U.S. 650, 655 (2012)).  The Seventh Circuit has made clear that a court should overturn a jury verdict "if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012).

### B.      Federal Rule of Criminal Procedure 33

The Federal Rules of Criminal Procedure also provide that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Unlike a motion for acquittal, when evaluating a motion under Rule 33, the Court need not view the evidence in the light most favorable to the government and it may consider the credibility of the witnesses.  *See United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017); *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  Rather, "a defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) ("[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.").  In other words, a court should grant a motion for a new trial if "the evidence 'preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand.'" *Conley*, 875 F.3d at 399 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

## II.      The Court Should Acquit Dr. Xiao of the False Tax Return Counts (Counts 4-6)

The Court should acquit Dr. Xiao of each of Counts 4 through 6 because no rational factfinder could have found all of the elements of each count beyond a reasonable doubt.  Counts 4 through 6 charge Dr. Xiao with filing a false tax return under 26 U.S.C. § 7206(1) for the years

2017-19 by checking the "no" box in response to question 7(a) in the Schedule B of IRS Form 1040. That question asks: "At any time during [the calendar year], did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?" GX 93-95. The Superseding Indictment alleges that Dr. Xiao violated § 7206(1) in each of those years because "in fact he had a financial interest in and signature authority over a financial account at Ping An Bank in the People's Republic of China." Superseding Indictment at 5-6. But the evidence presented at trial was insufficient to prove that Dr. Xiao understood the form, or, in fact, that he even read the question at issue at all.

To prove a violation of § 7206(1), the government must prove that (1) Dr. Xiao prepared an income tax return; (2) the income tax return was false as to a material matter; (3) Dr. Xiao signed the tax return, which was made under penalty of perjury; (4) Dr. Xiao acted willfully, *i.e.*, he knowingly violated a legal duty; and (5) Dr. Xiao filed the tax return with the IRS. 26 U.S.C. § 7206(1). The government's case failed to meet the Rule 29 standard in two key respects. ***First,*** the government did not prove beyond a reasonable doubt that Dr. Xiao prepared, signed, or filed the tax returns at issue. ***Second***, the evidence was far from sufficient to convince a reasonable factfinder that Dr. Xiao *willfully* violated the law. For the reasons set forth in greater detail below, Dr. Xiao therefore respectfully requests that the Court enter a judgment of acquittal on Counts 4-6.

A.    **The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao Prepared, Signed, or Filed the Tax Returns at Issue**

As noted *supra*, § 7206(1) requires the government to prove that Dr. Xiao prepared, signed, and filed the tax returns in question.[3] *See* 26 U.S.C. § 7206(1); 7th Cir. Pattern Instructions at 944.

---

[3] Notably, the Superseding Indictment does not allege that Dr. Xiao caused another to take any of these steps, and the government offered no evidence at trial supporting an alternative theory that Dr. Xiao is liable because he caused another to prepare, sign, or file his tax returns on his behalf. *See* Superseding Indictment at 5-6.

The government's evidence in support of these elements was minimal and circumstantial (at best), and no rational factfinder could have possibly determined that the government proved these elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The government's limited pieces of circumstantial evidence do not create a solid chain of inferences sufficient to prove the elements of the offenses alleged in Counts 4-6. To be sure, "[a] verdict may be rational even if it relies solely on circumstantial evidence," *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009), but the court has a special responsibility in such a case to "carefully consider each inference necessary to prove all elements of the offense." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).

Here, any evidence conceivably probative of the element that Dr. Xiao himself prepared and signed the tax returns in question is threadbare. The Government offered only the following evidence that conceivably offer proof of these elements: (1) 3 one-page electronic receipts prepared by TurboTax associated with Dr. Xiao's jointly filed tax returns; (2) the 2017-19 tax returns themselves; and (3) Dr. Xiao's recorded interview statement that he uses TurboTax as a general practice. This evidence, however, falls far short of the quantum of proof necessary to sustain the guilty verdicts for Counts 4 through 6. To the contrary, even minimal scrutiny of the circumstantial trial evidence reveals the myriad and fatal flaws in the government's case.

**The TurboTax receipts**. The government provided three one-page, electronic receipts prepared by TurboTax that were associated with Dr. Xiao's tax returns. GX 96-98. These documents list information regarding the filers (including that Dr. Xiao was the "primary" filer for each tax year), data regarding the filing itself, any payment made in connection with the filing, and a log of interactions with the IRS. *Id.* And although the TurboTax receipts include information on the filers and the submission, those receipts do not have any way to specifically tie the person whose name appears on the filing with the person who prepared, signed, and filed the returns using

TurboTax.  GX 96-98.  In fact, Lisa Skelly, the TurboTax employee, agreed that these receipts could not establish that it was Dr. Xiao himself who electronically signed the returns.  *See* May 2, 2022 Tr. at 777:21 ("No, there is no way for us to know that.").  Moreover, Ms. Skelly agreed more generally with the statement that there was no way for TurboTax to know if a user "hit the button to preview a copy of the tax forms that were being e-filed" or if a user "whoever it was, printed and reviewed a physical copy of the tax forms that would be filed with the government through e-file."  *Id.* at 778:4-19.  In short, the TurboTax materials do not prove who specifically used the software or how precisely the user, "whoever it was," interacted with the software.

**The tax returns for each of 2017-2019**.  The government also offered the actual returns associated with Dr. Xiao's tax filings in 2017-19.  GX 93-95.  Each of these filings lists Dr. Xiao as the primary filer, but do not contain a "wet signature," meaning that Dr. Xiao did not physically sign the tax returns.  GX 93 at 4; GX 94 at 1; GX 95 at 2.  Instead, in each instance, the signature field was marked with six asterisks—"******."  *Id.*  The government's sole IRS witness, Agent Welch, who was not involved in the investigation, testified perfunctorily that these asterisks are "the electronic PIN that's being masked by the IRS," and that the PIN indicates the return was electronically signed.  May 2, 2022 Tr. at 835:14-24.  But Agent Welch did not explain how the asterisks or the electronic PIN could be associated with Dr. Xiao.  The mere existence of an electronic PIN does not prove that Dr. Xiao himself created or entered the PIN or that he therefore prepared, signed, or filed the tax returns.

