**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No: 21-CR-40039-SMY |
| | ) | |
| | ) | |
| MINGQING XIAO | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM OF DEFENDANT MINGQING XIAO

Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036

Dowd Bennett LLP-St. Louis
7733 Forsyth Boulevard, Suite 1900
St. Louis, MO 63105

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................. 2

    A.   Dr. Xiao's Background ......................................................................... 2

        1.   Dr. Xiao's Commitment to Family ........................................... 3

        2.   Dr. Xiao's Early Life and Education ........................................ 7

        3.   Dr. Xiao's Career as an Educator ............................................ 8

        4.   Dr. Xiao's Involvement in the Community ............................. 14

    B.   The Offense Conduct ......................................................................... 17

    C.   The Pre-Sentence Investigation Report ............................................. 18

        1.   Paragraph 10 of the PSR ........................................................ 18

        2.   Paragraph 11 of the PSR ........................................................ 19

III.  ARGUMENT ................................................................................................. 20

    A.   Legal Standard ................................................................................... 20

    B.   The Federal Sentencing Guidelines Are Advisory and Only One of Several Factors to Be Considered in Sentencing ................................................. 21

    C.   A Sentence of Probation is Warranted ................................................ 22

        1.   Dr. Xiao's History and Characteristics Warrant a Sentence of Probation ................................................................................ 22

        2.   The Nature and Circumstances of the Offense Warrant a Sentence of Probation ............................................................... 29

        3.   A Sentence of Probation Reflects the Seriousness of the Offense ........... 32

        4.   A Sentence of Probation Is Warranted Because of the Significant Punishment Already Inflicted on Dr. Xiao ............................... 34

        5.   A Sentence of Probation Affords Adequate Deterrence, Promotes Respect for the Law, and Protects the Public from Further Crimes of the Defendant ................................................................... 35

        6.   A Sentence of Probation Will Help to Avoid Unwarranted Sentence Disparities ............................................................... 38

        7.   Dr. Xiao Made Complete Restitution ...................................... 40

IV.   CONCLUSION .............................................................................................. 43

## I.     INTRODUCTION

Dr. Mingqing Xiao is humbly before this Court after being convicted of making false statements on his tax returns and for failing to file a report concerning the existence of a foreign bank account.  The Superseding Indictment charged Dr. Xiao with possessing an account with Ping An Bank and failing to identify that account in tax returns filed in 2017, 2018, and 2019.  It also charged him with failing to file a Report of Foreign Bank and Financial Accounts ("FBAR") for 2019.  Dr. Xiao is deeply remorseful for his actions and he accepts complete responsibility for his conduct.  He and his family have suffered greatly as a result of this investigation, prosecution, and conviction.  He never before committed a crime and with the support of his community, his colleagues and his loved ones he is exactly the type of person that will never commit a crime again.  For these reasons and for the reasons articulated below, should the Court deem a sentence necessary, we respectfully request that this Court sentence Dr. Xiao to a term of probation, or in the alternative, to a sentence that does not include a period of incarceration, as such a sentence would be sufficient, but not greater than necessary, to comply with the goals of sentencing.[1]

As the evidence showed, in December of 2020, federal agents questioned Dr. Xiao in his home about his lawful activities in China.  During that interview, conducted to obtain evidence of alleged grant fraud pursuant to the government's unjust *China Initiative* investigation of Dr. Xiao, he voluntarily identified the existence of his foreign bank account and provided access to

---

[1] Alternatively, the Court could sentence Dr. Xiao to "time-served," which takes into consideration the time that Dr. Xiao was briefly detained after he self-surrendered and was processed by the United States Marshals Service, directly prior to his presentment before the Court.

the account through his cellphone.[2]  Indeed, Dr. Xiao continued to cooperate with the

government's investigation for weeks, providing information, including passwords, requested by

the agents.  While the investigation continued, but before he was indicted for grant fraud, Dr.

Xiao retained a tax professional who advised that Dr. Xiao authorize the preparation of revised

tax filings, including revised Form 1040s for the tax years 2017, 2018, and 2019 and a

delinquent FBAR for tax year 2019.  Dr. Xiao's amended tax filings report his previously

unreported income and also identified the Ping An Bank account.  Dr. Xiao submitted the filings

and paid all taxes owed to the IRS in August 2021, prior to the government's Superseding

Indictment.  *See* Revised PSR at 12.  Indeed, as discussed more fully below, had the government

not superseded with tax charges, Dr. Xiao would have been subject to the normal procedures

associated with his participation in the streamlined filing compliance procedures with the

Internal Revenue Service ("IRS") in which he certified that his conduct was not willful.[3]

## II.   BACKGROUND

### A.   Dr. Xiao's Background

Dr. Mingqing Xiao is a 60-year old mathematics professor at Southern Illinois University

at Carbondale.  Born in China but naturalized as a United States citizen in 2006, Dr. Xiao was

---

[2] When he was indicted for grant fraud charges in April of 2021, the initial indictment
was devoid of charges related to his tax returns.  It was only after Dr. Xiao rejected the
government's plea offer and proceeded towards trial that the government superseded and added
in the counts for which Dr. Xiao was convicted.

[3] *See* https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-
compliance-procedures ("Taxpayers using either the Streamlined Foreign Offshore Procedures or
the Streamlined Domestic Offshore Procedures, will be required to certify, in accordance with the
specific instructions set forth below, that the failure to report all income, pay all tax and
submit all required information returns, including FBARs (FinCEN Form 114, previously Form
TD F 90-22,1) was due to non-willful conduct. Non-willful conduct is conduct that is due to
negligence, inadvertence, or mistake or conduct that is the result of a good faith
misunderstanding of the requirements of the law.")

raised in a poor but loving family.  His parents made sure that their children focused on education and academics, despite the early financial, political and social circumstances that affected their lives.  Dr. Xiao's character, humility, and supportive personality, marked by kindness, empathy, and selflessness, was born out of his family's early struggles and his consistent academic achievements.  His support of others, a theme which permeates the numerous letters submitted by people who knew Dr. Xiao and were affected by his care, embodies the belief that to whom much is given, much will be required.

Up until his indictment and conviction, Dr. Xiao was pursuing the American dream.  Dr. Xiao's parents struggled in these difficult circumstances, but they were able to give him an opportunity to earn a doctorate in the United States, an opportunity he used to raise a wonderful family and become an accomplished researcher, educator, and community leader.  Throughout his successes and challenges, Dr. Xiao has never lost his focus on serving others as an educator, mentor, volunteer, and loved one.  He has diligently used his talents and resources to help other people, including raising three accomplished daughters and supporting his wife, who similarly serves her community as a medical physician for the United States Department of Veterans Affairs.

### 1.    Dr. Xiao's Commitment to Family

Prior to moving to Illinois for graduate school, Dr. Xiao met and married the love of his life, Dr. Qi Liu, a medical physician at the Veterans Administration Hospital in Marion, Illinois. Married in 1989, their marriage has been, from the start, one committed to the service of others. They remain tirelessly focused on their shared philosophy: "life is best when people are happy

because of you." Ex. 1, Qi Liu Letter.[4]  Qi recalls that one of their earliest dates was delayed after Dr. Xiao noticed an unaccompanied young girl at the hospital and asked Qi to treat her so that she didn't have to wait alone and in pain.  *Id.*

Their shared philosophy didn't waiver when they had children, and they instilled in their three daughters their life-approach and commitment to education.  Ming's dedication to his wife and his children are unparalleled.  He is a singularly devoted father and husband.  Teresa Xiao, Dr. Xiao's eldest daughter, is entering her final year of medical school at the University of Chicago.  She described her father as the embodiment of the American dream, someone who, "despite his professional degree, . . . would work in any way he could without complaint (including cleaning dormitory kitchens and working in restaurants) in order to create a secure home for [Teresa] and her two younger sisters."  Ex. 2, Teresa Xiao Letter.  When Teresa thinks of her childhood, she thinks of her father, who "is still the person who regularly prepares dinners at home and brings [her] to doctor appointments."  *Id.*  Dr. Xiao is a source of support and motivation who "reframes my perspective and reminds me of the privilege of practicing medicine and caring for others," and "continuously emails me and my sister cheesy motivational phrases."  *Id.*[5]

Doreen Xiao, Dr. Xiao's second daughter, is enrolled at the University of Chicago.  Even though Doreen was a (relatively) rebellious teenager who purposefully focused on the arts instead of STEM (i.e., "the family business"), her father remained her "biggest fan, bringing

---

[4] All exhibits, including the extensive collection of letters submitted in support of Dr. Xiao, are attached to the accompanying Declaration of James M. Hobbs.