**Dr. Xiao's recorded statement to law enforcement officers**.  Dr. Xiao's statement— "Yeah, I use TurboTax"—was in response to a general question as to whether or not Dr. Xiao and his wife "use[d] TurboTax to do your taxes."  GX 12 at 37:19.  This fleeting, non-specific statement did not provide any additional context regarding which tax years he was describing, whether he

was actually the person who prepared or submitted a final filing,[4] or how the software was used (*i.e.*, whether the software was used only to provide the government tax forms in an organized way or if was used in interview mode, which would prompt the user with a series of questions).[5]

Rather than present any direct proof that Dr. Xiao prepared and signed the tax returns at issue, the government relied on the jury to overinterpret these limited pieces of evidence and to **assume** that the government had proven that Dr. Xiao himself had prepared, signed, and filed the tax returns in question. These disjointed evidentiary pieces does not create a chain of reasonable inferences that proves all of the elements beyond a reasonable doubt. *See Coleman*, 566 U.S. at 655; *Jones*, 713 F.3d at 340; *Stevenson*, 680 F.3d at 855-56. In fact, despite the government's overwhelming resources, the case involved no forensic evidence that Dr. Xiao himself prepared, signed, or filed the returns, nor was there any testimony from any witness that he or she saw or was told by Dr. Xiao that he himself filed these returns, or any documentary evidence (from any of the the 13.4 GB of data collected from his Gmail account, the 22.9 GB collected from his SIUC email account, and the gigabytes of files found on the computers and mobile devices seized by the government) that Dr. Xiao communicated to anyone (including his wife, with whom the returns were jointly filed) that he himself had prepared and filed these returns.

The government must be held to its burden to prove every element of the offenses beyond a reasonable doubt. In the Seventh Circuit, a court should overturn a jury verdict "if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Stevenson*, 680 F.3d at 855-56. The government failed to prove the most basic elements of Counts 4 through 6—that Dr. Xiao himself prepared, signed, and filed the returns—beyond a reasonable

---

[4] Each of the tax returns was filed jointly by Dr. Xiao and his wife, Qi Liu. GX 93-95.

[5] *See* April 28, 2022 Tr. at 523:23; 526:4-7, ECF No. 176.

doubt.  At best, the government pointed to limited circumstantial evidence, including Dr. Xiao's listing as the primary filer on the returns and his statement to government investigators years after the fact that he *generally* uses TurboTax for tax preparation.  But that circumstantial evidence was not sufficient to "allow[] the jury to 'draw reasonable inferences from basic facts to ultimate facts.'" *Jones*, 713 F.3d at 340 (quoting *Coleman v. Johnson*, 566 U.S. 650, 655 (2012)).  The Court should therefore acquit Dr. Xiao of Counts 4-6.

### B.      The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao's Conduct Was Willful

A conviction under 26 U.S.C. § 7206(1) also requires sufficient proof that Dr. Xiao's conduct was *willful*, meaning that he acted with knowledge that his conduct violated a known legal duty.  *See* 26 U.S.C. § 7206(1); 7th Cir. Pattern Instructions at 140, 944.  Congress implemented this willfulness requirement for good reason.  Tax laws—including the definitions of terms used therein—are highly complex, and it would be unfair, unjust, and unworkable "to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care."  *Cheek v. United States*, 498 U.S. 192, 205 (1991) (quoting *United States v. Bishop*, 412 U.S. 346, 360-361 (1973)).  Against the backdrop of that policy objective and the stringent requirement to prove willful misconduct, the government's evidence in insufficient.  Because the evidence is not sufficient for a reasonable factfinder to conclude that Dr. Xiao was aware that he had a "financial interest" in or "signature authority" over the Ping An account, and that he thus knew of the requirement that he report the Ping An bank account in response to question 7(a) in Schedule B of IRS Form 1040, and nevertheless "voluntarily and intentionally violated that duty," *Cheek*, 498 U.S. at 201, the Court should acquit Dr. Xiao of Counts 4 through 6.  *See also* 7th Cir. Pattern Instructions at 140 ("A person does not act willfully if he believes in good faith that he is acting

within the law, or that his actions comply with the law.").[6]

### 1.    The Government Must Meet the High Bar of Proving Willfulness

In the criminal tax context, the government bears the heavy burden of proving beyond a reasonable doubt that the defendant *willfully* violated the tax law.  To prove willfulness in a criminal tax case, the government must show that "the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991).  In other words, the government must establish that "defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).  Willfulness "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Murphy*, 469 F.3d 1130, 1137 (7th Cir. 2006) (quoting *United States v. Hooks*, 848 F.2d 785, 790 (7th Cir. 1988)). Making this showing requires the government to negate "a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws."  *Id.* at 202.

The Supreme Court has repeatedly emphasized the complexity of the Tax Code and IRS regulations, as well as the burdens of that complexity on average citizens.  *See Cheek*, 498 U.S. at 205; *Bishop*, 412 U.S. at 360-361; *Spies v. United States*, 317 U.S. 492, 496 (1943).  Other courts have reached the same conclusion, going so far as to conclude that even expert tax professionals, including judges and tax attorneys who are much better informed than average taxpayers, do not always fully understand this area of the law.  *See, e.g., Manor Care, Inc. v. United States*, 630 F.3d

---

[6]  Indeed, the fact that the prosecution memo prepared by the IRS Special Agent (who was not called to testify), in setting forth its basis for alleging Dr. Xiao's willfulness, relied on the alleged facts underlying Counts 1 through 3, suggests that Counts 4 through 7 would never have been brought but for the allegations of which Dr. Xiao has now been acquitted.  *See* IRS Prosecution Memo at 6-7 (Oct. 1, 2021), attached as Exhibit A (filed under seal).