[5] As the Court is aware, Teresa Xiao was prepared to testify at trial ███████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████

[her] sisters to see [her] routines and smiling from the crowd." Ex. 3, Doreen Xiao Letter. Although Doreen acted like she "disliked school," Doreen wrote that her "dad was the one person who never gave up on me." *Id.* Although Doreen knew her "dad spent hours preparing comprehensive lessons," she "learned most from how he taught. He is warm and encouraging but will not hesitate to challenge you to be better than you thought was possible." *Id.* As a child, Dr Xiao "was the one who would bring me from school to dance class, cooking dinner after and making sure I did my homework," no matter "how resistant I was." *Id.* To this day, Doreen states that Dr. Xiao "is the most consistent person in my life." *Id.* Doreen also observed that Dr. Xiao shared this dedication with other students in the community as well; "[a]lthough being the middle child may have defined my childhood, my dad made sure I was never forgotten, and I am confident when I say that he worked his entire life to make sure no one else was forgotten either." *Id.*

Elaina Xiao, Dr. Xiao's youngest daughter, is currently a student at the Illinois Mathematics and Science Academy, a public boarding school in Chicago. Ex. 4, Elaina Xiao Letter. Because of her mother's incredibly demanding schedule as a physician, "my dad was usually the one listening to me in the choir and making home-cooked meals every night." *Id.* Elaina explained that her "childhood memories consist of him finishing off the Happy Meals I begged him to get me, listening to my karaoke skills before bed, and bringing me a stuffed panda after every visit to see his parents." *Id.* Elaina also remembered a time in seventh grade when she was devastated because she had not done well in a MathCounts competition after not preparing carefully, and was worried that her father would be disappointed. *Id.* Instead, Dr. Xiao was empathic and encouraging, and Elaina realized that "even if I quit the competition

entirely," her father would still support her.  *Id.*  Inspired by her father's resilience during the harrowing ordeal of his trial, Elaina has become interested in pursuing law in college.  *Id.*

His daughters bore witness to the FBI's first interview of their father.  They defended him when they sought to put words in his mouth and they were present as the FBI rifled through their family home attempting to find evidence of his purported grant fraud, of which he was fully exonerated at trial.  They stood by him as he was indicted and as he defended his liberty and his reputation at trial.  And they witnessed as this Court and the jury rejected the government's baseless assertions, regaining trust in the justice system.  They have, unfortunately, also suffered because of this prosecution.

Dr. Xiao's commitment to his family is widely recognized among his friends, neighbors, and colleagues.  Kara Benyas, a close friend of the family, explained that her two daughters and Dr. Xiao's younger two daughters were best friends growing up, and her children "had many fun playdates and sleepovers at Ming's house."  Ex. 5, Kara Benyas Letter.  Ms. Benyas explained that, "[a]s a mom, I always felt 100% comfortable sending my kids to Ming's house because I knew he would care for them like his own children."  *Id.*  Another parent, Rong Jiang, recalled a difficult time when she was pregnant with her fourth child and she and her husband had to make repeated trips to St. Louis for prenatal appointments.  Ex. 6, Rong Jiang Letter.  Ms. Jiang wrote: "Whenever we had to leave town, [Dr. Xiao] would pick up our three children, bring them to [Dr. Xiao's] home, feed them and entertain them."  *Id.*

Dr. Xiao's dedicated efforts as a husband and parent also supported his wife's career as a physician for the VA.  *See* Revised Presentence Investigation Report ("Revised PSR") ¶ 44 (noting that Qi Liu is a physician at Veterans Administration Medical Center in Marion, Illinois). Because of her demanding and unpredictable schedule, Dr. Xiao served as the primary caregiver

6

for their children. Qi fondly recalls Dr. Xiao's daily routine of taking a young Doreen in his arms

and singing her to sleep.  Ex. 1, Qi Liu Letter.  Even as their family grew to include three young

children, Dr. Xiao never complained about his sleepless nights caring for them.  *Id.*

"Mr. Mom's" dedication to the "day-to-day tasks of a parent," allowed the couple to balance

their careers with raising their children.  *Id.*



Qi credits Dr. Xiao for "holding his family together at the seams," supporting his wife

"physically, spiritually, and emotionally" as well as providing the comfort his daughters need.

*Id.*

### 2.     Dr. Xiao's Early Life and Education

Although Dr. Xiao was fortunate to be supported by dedicated parents, his family faced

many challenges during his childhood.  Ming's parents were originally from Malaysia, but

---

moved the family to China to seek a better life for Dr. Xiao and his younger brother.  *See* Revised PSR ¶ 42, ECF No. 200.  Dr. Xiao grew up poor in a town outside of Hong Kong.  *Id.* His father worked for a ferry company, earning as little as $5 to $6 U.S. dollars per month, and his mother worked in a chemical factory, earning even less.  *Id.*; Def.'s Objections to the Presentence Investigation Report at 8, ECF No. 197 (clarifying the employment history of Dr. Xiao's parents).

Dr. Xiao's childhood coincided with China's Cultural Revolution, an incredibly violent and chaotic time in Chinese history.  When Dr. Xiao was just seven years old, his father was imprisoned for a year in the late 1960s due to unfounded "loyalty concerns," *see* Revised PSR ¶ 43, an experience that was not unusual during a period marked by radical ideological indoctrination, purges, killings, and the exile of millions of citizens into forced labor in the countryside.  Despite the family's poverty and the incredibly difficult cultural and political environment, Dr. Xiao's parents stressed the importance of education, which was in short supply during the Cultural Revolution, and pushed Dr. Xiao and his brother to vigorously pursue education as a way to improve their lives.  *Id.*

With his parents' support, Dr. Xiao obtained a Bachelor of Science in Mathematics from the Guangdong University of Technology in 1983 and a Master of Science in Applied Mathematics from Sun Yat-Sen University in nearby Guangzhou in 1989.  At that time, his parents "sold everything" to help him continue his education in the United States.  *Id.* ¶ 42 Dr. Xiao moved from China to Illinois for graduate school in 1991, and he earned a Ph.D. from the University of Illinois at Urbana-Champaign in 1997.  *Id.* ¶ 41.

### 3.      Dr. Xiao's Career as an Educator

After marrying and moving to the United States, Dr. Xiao promptly put his education to work teaching and mentoring others.  After a post-doctoral fellowship at the University of

California Davis and a teaching fellowship at the U.S. Air Force Research Laboratory, rather than pursue a more lucrative job in the private sector, he returned to Illinois in 2000 and joined SIUC as an Assistant Professor in the Department of Mathematics.  In 2002, with hard work and perseverance, he received tenure and was promoted to Associate Professor.  In 2007, Dr. Xiao became a full Professor, and he continues to serve SIUC and its students today, even while he was forced to take administrative leave.

Diane Fritcher, a retired office administrator who worked at SIUC for twenty years, described Dr. Xiao as "always a very courteous, patient and kind professor making it a pleasure to work with him."  Ex. 7, Diane Fritcher Letter.  She noted his dedication to his students, both the "local students" that "he tirelessly dedicated himself to," his regular students, and the students he would teach when he served as a substitute.  She noted that Dr. Xiao is the kind of person who will step in at the last minute to serve as a substitute for a large lecture class who had an absent professor.  *Id.*  It is clear from the various attached letters that Dr. Xiao has always been unsparingly dedicated to his students.

Dr. Xiao has contributed significantly to the collaborative pursuit of science at SIUC.  He has received multiple research grants – all of which benefitted SIUC and its students – from sources as diverse as the National Science Foundation, the U.S. Air Force, and the Qatar Research Foundation. He has also published more than 100 academic articles and conference presentations.  In 2016, he received the Scholar Excellence Award from the College of Science in recognition of his work.  *See* Ex. 27.  Dr. Xiao's success as a researcher aided SIUC by enhancing its reputation, attracting graduate students, bringing in visiting professors, and generating grant funding.

But academic research is only one area where Dr. Xiao went above and beyond, as he also served as a dedicated educator, mentor, and advisor to numerous SIUC students over two decades of work.  The letters from Dr. Xiao's former students highlight his dedication to mentorship.  Dr. Xiao not only supervised his students academically as they completed their graduate work, but also provided support (including furniture, household items, and other supplies), a sense of community, and guidance, many of whom were in a new and unfamiliar place.

- Dr. Min A, a former graduate student currently working as a statistician at the Office of Inspector General at the U.S. Small Business Administration, described Dr. Xiao providing encouragement and setting up frequent meetings to assist her after she began to struggle following the death of her grandfather who had raised her and her inability to attend the distant funeral or spend time with her family.  Despite dealing with his own family issues, Dr. Xiao worked nights and weekends to help her complete her dissertation.  *See* Ex. 8, Min A Letter.  "When [she] successfully defended [her] Ph.D. thesis, Dr. Xiao smiled: 'Now I can call you Dr. Min A.'"  *Id.*  She noted that "[w]ith his remarkable training and supervision, I was offered a tenure-track faculty position by Coppin State University (and other universities) right after I received my Ph.D. and then was promoted to tenured professor four years later."  *Id.*

- Dr. Jun Liu, another former graduate student currently teaching at SIUE, remembered Dr. Xiao making the six hour drive to Chicago alone in order to pick him up on his first day ever in the United States.  Dr. Xiao invited his students to his home on Thanksgiving and Christmas, and treated his students "warmly as if we were at home with our parents."  When a graduate student had his first child, Dr. Xiao bought a brand-new car seat, as well as baby clothes and toys.  Dr. Xiao acted like a parent to his graduate students, and provided "selfless kindness, care, support, and love."  *See* Ex. 9, Jun Liu Letter.  After Dr. Liu finished his Ph.D. degree in August 2015, Dr. Xiao "encouraged [him] to stay and serve this great nation he beloved."  *Id.*

- Dr. Xiuquan Wang, another former graduate student now teaching at Tougaloo College in Mississippi, recalled having an interest in Mathematical Biology, despite SIUC not having a program in that field.  Dr. Xiao "made the seemingly impossible become possible," by springing into action to prepare a new curriculum for the subject, inviting professors from zoology and biology to create a joint mentoring

10

committee, and obtaining necessary resources from the math department.  On the personal side, the former student recalled a holiday at Dr. Xiao's home as "one of the happiest moments during my years at SIUC."  *See* Ex. 10, Xiuquan Wang Letter.