1377, 1386 (Fed. Cir. 2011) (stating the "[T]ax [C]ode is complex" and the Tax Court must be careful in interpreting its meaning); *Voss v. Comm'r*, 796 F.3d 1051, 1053 (9th Cir. 2015) ("This section of the Tax Code, like much of the Code, is complex—it requires attention to definitions within definitions and exceptions upon exceptions. "); *Loving v. IRS*, 742 F.3d 1013, 1014 (D.C. Cir. 2014) (stating that the "federal income [T]ax [C]ode is massive and complicated" and that "is it not surprising that many taxpayers hire someone else to help prepare their tax returns").  The high bar of willfulness is a logical response to this complexity because it ensures innocent taxpayers are not committing a crime despite their good faith efforts to comply with the Tax Code.

### 2.    The Evidence Did Not Support a Finding of Willfulness

To convict on Counts 4 through 6, the Government must have established beyond a reasonable doubt that Dr. Xiao "*[w]illfully* [made] and subscribe[d] any return . . . , which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter."  26 U.S.C. § 7206(1) (emphasis added).  Here, no rational factfinder could determine beyond a reasonable doubt that Dr. Xiao was aware he had a legal duty to report his account by checking "Yes" in response to question 7(a) of Schedule B of IRS Form 1040 for his 2017, 2018, and 2019 tax returns, but that he nevertheless intentionally lied in response to this question.  *See Murphy*, 469 F.3d at 1137 (conviction under § 7206(1) "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required") (quoting *Hooks*, 848 F.2d at 790).  In fact, the evidence showed that Dr. Xiao was not aware of this obligation.

The only evidence presented by the Government includes (1) the TurboTax software purportedly relied upon by Dr. Xiao (GX 99-102), (2) the face of Schedule B on Dr. Xiao's initial tax returns (GX 93-95), (3) the delinquent FBAR filings that Dr. Xiao subsequently hired a tax preparer to make in an effort to fix any issues with his taxes (GX 103-06), (4) evidence of Dr.

13

Xiao's awareness of a Ping An account in his name; and (5) statements by Dr. Xiao during the government's interview of him (GX 13-14).[7]  None of this evidence, however, is sufficient to prove that he ***willfully*** made a false statement on his tax returns.   The lack of evidence regarding willfulness here is in stark contrast to typical § 7206(1) cases involving a failure to report a foreign bank account, of which counsel did not identify a single prior example where the defendant relied on TurboTax, and which, instead, often involved obvious evidence of willfulness, such as lying to accountants, opening foreign accounts using shell companies, or using banking services in tax havens that were designed to avoid U.S. tax reporting.[8]

At most, the government's case posits a series of unconnected circumstantial evidence. Under such circumstances, the court has a special responsibility in such a case to "carefully consider each inference necessary to prove all elements of the offense." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013); *see also id.* (holding that "each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation") (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001)).  The pieces of circumstantial evidence presented by the government do not create a chain of sufficiently strong inferences to establish Dr. Xiao's willfulness.

---

[7] This Court declined to admit the transcript of the interview (GX 14) into evidence.  *See* May 2, 2022 Tr. at 819:19-24, ECF No. 177.  However, this motion refers to that exhibit for clarity and ease of reference by the Court.

[8] *See, e.g.*, *United States v. Hough*, 803 F.3d 1181, 1184 (11th Cir. 2015) (defendants communicated with Swiss banker regarding avoiding U.S. disclosure requirements and need to avoid "open disclosure" before moving more than $36 million into European banks); *United States v. Ellefsen*, 655 F.3d 769, 781-82 (8th Cir. 2011) (noting defendants "used a series of domestic and offshore entities to move money from the medical practice to several bank accounts," and "received multiple warnings . . . that the Aegis system was illegal"); *United States v. Vallone*, 698 F.3d 416, 485 (7th Cir. 2012), *cert. granted, judgment vacated sub nom. Dunn v. United States*, 570 U.S. 901 (2013), *and opinion modified and reinstated*, 752 F.3d 690 (7th Cir. 2014) (finding sufficient evidence of willfulness when defendant worked for company that set up sham trusts designed to avoid taxes and used the system himself to report only 10% of his income).

As preliminary matter, the question to which Dr. Xiao is alleged to have willfully provided a false response was not simply: "Do you have a foreign bank account?"  It was as follows:

> "At any time during [the calendar year], did you **have a financial interest in** or **signature authority over** a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?"

GX 93-95 (emphasis added).  Moreover, in apparent recognition that discerning the meaning of "financial interest" and "signature authority" is far from intuitive, each of these terms are defined, but those definitions do not appear in the tax return form itself (or in TurboTax), but are buried deep within the Code of Federal Regulations.  *See* 31 C.F.R. § 1010.350(e) (defining "financial interest" in more than 400 words comprising three paragraphs and four sub-paragraphs); *id.* § 1010.350(f) (defining "signature authority"—notwithstanding five sub-paragraphs of exceptions—as "the authority of an individual (alone or in conjunction with another) to control the disposition of money, funds or other assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained").  For a layperson to find and understand these regulations would be cumbersome and difficult.  The IRS's current instructions for Schedule B do include certain definitions, but also advise taxpayers that they should review FinCEN guidance regarding certain key terms.  *See* IRS, *2021 Instructions for Schedule B at B-3*, available at https://www.irs.gov/pub/irs-pdf/i1040sb.pdf.  The link provided to FinCEN's website does not connect to any specific guidance, and additional searching is required to find FinCEN's 22-page guide regarding electronic FBAR filings.  *See FinCEN,* BSA Electronic Filing Requirements For Report of Foreign Bank and Financial Accounts (FinCEN Form 114) (Jan. 2017).  Although this document includes definitions of the terms "financial interest" and "signature authority," it does not point to the relevant provisions of the Code of Federal Regulations.  Against the backdrop of this question's highly technical terms, the TurboTax

evidence was far from sufficient to establish that Dr. Xiao understood Schedule B's requirements and willfully made a false statement on his returns.  And, in fact, the government offered no evidence to suggest that Dr. Xiao knew or understood these definitions, or even reviewed them.