- Qilun Luo, a recent graduate student under Dr. Xiao's supervision, described Dr. Xiao as "not only a mentor but also a serious partner and a great friend."  *See* Ex. 11, Qilun Luo Letter.  Despite Dr. Xiao's own frugality, he was incredibly generous to his students.  Dr. Xiao's "kindness and compassion" are exemplified by his selflessness, his dedication of his time, and his donations of furniture and other necessities to his students.  The recent graduate recounted receiving a "TV, beds, tables, chairs, couch, rice cookers, cooking pans, [and] lamps," all from Dr. Xiao.  *Id.*

- Yi Liu, a current Ph.D. student in the SIUC School of Education, was encouraged by Dr. Xiao "to go back to school to get a degree."  *See* Ex. 12, Yi Liu Letter.  She has known Dr. Xiao since 2006 when she and her husband moved to Carbondale.  She described how he welcomed them, how he sent them flowers when she delivered her first child, and how he hosted picnics to allow the community to get together.  *Id.*

Of particular note, Dr. Xiao provided key mentorship to women in a field dominated by men.  Dr. Min A explained that gender stereotypes are prevalent in the field of mathematics, and "like many other public universities, [she] was one of only a few female math graduate students in SIUC."  Dr. Xiao was consistently dedicated to Dr. Min A's advancement, and "Dr. Xiao enthusiastically invited [her] to join his research group and encouraged [her] not to view gender as an obstacle in the study of mathematics."  *See* Ex. 8, Min A Letter.  Similarly, Yi Liu remembered being a stay at home mom who "dreamed of being a teacher."  *See* Ex. 12, Yi Liu Letter.  Upon learning that, Dr. Xiao encouraged her to apply to SIUC's education program and wrote a letter of recommendation on her behalf.  His encouragement helped push her to become a Ph.D. candidate at SIUC.  *Id.*

Dr. Xiao's mentoring of graduate students has also benefited SIUC and its Mathematics Department.  As Dr. John McSorley, a retired SIUC professor explained, SIUC has a "historical

tradition" of attracting international students, but the university has "experienced steep declines in enrollment that threatens the university both academically and financially." *See* Ex. 13, John McSorley Letter.  At trial, Dr. Kathleen Pericak-Spector, a Professor Emerita and Distinguished Teacher of Mathematics at SIUC, testified that SIUC's operations were hard hit when the state of Illinois did not pass a budget for several years.  *See* May 3, 2022 Trial Tr. at 926-27, ECF No. 178.  Dr. Pericak-Spector specifically recalled that "[a]t one point, it was so bad, we were going around to offices collecting paperclips because we didn't have enough paperclips." *Id.* Recruiting and retaining students, particularly international students, was crucial to SIUC's ability to survive and thrive

As set forth in Professor McSorley's letter, Dr. Xiao is a "hard working and productive mentor" to many of SIUC's graduate students. *Id.*  At the time of his indictment, Dr. Xiao was supervising six Ph.D. students (five in Mathematics and one in Computer Science), which means that "about 1/5 of our graduate students were under his supervision," despite the fact that Dr. Xiao was only one of fifteen tenured faculty in the Mathematics Department. *Id.*  Even while he has been placed on academic leave because of the government's charges, Dr. Xiao has continued to do what he could to assist these graduate students.  In some cases, Dr. McSorley "forwarded students' questions and thesis drafts to [Dr. Xiao] by email to ask him for assistance, which he was not necessarily required to respond to due to his administrative leave status," and Dr. Xiao "always replied to me with detailed comments on questions and corrections of the thesis drafts despite him facing tremendous legal challenges at the time." *Id.*  A letter from Dr. Michael Sullivan, Professor and Director of Graduate Studies in the School of Mathematical and Statistical Sciences, was more direct in describing Dr. Xiao's importance to SIUC.  As Dr. Sullivan explained, Dr. Xiao is still supervising two additional Ph.D. students, and the

12

department "need[s] Mingqing Xiao back in the classroom as soon as possible." *See* Ex. 14, Michael Sullivan Letter.

The letters from his colleagues show that Dr. Xiao also served SIUC by building relationships with Chinese universities and researchers. Dr. McSorley explained that Dr. Xiao worked with SIUC's International Office to recruit students from China, and, specifically, Dr. Xiao dedicated significant personal time and energy to developing a joint math program with Shenzhen University, a fact well known to this Court. *See* Ex. 13, John McSorley Letter. Due to Dr. Xiao's efforts, "a group of students from Shenzhen University attended SIUC in the fall of 2018, and enrolled in our mathematics program. This is the first time for the department to have such a large group of students who came from abroad with full tuition paid to SIUC, they all majored in mathematics." *Id.* In her letter, Dr. Pericak-Spector, the former SIUC professor who testified at trial, similarly explained that "[Dr. Xiao] played an active role in connecting SIU internationally through his recruitment of students and scholars. SIU encouraged Dr. Xiao to be a liaison between SIU and Shenzhen University." *See* Ex. 15, Kathleen Pericak-Spector Letter.

The impact of Dr. Xiao's tireless service to SIUC is evident in the support he has received from both the SIU Faculty Senate and the SIUC Faculty Association. Dr. Yueh-Ting Lee, the current SIU Faculty Senate President, attaches the Faculty Senate's letter to U.S. Attorney General Merrick Garland regarding its concerns with the China Initiative, as well as a December 14, 2021 resolution "calling on the university to end its disciplinary investigation into Professor Xiao and restore him to his regular full-time status." *See* Ex. 16, Yueh-Ting Lee Letter. The elected representatives of the SIUC Faculty Association also wrote in support of Dr. Xiao, and explained that "*Dr. Ming Xiao is a model faculty member and it would be of great benefit to SIU and the broader southern Illinois community for him to be able to return to the*

*classroom and other capacities of his work."  See* Ex. 17, Faculty Association Letter (emphasis

added).  The Faculty Association further "hopes that Dr. Xiao is able to promptly return to his

work at SIUC and within the broader community."  *Id.*

In short, Dr. Xiao has consistently dedicated his time and energy to the wellbeing of his

graduate students and the success of SIUC, is a beloved member of the SIUC community, and

his contributions, should Dr. Xiao be sentenced to prison, would be irreplaceable.  These

students and the greater SIUC community, continue to need Dr. Xiao's presence, time and

energy.

### 4.    Dr. Xiao's Involvement in the Community

In addition to his commitments to SIUC, its students, and his colleagues, Dr. Xiao has

also dedicated significant time, energy, and resources to serving the greater southern Illinois

community by developing, organizing, and teaching an extracurricular math program and

coaching MathCounts teams at multiple local schools.  Dr. Xiao saw a need for additional math

education in his community, and he stepped in to provide it with no consideration of personal

benefit.

Starting in 2013, Dr. Xiao organized weekend math and Chinese lessons for area

children.  The program was free and open to the public.  These classes took place on Saturdays

and provided an opportunity for enrichment and extracurricular advancement.  On a typical

Saturday during the eight years before Dr. Xiao was indicted and stopped participating, he would

spend three hours teaching math to local students at SIUC.[7]  A letter signed by more than one

hundred people, as well as nearly a dozen individual letters from parents and a student expressed

---

[7] Dr. Xiao was placed on administrative leave following the initial indictment, which meant he lost access to the SIUC facilities (where the Saturday classes were held) and his SIUC email account (which is how he had communicated with the tutors and families involved).

their gratitude to Dr. Xiao for his time, dedication, and expertise.  *See* Ex. 18, Community Letter; Ex. 19, Sylvia Smith Letter; Ex. 20, Jonathan Wiesen Letter; Ex. 21, Adrian Martin Letter; Ex. 22, Shahram Rahimi Letter; Ex. 23, Tao Huang Letter; Ex. 24, Sha Luo Letter; Ex. 25, Ryan Dai Letter; Ex. 5, Kara Benyas Letter; Ex. 6, Jiang Rong Letter.  Ryan Dai, a 14-year old freshman at Carbondale Community High School, has been a student of Dr. Xiao's since he was in grammar school. He wrote, "Dr. Xiao loves teaching math," and he expressed how Dr. Xiao did so especially during the difficult times of the pandemic.  Ex. 25, Ryan Dai Letter.  "Even during covid, Dr. Xiao valued teaching us.  Through online classes, Dr. Xiao continued to teach me things I had never heard of."  *Id.*  Dr. Xiao was willing to "spend hours explaining problems to help us understand the material."  *Id.*

From the perspective of the parents involved in the program, Dr. Xiao's enthusiasm for teaching their children was "palpable," as he "observed and remembered every kid's strengths and abilities, and he encouraged every single one of them to continue on the path of hard work and education."  Ex. 21, Adrian Martin Letter.  The classes had a real impact on the direction of the students' lives, and "it is impossible to overlook Professor Xiao's impact on" the future success of the students, including many who "went on to study at the most prestigious institutions of higher education."  *Id.*  Another parent observed that, based on his high-quality tutoring, Dr. Xiao "could make tens of thousands of dollars if not more [for these services], but he made none."  Ex. 22, Shahram Rahimi Letter.  Another parent, Dr. Tao Huang, a former professor at SIUC, explained that she was "so inspired by Dr. Xiao's devotion to our community," as expressed through the Saturday classes, that she herself decided to volunteer to teach Chinese to younger students as part of the program.  Ex. 23, Tao Huang Letter.  The work it required of her made her "understand more deeply" the "truly extraordinary" effort that Dr.