***First***, and perhaps most critically, as Ms. Skelly acknowledged in her testimony, the specific language asked in question 7(a) of Schedule B ***does not appear anywhere in the TurboTax software***.  She was asked if she would agree with the statement that "there is no question in TurboTax for tax year 2019 that uses this exact language, 'At any time during 2019 did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?'"  May 2, 2022 Tr. at 779:20-780:1, ECF No. 177.  Ms. Skelly agreed with this statement, as she must, because the software simply did not ask the question as it appeared on the tax returns.  *Id.* at 780:2.  Indeed, she acknowledged that a user "would not see" the exact question as phrased in question 7(a) "even if [they] went through every single prompt on TurboTax."  *Id.* at 780:3-8.  And she admitted that the same defect existed in the 2017 and 2018 versions of the software.  *Id.* at 782:11-20.

In fact, the limited guidance provided by the TurboTax software as to how to answer this question, as presented by the government, was confusing and difficult to find.  Following the prompts provided by the software, the initial question that would cause the software to complete a response to question 7(a) on Schedule B appears in the apparently unrelated "Interests and Dividends" section.  GX 102 at 3; May 2, 2022 Tr. at 760:2-23.  That screen, which is copied below, asks a series of unrelated questions, which it notes "apply to very few people."  GX 102 at 3; May 2, 2022 Tr. at 760:12-14.  The question about "foreign bank accounts or trusts" is not even assigned an independent check box, and instead it follows a reference to "discounted loans"—an entirely different tax issue that even Ms. Skelly struggled to explain.  *Id.*

16

Ms. Skelly testified that a user who unknowingly and innocently selected "none of the above" on this screen—a possibility that the Government's evidence cannot exclude—would never be prompted with more detailed guidance regarding reporting foreign accounts on Schedule B. *See* May 2, 2022 Tr. at 765:21-766:17 ("Because we know the answer, so they shouldn't be getting a screen that asks the questions separately again."). Given the absence of this language from any screen the TurboTax user would have seen, no rational factfinder could conclude that the screens provided sufficient notice of Schedule B's requirements, such that a taxpayer who innocently misunderstood the prompt will not have committed a felony by checking "none of the above."

***Second***, although the government provided evidence regarding the text of question 7(a) on Schedule B, and the accompanying answer on the return, as previously noted, there is zero evidence proving that Dr. Xiao, even assuming he was the one who prepared the returns via TurboTax, actually saw this question together with the associated answer, which was computer-generated based on his answers to other questions. May 2, 2022 Tr. at 732:4-5 (Ms. Skelly testified "If 'none of the above' is checked, then the form is filled out saying that they don't have any of these items."). TurboTax does not actually require the user to review their full returns before e-filing with the IRS—as noted *supra*, Ms. Skelly agreed that there was no way for TurboTax to know if a user "hit the button to preview a copy of the tax forms that were being e-filed" or if a user "whoever it was, printed and reviewed a physical copy of the tax forms that would be filed

17

with the government through e-file." May 2, 2022 Tr. at 778:4-19. Thus, there is no evidence—from TurboTax or any other testimonial or documentary source—that Dr. Xiao was aware of the full question in the form that it was asked on the form. Accordingly, no rational factfinder could conclude that the text of question 7(a) put Dr. Xiao on notice of the filing requirement, or that Dr. Xiao willfully checked the "no" box in response to that question.

*Third*, the evidence of the untimely FBAR filings submitted on behalf of Dr. Xiao in April and July 2021, *see* GX 103-106, which state that the Ping An account was a foreign account under Dr. Xiao's control, offer no additional probative value. Those after-the-fact statements have no bearing on Dr. Xiao's understanding or purported willfulness at the time of the 2017, 2018, and 2019 tax filings. Although this Court ruled that those submissions could be construed as an admission as to the nature of the bank account, *see* May 2, 2022 Tr. at 866:24-867:1, the evidence went only to the fact that the foreign bank account existed, and not to (1) the fact that Dr. Xiao understood that he had a "financial interest" in or "signature authority" over the bank account at issue, or (2) what Dr. Xiao understood with respect to FBAR requirements *at the time he submitted those earlier returns*. No rational juror could infer that a statement made years later, following advice by a professional tax preparer, could provide any insight into Dr. Xiao's knowledge and intent at the moment the returns were initially submitted.

*Fourth,* and finally, the recording of Dr. Xiao's interview by law enforcement agents, *see* GX 13-14, makes clear that Dr. Xiao, who had no reason to think he was being recorded (thus rendering his statements more credible),[9] stated repeatedly that he did not believe the money in the Ping An account belonged to him because it was encumbered by the obligation to use the funds

---

[9] FBI Special Agent Stephen Dalecheck testified that the recording was surreptitious to elicit more truthful answers from Dr. Xiao. *See* April 28, 2022 Tr. at 539:12-15.

only to reimburse his flights, hotels, and other expenses associated with his work in Shenzhen.

For example, Dr. Xiao stated at different points during the interview:

- "And if I uh, uh, uh, uh, uh visit them so they, but they say they give me, they, Shenzhen University give me some money, is they say the money is for me to visit them. [ . . . ] And for cover the travel and the . . . [ . . . ] Expense." GX 14 at 23:34-14:2.

- "But this money I only use it as I, for the, when I, let's see, when I, this money I only use when I travel to them." GX 14 at 24:20-21.

- "Because I the point is, honest speaking, is that they take this money that they give me, that every month they give me, just try to promote uh the collaboration they what  they say and actually it, it's that the money is mainly a way of use for me when I travel to China to visit them.  [ . . . ]  For the uh airplane fee and for the, for the because the, originally I think they calculate this amount as the base on every year I sp, they require that, the every year they say you need to come over to give a talk, give. . . [ . . . ] A presentation. And so they calculate the cost of for the airfare fee and for the lodging, for the, for the hotel." GX 14 at 29:1-17.

- "No because I don't view that one as my income personally because uh actually is not  the, I understand there's no use of my personal pleasure it's only when I need to travel to there to work with the University there and then I can use it but not like a so I didn't actually you can see the money sit there I didn't actually use it." GX 14 at 34:29-32.