Xiao had dedicated to the program "with a big smile on his face, every week, for many, many years." *Id.*

Separate from the Saturday math classes, Dr. Xiao has also volunteered as a coach for multiple MathCounts teams in his community. MathCounts is a program for sixth through eighth grade students modeled on athletic competitions where individuals and teams compete in local math competitions, with winners moving on to state, and then national competitions. Ex. 26, Jonathan Wheeler Letter. The Unity Point School team coached by Dr. Xiao took second place in the chapter competition in 2015 and then won the competition for the following five years. Several students on Dr. Xiao's team took first place in individual competitions. *Id.* But Dr. Xiao's ultimate goal was education, not winning. Dr. Xiao also served as assistant coach, and later head coach for Trinity Christian School, showing that he was committed "to improving math literacy in as many children as he can reach as opposed to limiting his efforts to only 'the home team.'" *Id.* Multiple letter writers noted that Dr. Xiao's free tutoring during the Saturday classes meant that he was effectively helping the students who would later compete against his own MathCounts team, and at times, his own children. *Id.*; Ex. 22, Shahram Rahimi Letter ("Why in the world he wanted to teach all these kids to beat his own daughter (and then his other kids).").

And his service often went to those students most in need of it. As MathCounts Coordinator Jonathan Wheeler explained, "the southernmost seventeen counties of Illinois that participate in our Chapter competition are in general some of the poorest counties in the state and suffer from the typical attendant deficiencies in educational resources." Ex. 26, Jonathan Wheeler Letter. Even for students attending strong public schools, "there was and is a limit to

16

how much a public school can provide," and Dr. Xiao took it upon himself to provide more.  Ex. 19, Sylvia Smith Letter.

Dr. Xiao's dedication to his community was well known, and in recognition of his good works, Dr. Xiao was recognized by WSIU public radio station as a 'Neighborly' Award Winner, "[i]n recognition of your efforts to improve your community via acts of kindness and compassion."  *See* Ex.28.  This was a recognition that many, including Dr. Adrian Martin and Yi Liu, recognized immediately how deserving Dr. Xiao was of this award.  *See* Ex. 12, Yi Liu Letter; Ex. 21, Adrian Martin Letter.  Dr. Xiao's recognition and respect in the greater southern Illinois community is both deep and broad.  A group of supporters prepared a joint letter to the Court, signed by more than 100 individuals, expressing their admiration for Dr. Xiao's "innumerable" contributions to the community, including his recruitment efforts for SIUC, the Saturday math classes, his MathCounts coaching, and his devotion to his students.  Ex. 18, Community Letter.

It is clear from all of these letters that Dr. Xiao is a beloved father, husband, colleague, friend and mentor and that he is supported by an entire community of people that believe in him, believe that he will continue to serve in the many ways that he already has, and that he will continue to be a productive member of society if he is given a non-incarceration sentence.

### B.     The Offense Conduct

The government initially charged Dr. Xiao with two counts of wire fraud under 18 U.S.C. § 1343 and one count of making a false statement under 18 U.S.C. § 1001(a)(1) as part of the defunct and unjust *China Initiative*.  Indictment, ECF No. 1.  The government did not charge him with any tax counts although they threatened and followed through with bringing additional tax-related charges if Dr. Xiao did not agree to plead guilty to the charges in the initial indictment; *i.e.*, the same charges that Dr. Xiao was fully acquitted of at trial.  On October 5, 2021, after Dr.

17

Xiao declined to accede to the government's threats and only 20 days before trial was originally scheduled to commence, the government filed a Superseding Indictment charging three additional counts of filing a false tax return under 26 U.S.C. § 7206(1) and one count of failure to file a Report of Foreign Bank and Financial Accounts under 31 U.S.C. §§ 5314 and 5322. Superseding Indictment, ECF No. 57.  These charges were brought by the government after Dr. Xiao amended his previous tax returns and filed delinquent FBARs (GX 103-106) with the assistance of a retained tax professional.

The government's prosecution of Dr. Xiao for allegations of wire fraud and false statements in relation to his receipt of a federal grant failed to yield guilty verdicts.  After the close of the government's case-in-chief, this Court granted Dr. Xiao's motion for a judgment of acquittal and dismissed Counts 1 and 2.  May 3, 2022 Tr. at 8:7-16, ECF No. 169.  The jury later acquitted Dr. Xiao of the only remaining charge from the initial indictment and the last of the charges related to the purported grant fraud—the false statement charge alleged in Count 3.  May 4, 2022 Tr. at 1095:5-7, ECF No. 179.  However, the jury convicted Dr. Xiao of the four remaining tax-related charges.

### C.   The Pre-Sentence Investigation Report

Prior to the submission of the Revised PSR, Dr. Xiao submitted his proposed corrections. After conferring with counsel for Dr. Xiao and the government, many of Dr. Xiao's proposed revisions to the initial PSR were accepted.  However, the Probation Office declined to make certain changes requested by Dr. Xiao.  We offer below the most relevant changes that we ask the Court to consider.

### 1.   Paragraph 10 of the PSR

Paragraph 10 of the PSR currently provides:

> *The investigation of the instant offense was conducted by the Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS) in 2020 after MingQing Xiao, a mathematics professor at Southern Illinois University Carbondale (SIUC), received overlapping grants from research/educational organizations in China and the United States.*

Dr. Xiao respectfully submits that this paragraph is incomplete and factually inaccurate. While Dr. Xiao had applied for grants from organizations in both the United States and foreign countries, there was no testimony or evidence presented at trial that Dr. Xiao "received overlapping grants from research/educational organizations in China and the United States." Dr. Xiao respectfully submits that the statement below more accurately depicts the nature of the investigation.

> *The investigation of the instant offense was a result of a 2020 Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS) investigation of MingQing Xiao's relationships with research/educational organizations in China and the United States. MingQing Xiao is a mathematics professor at Southern Illinois University Carbondale (SIUC).*

### 2.    Paragraph 11 of the PSR

Paragraph 11 of the PSR currently provides:

> *Records revealed that Xiao conducted collaboration work with the National Science Foundation of Guangdong Province of China and Shenzhen University from 2016 through 2020. Xiao's contract with the National Science Foundation of Guangdong Province of China was set to expire in 2022, and his contract with Shenzhen University was intended to expire in 2023. Xiao was paid a monthly salary based on his teaching and research assistance to Shenzhen University. As a mathematics professor at SIUC, Xiao also maintained the ability to apply for research grants through the National Science Foundation (NSF) in the United States.*

Dr. Xiao respectfully submits that this paragraph is incomplete, factually inaccurate, and irrelevant to the tax charges in Counts 4 through 7 of the Superseding Indictment. As supported by the Court's and jury's acquittal of Dr. Xiao on Counts 1, 2, and 3, the evidence at trial demonstrates that Dr. Xiao did not have a contract with the National Science Foundation of Guangdong Province of China and his contract with Shenzhen University provided only a

19

stipend to subsidize his costs of travel to Shenzhen and housing while in China.  Dr. Xiao's

contract with Shenzhen University required him to make two two-week trips per year to

Shenzhen University in order to conduct seminars and provide research assistance to Shenzhen

University students and professors.  Dr. Xiao did not engage in collaborations with or have a

contract with the National Science Foundation of Guangdong Province of China.  Dr. Xiao

respectfully submits that because Paragraph 11 of the PSR is incomplete, factually inaccurate,

and irrelevant to the tax charges of which Dr. Xiao was convicted, it should not be included in

the PSR.

## III.    ARGUMENT

### A.    Legal Standard

In determining an appropriate sentence, courts must first calculate the applicable

Guidelines range, which serves as a "starting point and the initial benchmark" for a sentencing

decision.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Once the Guidelines range is calculated,

courts must "consider what sentence is appropriate for the individual defendant in light of the

statutory sentencing factors" set forth in 18 U.S.C. § 3553(a).  *Nelson v. United States*, 555 U.S.

350, 351 (2009).  Those factors include "the history and characteristics of the defendant," §

3553(a)(1); the "nature and circumstances of the offense," *id.*; the "need to avoid unwarranted

sentence disparities," § 3553(a)(6); the need to "reflect the seriousness of the offense," "provide

just punishment," "protect the public" and provide "adequate deterrence," § 3553(a)(2)(A)-(C);

"the kinds of sentences available," § 3553(a)(3); and the need to "promote respect for the law,"

§ 3553(a)(2)(A).  As discussed more fully below, each of these factors militates toward a lenient

sentence of probation, or in the alternative, a sentence that does not include any period of

incarceration.