- "Uh no sorry, that because, no I didn't. Because at the time I, I still kinda uh, uh, uh, 1 uh thinking this is whether it's my money or not." GX 14 at 37:1-2.

-  "Uh, for the uh way that [inaudible] if I not actually work with them maybe they ask or maybe I just give them back so I didn't view it as my personal money. Completely. So this is uh, if I view it completely as my money I might just, why just don't use it?  Because I didn't use it."  GX 14 at 38:2-5.

- "[Inaudible] that [inaudible] not my money, my own money in there." GX 14 at 39:16.

- "No uh, uh no, no. I didn't think that, because I always thinking this not, I didn't view this as my money. It's not because, I don't use it like my regular money I, you, even though it's theoretically placed under my name."  GX 14 at 42:38-40.

- "No, no, no, no, it's just because, no I, because I still, I insisted with the reason that I do, not sure this is my money. How to appropriately to report and handle this money. So I still, uh, I, I, I still in, in, in my uh, thinking process. So, I didn't, I still because, I'm busy person, I work on my research on my own."  GX 14 at 53:21-24.

- "The thing they try to find out later on and this what they say you need to ah, ah, ah, uh, uh, uh, uh, they use them and so I think it's just kind of like a travel reimbursement the way some money back that if I didn't use, fully use it and maybe later on I need to return back. So, I, I, I'm not sure that, that could happen, even though they haven't asked me yet, it's not one hundred percent [100%] is the same this is yours, even though it's under my name and under any circumstance I may be asked this, and say well...y, y, you need to give us the, back this amount this, it's possible." GX 14 at 53:29-54:4.

Dr. Xiao's repeated confidence that the money in the Ping An account did not belong to him (or at worst, his confusion about the tax treatment of the account), with no evidence presented by the Government to rebut it, renders the evidence insufficient to prove to a rational factfinder that Dr. Xiao willfully lied about the account.[10]  At best, Dr. Xiao's statements prove only that he knew there was a bank account in China opened in his name, and that he subjectively believed that, contrary to one of question 7(a)'s requirement, that he did ***not*** have a "financial interest" in that account.  In fact, the interviewing agents never mentioned the term "financial interest" during the interview, or asked him anything about whether he thought he had "signature authority" over the account, rendering zero evidence that he had any understanding of what either of those terms meant.[11]

_____

[10] Dr. Xiao's understanding that the money was for travel is consistent with Dr. Kathleen Pericak-Spector's testimony that, due to the SIUC budget shortfall, travel had to be paid for by grant funds, personal money, or the institution being visited.  May 3, 2022 Tr. at 927:15-18.

[11] To the contrary, when the agents asked Dr. Xiao if Shenzhen University was a "co-signer" on the account, Dr. Xiao's response suggested that he did not understand the question or what the term "co-signer" meant.  *See* GX 14 at 35:16-24.  ("JM: [ . . . ] Is, is the uh Shenzhen University a co-signer on this account or is this just your account?  MX: Uh.  JM: This account, is it your account or is it the University's account?  MX: Uh this uh, uh, uh my account.").

Proving that Dr. Xiao's understanding was wrong is not sufficient to convict him. The Supreme Court has stated repeatedly that the criminal tax laws do not "penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." *Cheek*, 498 U.S. at 205 (citing *Bishop*, 412 U.S. 360-61). The government should be prevented from penalizing an innocent error based on a good faith understanding where it has not provided sufficient evidence to support a finding of willful misconduct. In reality, far from proving willfulness beyond a reasonable doubt, the government's evidence lacked many of the indicia of willfulness relied upon in other cases, both civil and criminal. In other words, the typical facts that would both trigger IRS and DOJ scrutiny and also prove willfulness simply were not alleged or proved in this case.[12] For these reasons, the Court should therefore enter a judgment of acquittal as to Counts 4-6.

### III.   The Court Should Acquit Dr. Xiao of the FBAR Count (Count 7)

The Court should also acquit Dr. Xiao of Count 7, the FBAR count, for two reasons. ***First***, as set forth below, the government did not present sufficient evidence for a reasonable factfinder to conclude that Dr. Xiao's failure to file an FBAR met the high standard of willfulness. ***Second***,

---

[12] *See, e.g., United States v. DeMauro*, No. 17-cv-0640, 2021 WL 1979484 (D.N.H. May 18, 2021) (discussing efforts at concealment, "from pseudonymously opening multiple foreign bank accounts, to periodically writing checks to distant relatives and transferring money through her attorney to disguise the domestication of her foreign assets"); *United States v. Gentges*, 531 F. Supp. 3d 731, 742-744 (S.D.N.Y. 2021) (withholding information from accountant; using "numbered" bank account rather than account in his name; instructing bank to hold his mail in Switzerland; instructing bank not to invest in U.S. securities; moving money to new Swiss banks as they changed their compliance practices); *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1090 (S.D. Cal. 2021) (using "numbered" Swiss bank account; requesting mail hold; withholding relevant information from accountant; traveling regularly to Switzerland to meet with bankers); *United States v. Little*, 828 Fed. Appx. 34, 38 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 125 (2021) (noting defendant was a "British-trained barrister admitted to the New York Bar with a quarter-century of experience in complex international financial transactions who, for much of his life, has claimed German domicile for tax purposes"); *Quiel v. United States*, No. 11-cr-2385, 2017 WL 4803823, at *1 (D. Ariz. Oct. 25, 2017) (noting use of nominees to avoid reporting requirements); *United States v. Pomerantz*, No. 16-cv-0689, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017) (noting selective filing of FBARs in different years depending on level of income at issue).

the government did not present sufficient evidence that Dr. Xiao engaged in a reportable "transaction" that would have triggered his obligation to file an FBAR, which is the only trigger for the reporting requirement in the Bank Secrecy Act provision that underlies the FBAR charge.