**B.** **The Federal Sentencing Guidelines Are Advisory and Only One of Several Factors to Be Considered in Sentencing**

The Supreme Court has long upheld the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citation omitted). After *Booker*, sentencing courts are again free to, and indeed must, consider the totality of the offender's history and circumstances at sentencing (including factors such as age, education and vocational skills, ties to family and the community, and civic, charitable and public service). *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 59 (2007). "No limitation shall be placed on the information concerning the background, character and conduct which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005) (quoting 18 U.S.C. § 3661).The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a). The Guidelines remain relevant as an "initial benchmark" but are "only one of [seven] factors to consider when imposing [a] sentence." *Gall*, 552 U.S. at 49, 59; *accord Peugh v. United States*, 569 U.S. 530, 536 (2013). The Guidelines are not presumed to be reasonable, and are entitled to no greater weight than any other factor. *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 352 (2009); *United States v. Vaughn*, 614 F.3d 412, 415 (7th Cir. 2010) ("A district court is free to impose a sentence outside the guidelines range so long as the judge explains why that sentence is appropriate under § 3553(a).").[8] The Court need not justify departure from them or find extraordinary reasons to do so; it is sufficient if "the Guidelines sentence . . . fails properly to reflect § 3553(a) considerations" or "the case warrants a

---

[8] *Accord Rita v. United States*, 551 U.S. 338, 351 (2007) (a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"); *United States v. Terrell*, 696 F.3d 1257, 1261-62 (D.C. Cir. 2012) (reversing where the sentencing court excessively weighed the Guidelines over other Section 3553(a) factors).

different sentence regardless." *Rita*, 551 U.S. at 351.  After considering the nature and circumstances of the offense, the history and characteristics of the defendant, all of the purposes set forth under § 3553(a)(2), the Guidelines, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), the Court must impose the lowest sentence that is sufficient to comply with those purposes.  *Pepper*, 562 U.S. at 491; *Kimbrough*, 552 U.S. at 101.

C.     **A Sentence of Probation is Warranted**

For the reasons set forth below, Dr. Xiao respectfully submits that, under § 3553(a), a sentence of sentence of probation, or in the alternative, a sentence that does not include any period of incarceration, is warranted.

1.     **Dr. Xiao's History and Characteristics Warrant a Sentence of Probation**

Under § 3553(a)(1), the Court must consider "the history and characteristics of the defendant" when imposing a sentence:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) *aff'd*, 237 F. App'x 713 (2d Cir. 2007).  In other words, the Supreme Court has made clear that, in imposing a sentence, courts should take the full measure of not just the offense but of the person convicted of the offense.  *Koon v. United States*, 518 U.S. 81, 113 (1996).  As set forth below, Dr. Xiao's unimpeachable character as a father and husband, an educator, and a constant volunteer in his

community all counsel in favor of a sentence of probation, or in the alternative, a sentence that does not include any period of incarceration.

Courts have repeatedly imposed below-Guidelines sentences based on the defendant's past behavior demonstrating integrity, public service, and devotion to community.  For instance, in *United States v. Warner*, 792 F.3d 847 (7th Cir. 2015), the Seventh Circuit affirmed a probationary sentence in a tax evasion case where the Guidelines called for a sentence of forty-six to fifty-seven months.  In that case, the district court relied on the defendant's "charitable works and the generosity they bespeak" as the "primary mitigating factor that drove the court toward a lenient sentence." *Id.* at 857.  The Seventh Circuit observed that the evidence of good character was not based simply on the size of the checks being written:  "The district court looked behind the numbers to [the defendant's] character and found him to be a genuinely benevolent person. A non-wealthy defendant who showed similar qualities would be entitled to similar treatment (all else being equal)." *Id.* at 859.  As set forth below, Dr. Xiao's good works, including his devotion to his community, his students, his colleagues and his family are an appropriate basis for a below-Guidelines sentence.  *See also United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming below-Guidelines sentence based on extraordinary public service and good works where defendant served in Marine Corps active reserves and as a volunteer firefighters, and had recently acted as a "Good Samaritan," demonstrating his good character); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming below-Guidelines, non-custodial sentence in securities fraud and tax evasion case based on defendant's organizing and running youth football team in depressed area and help for members to attend better schools and go to college).

23

### a.    Dr. Xiao is a Devoted Father and Husband

It cannot be disputed that Dr. Xiao is a devoted, loving father to his three daughters: Teresa (age 25), Doreen (age 19), and Elaina (age 15).  Despite being an accomplished academic with a full work schedule, Dr. Xiao has made being present for his family a priority.  He "always [made] time to prepare all of [the family's] meals and shuttle [his daughters] to school, to extracurriculars and sports, and to music lessons without complaint."  Ex 2, Teresa Xiao Letter. Dr. Xiao has worked tirelessly to provide a loving home for his family and serves as his daughters' biggest supporter.  He is the person they go to with good news, as well as the shoulder they cry on as they seek comfort and guidance.  Teresa attributes her scholarly achievements to the hard work and integrity Dr. Xiao not only taught her, but mirrored at home.  Doreen describes how Dr. Xiao's belief in her, combined with his warmth and encouragement, allowed her to become the curious, creative, and persistent young woman she is.  And Elaina describes Dr. Xiao as the one "usually the one listening to me in the choir and making home-cooked meals every night," as well as providing a constant source of assistance, empathy, and encouragement. Ex 4, Elaina Xiao Letter.

Dr. Xiao has been a steady rock in his daughter's lives, providing the consistent love and guidance they needed to blossom into the thoughtful, accomplished young women they are.  Dr. Sylvia Smith, a colleague at SIUC, recalls Dr. Xiao being a "doting parent" who truly enjoyed participating in his children's school events and activities.  Ex 19, Sylvia Smith Letter.  Even now, he "regularly prepares dinners at home" and never misses a call from his daughters.  Ex 2, Teresa Xiao Letter.  The strong moral character and academic successes of Teresa, Doreen, and Elaina are a testament to Dr. Xiao's character and values: empathy, integrity, and a commitment to others.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████     Earlier in their lives, he also supported Dr. Liu's career and service to

her patients when he took the laboring oar in parenting their three daughters, as each of them has

described in their respective letters.

> **b.** **Dr. Xiao is a Devoted Educator and Dedicated Contributor to His Community**

Dr. Xiao has also been a pillar of his community; he has shown the members of his

community the same love, devotion, and generosity he provides to his own family.  When

members of the community describe Dr. Xiao, they always highlight his "big smile and kind

greetings."  Ex 6, Rong Jiang Letter.  Ms. Jiang, a friend and neighbor of over 15 years, warmly

remembers Dr. Xiao inviting her family to participate in his Thanksgiving dinner when they had

no plans of their own, a theme that resonated with others who were invited to Xiao family

holiday dinners.  *Id.*  Dr. Adrian Martin, a neighbor of Dr. Xiao stated that Dr. Xiao, "[t]hrough

his passion for education and through his energy, devotion and loyalty," has "established himself

as a leader in [the] community."  Ex 21, Adrian Martin Letter.

Dr. Xiao's good character is best exemplified by the fact that he is trusted by his

community to watch and support their children with the same care he provides to his own

children.  After identifying the dearth of supplemental resources dedicated to education in

southern Illinois, Dr. Xiao started a weekly weekend pre-college math class for the children in

his neighborhood.  Since the program's inception in 2013, he has grown the program from a

weekend math program to a program providing full K-12 classes in mathematics, computer

programming, and Chinese language.  As demand for the program grew beyond what Dr. Xiao could personally provide, he enlisted the help of other professors and educators to provide this needed resource to as many children as possible.  Prior to his indictment, Dr. Xiao spent eight years running this volunteer weekend math program to provide a needed resource for students in southern Illinois.[9]  Many members of the community describe Dr. Xiao and this program, affectionately known as "Ming Math," in glowing terms and emphasize the profound impact it has had on their children's education.

In addition, Dr. Xiao's nurturing relationships with his graduate students offer an illustrative example of Dr. Xiao's selflessness.  When his former graduate student, Xiuquan Wang, wanted to pursue a degree in Mathematical Biology, a field that SIUC does not specialize in, Dr. Xiao studied the subject matter, created a curriculum, and gathered a collection of faculty from SIUC's zoology and biology departments to ensure that Dr. Wang had the opportunity to pursue his passion.  Ex 10, Xiuquan Wang Letter.  Dr. Wang has since graduated and has a distinguished career in this field.  With another of Dr. Xiao's former graduate students—Dr. Min A—Dr. Xiao provided the support and guidance she needed to finish, write, and defend her thesis after the grandfather who raised her died.  Ex 8, Min A Letter.

Despite being suspended by SIUC following his indictment, Dr. Xiao has continued to demonstrate his devotion to his graduate students; he has provided them with continual guidance and worked with SIUC faculty members to not only revise and correct their papers but also to help get those papers published.  Ex 13, John McSorley Letter.  Dr. Xiao has a deep and personal connection with his students that extends beyond academics.  He invites them to his home, cooks

---

[9] As noted above, when Dr. Xiao was placed on administrative leave following the initial indictment, he lost access to the SIUC facilities and the email account he had used to organize the program.

for them, and treats them as he would any member of his family.  He is beloved because he has consistently and selflessly committed himself to the community while asking for nothing in return.  "Dr. Xiao is the type of person who never asks you to return any favors even though he does so much for others."  Ex 10, Xiuquan Wang Letter.