### A. The Evidence Was Not Sufficient For a Reasonable Jury to Find that Dr. Xiao's Failure To Failure An FBAR Was Willful

The government's proof that Dr. Xiao willfully failed to file an FBAR—meaning he was aware of the legal duty to do so, and intentionally chose not to make the filing—is entirely insufficient to convince a rational factfinder of guilt. The Court should therefore enter a judgment of acquittal on Count 7. Similar to the § 7206(1) charges alleged in Counts 4-6, the government must establish that Dr. Xiao acted willfully to prove that he violated 31 U.S.C. §§ 5314 and 5322(a) by failing to file an FBAR. *See* 31 U.S.C. § 5322(a). Specifically, § 5314(a) instructs the Secretary of the Treasury to "require a resident or citizen of the United States . . . keep records and file reports, when the resident, citizen, or person makes a transaction . . . with a foreign financial agency." 31 U.S.C. § 5314(a). Section 5322(a), in turn, makes it a crime if a "person willfully violat[es] this subchapter or a regulation prescribed or order issued under this subchapter." 31 U.S.C. § 5322(a). The regulation promulgated in connection with § 5314(a) is codified at 31 C.F.R. § 1010.350(a), and provides, in part, that "[e]ach United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. § 5314 to be filed by such persons."

As noted above, willfulness "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Murphy*, 469 F.3d 1130, 1137 (7th Cir. 2006) (quoting *United States v. Hooks*, 848 F.2d 785, 790

(7th Cir. 1988)).  In other words, in the context of Count 7, the government must prove that Dr. Xiao knew of the FBAR requirement, but knowingly chose to defy it, realizing that his choice was a violation of the law.  The government's proof of that element was insufficient to convince a rational factfinder beyond a reasonable doubt, and the Court should enter a judgment of acquittal.

Just as it was in the context of Counts 4 through 6, the actual evidence offered by the government supporting the contention that Dr. Xiao willfully failed to file an FBAR was at best circumstantial, and could not be tied together into a chain of reasonable inferences that proves Dr. Xiao's willfulness beyond a reasonable doubt.  *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013); *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001).  Critically, the government presented no substantial evidence that Dr. Xiao knew what the terms "financial interest" or "signature authority" even meant, much less that he knew what was required by those terms and voluntarily violated the law anyway.  *See* Section II.B.2, *supra*. And, as described in greater detail *supra*, the recorded interview offered by the government makes clear that Dr. Xiao simply did not view the money in the Ping An account as his to use.  *See id.*  Although he at one point appears to express a limited understanding that holdings of $10,000 could trigger some reporting obligation, he emphasized again that he did not believe the requirement applied to him because the money in the account simply was not his.  GX 14 at 55:11-37 ("It is my ignorance I think is that I just because this I think the money is not that, uh, uh I understand is that you need to report is more than one, ten thousand [10,000], more than ten thousand [10,000] you need to report, that's what I saw the information somewhere.").  Even if this evidences knowledge of the FBAR requirement generally, there is no evidence to support when Dr. Xiao learned of this requirement, and none to show that he was aware of this requirement at the time that he was supposed to have filed an FBAR.

Moreover, the selections of the TurboTax software offered by the government make no mention of FinCEN or the FBAR requirement. *See* Section II.B.2, *supra*. And there is no evidence that Dr. Xiao actually reviewed the underlying forms that were submitted to the IRS in connection with his initial tax returns. *Id.* Even if he had, several courts have held that merely signing a tax return with a Schedule B does not put a taxpayer on constructive notice of the FBAR filing obligation even in the civil context, where the lower standard of reckless conduct can constitute willfulness. *See, e.g., United States v. Schwarzbaum*, No. 18-cv-81147, 2020 WL 1316232 (S.D. Fla. Mar. 20, 2020) ("Imputing constructive knowledge of filing requirements to a taxpayer simply by virtue of having signed a tax return would render the distinction between a non-willful and willful violation in the FBAR context meaningless. Because taxpayers are required to sign their tax returns, a violation of the FBAR filing requirements could never be non-willful."); *United States v. Flume*, No. 16-cv-0073, 2018 WL 4378161 (S.D. Tex. Aug. 22, 2018) ("If every taxpayer, merely by signing a tax return, is presumed to know of the need to file an FBAR, 'it is difficult to conceive of how a violation could be nonwillful.'") (citation and internal quotation marks omitted). And even among the courts that have concluded that signing a return that contains Schedule B creates such constructive notice, several of those courts nonetheless hold that merely signing a tax return with an incorrect Schedule B does not automatically make an FBAR violation willful because that rule would transform the willfulness standard into a strict liability offense. *See, e.g., Jones v. United States*, No. 19-cv-0173, 2020 WL 4390390 (C.D. Cal. May 11, 2020); *United States v. De Forrest*, 463 F. Supp. 3d 1150, 1158 (D. Nev. May 31, 2020). Those decisions logically require the government to prove more to establish that a failure to file an FBAR was willful. In fact, the IRS's position at the time of the alleged offense regarding **civil** FBAR liability was that "[t]he mere fact that a person checked the wrong box, or no box, on a Schedule B is not

sufficient, by itself, to establish that the FBAR violation was attributable to willful blindness." I.R.M. 4.26.16.4.5.3 at ¶ 6 (July 1, 2008).  But the absence of any such proof—any proof of willfulness—is striking.  It is also worth emphasizing here that the evidence presented at trial made clear that Dr. Xiao has no background or education in tax issues, and no special training or expertise in issues related to international tax that would have put him on notice of the FBAR requirement.

In light of all of this evidence, no rational factfinder could conclude beyond a reasonable doubt that Dr. Xiao was aware of the requirement to make an FBAR filing for the 2019 tax year, but that he willfully decided not to do so.  At worst, the circumstantial evidence could show that Dr. Xiao made a mistake by omission regarding his fulfillment of the FBAR filing requirement. But that is not sufficient to sustain a conviction for a willful violation of the law.  For this reason, the Court should enter a judgment of acquittal as to Count 7.