### c. Dr. Xiao Has No Criminal History

Dr. Xiao has no criminal history (Revised PSR ¶¶ 33-39), which counsels in favor of a below-Guidelines sentence.  Congress tasked the Sentencing Commission  with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j).  That common sense approach reflects the reality that first-time offenders have a low risk of recidivism, which is clearly the case for Dr. Xiao.  In fact, courts regularly impose below-Guidelines sentences where the defendant has no prior criminal history.  *See, e.g.*, *United States v. Jackson*, 860 F.3d 438, 449 (7th Cir. 2017); *United States v. Ross*, 557 F.3d 237 (5th Cir. 2009) (affirming reasonableness of below-Guidelines sentence based on factors including the defendant's lack of criminal history); *see also* Sentencing Commission, *Recidivism and the "First Offender*," (May 2004), *available at* https://www.ussc.gov/research/research-publications/recidivism-and-first-offender (finding that recidivism rate for defendants with zero criminal history points is substantially lower than recidivism rates for other offenders, and even for offenders with only one criminal history point).  Considering Dr. Xiao's lack of criminal history similarly militates in favor of a below-Guidelines sentence of probation, or in the alternative, a sentence that does not include any period of incarceration.

### d.      Dr. Xiao Is An Older Defendant

Dr. Xiao is 60 years old, which further suggests that a below-Guidelines sentence is

appropriate.  The government asserts that Dr. Xiao's age should not sway the Court's evaluation

of the proper sentence.  *See* Government Sentencing Memo at 6.  But the Sentencing Guidelines

do contemplate that a court should consider a defendant's age.  Specifically, "[a]ge (including

youth) may be relevant in determining whether a departure is warranted, if considerations based

on age, individually or in combination with other offender characteristics, are present to an

unusual degree and distinguish the case from the typical cases covered by the guidelines."

U.S.S.G. § 5H1.1.  In particular, "[a]ge may be a reason to depart downward in a case in which

the defendant is elderly and infirm and where a form of punishment such as home confinement

might be equally efficient as and less costly than incarceration."  *Id.*  While Dr. Xiao is not

elderly, he is certainly an older defendant, and courts regularly impose below-Guidelines

sentences based on this factor.  *See, e.g.*, *United States v. Dusenberry*, 9 F.3d 110 (6th Cir. 1993)

(finding downward departure appropriate based on defendant's age and medical conditions);

*United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (factors including defendant's age, health,

and employment history supported downward variance).  This practice reflects the reality,

recognized by the Sentencing Commission, that older defendants are much less likely to commit

further crimes.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History

Computation of the Federal Sentencing Guidelines* at 12, 28 (May 2004), *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/

2004/200405_Recidivism_Criminal_History.pdf.  Unfortunately, the DOJ's Office of the

Inspector General has also concluded that older adults in prisons are vulnerable to abuse by

younger inmates.  U.S. Dep't of Justice, Office of the Inspector General, *The Impact of an Aging

Inmate Population on the Federal Bureau of Prisons* at 29-30 (May 2015), *available at*

https://oig.justice.gov/reports/2015/e1505.pdf.  All of these factors counsel in favor of a below-Guidelines sentence of probation, or in the alternative, a sentence that does not include any period of incarceration.

> **2.     The Nature and Circumstances of the Offense Warrant a Sentence of Probation**

The "nature and circumstances of the offense" also militate towards a sentence of probation, or in the alternative, a sentence that does not include any period of incarceration.  18 U.S.C. § 3553(a)(1).  It is beyond quarrel that it is important for the Internal Revenue Service to be able to identify individuals attempting to hide "illicit" funds in foreign bank accounts for purposes of cheating the United States government of proper tax payments.  But the government's tone-deaf analysis of the nature and characteristics of this offense is both disingenuous and disappointing for there is no evidence of Dr. Xiao trying to "hide" "illicit funds" and there is no evidence that he was trying to "cheat" the United States government.

In this case, it is clear that the tax charges that were brought against Dr. Xiao were brought in the Superseding Indictment *after* Dr. Xiao refused to accept a plea offer to the charges for which he was ultimately acquitted and within weeks before the original trial date.  Had he accepted that plea offer, these charges would never have been brought.  In an attempt to heighten the severity of the conduct, the government writes that "thousands of U.S. tax dodgers conceal billions of dollars in assets within secrecy-shrouded foreign banks."  *See* Gov't's Sentencing Memorandum at 4.  But the amount of underpaid tax here was $27,984.00—an amount that Dr. Xiao did pay, once he met with tax counsel and understood and appreciated that he was wrong.  Again, this is a *no loss case.*  Despite the government's arguments, there was no evidence presented that Ping An Bank is "secrecy-shrouded" and certainly no evidence that Dr. Xiao was attempting to hide the existence of his foreign bank account (in addition to the Chinese taxes,

which had already been paid from that account).  Indeed, after he was approached by federal

agents, he voluntarily spoke and raised the Ping An account unprompted.  Moreover, he

amended his returns, filed the appropriate FBAR and paid all taxes owed.  All of these factors

also place Dr. Xiao's conduct in stark contrast to typical § 7206(1) cases based on a failure to

report a foreign bank account, which often involved obvious evidence of willfulness, such as

lying to accountants, opening foreign accounts using shell companies, or using banking services

in tax havens that were designed to avoid U.S. tax reporting.[10]

That Dr. Xiao paid the taxes he owed further undercuts the government's gratuitous

argument here that Dr. Xiao is a "tax-dodger."  It is correct that Dr. Xiao failed to report his

foreign income and bank account as required by law.  He has not, however, sought to deprive the

United States government, or any government, of the taxes that he owed as he has faced no

allegations that he improperly sought to *hide* income.  This argument by the government is

disingenuous, as it repeatedly stated prior to trial that this case was not about *tax evasion*, but

now seeks to influence the Court's sentence by falsely accusing Dr. Xiao of attempting to "cheat

the system" by not paying his taxes.[11]  Interestingly, the government does not address the fact

---

[10] *See, e.g.*, *United States v. Hough*, 803 F.3d 1181, 1184 (11th Cir. 2015) (defendants communicated with Swiss banker regarding avoiding U.S. disclosure requirements and need to avoid "open disclosure" before moving more than $36 million into European banks); *United States v. Ellefsen*, 655 F.3d 769, 781-82 (8th Cir. 2011) (noting defendants "used a series of domestic and offshore entities to move money from the medical practice to several bank accounts," and "received multiple warnings . . . that the Aegis system was illegal"); *United States v. Vallone*, 698 F.3d 416, 485 (7th Cir. 2012), *cert. granted, judgment vacated sub nom. Dunn v. United States*, 570 U.S. 901 (2013), *and opinion modified and reinstated*, 752 F.3d 690 (7th Cir. 2014) (finding sufficient evidence of willfulness when defendant worked for company that set up sham trusts designed to avoid taxes and used the system himself to report only 10% of his income).

[11] In the government's own words, "[t]he indictment does not charge [Dr. Xiao] with tax evasion."  United States' Supplemental Motions in Limine at 3, ECF 107.

that, as shown at trial, Dr. Xiao's income from Chinese sources was subject to taxation by the Chinese government.

In an additional attempt to worsen the conduct, the government argues that Dr. Xiao "repeated his criminal conduct."  This court should give no weight to the government's argument that "[r]epetitive criminal behavior over a long period of time reflects greater criminal culpability."  *See* Gov't's Sentencing Memorandum at 5.  But this is wholly different from the repeat offender characterization that the government attempts to apply here.  The evidence at trial clearly shows that Dr. Xiao did not become aware of any deficiencies in his tax filings until at the very earliest 2020.  This simply isn't the kind of repetitive conduct now asserted by the government.  Indeed, the evidence shows that after he was alerted to the possibility that his tax returns were incorrect in 2020, he sought to amend his returns.

This Court should also give no weight to the government's attempt to artificially expand the scope of the offense and relitigate the Counts the government failed to prove at trial, when it repeatedly asserts that Dr. Xiao engaged in "a broader course of deceptive conduct designed to hide and conceal his activities in China."  *Id.*  Of course, both this Court and the jury rejected those claims.  As the evidence at trial showed, Dr. Xiao openly collaborated with foreign individuals and Chinese universities for his academic benefit and the benefit of SIUC.[12]  Not only was Dr. Xiao transparent about these activities, he was praised for them.  *See* Ex. 13, John McSorley Letter; Ex. 15, Kathleen Pericak-Spector Letter.

---

[12] *See* Ex. 13, John McSorley Letter ("MingQing has worked with the International Office of SIUC to help recruit students from China, as traditionally SIUC has a significant number of students from China. In particular, MingQing has worked in the development of a Math graduate program with Shenzhen University of China in an effort to increase our enrollment and to expand the SIUC academic capacity.").