### B.    The Evidence Was Not Sufficient for a Reasonable Jury to Find that Dr. Xiao Engaged in a Reportable "Transaction"

The FBAR charge contained in Count 7 is rooted in sections of the Bank Secrecy Act, 31 U.S.C. §§ 5314 and 5322(a), and on a regulation promulgated by the Secretary of the Treasury (the "Secretary"), 31 C.F.R. § 1010.350 (the "Regulation").  The Court, however, should enter a judgment of acquittal on this count, because the government has not provided evidence sufficient for a reasonable jury to find that Dr. Xiao engaged in a reportable *transaction*, which is the only proper basis for liability under the governing statute.  The Regulation exceeds the authority granted by Congress because "an agency does not have authority to invade the province of the legislature by promulgating regulations that contravene the governing statute."  *K.R. v. Anderson Cmty. Sch. Corp.*, 81 F.3d 673, 679 (7th Cir. 1996), *cert. granted, judgment vacated on other grounds,* 521 U.S. 1114 (1997); *see also In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 42 (1st Cir. 2015) (explaining that an agency cannot "add[] to the statute . . . something which is not there").

Specifically, the Regulation adds a requirement that a U.S. person report a "relationship" with a foreign bank. 31 C.F.R. § 1010.350. This requirement simply does not exist in the statute, which requires that a U.S. person report a "transaction," not a "relationship." The Regulation thus improperly stretches the IRS's delegated authority to reach conduct that § 5314(a) does not outlaw. The Regulation is arguably void in its entirety, but, for the purposes of this Motion, it is clear at the very least that the Government has not provided sufficient evidence that Dr. Xiao initiated any such transaction during the relevant period. The Court should thus acquit Dr. Xiao of Count 7.

### 1.    The Treasury Regulation, As Written, Exceeds the Power Granted By Congress in the Bank Secrecy Act

Under the separation of powers principles enshrined in the Constitution, "the power to define criminal offenses . . . resides wholly with the Congress." *Whalen v. United States*, 445 U.S. 684, 689 (1980). Congress, of course, may empower an agency of the Executive Branch to promulgate regulations, but the "scope" of a regulation "cannot exceed the power granted [to the agency] by Congress[.]" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976). The Seventh Circuit elaborated on this principle in *K.R. v. Anderson Cmty. Sch. Corp. See* 81 F.3d at 679. Consistent with separation of powers principles, "[a]n agency does not have authority to invade the province of the legislature by promulgating regulations that contravene the governing statute— in other words, to make law." *Id.* (citing *Ernst & Ernst*, 425 U.S. at 213-14) (1976)). Vindicating this principle requires that "regulations that are inconsistent with the statute are void." *Id.*[13]

---

[13] Indeed, the Supreme Court made this clear in *United States v. Calamaro*. 354 U.S. 351 (1957). *Calamaro* involved "a type of lottery[,]'" which employed three participants—a "banker," a "writer," and a "pick-up man[.]" *Id.* at 353 (internal quotation marks omitted). The Supreme Court affirmed the reversal of the conviction of a pick-up man, holding that the applicable statute reached the banker and the writer but not the pick-up man. *Id.* The government sought to salvage the conviction on the ground that "the Treasury Regulations relating to the statute purport to include the pick-up man[.]" *Id.* at 358. The government contended that the regulation "constitutes an administrative interpretation to which [the Court] should give weight in construing the statute[.]" *Id.* The Court rejected that position: "[W]e cannot but regard this Treasury Regulation

Here, Congress has spoken "with specificity[.]" *JPMorgan*, 799 F.3d at 42.  31 U.S.C. § 5314(a) provides, in pertinent part, that:

> the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

The disjunctive language in the statute is clear.  The statute only applies to a person who makes a transaction themselves ***or*** who maintains a relationship "for any person," implying a person other than themselves.  31 U.S.C. § 5314(a).  Any other reading of the statute would sidestep the natural reading of the provision and would make the phrase "for any person" a nullity, a result which is inconsistent with core principles of statutory interpretation.  *See, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citations omitted)); *see also Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presume[s] that Congress intended a difference in meaning.").  By contrast, the Regulation provides that a U.S. person having a specified interest in, or specified authority over, a specified kind of account shall report such "relationship." 31 C.F.R. § 1010.350.

To be sure, a "transaction" and a "relationship" are different things.[14]  Indeed,

---

as no more than an attempted addition to the statute of something which is not there.  As such the regulation can furnish no sustenance to the statute." *Id.* at 359 (footnote omitted).

[14] *See also* Black's Law Dictionary (11th ed. 2019) (defining "transaction" as "The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. . . .  Something performed or carried out; a business agreement or exchange. . . . Any activity involving two or more persons.") (defining "relationship" as "The nature of the association between two or more people; esp., a legally recognized association that makes a difference in the participants' legal rights and duties of care.").

"relationship" reaches much further than "transaction." The Regulation therefore expands regulatory authority to reach conduct that the statute does not outlaw.  The Regulation "operates to create a rule out of harmony with the statute," *United States v. Kahn*, 5 F.4th 167, 176 (2d Cir. 2021) (internal quotation marks omitted), by "broaden[ing] [Treasury's] regulatory authority over activities that the plain language of the statute would not otherwise permit."  *Didrickson v. Dep't of Interior*, 796 F. Supp. 1281, 1291 (D. Alas. 1991).  In other words, "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Lawrence + Memorial Hosp. v. Burwell*, 812 F.3d 257, 267 (2d Cir. 2016) (internal quotation marks omitted). Thus, a conviction can only stand where the language of the statute itself is violated, meaning that the government must prove a "transaction," rather than a mere "relationship."

2.    **The Evidence Was Not Sufficient For a Reasonable Jury to Find That Dr. Xiao Made a Transaction During the Relevant Period**

The evidence presented by the government at trial was insufficient for a reasonable juror to find that Dr. Xiao "ma[de] a transaction," and the Court should therefore enter a judgment of acquittal.  The only evidence provided by the government and available to the jury regarding activity in the Ping An bank account in 2019 came in the form of translations of selected photos of the Ping An application on Dr. Xiao's cell phone.  GX 91.  These selective translations, which make up only a portion of the photographs of the phone taken by the government, *see* GX 89 (containing 98 pages of untranslated photographs) are disjointed and confusing.  The government did not provide any sufficiently clear bank records or supporting evidence regarding the entries shown on the photographs.  More important still, the photographs lack any context that could establish that Dr. Xiao himself was responsible the transactions associated with the account.  Thus, no rational factfinder could find beyond a reasonable doubt that Dr. Xiao made a transaction in the Ping An account during 2019, and the Court therefore should acquit on Count 7.