Prior to his Indictment, Dr. Xiao had no contacts with the criminal justice system.  He has never been convicted of any other crimes, he has no other pending charges, and he does not have any other arrests.  Revised PSR at 6.  The instant offense does not involve efforts to conceal assets or hide income from the United States government nor does it involve efforts to illegally lower Dr. Xiao's tax obligations.  Dr. Xiao was convicted of one count of failing to file a report of a foreign bank account (FBAR) in violation of 31 U.S.C. § 5314, and three counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1). The specific conduct charged by the government was that Dr. Xiao had "a financial interest in and signature authority over a financial account located in a foreign country despite answering 'no' to that question on Form 1040 in tax years 2017, 2018, and 2019."  United States' Supplemental Motions in Limine (ECF. 107) at 3.  Put simply, Dr. Xiao's conviction was for no more than his failure to accurately and appropriately report his foreign bank account and related income on his tax forms in 2017, 2018 and 2019.[13]

### 3.    A Sentence of Probation Reflects the Seriousness of the Offense

Ensuring that the sentence imposed is sufficient "to reflect the seriousness of the offense" is another factor to be considered by the Court in imposing a sentence.  18 U.S.C. § 553(a)(2)(A).  Dr. Xiao's actions upon learning that he may have filed false tax returns reflect his recognition of the seriousness of the offenses. Dr. Xiao was transparent with the FBI agents who met with him.  Their questioning led him to retain a tax professional and upon that professional's advice, he sought to correct them immediately.  Given that he acted to remedy his failures with haste, a sentence of probation, or in the alternative, a sentence that does not include any period of

---

[13] The government's emphasis on repeated violations as somehow indicative of Dr. Xiao's bad intent is just as probative of an innocent misunderstanding of the question on the tax forms that was never clarified for him over the course of the three years.

incarceration, is more than commensurate with that level of seriousness.  It is a gross mischaracterization of trial testimony and any material in evidence to suggest that Dr. Xiao was confronted about by the FBI about the existence of his Ping An bank account and that he took steps to conceal it.  On the contrary, in December 2020, it was Dr. Xiao that volunteered to agents the existence of the account.  He voluntarily showed them the application, permitted them to take photographs of his account statements, and gave the government agents passwords to access the account.  It was their review of the account's application on his cell phone (consented to and volunteered by Dr. Xiao) that gave rise to further discussion of whether Dr. Xiao had appropriately reported the existence of such accounts on his U.S. taxes.  *See* May 2, 2022 Trial Tr. at 797:7-18, ECF No. 177; GX 14 at 24:4-31.[14]  Immediately following, in January 2021 he retained tax counsel to advise him for a compliance review and preparation of his personal tax returns. With guidance of his counsel, in August 2021, he completed a Form 414654 Certification by US for Streamlined Domestic Offshore Procedures.  As the government is aware, with this submission to the IRS, Dr. Xiao paid $31,980.55 (comprised of $27,984.00 in tax and interest and $3,996.55 in offshore penalties).

As discussed below, he has not committed an offense that is typically criminally prosecuted in federal courts in the Southern District of Illinois and, there is no continuing severe financial loss or other ongoing harm that any period of incarceration would serve to mitigate.

---

[14] This Court declined to admit the transcript of the interview (GX 14) into evidence.  *See* May 2, 2022 Tr. at 819:19-24, ECF No. 177.  However, this filing refers to that exhibit for clarity and ease of reference by the Court.

**4.    A Sentence of Probation Is Warranted Because of the Significant Punishment Already Inflicted on Dr. Xiao**

The Court must also consider whether the sentence imposed "provide[s] just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  By virtue of this indictment, the unwarranted microscope placed on the integrity of his research and finances, the damage to his reputation and good-standing, the emotional harm to his family and other relationships, the financial, emotional, physical, and mental demands of trial, and the continued jeopardy of his future employment, Dr. Xiao's life has already been ruined.  ████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████  It has disrupted the lives of his three daughters, each of whom has been attempting to dutifully focus on their studies and has been relying entirely on him for support ███████████████  It has disrupted his ability to serve his students and his community as he remains on leave from his teaching duties at SIUC and is unable to serve in his community teaching roles.  Although he was acquitted of all charges related to any grant fraud and any conduct related to the DOJ's now repudiated China Initiative, his reputation amongst his colleagues and practitioners in his field will always be tied to this prosecution.  And the mere misperception created by his highly publicized prosecution under the "China Initiative" that he could possibly be an agent of the Chinese government will be nearly impossible for him to shake, especially given his minority status as a Chinese-American in southern Illinois.  The damaging nature of charges lodged by the government have been punishment enough for Dr. Xiao.  Any sentence of incarceration would remove this otherwise productive and strong contributor to the fabric of his various communities.  Any sentence of incarceration would almost ensure that his current employer, SIUC, would remove him from

temporary administrative leave and terminate him.  Any sentence of incarceration would separate

and remove him from the family that so desperately needs him now more than ever.

> 5. **A Sentence of Probation Affords Adequate Deterrence, Promotes Respect for the Law, and Protects the Public from Further Crimes of the Defendant**

>> a. **Specific Deterrence Has Been Achieved and Dr. Xiao Has No Risk of Recidivism**

Subjecting Dr. Xiao to any term of imprisonment is wholly unnecessary to reach the

sentencing objective of "protecting the public from future crimes perpetrated" by *this* defendant.

*See United States v. Mosley*, No. 06-CR-30111-SMY, 2022 WL 2952528, at *2 (S.D. Ill. July 25,

2022); 18 U.S.C. § 3553(a)(2)(C).

First, as previously noted, Dr. Xiao has no criminal history (Revised PSR ¶¶ 33-39), and

he has been fully cooperative with the U.S. Probation & Pretrial Services during the entirety of

his term of supervision.  As Dr. Xiao's assigned Probation Officer, Schuyler Stephens, can attest,

Dr. Xiao has been present for all unannounced meetings, communicative about any needed travel

and compliant with any and all restrictions.  Second, Dr. Xiao's family, colleagues, loved ones,

and friends, who have supported him throughout his prosecution and trial, will serve as a strong

resource for him and will provide the necessary suasion to reduce any risk of recidivism.  Third,

Dr. Xiao's desire to continue his teaching at SIUC and mentoring and assisting students in his

community (both young and old) will eliminate any risk of recidivism.  Lastly, the government

did not address specific deterrence in their sentencing memorandum, but it is evident from Dr.

Xiao's actions—from after he was questioned by federal agents through trial—that he is

remorseful about his conduct, and sought to correct his mistakes.  He is simply not a candidate to

commit any future crimes.  It is not in his character, and he has learned significant lessons from

this experience.

Accordingly, there is no demonstrated need in this matter to subject this defendant to any term of confinement or ongoing supervision in order to maintain his lawful behavior.

### b.  A Sentence of Probation Would Be Sufficient to Ensure General Deterrence

A sentence incarcerating Dr. Xiao would not serve the function of general deterrence either.  *See* 18 U.S.C. § 3553(a)(2)(B) ("[t]he court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct").  General deterrence is a key "means of preventing like or related crimes" in all cases. *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014).  In this case, however, any general deterrence has already been effectuated.

As the government proclaimed when Dr. Xiao was indicted, this case was part of the now-repudiated China Initiative.  *See* Dep't of Justice, Press Release, Mathematics Professor and University Researcher Indicted for Grant Fraud (Apr. 21, 2021) ("The prosecution is part of the Justice Department's ongoing China Initiative.").  DOJ's China Initiative prosecutions and the related investigations and reviews by research funding agencies were one of the primary focuses of U.S. higher education for many years.  *See, e.g.,* Anton Louthan, "The China Initiative and its Implications for American Universities," Foreign Policy Research Institute (Apr. 11, 2022), https://www.fpri.org/article/2022/04/the-china-initiative-and-its-implications-for-american-universities/.  The China Initiative prompted diligence to the point of paranoia.  Inside Higher Ed conducted a survey in 2021 that found that, in light of the China Initiative, "half of Chinese scientists at U.S. universities report concerns about being surveilled by the U.S. government."  Elizabeth Redden, "A Retreat From China Collaborations in the Face of U.S. Scrutiny," Inside Higher Ed (Oct. 29, 2021), https://www.insidehighered.com/news/2021/10/29/survey-finds-chilling-effect-china-initiative.  Universities and academics across the country have scrutinized

36

their processes for applying for grants, but this heightened awareness is broader, it has extended to all foreign ties, including related tax issues.  The intense fear of the consequences of facing a federal investigation and prosecution (regardless of sentence) is already a strong general deterrent, and the specific sentence imposed by this Court is unlikely to change that existing effect.[15]  Indeed, there is literature and commentary that suggests that the China Initiative has harmed the sharing of valuable scientific insight and caused academics to forego opportunities abroad (both foreign professors coming here and U.S. professors going abroad).

### c.   A Prison Sentence Is Not Necessary Here to Promote Respect for the Law

Yet another consideration in sentencing is whether the sentence imposed "promote[s] respect for the law." 18 U.S.C. § 3553(a)(2)(A).  For his entire adult life, Dr. Xiao has gone to great lengths to be a dutiful and law-abiding citizen. Subjecting him to a prison sentence for making and subsequently correcting a misrepresentation in his IRS filings will not promote further respect for the law.  Indeed, to the contrary, courts have recognized that a sentence that is excessive in light of the seriousness of the offense and all relevant factors actually promotes *disrespect* for the law because of its apparent injustice.  *See, e.g.*, *United States v. Zavala*, 300 F. App'x 792 (11th Cir. 2008); *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008).  In *Gall v. United States*, the Supreme Court gave voice to this concept when it quoted approvingly the reasoning of the district court below, which had concluded: "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances

---

[15] The Government's proclaimed concern with general deterrence, *see* Government Sentencing Memo at 7-8, must be taken with a grain of salt given that it was more than willing to decline charging Dr. Xiao with these charges had he accepted its plea offer as to the original grant-related charges.

involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (citations omitted).  For all of the factors set forth in this Sentencing Memorandum, a sentence of probation, or in the alternative, a sentence that does not include any period of incarceration, would send a message of fairness and due process, thereby furthering the goal of promoting respect for the law.