28

## IV.     Alternatively, the Court Should Grant a New Trial Pursuant to Rule 33

Again, the Court should acquit Dr. Xiao of the remaining four tax-related counts for the reasons set forth *supra*, as well as provide in its order that if its judgment of acquittal of these counts is overturned on appeal, it would grant a new trial.  *See* Fed. R. Crim. P. 29(d)(1).  Even if this Court were to deny Dr. Xiao's motion for judgment of acquittal on any of the counts, however, the Court should at least order a new trial on that count, for the reasons set forth below.

### A.     Sufficiency of the Evidence

Absent an acquittal of the Counts 4-7 under Rule 29, the Court should grant a new trial under Rule 33 because the verdict was against the weight of evidence for the reasons set forth *supra*.  Under the less stringent Rule 33 standard, it is even more clear that the government has failed to meet its burden, and a new trial is appropriate because the evidence "'preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand.'" *Conley*, 875 F.3d at 399 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

### B.     No Limiting Instruction Following Judgment of Acquittal on Counts 1 and 2

At the conclusion of the charge conference, counsel for Dr. Xiao requested a limiting instruction that would instruct the jury to disregard certain evidence presented by the government that was only relevant to the previously dismissed wire fraud counts.  May 3, 2022 Tr. at 994:8-13, ECF No. 178.  The defense specifically highlighted the risk of prejudice raised by two exhibits—the email exchange between Dr. Xiao and NSF program director Yvonne Ou and Dr. Xiao's unfinished application to the National Natural Science Foundation of China.  *Id.* at 995:8-21.  Both of these documents post-dated Dr. Xiao's alleged false statement charged in Count 3, and were therefore irrelevant to any of the remaining counts.  A limiting instruction could have made clear that the jury should disregard that evidence, and would have ensured that the jury did not improperly assume that Dr. Xiao was generally a dishonest person or had a propensity to

withhold information from the government, including in his tax filings.  Indeed, courts in the Seventh Circuit have repeatedly noted the importance of a limiting instruction when a subset of the counts are dismissed mid-trial.[15]  Dr. Xiao respectfully suggests that this Court's failure to issue such a limiting instruction was error, particularly in light of the jury's guilty verdicts on Counts 4 through 7 despite zero evidence suggestive of Dr. Xiao's dishonesty beyond the circumstances of his email exchange with Dr. Ou.  There was thus "a reasonable possibility that [this] trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006).  Because Dr. Xiao's rights "have been jeopardized by errors or omissions during trial," it would be appropriate in the interest of justice to grant a new trial under Rule 33. *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

## CONCLUSION

For the foregoing reasons, Dr. Xiao respectfully requests that this Court enter a judgment of acquittal as Counts 4 through 7 pursuant to Rule 29, or, in the alternative, that the Court grant a new trial on those counts pursuant to Federal Rule of Criminal Procedure 33.

---

[15] *See, e.g.*, *United States v. Lahey*, 55 F.3d 1289, 1295 (7th Cir. 1995) (noting that defendant "did not move to strike this evidence after the district court had granted [his] motion for judgment of acquittal on Counts One through Five, and did not request that the district court give a limiting instruction to the jury that this evidence should not be considered with respect to Count Six");  *United States v. Gorny*, 732 F.2d 597, 603 (7th Cir. 1984) ("After Gorny's acquittal on [certain] counts, the district judge gave proper limiting instructions to the jury not to consider any of the evidence presented on those counts in deliberating on the other counts . . . ."); *United States v. Joyner*, 669 F. Supp. 226, 228 (N.D. Ill. 1987) (noting prior to trial that if, at trial, "the government is unable to produce sufficient evidence on the issue of materiality, this court will dismiss [the relevant count] and issue a proper limiting instruction to the jury sufficient to remove any prejudice the evidence submitted on [that count] may have caused" to jury's evaluation of other counts).

Dated:  June 3, 2022

Respectfully submitted,

By: _/s/ Patrick F. Linehan_____
    Patrick F. Linehan, *pro hac vice*
    James M. Hobbs, *pro hac vice*
    Steptoe & Johnson LLP
    1330 Connecticut Avenue, NW
    Washington, DC  20036
    plinehan@steptoe.com
    jhobbs@steptoe.com
    202.429.3000

    Ryan P. Poscablo, *pro hac vice*
    Steptoe & Johnson LLP
    1114 Avenue of the Americas
    New York, NY 10036
    rposcablo@steptoe.com
    212.506.3900

    Michelle D. Nasser
    Dowd Bennett LLP-St. Louis
    7733 Forsyth Boulevard, Suite 1900
    St. Louis, MO 63105
    mnasser@downbennett.com
    314.889.7300

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022 I electronically filed Defendant's Post-Trial Motion

for Judgment of Acquittal or, in the alternative, for a New Trial with the Clerk of Court using the

CM/ECF system which will send notification of such filing to all counsel of record, including:


Peter T. Reed
Assistant United States Attorney
9 Executive Drive
Suite 300
Fairview Heights, IL 62208

Scott A. Verseman
Assistant United States Attorney
9 Executive Drive
Suite 300
Fairview Heights, IL 62208

Shawn Derek Shugert
Trial Attorney, National Security Division
950 Pennsylvania Ave., NW
Suite 7700d
Washington, DC 20530


         /s/ Patrick F. Linehan
         Patrick F. Linehan
         Steptoe & Johnson LLP
         1330 Connecticut Avenue, NW
         Washington, DC  20036
         plinehan@steptoe.com

         *Attorney for Defendant*