> **6.      A Sentence of Probation Will Help to Avoid Unwarranted Sentence Disparities**

In preparing this sentencing memorandum, the undersigned counsel undertook a search for any and all cases in which both 26 U.S.C. § 7206(1) (false statement on a tax return) and 31 U.S.C. §§ 5314 and 5322 (failure to file an FBAR) were charged in the Southern District of Illinois over the past ten years.  Despite our efforts, which included reviewing the U.S. Attorney's website, the Court's PACER docket, public searches and Westlaw searches, we have found only the very small number of inapplicable cases, which are set forth in the footnote below.[16]  This is not simply because the United States has not identified such individuals.  It is because a civil regulatory regime exists to deal with situations in which individual taxpayers fail to identify the existence of such an account, and in no instance are they asked to serve twelve months in jail to do so.  Indeed, the IRS has implemented Streamlined Filing Compliance Procedures which are specifically designed to assist individuals, such as Dr. Xiao, who failed to

---

[16] *See e.g., United States v. Clark*, No.17-CR-30010-SMY (S.D. Ill. 2017) (defendant charged with 26 U.S.C. § 7206(1) where she embezzled over $700,000 and reported an adjusted gross income of only $35,825); *United States v. Ruffin*, No. 13-CR-30022-DRH (S.D. Ill. 2013) (defendant charged with 26 U.S.C. § 7206(1) where, over the course of five years, she claimed false dependents and tax deductions to illegally reduce her tax burden); *United States v. Combs*, No. 13-30018-DRH (S.D. Ill. 2013) (defendant charged with 26 U.S.C. § 7206(1) where he claimed false Schedule C income and expenses in order to generate large tax refunds).

appropriately report their foreign financial assets in efficiently resolving their tax and penalty obligations.[17]

We respectfully submit that criminal FBAR prosecutions are quite rare in any jurisdiction.  From 2016 to 2020, the IRS initiated a total of 97 criminal FBAR investigations, an average of 16 investigations each year, among a population of nearly 150 million U.S. taxpayers who file a return.  *See* Dep't of the Treasury, 2020 Report of Foreign Bank and Financial Accounts (FBAR) Report to Congress at 10 (2020).  Less than half of these investigations ended in a criminal conviction for the individual investigated.  *Id.*  During the same time period, the IRS initiated nearly 25,000 *civil* FBAR examinations and assessed penalties of totaling over $1 billion.  *Id.*  The IRS regularly initiates *civil* proceedings against individuals who have intentionally concealed foreign accounts containing vast sums without pursuing criminal charges against these individuals. In fact, there are many instances where an individual involved in far more egregious conduct than Dr. Xiao faced ***civil*** FBAR enforcement, rather than a criminal indictment.  For example:

- In *United States v. Park*, 389 F. Supp. 3d 561, 573 (N.D. Ill. 2019), the government brought a civil case after the defendant fled the country to avoid an FTC lawsuit and the government discovered he had more than $7 million in eight foreign accounts, including accounts in Switzerland.

- In *United States v. Rum*, 995 F.3d 882 (11th Cir. 2021), the government brought a civil suit in a case involving $1.1 million in a Swiss bank account, where the defendant chose to have a numbered, not named, account and paid the bank to hold his mail and not send to the U.S.

- In *United States v. Goldsmith*, 541 F. Supp. 3d 1058 (S.D. Cal. 2021), the government sought a civil FBAR penalty of nearly $1 million where the defendant inherited a foreign bank account from his parents and transferred the funds to a numbered Swiss account, did not inform his tax

---

[17] *See* Streamlined Filing Compliance Procedures, IRS, https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (last visited September 15, 2022).

preparer, failed to disclose the account on the preparer's questionnaire forms, and made withdrawals from the account for vacations.

- In *United States v. Schoenfeld*, 396 F. Supp. 3d 1064 (M.D. Fla. 2019), the government sought a civil FBAR penalty where the defendant opened a Swiss bank account that held roughly $1.2 million, failed to report the income, attempted to prevent the Swiss bank from releasing the account information to the IRS, and ultimately refused to pay the IRS penalty.

A relevant analog to this case is the government's prosecution of Dr. Xiao-Jiang Li, a former Emory University professor, who was involved in a Chinese Thousand Talents Program. *See United States v. Li*, No. 20-cr-0164 (N.D. Ga.). In that case, Dr. Li was convicted of failing to report foreign income on his tax returns, and the tax loss was calculated to be $35,089. *See* United States' Sentencing Memo., *United States v. Li*, No. 20-cr-0164 (N.D. Ga. May 8, 2020), ECF No. 6. Despite a Guidelines range of 6 to 12 months, the court imposed a sentence of 1 year of probation. *See* Judgment, *United States v. Li*, No. 20-cr-0164 (N.D. Ga. May 8, 2020), ECF No. 10. A below-Guidelines sentence that does not include any period of incarceration would similarly be appropriate in this case.

### 7. Dr. Xiao Made Complete Restitution

Another factor the court must consider in determining the sentence to be imposed is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Here, we respectfully submit that such a need is limited. As the Revised PSR makes clear, "[r]estitution is not applicable in this case" because Dr. Xiao has rectified his mistakes voluntarily by paying the entirety of the $27,984 in taxes he owed. Revised PSR at 12.

Dr. Xiao was first alerted of the possibility of potential deficiencies in his tax filings when FBI agents interviewed him in December of 2020. He took corrective action immediately upon learning that the government had questions regarding his tax filings; after speaking with

agents of the FBI, Dr. Xiao sought and retained experienced tax professionals to assist him. Over the course of the next several months, Dr. Xiao's retained tax professional, prepared revised tax filings including revised Form 1040s for the tax years 2017, 2018, and 2019 and a delinquent FBAR for tax year 2019.  In these revised tax filings, Dr. Xiao reported his previously unreported income from his activities in China and also reported the Ping An bank account.[18] Dr. Xiao submitted the filings and paid all taxes owed to the IRS in August 2021, prior to the government's Superseding Indictment.  *See* Revised PSR at 12.  Dr. Xiao's willing and voluntary payment of such restitution mitigates the need to provide "restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).

Moreover, courts have imposed and approved of below-Guidelines sentences where the defendant's complete restitution.  In these situations, courts "have looked to a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility."  *United States v. Kim*, 364 F.3d 1235, 1244 (11th Cir. 2004).  Complete restitution, particularly when it is made before any indictment, is a basis for a below-Guidelines sentence.  *See, e.g.*, *id.* (affirming imposition of non-prison sentence despite Guidelines recommendation of 24 months where defendants made significant restitution payment after entering guilty plea to conspiracy to defraud the United States); *United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999) (affirming below-Guidelines sentence where defendant voluntarily made restitution a year before he was indicted and where he paid back 94% of what he owed the victim bank).  As set forth

---

[18] On the advice of his retained tax experts, Dr. Xiao filed conservative amendments of his tax filings. For example, these conservative filings do not include allowable deductions for Dr. Xiao's work-related travel to China.

above, Dr. Xiao's additional tax payments (including penalties) were voluntary, they were complete, they were significant, and they were made before he was indicted on the tax charges. A sentence of probation, or in the alternative, a sentence that does not include any period of incarceration, is therefore appropriate. [19]

---

[19] We further respectfully submit that no fine or restitution is warranted.

## IV.    CONCLUSION

We respectfully request that the Court impose a sentence of probation, or in the

alternative, a sentence that does not include any period of incarceration, because such a sentence

is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.


Dated:  September 15, 2022

Respectfully submitted,

By:_____
Ryan P. Poscablo, *pro hac vice*
Brittney Denley, *pro hac vice*
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.3900

Patrick F. Linehan, *pro hac vice*
James M. Hobbs, *pro hac vice*
Joshua Dupre, *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
plinehan@steptoe.com
202.429.3000

Michelle D. Nasser
Dowd Bennett LLP-St. Louis
7733 Forsyth Boulevard, Suite 1900
St. Louis, MO 63105
mnasser@downbennett.com
314.889.7300

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022, I electronically filed the foregoing Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record, including:

Peter T. Reed
Assistant United States Attorney
9 Executive Drive
Suite 300
Fairview Heights, IL 62208

Scott A. Verseman
Assistant United States Attorney
9 Executive Drive
Suite 300
Fairview Heights, IL 62208

Shawn Derek Shugert
Trial Attorney, National Security Division
950 Pennsylvania Ave., NW
Suite 7700d
Washington, DC 20530

/s/ Ryan P. Poscablo
Ryan P. Poscablo
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
rposcablo@steptoe.com
212.506.39001330

*Attorney for Defendant*